GREENBERG TRAURIG, LLP
David E. Sellinger (Atty ID: 008512008)
Jason H. Kislin (Atty ID: 03332003)
Jaclyn DeMais (Atty ID: 071692013)
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 360-7900
*Attorneys for Defendant*
*AvalonBay Communities, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RANI SITTOL, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AVALONBAY COMMUNITIES, INC.,<br><br>Defendant. | **NOTICE OF REMOVAL** |

TO:    THE HONORABLE JUDGES AND CLERK OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PLEASE TAKE NOTICE that Defendant AvalonBay Communities, Inc. ("Defendant" or "AvalonBay"), pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446, and 1453, and with full reservation of all defenses, by its undersigned attorneys, submits this Notice of Removal to this Court from the Superior Court of New Jersey, Law Division, Civil Part, Bergen County, in which the state action described below is now pending, but which is within the original jurisdiction of this Court.

In support of removal to this Court, Defendant alleges as follows:

## PROCEDURAL HISTORY AND TIMELINESS OF REMOVAL

1.      On February 19, 2025, Plaintiff filed a putative class action Complaint captioned *Rani Sittol, individually and on behalf of all others similarly situated, v. AvalonBay Communities, Inc.*, Docket No. BER-L-1209-25 (N.J. Super. Ct., Law Div., Bergen County), against AvalonBay in the Superior Court of New Jersey, Law Division, Civil Part, Bergen County (the "State Court Action").

2.      Pursuant to 28 U.S.C. § 1446(a) and Local Civil Rule 5.1(e), a copy of the Notice of Filing of Notice of Removal served upon counsel for Plaintiff Rani Sittol and filed with the Clerk of the Superior Court of New Jersey, Law Division, Civil Part, Bergen County is attached to this Notice as **Exhibit A** (without its accompanying attachments), and true and correct copies of the Summons, Complaint, Civil Case Information Statement, and Track Assignment Notice in the State Court Action are attached to this Notice as **Exhibit B.**

3.      On March 3, 2025, Plaintiff effected service of the Summons and Complaint on AvalonBay through service of process on AvalonBay's registered agent, located in West Trenton, New Jersey.  Thirty days have thus not yet elapsed from service of process on the Defendant.  This Notice is therefore timely pursuant to 28 U.S.C. § 1446(b).

4.      The Superior Court of New Jersey, Bergen County is located within this judicial district. 28 U.S.C. § 110.  This Notice is therefore properly filed in this Court pursuant to 28 U.S.C. § 1441(a).

## ALLEGATIONS OF THE COMPLAINT

5.      This action is a putative class action purportedly brought on behalf of all current and former AvalonBay tenants, regardless of what state they reside in, who, since February 19,

ACTIVE 709117495v1

2019, either renewed their lease or moved out of their unit after receiving an offer from AvalonBay to renew their lease. Complaint ¶¶ 59-60.

6.     AvalonBay is a property management company, and it manages the property known as Avalon Teaneck in New Jersey and properties in other states including, California, Florida, Massachusetts, New York, Maryland, Virginia and Washington.  Complaint at ¶ 6.

7.     The Complaint alleges that existing tenants at AvalonBay properties are charged renewal rates that are higher than the rent for new tenants for the same or allegedly comparable units.  Complaint ¶¶ 2-3.  The Complaint asserts that AvalonBay engages in an allegedly improper practice of putting existing tenants, near the end of their existing lease terms, in the position of having to choose between payment of the alleged improper renewal rate or having to incur the expense and "life upheaval" of moving out. Id. at 3.  To that end, the Complaint alleges that the measure of damages for existing tenants who choose to renew is the difference between the rent they should have been charged (what the Complaint alleges is the "market" rent) and the renewal rent they were offered, which the Complaint claims is above-market rent and includes an alleged "Renewal Premium". Complaint ¶¶ 34-37; 43-47.  The Complaint alleges that existing tenants who choose to move out suffer damages in the amount of the costs associated with moving.  Complaint ¶83.

8.     On behalf of Plaintiff and the putative class, the Complaint purports to state claims for (a) violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*. ("NJCFA"), Complaint ¶¶ 74-86; (b) violation of the California False Advertising Law, *Cal. Bus. & Prof. Code* § 17500, *et seq.*, Complaint ¶¶ 87-93; (c) violation of the California Unfair Competition Law, *Cal. Civ. Code* § 1770, *et seq.*, *id*. ¶¶ 94-102; (d) violation of the Florida Deceptive and Unfair Trade Practices Act, *Fl. St. Ann.* § 501.201, *et seq.*, Complaint ¶¶ 103-120; (e) violation of the

3

Massachusetts Consumer Protection Act, *Mass. Gen. Laws Ann.* ch. 93A, § 11, *et seq.*, Complaint ¶¶ 121-134; (f) violation of the New York Deceptive Practices Act*, N.Y. Gen. Bus. Law* § 349, *et seq.*, Complaint ¶¶ 135-146; (g) violation of the New York Deceptive Practices Act*, N.Y. Gen. Bus. Law* § 350, *et seq.*, Complaint ¶¶ 147-163; (h) violation of the Washington Consumer Protection Act, *Wash. Rev. Code Ann.* § 19.86.010, *et seq.*, Complaint ¶¶ 164-175; (i) violation of the Maryland Consumer Protection Act, *Md. Code Ann.* § 13-301, *et seq.*, Complaint ¶¶ 176-187; (j) violation of the Virginia Consumer Protection Act, *Va. Code Ann.* § 59.1-196, *et seq.*, Complaint ¶¶ 188-199 (claims (a)-(j) collectively, the "Statutory Claims"); (k) common law Fraud, Complaint ¶¶ 200-207; (l) Unjust Enrichment, Complaint ¶¶ 208-214; and (m) Breach of the Covenant of Good Faith and Fair Dealing, Complaint ¶¶ 215-225.

9. With respect to these claims, the Complaint seeks, *inter alia*, compensatory damages in an unspecified amount, treble damages pursuant to the NJCFA, as well as special, incidental, statutory, and punitive damages, attorneys' fees, interest, and costs of suit. *Id.*, Prayer for Relief at p. 37.

10. As to the claims alleged in the Complaint, Plaintiff "seeks to represent a class of all current and former AvalonBay tenants who renewed their leases with AvalonBay at least once any time between February 19, 2019, and class certification or moved out any time between February 19, 2019, and class certification after receiving a renewal offer." Complaint ¶ 60.

11. Defendant disputes the Complaint's factual and class-related allegations and legal conclusions and denies that Plaintiff or the putative class have been harmed in any way and that this case is appropriate for class action treatment.

## BASES FOR REMOVAL

### A. DIVERSITY UNDER § 1332(a)

12.     This federal district court has original jurisdiction over Plaintiff's individual claims on the basis of diversity jurisdiction under 28 U.S.C. § 1332(a).

13.     The required diversity of citizenship under 28 U.S.C. § 1332(a) is satisfied because the parties are "citizens of different States."  28 U.S.C. § 1332(a)(1).

14.     Plaintiff is an individual residing in Teaneck, New Jersey.  Complaint ¶ 5.

15.     AvalonBay is a Maryland corporation with its principal place of business located in Virginia.  Complaint ¶ 6.

16.      The required amount in controversy under 28 U.S.C. § 1332(a), $75,000, is satisfied as follows.

       a.   The Complaint alleges that Plaintiff paid $3,410 in rent in August 2023. Complaint ¶ 47.

       b.   The Complaint also alleges that for the subsequent lease term AvalonBay offered Plaintiff a renewal rate of $4,129, whereas "around the same time" AvalonBay also advertised comparable units to new tenants for $2,800 to $2,900.  *Id.*

       c.   Plaintiff's current lease term is twenty-two months.  See March 28, 2025 Certification of Peter Muenzfeld ("Muenzfeld Cert.") at ¶ 2.

       d.   From these allegations, inferring that Plaintiff paid $4,129 per month in rent during his twenty-two-month term, while comparable units went for up to $2,900 per month, Plaintiff alleges to have overpaid by at least $27,038 over the life of his twenty-two-month lease (the difference between the alleged advertised rent and monthly rent ($1,229) multiplied by twenty-two months).

ACTIVE 709117495v1

e.  As referenced above, Plaintiff seeks to recover under, among other things, the NJCFA, which provides for the award of treble damages to successful plaintiffs. Therefore, on the face of the Complaint, Plaintiff alleges individual actual damages of approximately $81,114, an amount exceeding the threshold for diversity jurisdiction. This amount does not include attorney's fees, recovery for which the NJCFA provides.

17.  While AvalonBay disputes that it is liable to Plaintiff for any amount, or that Plaintiff suffered any injury whatsoever, and while disputing Plaintiff's allegations, the matter in controversy, based on the allegations in the Complaint, exceeds the $75,000 threshold set forth in 28 U.S.C. 1332(a).

**B.  DIVERSITY UNDER THE CLASS ACTION FAIRNESS ACT**

18.  Even if Plaintiff's individual claims did not give rise to diversity jurisdiction under 28 U.S.C. § 1332(a), which they do, this action is within the original jurisdiction of this Court, and removal is proper under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332, 1446, and 1453 ("CAFA").

19.  CAFA grants district courts original jurisdiction over putative class actions where the amount in controversy exceeds $5 million and any member of the putative class of plaintiffs is a citizen of a State different from that of the defendant.  As set forth below, this action satisfies each of the requirements of 28 U.S.C. § 1332(d)(2) for original jurisdiction under CAFA.

20.  <u>Covered Class Action</u>.  Without conceding that there is any merit to the Complaint's allegations or claims, this action meets the CAFA definition of a class action, which is "any civil action filed under [R]ule 23 of the Federal Rules of Civil Procedure or similar State

ACTIVE 709117495v1

statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B); 1453(a). *See* Complaint ¶¶ 59-60.

21.    <u>Class Action Consisting of More than 100 Members</u>.  The putative class defined in the Complaint includes all tenants at AvalonBay properties, across multiple states, spanning six years. Complaint ¶¶ 59-73.  According to AvalonBay's most recent Form 10-K filed with the SEC,[1] AvalonBay had 5,563 rentable apartment units in the State of New Jersey. Except where AvalonBay has determined not to renew a tenant's lease for just cause, AvalonBay's practice is to send a renewal offer to every tenant before the tenant's operative lease term expires. See Muenzfeld Cert. at ¶ 3.   Collectively from 2020-2024, there were over 500 renewal offers accepted by residents in AvalonBay's Teaneck Property alone.  Id. at ¶4.   Accordingly, the number of potential class members, even limited to just one building in New Jersey, far exceeds the CAFA threshold, which requires a putative class of more than 100 people.  28 U.S.C. § 1332(d)(5)(B).

22.    <u>Diversity</u>.  The required diversity of citizenship under CAFA is satisfied because "any member of a class of Plaintiffs is a citizen of a State different from any Defendant." 28 U.S.C. § 1332(d)(2)(A).  Plaintiff alleges that he is a New Jersey citizen.  Complaint ¶ 5.  As set forth in detail below, the Defendant is not a New Jersey citizen and is, in fact, a citizen of another state, thus satisfying CAFA's requirement of minimal diversity of citizenship.  *See Ramirez v. Vintage Pharms., LLC*, 852 F.3d 324, 328 (3d Cir. 2017) (noting that CAFA only requires "minimal diversity").

---

[1] A true and correct copy of AvalonBay's most recent Form 10-K dated December 31, 2024, is attached hereto as **Exhibit C**.
https://www.sec.gov/Archives/edgar/data/915912/000091591225000005/avb-20241231.htm.

23.     Specifically, when evaluating diversity jurisdiction, a corporation shall be deemed to be a citizen of every state in which it has been incorporated and of the state where it has its principal place of business.  28 U.S.C. § 1332(c)(1).

24.     AvalonBay is a Maryland corporation with its principal place of business located in Virginia.  Complaint ¶ 6.

25.     Accordingly, because Plaintiff and Defendant are citizens of different states, this matter meets the diversity requirements under CAFA.  28 U.S.C. § 1332(d)(2)(A).

26.     <u>Amount in Controversy</u>.  Under CAFA, the claims of the individual class members are aggregated to determine if the amount in controversy exceeds the required "sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. §§ 1332(d)(2), (d)(6).  Without conceding any merit to the Complaint's allegations or claims, the amount in controversy here satisfies this jurisdictional threshold.  In that regard, as discussed above, the putative class defined in the Complaint includes "all current and former Avalon tenants who renewed their leases with Avalon at least once any time between February 19, 2019, and class certification or moved out any time between February 19, 2019, and class certification after receiving a renewal offer."  Complaint ¶ 60.

27.     As noted above, Plaintiff alleges that new tenants of AvalonBay properties are offered an initial lease based on market rent, but then AvalonBay offers existing tenants a renewal rate that is more than what AvalonBay would offer to a new tenant for the same or an allegedly comparable unit.

28.     For tenants who renewed their leases, the Complaint seeks reimbursement for the difference between the renewal rate offered to the existing tenant and what Plaintiff claims is the market rate (i.e. the rate offered to new tenants for the same or an allegedly comparable unit).  For

ACTIVE 709117495v1

tenants who moved out of an existing unit after receiving a renewal offer, Plaintiff seeks reimbursement of the expenses those tenants incurred in moving.  Complaint ¶ 2.

29.    Although Defendant disputes Plaintiff's damages theory, the Complaint, on its face, alleges damages that exceed the $5 million CAFA threshold.  The Complaint identifies the renewal rates allegedly offered to five different tenants in the Teaneck building, including Plaintiff, and the alleged initial lease rate for the same unit, or allegedly similar units, that were purportedly offered to prospective tenants at about the same time. See Complaint, ¶¶ 43 - 47.

30.    For example, in paragraph 43 of the Complaint Plaintiff claims that an Avalon Teaneck tenant was paying $2,850 per month and received a renewal offer of $3,500 per month representing a $650 per month increase in rent.  Plaintiff further alleges that at the same time as this tenant received the renewal offer, AvalonBay was listing allegedly comparable units for $2,900 per month.  The other examples are each somewhat similar.

31.    The average of the differences between the amount that the Complaint alleges was the offered renewal rate and the amount that the Complaint alleges was the rate for new tenants for the same or allegedly comparable units equals $612.80 per month, which amounts to $7,353.60 per year.  Complaint ¶¶ 43-47. AvalonBay's Teaneck building has had over 500 renewal offers accepted between 2020 and the end of 2024.  See Muenzfeld Cert. at ¶ 4.  Without conceding that there is any merit to the Complaint's allegations or claims, using the average difference as alleged by Plaintiff as a rough measure of damages per putative class member, solely for purposes of this analysis, and applying that average difference to the over 500 renewals during the class period, the amount in controversy alleged in the Complaint for just one sub-set of the putative class – namely, the existing tenants who chose to renew their leases at the Teaneck property – amounts to over approximately $3,676,800 ($7,353.60 multiplied by 500 renewals at

9

AvalonBay Teaneck).  When trebled under the NJCFA, as Plaintiff requests in the Complaint (Complaint ¶ 86), the amount in controversy for that subset of the putative class amounts to over approximately $11,030,400.[2]

32.    Plaintiff and the putative class also seek to recover attorneys' fees pursuant to, at least, the NJCFA claim.  Complaint ¶ 86.  The likely amount of such fees also should be counted in determining the amount in controversy.  *See Frederico v. Home Depot*, 507 F.3d 188, 199 (3d Cir. 2007).

33.    For purposes of removal "the question is not what damages the Plaintiff will recover, but what amount is 'in controversy' between the parties.'"  *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 448 (7th Cir. 2005).  Indeed, CAFA removal is still appropriate even if there is "a good chance that the Plaintiff will fail and the judgment will be zero."  *Id.*  Moreover, rather than submit evidence, a defendant need only include a plausible allegation that the amount in controversy exceeds the statutory CAFA minimum.  *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 83, 87 (2014).  While Defendant disputes it is liable to Plaintiff or the putative class for any amount, disputes that AvalonBay applied any "Renewal Premium", and disputes that Plaintiff or the putative class suffered any injury whatsoever, for purposes of satisfying the jurisdictional prerequisites of CAFA, the matter in controversy far exceeds $5 million.

34.    <u>Home State Exception</u>.    Notwithstanding CAFA's diversity and amount-in-controversy requirements described above, federal courts must decline CAFA removal if "greater

---

[2] This amount in controversy does not consider the alleged damages suffered by any of the tenants of any of the other AvalonBay properties in New Jersey or the seven other states identified in the Complaint who renewed their leases, nor does it consider the alleged damages suffered by any of the tenants who moved out after receiving a renewal offer. When those additional alleged damages are considered, the amount in controversy unquestionably and vastly exceeds the $5 million jurisdictional threshold.

ACTIVE 709117495v1

than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed." 28 U.S.C. §1332(d)(4)(A)(i)(I).

35.     AvalonBay's 2024 Form 10-K shows that more than two-thirds of the putative class are tenants in states other than New Jersey. Specifically, AvalonBay owns 73,216 rental units within the eight states implicated in the Complaint's Statutory Claims. Of that amount, only 5,563, or 7.6%, are in New Jersey. Therefore, applying the Complaint's allegations, it reasonably can be inferred that greater than two-thirds of putative class members are not citizens of New Jersey. Accordingly, CAFA's Home State Exception is not implicated, and this action remains properly removable under CAFA.

## NO OTHER PROCEEDINGS

36.     As of the date of the filing of this Notice, no proceedings have occurred in the Superior Court of New Jersey, Law Division, Civil Part, Bergen County.

## RESERVATION OF DEFENSES AND RIGHTS

37.     Defendant does not waive and expressly reserves all defenses.

38.     Defendant reserves the right to amend or supplement this Notice as necessary.

39.     If any question arises as to the propriety of the removal of this action, Defendant requests the opportunity to present a brief and request oral argument in support of removal.

WHEREFORE, Defendant gives notice that the above-described action pending against it in the Superior Court of New Jersey, Law Division, Civil Part, Bergen County is properly removed to this Court.

**GREENBERG TRAURIG, LLP**

By: */s/ David Sellinger*
    David E. Sellinger
    Jason H. Kislin
    Jaclyn DeMais
    500 Campus Drive, Suite 400
    Florham Park, New Jersey 07932
    (973) 360-7900

    *Attorneys for Defendant*
    *AvalonBay Communities, Inc.*

Dated: March 28, 2025

## <u>CERTIFICATION OF SERVICE</u>

I, David Sellinger hereby certify that on March 28, 2025, I caused a true and correct copy of the foregoing Notice of Removal to be served by way of the Court's electronic filing system and email upon the following counsel of record:

Matthew F. Gately
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
mfg@njlawfirm.com

WATSTEIN TEREPKA LLP
Ryan D. Watstein
ryan@wtlaw.com
Keith Emanuel
kemanuel@wtlaw.com
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
*Attorneys for Plaintiff*

_____*/s/ David Sellinger*_____
David Sellinger

ACTIVE 709117495v1

# EXHIBIT A

GREENBERG TRAURIG, LLP
David E. Sellinger (Atty ID: 008512008)
Jason H. Kislin (Atty ID: 03332003)
Jaclyn DeMais (Atty ID: 071692013)
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 360-7900
*Attorneys for Defendant*
*AvalonBay Communities, Inc.*

| | |
|---|---|
| RANI SITTOL, Individually and on Behalf of All Others Similarly Situated, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.:  BER-L-1209-25 |
| Plaintiff, | *Civil Action* |
| v. | |
| AVALONBAY COMMUNITIES, INC., | **NOTICE OF FILING OF NOTICE OF REMOVAL** |
| Defendant. | |

**PLEASE TAKE NOTICE** that Defendant AvalonBay Communities, Inc. ("Defendant") through its attorneys, Greenberg Traurig, LLP, hereby gives notice that it has filed, pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446, and 1453, a Notice of Removal of this action to the United States District Court for the District of New Jersey.

A true copy of the Notice of Removal in the United States District Court for the District of New Jersey (without exhibits) is attached.

Dated: March 28, 2025                    Respectfully submitted,

                            GREENBERG TRAURIG, LLP

                            By: */s/ David E. Sellinger*
                                David E. Sellinger

                                *Attorneys for Defendant*
                                *AvalonBay Communities, Inc.*

# EXHIBIT B

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Matthew F. Gately (Atty. No. 025452009)
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
(201) 845-9600 (telephone)
(201) 845-9423 (fax)
mfg@njlawfirm.com

Additional Counsel on Signature Page

Attorneys for Plaintiff and for
Proposed Class

| | |
|---|---|
| Rani Sittol, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>AvalonBay Communities, Inc.<br><br>      Defendant. | SUPERIOR COURT OF NEW JERSEY<br>BERGEN COUNTY<br>LAW DIVISION<br><br>Civil Action<br><br>Docket No. |

## CLASS ACTION COMPLAINT AND JURY DEMAND

### PRELIMINARY STATEMENT

1.    AvalonBay Communities, Inc. ("Avalon") is one of the country's largest REITs. Over the last several years, it has charged millions in "Renewal Premiums" that it failed to disclose when advertising apartments for rent. Avalon imposes bait-and-switch tactics: unsuspecting tenants sign leases to live at Avalon properties only to learn that Avalon price gouges its tenants when up for lease renewal. This lawsuit seeks a refund of those illegal, undisclosed Renewal Premiums.

2.     Avalon's scheme works like this: it advertises its monthly apartment rental rates online at numbers that substantially track fair market value. That entices would-be tenants to move in, reasonably concluding that Avalon will continue to offer market rates. When those tenants are later up for renewal of their leases, Avalon charges them substantially above-market rates to renew, even though Avalon offers comparable units to new tenants at the same time at roughly fair market value. Avalon did not disclose this steep "Renewal Premium" to its tenants when they moved in, at any other time prior to their renewal letters, or ever. The Renewal Premium is an extortionate amount above market value that Avalon determines existing tenants are willing to pay to avoid the inconvenience and expense of moving.

3.     Between a rock and a hard place, existing Avalon tenants thus face two options upon renewal of their lease: (1) pay Avalon's exorbitant undisclosed Renewal Premium to continue living in their homes or (2) bear the expense and life upheaval of moving in order to avoid it and rent housing at fair market value. Either way, at the close of one lease term, existing Avalon tenants must bear unexpectedly increased and previously undisclosed expenses. Avalon preys on the vulnerability of its tenants' inability to drop everything and move, extorting those whose circumstances are such that they cannot move and financially evicting others.

4.     Avalon's practice of charging existing tenants the undisclosed Renewal Premium violates numerous state consumer protection statutes and damages all Avalon tenants presented with offers to renew their lease. This lawsuit seeks to right that wrong by requiring Avalon to reimburse the full amount of the Renewal Premium (for those who stayed) or the expenses incurred as a result (for those who left in lieu of paying the undisclosed Renewal Premium).

2

## PARTIES

5.      Rani Sittol is an individual resident of Bergen County in New Jersey who lives at Avalon Teaneck, an Avalon property in Teaneck, NJ. Sittol and his wife are critical care medicine physicians. The couple has a one-year-old child.

6.      AvalonBay Communities, Inc. is a corporation incorporated in Maryland. Avalon is the property management company at Avalon Teaneck and is party to leases at its properties in New Jersey, California, Florida, Massachusetts, New York, Maryland, Virginia, and Washington, among others.

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Avalon because this case arises from Avalon's management of properties in New Jersey and its advertisements to prospective tenants in New Jersey.

8.      Venue is proper in this district because Avalon actually does business in this district at 1775 Windsor Road, Teaneck, New Jersey 07666. N.J. Ct. R. 4:3-2(b).

## FACTUAL ALLEGATIONS

A.      Moving Residences is Expensive, Time-Consuming, Life-Upheaving, and Stressful. [1]

9.      Moving is an ordeal. It is time-consuming. It requires hours canceling and setting up necessary utilities such as natural gas, electricity, water, and internet. It can require spending hours canceling and setting up elective services like cable TV, landline phones, renter's insurance, and parking. It requires updating one's address to receive goods and services, like Amazon packages, grocery and restaurant delivery, magazine subscriptions, and

---

[1] These headings within the "Factual Allegations" section should be read as substantive allegations.

3

other mail and package delivery services. It requires updating one's address with other institutions, like U.S. Post Office, banks, employment, insurance, and healthcare providers.[2] It requires researching moving companies by comparing prices, reviews, services, recommendations from friends, etc., and spending time receiving estimates.

10.    Moving requires packing all of one's belongings. This requires sorting, organizing, winnowing down, deciding which items to keep, which items to sell, which items to donate, which items are outgrown, no longer needed, missing necessary pieces. Entire industries are now devoted to this event alone, spurring books and reality TV series that captivate audiences.[3] Packing encompasses selecting and obtaining the appropriate containers for all of one's belongings, taking care to ensure that fragile items have sufficient padding not to break in transit.

11.    Moving requires cleaning. Movers must thoroughly clean the rented residence they are leaving, taking care to ensure that everything looks substantially the same as when they moved in, wiping counters, scrubbing bathtubs and toilets, vacuuming, sweeping, mopping floors, cleaning kitchen cabinets and appliances, dusting fans, wiping walls, light switches, baseboards, cupboard interiors, cleaning outdoor areas, patios, balconies, porches, driveways, garages, carports.

---

[2]    See also    https://www.buzzfeed.com/clareaston/reasons-why-moving-house-sucks (accessed 3 October 2024) (mainstream media recognizing the painfulness of moving).

[3] See, e.g., KonMari.com (describing the KonMari method of organization and the KonMari consultant program); Marie Kondo, The Life-Changing Magic of Tidying Up; Get Organized with The Home Edit, streaming on Netflix; Tidying Up with Marie Kondo, streaming on Netflix; 8 seasons of Hoarding: Buried Alive on TLC.

12.     Moving out of a rental property involves the interplay between landlord and tenant of negotiating the security deposit and what money is owed between the parties, and often the ensuing time and effort in asserting one's rights if the landlord improperly encroached on them.

13.     Moving requires transporting furniture from one residence to another, with special care to ensure table corners and legs are not banged, nicked, and damaged, paint and stain are not scuffled, dinked, and dented in transit. Some furniture is very heavy, requiring multiple able-bodied persons to lift it. Moving furniture can require dissembling it in order to get it through doorways or onto a truck without consuming inordinate space. Sometimes this involves carrying furniture up and down multiple sets of stairs.

14.     Moving is expensive. Hiring full-service movers typically costs between $4,000 and $10,000, depending on a variety of factors.[4] Whether one decides to bear that cost on her own or outsource it to a moving company, the value of the service is substantial. Move-out cleaning costs average around $360.[5] The average cost of moving insurance is 1-2% of the moved property's value.[6]

15.     Moving often requires taking paid or unpaid time off work.

16.     Moving often requires temporary storage units if the timing of the two residences does not perfectly coordinate.

---

[4] See HomeAdvisor's empirical cost collections (https://www.homeadvisor.com/cost/storage-and-organization/long-distance-move/) (accessed 7 October 2024).

[5] Angie's List (https://www.homeadvisor.com/cost/storage-and-organization/long-distance-move/) accessed 7 October 2024.

[6] Angie's list (https://www.angi.com/articles/moving-insurance-worth-cost.htm) (accessed 7 October 2024).

17.     Moving often requires short-term interim housing if the timing of the two residences does not perfectly coordinate.

18.     Other out-of-pocket expenses can include overlap of utilities, or premature cancellation.

19.     Moving involves social, emotional, and inter-personal cost. Moving can instigate dramatic changes to one's social community. For families with children, moving often directly affects which school children attend, which can cause academic disruption, social adjustment, emotional stress, loss of continuity, impact to identity and self-esteem, educational gaps, behavioral changes, and the like. Moving can also instigate dramatic changes to one's network, requiring the time and toll of finding a new dentist, doctor, hair stylist, car repair shop, local bank, etc.

20.     Moving is stressful. Psychiatrists rank moving high on lists of stressful events. And it can cause other independently stressful events, like change in behavior of family members, change in financial state, change in the number of arguments with a spouse, revision of personal habits, change to new schools, change in social activities, change in sleeping habits, major change in eating habits. Children who move once between the ages of 10 and 15 are 41% more likely to be diagnosed with depression in adulthood, compared with those whose families don't move.[7] Kids who move twice or more at that age are 61% more likely to develop depression as adults. Id. By comparison, kids who live in a poor

---

[7] U.S. News & World Report, Dennis Thompson, "Frequent House Moves Take Lifetime Toll on Kids' Mental Health," July 18, 2024, available at https://www.usnews.com/news/health-news/articles/2024-07-18/frequent-house-moves-take-lifetime-toll-on-kidsmentalhealth#:~:text=Children%20who%20move%20once%20between,likely%20to%20develop%20depression%2C%20results. (accessed 18 October 2024).

neighborhood are only 10% more likely to develop depression as adults than those who don't. Id.

21.     Moving is life-disrupting. Because of how inconvenient, expensive, and time-consuming moving is, those planning to move try to carefully plan out when such a major life event should fall, to make sure the moving date avoids other major life events, like the birth of a child, medical procedures, a big work deadline, or job change, and movers generally coordinate the timing with work schedules, school schedules, travel schedules, and other life schedules. There are times in one's life that one simply cannot drop everything to move.

B.     Avalon Lures Prospective Tenants to Move into Its Properties.

22.     Avalon is the owner and manager of scores of Avalon apartment communities and is responsible for setting rental rates for tenants.

23.     Avalon advertises its rates at substantially the same prices as comparable properties in the respective areas.

24.     For example, prospective tenants considering moving in to Avalon Teaneck, an Avalon property in Teaneck, NJ, observe that its advertised rates are substantially similar to those at One Five Hundred and Teaneck Square, which are other "luxury" apartment complexes in Teaneck, NJ.

25.     Thereby, Avalon misleads prospective tenants to believe that its rates track fair market value and are otherwise reasonable.

26.     Avalon does not disclose the Renewal Premium. It does not disclose that it will only allow tenants to renew their leases at substantially above-market rates.

27.     When listing rates on its website, Avalon explains that advertised rates are for "new move-ins to the community." That does not inform prospective tenants of the Renewal Premium. Reasonable consumers do not understand that to mean that Avalon has a present intention to assess the Renewal Premium when their leases are up for renewal.

28.     Prospective tenants looking for a luxury apartment then sign leases with Avalon expecting that their rent will substantially track market rate for as long as they decide to live there. Prospective tenants certainly do not expect, and Avalon does not disclose, that it will offer lease renewals only at an above-market premium that Avalon does not charge to new tenants.

29.     Avalon does nothing to dispel prospective tenants' reasonable expectations that their rent rates will continue to track the market.

30.     Avalon did not advise Plaintiff that it would assess the Renewal Premium.

31.     In general, Avalon does not list advertised rental rates as discounted, a "move-in special," or reflecting a promotional value.

32.     Avalon's leases do not disclose the Renewal Premium. Plaintiff's lease is largely silent about renewals. All that it says about renewal is that a renewal lease term "would begin at the end of the term of this Lease and may be on different terms from this Lease[.]" That's not a disclosure of the Renewal Premium. Avalon intentionally omits its intention to charge the Renewal Premium to mislead and entice new tenants to lease from Avalon.

33.     In fact, the limited representations Avalon makes about renewal rates in the lease affirmatively suggest that it won't charge the Renewal Premium. Even month-to-month tenancies that automatically result from not informing Avalon of an intent to renew will occur at "market month to month rent[.]" (emphasis added). Reasonable consumers, including

Plaintiff, would interpret that language to mean that Avalon charges market-based rates to renewal tenants and does not seek to charge any Renewal Premium.

      C.      Avalon Secretly Imposes a Renewal Premium to Require Tenants to Choose Between Moving or Paying Unexpected Rent Increases.

34.     As the end of Avalon tenants' first lease term approaches, Avalon presents its existing tenants with the rate at which it will allow tenants to renew their leases.

35.     The renewal rates that Avalon presents to its existing tenants substantially exceed the rates tenants are already paying and substantially exceed the rates Avalon advertises online for the same or substantially the same unit at the time of the renewal offers.

36.     Thus, Avalon charges tenants in second and subsequent lease terms substantially more for the same product than it charges tenants in their first lease term.

37.     Avalon's dramatic increases in rental rates only for renewals do not reflect a change in market conditions.

38.     Instead, Avalon carefully calculates its renewal rates at dramatic enough increases that it gains unwarranted profits but not so much that all tenants choose to bear the considerable life expense of moving. This is Avalon's "Renewal Premium." It price-gouges Avalon's existing tenants.

39.     Reasonable prospective tenants would not choose to move in to Avalon properties if Avalon disclosed the Renewal Premium, which is why Avalon doesn't disclose it. For example, reasonable prospective tenants, including Plaintiff here, would not move in if Avalon represented to them in evaluating Avalon properties, "when you renew your lease, we will add to your rate an amount above market that we calculate you are willing to pay in order to remain in your home and avoid the hassle and expense of moving."

40.     If Avalon disclosed the Renewal Premium, prospective tenants, including Plaintiff, would simply choose to lease apartments that don't assess the Renewal Premium. So Avalon doesn't disclose that material information that would prevent it from attracting tenants.

41.     Avalon instead misleads prospective tenants into believing that it will not assess the Renewal Premium. Avalon misled Plaintiff, who did not expect Avalon to assess the Renewal Premium.

42.     Numerous tenants have observed and complained about the Renewal Premium upon discovering it, which was not disclosed to them when they went through the hassle and expense of moving in to Avalon units in the first place.

43.     For example, one tenant moved in to his one-bedroom apartment at Avalon Teaneck in May 2023 at the rate of $2850 per month. He received a renewal offer in May 2024 that increased his monthly rate by $650 to $3500 per month—a nearly 25% increase. At the same time, Avalon Teaneck was listing comparable one-bedroom apartments online for $2900, meaning that the $650 increase was not attributable to a dramatic change in market conditions, but evidenced Avalon's Renewal Premium. Once he notified Avalon that he would not be renewing his lease at the increased rate of $3500, Avalon listed his unit online at the rate of $3025, $475 per month less than quoted renewal rate.

44.     Another tenant moved in to a one-bedroom upgrade scheme apartment at Avalon Teaneck at the rate of $3190. Avalon offered him a renewal of his lease at the rate of $3795, an increase of $605, or 19%. At the same time his renewal offer was pending, this tenant's neighbor moved in to a one-bedroom non-upgrade scheme unit near this tenant's unit at the rate of $3050 per month. Similarly, Avalon Teaneck was listing other one-bedroom

units online at the rates of $3095, $3140, $3053, and $3355, meaning that the $605 increase Avalon offered to this tenant was not attributable to changed market conditions but evidenced Avalon's Renewal Premium.

45.     Another tenant moved in to a one-bedroom apartment at Avalon Teaneck at the rate of $2605. Avalon offered her a renewal rate at $2900, an increase of $295 per month, or 11.3%. When she decided to move out rather than pay the unexpected increase, the next tenant who moved in to her unit paid $2605 per month, the same rate that this tenant had been paying in her first term but which Avalon wouldn't offer her in her renewal term, evidencing Avalon's Renewal Premium.

46.     Another tenant moved in to a two-bedroom apartment at Avalon Teaneck in August 2022 at the rate of $3520. Avalon offered her a renewal rate in May 2024 at the rate of $4315, an increase of $795 per month, or 23%. Shortly after this tenant notified Avalon Teaneck that she would not renew her lease due to the unexpected increase, upon information and belief, the next tenant who moved in to this tenant's unit paid approximately $3560, evidencing that Avalon charges its existing tenants a Renewal Premium.

47.     Plaintiff Rani Sittol moved in to a two-bedroom apartment at Avalon Teaneck in June 2020. His rent in August 2023 was $3410. Avalon offered him a renewal rate of $4129 for the same lease term, an increase of $719, or 21%. Around the same time, Avalon was advertising comparable units online for $2,800 to $2,900, evidencing Avalon's Renewal Premium.

48.     Tenants complain about these practices online as well, as follows:

        a.     "Good first year deal, harsh rent increases after . . . ." dontfeedthenerd,

               https://www.reddit.com/r/bayarea/comments/1aqaikz/for_those_of

_you_who_have_lived_at_avalon/_?rdt=58803 (accessed 16 December 2024);

b.  "Also illegal rent raises practices. They raise it over 10 yoy in protected parts hoping you won't say anything." CaptTrit https://www.reddit.com/r/bayarea/comments/1aqaikz/for_those_of _you_who_have_lived_at_avalon/ (accessed 16 December 2024);

c.  "The latest lease request are on average b/w 20% - 30 % - basically the ballpark which has been deemed unconscionable." https://www.reddit.com/r/Hoboken/comments/12u3l0v/the_avalon _is_a_hell_hole_and_i_think_i_know_why/ (accessed 16 December 2024);

d.  "Exorbitant rental prices: Numerous tenants have chosen to depart due to excessively high rent escalations. The number of vacant units further underscores this issue." Brooke Haag, https://www.trustpilot.com/review/www.avaloncommunities.com (accessed 16 December 2024);

e.  "I just had a 17% annual increase in my rent. That is th [sic] HIGHEST in the NATION for a one year period in 2024. Yes you heard me correctly, In ******,********, apartments have recorded a 13% rent increase as of March 2024. I just received 17% DESPITE I showed them 4 comps showing substantially less." George S, 6/29/24, https://www.bbb.org/us/va/arlington/profile/apartments/avalonbay

-communities-inc-0241-23004648/ customer-reviews (accessed 16 December 2024);

f.  "They just care about your money. DONT SIGN a Lease here this complex is worst worst worst." Andy M, 5/4/24, https:// www.bbb.org/ us/ va/ arlington/ profile/ apartments/ avalonbay -communities-inc-0241-23004648/ customer-reviews (accessed 16 December 2024);

g.  "Their tactics are nothing short of a scam, especially if you are not familiar with their deceptive methods of trapping you into their agreement." Zaya E, 12/12/23, Id.

49.  Avalon's COO Sean Breslin's statement in a recent earnings call further evidences Avalon's scheme. Breslin stated that he wasn't surprised by an increase in move-outs "[g]iven the numbers we've been pushing through," but added "we continue to source demand that is comfortable paying what we are expecting, and their income appears to support it." AvalonBay Q3 FY 2022 Earnings Call.

50.  Avalon's statistical data also evidences that it assesses the Renewal Premium. For example, while new move-in lease rates were increasing at 0.5% (Q1 2024), 1.8% (April 2024), and 2.8% (May 2024), renewal rates were increasing at 4.3% (Q1 2024), 4.4% (April 2024), and 4.6% (May 2024), respectively.[8]

---

[8] See Business Wire, AvalonBay Communities, Inc. Announces Participation in Nareit's REITweek Conference, Provides Second Quarter 2024 Operating Update, and Publishes Updated Investor Presentation, https:// investors.avalonbay.com/ news-events/ press-releases/ detail/ 396/ avalonbay-communities-inc-announces-participation-in-nareits-reitweek-conference-provides-second-quarter-2024-operating-update-and-publishes-updated-investor-presentation (accessed 13 December 2024).

51.     But Avalon doesn't tell its tenants upfront about the Renewal Premium.

52.     Nor does Avalon explain the Renewal Premium to tenants when assessing it.

53.     Avalon never tells its tenants that it assesses the Renewal Premium. Many tenants don't even realize Avalon assesses it, assuming instead that market conditions have changed.

54.     Avalon never disclosed the Renewal Premium to Plaintiff. In presenting the renewal rates, Avalon never told Plaintiff that those rates included the Renewal Premium.

55.     Avalon charges existing tenants the Renewal Premium because it is attempting to price gouge them – that is, Avalon takes advantage of the fact that the tenant's only alternative to paying the Renewal Premium is the even less appealing option of moving. Avalon doesn't disclose this upfront because it knows that if it did, prospective tenants would never sign leases with Avalon in the first place.

56.     In other services, consumers may be able to simply cancel services or cease purchases to signal to an opportunistic corporation that its prices are unconscionable, unacceptable, and extortionate. But here, Avalon preys on its tenants' peculiar vulnerability that requires them to undergo substantial life upheaval in order to change the status quo and stop Avalon from its conniving tactics.

D.      Avalon's Tenants Suffer Damages.

57.     Because Avalon fails to disclose its Renewal Premium, tenants suffer damages by moving in under false pretenses, and paying the undisclosed Renewal Premium or paying to move out.

58.     When Plaintiff Rani Sittol and his wife received their renewal offers from Avalon, they were shocked by the dramatic increase in rent that Avalon sought to impose. Nevertheless, because they had a newborn baby in addition to busy work schedules as critical care medicine physicians, moving out was not a viable option for them at the time. So Plaintiff Sittol and his wife renewed their lease, pursuant to which they must pay Avalon's Renewal Premium month after month. Sittol and his family would not have moved in to Avalon Teaneck in the first place if Avalon had disclosed the Renewal Premium to them when they were considering the move.

## CLASS ALLEGATIONS

59.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 4:32-1 of the New Jersey Rules of Court.

60.     Rani Sittol seeks to represent a class of all current and former Avalon tenants who renewed their leases with Avalon at least once any time between February 19, 2019, and class certification or moved out any time between February 19, 2019, and class certification after receiving a renewal offer.

61.     Excluded from the Classes are (i) Defendant; (ii) any entity in which Defendant has a controlling interest; (iii) the judicial officer(s) to whom this action is assigned; (iv) Plaintiff's attorneys; and (v) the immediate family members, legal representatives, heirs, successors, or assigns of any party excluded under (i)—(iii).

62.     Plaintiff reserves the right to modify or amend the definition of the proposed classes and to add additional subclasses before this Court determines whether certification is appropriate.

63.     Plaintiff is a member of the proposed class.

64. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 4:32-1. This case is maintainable as a class action.

65. As to numerosity, the parties are so numerous that joinder is impracticable. Upon information and belief, and subject to class discovery, the class consists of many thousands of members or more, the identities of whom can be readily ascertained from Avalon's records of who has lived at its properties, which are not currently available to Plaintiff.

66. As to commonality, the questions here are ones of common or general interest such that there is a well-defined community of interest among class members. These questions predominate over questions that may affect only individual class members because Avalon acted or failed to act on grounds generally applicable to the class. Such common legal and factual questions include, but are not limited to: (i) whether Avalon assessed the Renewal Premium to existing tenants; (ii) whether Avalon failed to disclose the Renewal Premium to prospective tenants considering whether to sign leases with Avalon; (iii) whether Avalon intended that prospective tenants rely on its failure to disclose the Renewal Premium; (iv) whether a reasonable prospective tenant would have considered the Renewal Premium material to his or her decision to sign a lease for an Avalon property; (v) whether Avalon's conduct was unfair and/ or deceptive; (vi) whether Avalon was unjustly enriched; (vii) whether Avalon's conduct harmed class members; and (viii) whether Avalon's conduct violated the state consumer protection statutes brought forth herein.

67.     As to typicality, Plaintiff's claims are typical of the other members of the classes in that they arise out of the same wrongful business practices by Avalon, as described herein. The evidence and legal theories regarding Avalon's alleged wrongful conduct committed against Plaintiff and absent class members are substantially the same because the challenged practices are uniform for Plaintiff and the class members. For example, Avalon calculated the Renewal Premium based on what it determined tenants were willing to pay in order to avoid moving and imposed the Renewal Premium uniformly to existing tenants through their renewal offers. Accordingly, in pursuing his own legal claims, Plaintiff will also serve the interests of the class.

68.     As to adequacy, Plaintiff is an adequate representative of the class in that his experience epitomizes the defined classes. Additionally, (i) Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated; (ii) Plaintiff has retained competent counsel experienced in litigating class actions; (iii) there is no conflict of interest between Plaintiff and the unnamed members of the class; (iv) Plaintiff anticipates no difficulty in management of this litigation as a class action; and (v) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and address the legal issues associated with this type of litigation.

69.     As to predominance, questions of law and fact common to the class will predominate over questions of law and fact that may affect class members individually. For example, the common questions enumerated in paragraph 66 provide all or substantially all of the items Plaintiff must ultimately prove in this case. Plaintiff's common law and statutory claims do not vary widely by state but stem from the same set of facts. Avalon owed the same duties to all members of the proposed class, and all class members sustained damages arising

out of the same type of wrongful conduct by Avalon. Any questions affecting individual members of the class pertain to the amount of damages. Therefore, the questions of law and fact as to whether Avalon is liable predominate over any questions affecting individual members.

70.     As to superiority, a class action is the superior method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods in that it will permit the numerous class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that thousands of individual actions would require. Class action treatment will also permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against a well-funded defendant.

71.     Because the damages suffered by the individual class members will likely be relatively small given the magnitude and consequent cost of litigation, if this matter is not permitted to proceed on behalf of a class, many, if not all, class members will be denied the ability to properly present their claims.

72.     There are no difficulties likely to be encountered in the management of this action, and it is desirable to litigate the class members' claims in one forum. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

73.     Therefore, this case is properly maintainable as a class action.

COUNT I
VIOLATION OF THE NEW JERSEY
CONSUMER FRAUD ACT
N.J. Stat. § 56:8-1, et seq.

74.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

75.    This cause of action is brought by Plaintiff and class members in New Jersey pursuant to the New Jersey Consumer Fraud Act, N.J. Stat § 56:8-1, et seq. ("NJCFA").

76.    Plaintiff and class members in New Jersey are "person[s]" under N.J. Stat. § 56:8-1(d) because they are natural persons.

77.    Avalon is a "person" engaged in the sale or advertisement of merchandise because it is a corporation. Id. § 56:8-1(d).

78.    The transactions described herein are "sale[s]" or "advertisement[s]" of real estate under the NJCFA because they are "offer[s] for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute" Avalon's rental units and/ or "attempt . . . to induce directly or indirectly any person to enter or not enter into any obligation." Id. § 56:8-1(e), (a).

79.    The NJCFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]" Id. § 56:8-2.

80.     Avalon violated the NJCFA by omitting material facts in advertising rates to prospective tenants, including Plaintiff, namely, by omitting the fact that it charges the "Renewal Premium" to existing tenants. Avalon concealed this fact to induce Plaintiff and class members to enter into the lease agreements and to profit off undisclosed Renewal Premiums.

81.     Plaintiff and class members in New Jersey would not have moved in to Avalon properties had they known that Avalon would charge the Renewal Premium at the time of lease renewal.

82.     Avalon's violation of the NJCFA caused Plaintiff and the class members ascertainable losses in the forms of luring them to move in to Avalon properties under false pretenses and placing them into the predicament of choosing between paying the Renewal Premium or moving out.

83.     Plaintiff and class members in New Jersey who renewed their lease suffered the ascertainable loss of paying the Renewal Premiums to Avalon.

84.     Class members in New Jersey who moved out suffered the ascertainable loss of expenses attributable to moving out of Avalon properties.

85.     As such, Avalon's unlawful practices and conduct caused Plaintiff's and class members' ascertainable losses.

86.     Plaintiff and class members in New Jersey seek actual damages, statutory damages, including treble damages, punitive damages, a refund, attorneys' fees and costs, and all other relief allowed under New Jersey law.

COUNT II
VIOLATION OF CALIFORNIA
FALSE ADVERTISING LAW
CAL. BUS. & PROF. CODE § 17500, et seq.

87.     Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

88.     This cause of action is brought by Plaintiff and class members in California pursuant to California's False Advertising Law ("CFAL"), Cal. Bus. & Prof. Code § 17500, et seq.

89.     The CFAL makes it unlawful for any person "with intent directly or indirectly to dispose of real or personal property [] to induce the public to enter into any obligation relating thereto . . . to make or disseminate . . . before the public . . . any statement which is untrue or misleading . . . as part of a plan or scheme with the intent not to sell that personal property [] so advertised at the price stated therein." Id.

90.     Avalon's advertisements for leasing units at its properties were deceptive because they would lead and did lead reasonable consumers to believe that Avalon does not impose an extortionate Renewal Premium.

91.     Plaintiff and class members were exposed to these advertisements when deciding whether to move in to Avalon properties.

92.     Avalon's deceptive advertisements were material to Plaintiff's and class members' decision to rent units at Avalon properties.

93.     Plaintiff and class members seek restitution and all other available remedies under California law for Avalon's false advertisements.

COUNT III
VIOLATION OF CALIFORNIA
UNFAIR COMPETITION LAW
CAL. CIV. CODE § 1770, et seq.

94.     Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

95.     This cause of action is brought by Plaintiff and class members in California pursuant to California's Unfair Competition Law ("CUCL"), Cal. Civ. Code § 1770, et seq.

96.     The CUCL Law prohibits any person "unfair competition." Id.

97.     The CUCL incorporates business practices proscribed as unlawful by other California statutes, including the CFAL's prohibition on "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal Bus. & Prof. Code § 17200; Wilson v. Hewlet-Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012); Cel-Tech Commc'ns, Inc., v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 539–40 (1999).

98.     Avalon's practices are unlawful because they violate California Bus. & Prof. Code § 17200 and various other laws described herein.

99.     Avalon's advertisements for leasing units at its properties are deceptive because they would lead and did lead reasonable consumers to believe that Avalon does not impose an extortionate Renewal Premium.

100.    Avalon's advertisements and practice of imposing the Renewal Premium without disclosing it are unfair because they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers who do not expect such practices and would find them outrageous.

101.    As a direct and proximate result of Avalon's violations, Plaintiff and class members in California have been injured in an amount to be proven at trial.

102.     Plaintiff and class members in California seek restitution and all other available remedies under California law.

## VIOLATION OF FLORIDA
## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### FLA. STAT. ANN § 501.201, et seq.

103.     Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

104.     This cause of action is brought by Plaintiff and class members in Florida pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, et seq.

105.     FDUTPA's stated purpose is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Id. § 501.202(2).

106.     Plaintiff and class members in Florida are "consumer[s]" under the FDUTPA, which includes individuals. Id. § 501.203(7).

107.     The transactions at issue constitute "trade or commerce" as defined by FDUTPA because they include "advertising" and "offering" by "rental" of "property." Id. § 501.203(8).

108.     At all relevant times, Avalon was engaged in trade or commerce.

109.     FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Id. § 501.204(1).

110.     Avalon violated FDUTPA by engaging in the conduct described herein, including by assessing the Renewal Premium and failing to disclose it, which constitutes unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

111.     In violation of FDUTPA, Avalon employed fraud, deception, false promise, and the knowing concealment, suppression, or omission of material facts in the advertisement of rental units in the state of Florida.

112.     Specifically, Avalon violated FDUTPA, including by:

- Formulating and implementing a scheme to take advantage of its tenants by charging them rates that no one would willingly pay;

- Luring prospective tenants to move in to its properties at rates that substantially track the market;

- Calculating tenants' renewal rates based on what tenants are willing to pay in order to avoid moving, thereby assessing and imposing the Renewal Premium;

- Presenting existing tenants with renewal rates that include the Renewal Premium and thereby presenting them with the alternatives of paying the Renewal Premium or bearing the expenses of moving out; and

- Profiting off the impossible predicament it imposes on its tenants.

113.     Avalon's unfair and deceptive practices are material to the terms of consumers' leases.

114.     Avalon has a duty to inform prospective tenants about the material terms of leasing apartments at its properties.

115.     Avalon's imposition of the Renewal Premium and failure to disclose it would influence a reasonable consumer's decision to lease a unit at an Avalon property.

116.     Reasonable persons would have been and were deceived by the above-described acts and omissions.

117.     Plaintiff and class members in Florida suffered financial damages as a result of said unlawful conduct.

118.     Had Plaintiff and class members in Florida been informed that Avalon imposes the Renewal Premium, they would have taken steps to avoid those damages, such as not renting units at Avalon properties.

119.     Avalon's violations of FDUTPA directly and proximately cause and caused injury to Plaintiff and class members.

120.     Plaintiff and class members in Florida seek actual damages, punitive damages, attorneys' fees and costs, and all other relief allowed under Florida law.

COUNT IV
VIOLATION OF MASSACHUSETTS
CONSUMER PROTECTION ACT
MASS. GEN. LAWS ANN. CH. 93A, § 11

121.     Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

122.     This cause of action is brought by Plaintiff and class members in Massachusetts pursuant to the Massachusetts Consumer Protection Act ("MCPA"), M.G.L.A. Ch. 93A, et seq.

123.     The MCPA prohibits unfair and deceptive acts or practices in the conduct of trade or commerce. Trade and commerce include "the advertising, the offering for rent or lease [of] any property, tangible or intangible, real, personal or mixed[.]" Id. ch. 93A, § 1(b).

25

124.    Avalon is a "person" under the MCPA because it is a corporation.

125.    Avalon was engaged in trade or commerce at all relevant times by offering and leasing rental units.

126.    Avalon engaged in unfair practices because failing to disclose its Renewal Premium falls within the penumbra of established concepts of unfairness, including by constituting bait-and-switch tactics that prey on tenants' understandable resistance to moving. Avalon's failure to disclose its Renewal Premium is further an unfair practice because it is unethical, oppressive, and unscrupulous, as Avalon schemes to place its tenants in a catch-22 that Avalon profits from.

127.    Avalon engaged in deceptive practices because its failure to disclose its Renewal Premium was likely to and did mislead consumers who reasonably under the circumstances did not expect Avalon to assess a Renewal Premium after they moved in and approached the time to renew their leases.

128.    Avalon's unfair and deceptive practices caused substantial injury to consumers and competitors who do not charge Renewal Premiums.

129.    Plaintiff and class members in Massachusetts suffered loss by moving in to Avalon properties under false pretenses.

130.    Plaintiff and class members in Massachusetts who renewed their Avalon leases suffered additional loss by paying the Renewal Premium.

131.    Class members in Massachusetts who moved out suffered loss by bearing the expenses of moving out of Avalon properties.

132.    Reasonable consumers would find Avalon's undisclosed Renewal Premium material to their decision of whether to move in to Avalon properties.

133.    Avalon's unfair and deceptive practices were willful because it knew it would assess the Renewal Premium and knew that it failed to disclose the Renewal Premium.

134.    Plaintiff and class members in Massachusetts seek actual damages, treble damages, punitive damages, attorneys' fees, and all other relief available under Massachusetts law.

COUNT V
VIOLATION OF NEW YORK
DECEPTIVE PRACTICES ACT
N.Y. GEN. BUS. LAW § 349, et seq.

135.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

136.    This cause of action is brought by Plaintiff and class members in New York pursuant to the New York Deceptive Practices Act ("NYDPA"), N.Y. Gen. Bus. Law § 349, et seq.

137.    The NYDPA prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

138.    At all relevant times, Avalon was engaged in the conduct of business, trade or commerce or in the furnishing of services by offering and leasing residential units to consumers.

139.    Advertising and leasing rental units to tenants in New York was a consumer-oriented act within the meaning of N.Y. Gen. Bus. Law § 349.

140.    Avalon's undisclosed Renewal Premium has ramifications for the public at large and is harmful to the general public interest because hundreds and thousands of consumers interested in Avalon properties lack material terms in deciding whether to lease units at Avalon properties.

141.    Avalon engaged in unfair or deceptive practices as defined in § 349 by advertising rental rates online at prices that resemble market value without disclosing that the rental rates upon lease renewal will include an additional Renewal Premium to existing tenants.

142.    Reasonable consumers interested in leasing units at Avalon properties would want to know about Avalon's undisclosed Renewal Premium in developing their decisions about whether to sign leases for Avalon units and move in there.

143.    Reasonable consumers are misled by Avalon's failure to disclose its Renewal Premium.

144.    Avalon's failure to disclose its Renewal Premium is deceptive and misleading.

145.    Avalon's deceptive and misleading failure to disclose its Renewal Premium directly and proximately caused injury to Plaintiff and class members in New York.

146.    Plaintiff and class members in New York seek actual and punitive damages, attorneys' fees and costs, and all other relief allowed under New York law.

COUNT VI
VIOLATION OF NEW YORK
DECEPTIVE PRACTICES ACT
N.Y. GEN. BUS. LAW § 350, et seq.

147.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

148.    This cause of action is brought by Plaintiff and class members in New York pursuant to the New York Deceptive Practices Act, N.Y. Gen. Bus. Law § 350, et seq.

149.    The NYDPA prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

150.    The statute defines false advertising as advertising that is "misleading in a material respect." N.Y. Gen. Bus. Law § 350-a.

151.    At all relevant times, Avalon was engaged in business, trade or commerce, or the furnishing of services.

152.    Avalon's conduct of failing to disclose to prospective tenants that it charges existing tenants a Renewal Premium in excess of market rate constitutes false advertising under the NYDPA.

153.    Without being told otherwise, reasonable prospective tenants expect Avalon's renewal rates to substantially track its advertised rates and/ or market conditions.

154.    Avalon's failure to disclose the Renewal Premium to prospective tenants misleads them into believing Avalon's advertised rates will bear a close relationship to their renewal rates.

155.    Avalon's Renewal Premium is a material fact that prospective tenants would want to know in deciding whether to move in to Avalon properties.

156.    Price is one of the most material terms in a lease agreement.

157.    Avalon's Renewal Premium is material to reasonable consumers deciding whether to move in to Avalon properties.

158.    Plaintiff and class members in New York have suffered damages related to moving in to Avalon properties under false pretenses.

159.    Plaintiff and class members in New York who renewed their leases suffered additional damages of paying Avalon's undisclosed Renewal Premium.

160.    Class members in New York who moved out suffered additional damages of moving out to avoid paying Avalon's undisclosed Renewal Premium.

161.     Plaintiff and class members in New York seek actual damages or $500 per violation, whichever is greater, from Avalon for Avalon's violation of the NYDPA's false advertising prohibition.

162.     By calculating renewal rates based on the Renewal Premium and knowingly failing to disclose it to prospective tenants, Avalon willfully or knowingly engaged in false advertising. Accordingly, a punitive award is appropriate, such that the damages be increased in an amount three times actual damages up to ten thousand dollars ($10,000) for each of Avalon's violations.

163.     Plaintiff and class members seek all other relief available under New York law.

COUNT VII
VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT
WASH. REV. CODE ANN. § 19.86.010, et seq.

164.     Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

165.     This cause of action is brought by Plaintiff and class members in Washington pursuant to the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code Ann. § 19.86.090, et seq.

166.     The WCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Id. § 19.86.020.

167.     Avalon engaged in trade or commerce at all relevant times by offering and leasing residential units to consumers.

168.     Avalon engaged in unfair practices by engaging in the conduct described herein, including by charging existing tenants a Renewal Premium that it failed to disclose when they moved in.

169.    Avalon engaged in deceptive practices by engaging in the conduct described herein, including by failing to disclose to prospective tenants that it would charge existing tenants the Renewal Premium.

170.    Avalon's failure to disclose the Renewal Premium and engaging in deceptive practices misled consumers about material lease terms, who reasonably believed that Avalon does not assess the Renewal Premium to existing tenants.

171.    Avalon's unfair and deceptive practices affected the public interest because it injured tenants who were induced to move in to Avalon properties then unexpectedly faced the Renewal Premium, which they had to either pay to Avalon or incur substantial expense to avoid.

172.    Avalon's unfair and deceptive practices caused economic loss to Plaintiff and class members in Washington because they would not have moved in to Avalon properties had they known about Avalon's Renewal Premium.

173.    Avalon's unfair and deceptive practices caused additional economic loss to Plaintiff and class members in Washington who renewed their leases and paid the Renewal Premium.

174.    Avalon's unfair and deceptive practices caused additional economic loss to class members in Washington who moved out to avoid the Renewal Premium.

175.    As a result of Avalon's unlawful practices Plaintiff and class members in Washington seek actual and punitive damages, attorneys' fees and costs, treble damages, and all other relief allowed under Washington law.

COUNT VIII
VIOLATION OF MARYLAND
CONSUMER PROTECTION ACT
MD. CODE ANN. § 13-301, et seq.

176.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

177.    This cause of action is brought by Plaintiff and class members in Maryland under the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann. § 13-301, et seq.

178.    Avalon is a "person" under the MCPA.

179.    The MCPA prohibits Avalon from engaging in any unfair, abusive, or deceptive trade practice in the lease of any consumer realty or the offer for lease of consumer realty. Id. § 13-303(1), (2).

180.    The MCPA prohibits Avalon from advertising consumer realty with the intent not to rent units as advertised or offered. Id. § 13-303(5).

181.    The MCPA prohibits Avalon from deception, fraud, false pretense, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion of consumer realty. Id. § 13-303(9).

182.    By failing to disclose the Renewal Premium, Avalon violated each of these provisions.

183.    Reasonable consumers would have decided not to move in to Avalon properties if Avalon had disclosed the Renewal Premium. Thereby, Plaintiff and the Maryland class relied on Avalon's failure to disclose the Renewal Premium, which was material to their decision about where to move.

184.    Reasonable consumers interpreted Avalon's failure to disclose the Renewal Premium to mean that Avalon would not assess a Renewal Premium.

185.    Relying on Avalon's failure to disclose the Renewal Premium, Plaintiff and class members in Maryland decided to move in to Avalon properties.

186.    Avalon's failure to disclose the Renewal Premium damaged Plaintiff and class members in Maryland, who either paid the Renewal Premium or moved to avoid it.

187.    As a result of Avalon's unlawful practices, Plaintiff and class members in Maryland seek actual and punitive damages, attorneys' fees and costs, and all other relief allowed under Maryland law.

COUNT IX
VIOLATION OF VIRGINIA
CONSUMER PROTECTION ACT
VA. CODE ANN. § 59.1-196, et seq.

188.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

189.    This cause of action is brought by Plaintiff and class members in Virginia under the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-199, et seq.

190.    Avalon is a "supplier" engaged in a "consumer transaction" under the VCPA, which includes the advertisement and lease of services for personal, family, or household purposes. Id. § 59.1-198.

191.    The VCPA prohibits any "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Id. § 59.1-200(A)(14).

192.    The VCPA prohibits advertising with the intent not to sell as advertised or with intent not to offer at the price advertised. Id. § 59.1-200(A)(8).

193.    By failing to disclose the Renewal Premium, Avalon violated each of these provisions.

33

194. Reasonable consumers would have decided not to move in to Avalon properties if Avalon had disclosed the Renewal Premium. Thereby, Plaintiff and class members in Virginia relied on Avalon's failure to disclose the Renewal Premium, which was material to their decision about where to move.

195. By failing to disclose the Renewal Premium, Avalon intended consumers to believe it would not assess the Renewal Premium, because virtually no one would move in had they known about the Renewal Premium.

196. Reasonable consumers interpreted Avalon's failure to disclose the Renewal Premium combined with its offer of essentially market rate rents for new tenants to mean that Avalon would not assess a Renewal Premium.

197. Relying on Avalon's failure to disclose the Renewal Premium, Plaintiff and class members in Virginia decided to move in to Avalon properties.

198. Avalon's failure to disclose the Renewal Premium damaged Plaintiff and class members in Maryland, who either paid the Renewal Premium or moved to avoid it.

199. As a result of Avalon's unlawful practices Plaintiff and class members in Virginia seek actual and punitive damages, attorneys' fees and costs, treble damages, and all other relief allowed under Virginia law.

## COUNT X
## FRAUD

200. Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

201. Avalon participated in the conduct described above, which constituted material omissions of fact.

202.    At the time Avalon omitted these facts, it knew it would charge a Renewal Premium and intended Plaintiff and members of the class to rely upon the concealment.

203.    Avalon's conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing that Avalon will charge tenants fair and disclosed rates when in fact Avalon knows it will charge tenants the Renewal Premium.

204.    Plaintiff and class members would have considered the Renewal Premium to be a material factor in their decision to lease units at Avalon properties, and the Renewal Premium is material to the average, reasonable consumer.

205.    Plaintiff and class members were actually misled and deceived by Avalon's material omission of the Renewal Premium, to their detriment.

206.    Avalon intentionally calculated the Renewal Premium, intentionally failed to disclose it, and intended that consumers rely on that failure to disclose in deciding whether to sign leases for Avalon properties.

207.    As a result of Avalon's conduct, Plaintiff and class members have been and continue to be damaged in an amount to be proven at trial.

COUNT XI
UNJUST ENRICHMENT

208.    Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

209.    Plaintiff and class members conferred a benefit on Avalon by leasing units.

210.    Plaintiff and class members who renewed their leases conferred the additional benefit on Avalon of paying the Renewal Premium.

211.    Because of Avalon's Renewal Premium that it did not disclose to tenants, prospective tenants, or the public, Plaintiff and class members who renewed their Avalon

leases paid a higher price for their units upon renewal than the unit's rental market value, and Avalon obtained money that rightfully belonged to Plaintiff and class members.

212.   Avalon derived benefits from Plaintiff's and class members' rental payments and renewal payments.

213.   Avalon has been unjustly enriched at the expense of Plaintiff and class members, and its retention of the benefits Plaintiff and class members conferred on it would be inequitable.

214.   Plaintiff and class members seek an order requiring Avalon to make restitution to them.

COUNT XII<br>
BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

215.   Plaintiff incorporates by reference the allegations in all other paragraphs as though fully set forth herein.

216.   Plaintiff and class members were parties to a lease agreement with Avalon.

217.   Implied in those lease agreements was a covenant of good faith and fair dealing.

218.   The primary purpose of those lease agreements was to provide Plaintiff and class members a place to live in exchange for an agreed-upon reasonable rate.

219.   Avalon entered those lease agreements with improper motives with the purpose of depriving Plaintiff and members of the class the rights and benefits they were due under these agreements. Specifically, when Avalon presented the lease agreements to Plaintiff and class members, it knew it would assess the Renewal Premium, requiring Plaintiff and class members either to pay rates not previously agreed upon or no longer have a place to live.

220.   Avalon's deceptive conduct induced Plaintiff and class members to move in to Avalon properties under false pretenses.

221.     Plaintiff and class members reasonably expected Avalon to continue to provide them a place to live at a reasonable rate.

222.     Avalon destroyed those reasonable expectations by assessing the Renewal Premium and failing to disclose that Renewal Premium to Plaintiff and class members at the time that they signed leases and moved in to Avalon properties.

223.     Avalon's improper motives denied Plaintiff and class members the benefit of the bargain.

224.     Therefore, Avalon breached the covenant of good faith and fair dealing implied in its lease agreements with Plaintiff and class members.

225.     Plaintiff and class members were damaged by Avalon's breach of the covenant of good faith and fair dealing in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Claimants respectfully request that the Court:

a.      Determine that the claims alleged herein may be maintained as a class action, and issue an order certifying the class defined above;

b.      Appoint Plaintiff as the representative of the class and their counsel as class counsel;

c.      Award all actual, general, special, incidental, statutory, treble, and punitive damages to which Plaintiff and class members are entitled;

d.      Award Plaintiff and class members equitable relief, including restitution;

e.      Award Plaintiff and class members attorneys' fees and costs of litigation;

f.      Enjoin Defendant from further violating the laws;

g.      Award pre-judgment and post-judgment interest;

  h.  Grant any other relief that the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

RULE 4:5-1 CERTIFICATION

I hereby certify that the matter in controversy is not the subject of any other action or arbitration proceeding that is either pending or contemplated. I further certify that Plaintiff is not presently aware of any non-parties who should be joined in this action pursuant to R. 4:28 or who are subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

RULE 1:38-7(b) CERTIFICATION

I hereby certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Plaintiff hereby designates Matthew F. Gately as trial counsel.

DATED:  February 19, 2025

            / s/  Matthew F. Gately
            Matthew F. Gately
            COHN LIFLAND PEARLMAN
             HERRMANN & KNOPF LLP
            Park 80 West – Plaza One
            250 Pehle Avenue, Suite 401
            Saddle Brook, NJ  07663
            (201) 845-9600 (telephone)
            (201) 845-9423 (fax)
            mfg@njlawfirm.com

WATSTEIN TEREPKA LLP
Ryan D. Watstein (pro hac vice forthcoming)
T: 404-782-0696
Email: ryan@wtlaw.com
E. Keith Emanuel (pro hac vice forthcoming)
T: 404-905-2416
Email: kemanuel@wtlaw.com
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318

Attorneys for Plaintiff

# Civil Case Information Statement

**Case Details: BERGEN | Civil Part Docket# L-001209-25**

**Case Caption:** SITTOL RANI  VS AVALONBAY
COMMUNITIE S, INC.

**Case Initiation Date:** 02/19/2025

**Attorney Name:** MATTHEW F GATELY

**Firm Name:** COHN LIFLAND PEARLMAN HERRMANN &
KNOPF

**Address:** PARK 80 WEST - PLAZA ONE 250 PEHLE AVE
STE 401
SADDLE BROOK NJ 07663

**Phone:** 2018459600

**Name of Party:** PLAINTIFF : Sittol, Rani

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Rani Sittol?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Other(explain)   Resident and Property Management Company

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
       **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
       **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** YES
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>02/19/2025</u>
Dated

<u>/s/ MATTHEW F GATELY</u>
Signed

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK        NJ 07601-7680
                                 TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 221-0700
COURT HOURS  8:30 AM - 4:30 PM

                        DATE:   FEBRUARY 19, 2025
                        RE:     SITTOL RANI  VS AVALONBAY COMMUNITIE S, INC.
                        DOCKET: BER L -001209 25

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON WILLIAM C. SOUKAS

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      002
AT:  (201) 221-0700 EXT 25627.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.
                        ATTENTION:
                             ATT: MATTHEW F. GATELY
                             COHN LIFLAND PEARLMAN HERRMANN
                             PARK 80 WEST - PLAZA ONE
                             250 PEHLE AVE STE 401
                             SADDLE BROOK      NJ 07663


ECOURTS
```

SUPERIOR COURT OF NEW JERSEY, COUNTY OF BERGEN

| | | | |
|---|---|---|---|
| **Rani Sittol** | | Case No.: | **BER-L-001209-25** |
| | Plaintiff/Petitioner | | |
| vs. | | | |
| **AvalonBay Communities, Inc.** | Defendant/Respondent | AFFIDAVIT OF SERVICE OF **SUMMONS; COMPLAINT; TRACK ASSIGNMENT NOTICE; CIVIL CASE INFORMATION STATEMENT** | |

Received by **Michael Weinshenker**, on the **28th day of February, 2025 at 6:32 PM** to be served upon **AvalonBay Communities, c/o C T Corporation Systems** at **820 Bear Tavern Rd, Ewing, Mercer County, NJ 08628**. On the **3rd day of March, 2025 at 9:19 AM**, I, **Michael Weinshenker, SERVED AvalonBay Communities, c/o C T Corporation Systems** at **820 Bear Tavern Rd, Ewing, Mercer County, NJ 08628** in the manner indicated below:

**CORPORATE SERVICE**, by personally delivering **1** copy(ies) of the above listed documents to the named Corporation, by serving **Dionne Evans**, on behalf of said Corporation.
THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS: **I delivered the documents to Dionne Evans who identified themselves as the person authorized to accept with identity confirmed by subject stating their name. The individual accepted service with direct delivery. The individual appeared to be a black-haired black female contact 45-55 years of age, 5'4"-5'6" tall and weighing 140-160 lbs.**

Service Fee Total: **$170.00**

Per 28 U.S.C. § 1746. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| NAME: _____ | N/A | 3/4/2025 |
| Michael Weinshenker | Server ID # | Date |

Notary Public: Subscribed and sworn before me on this __4__ day of __March__ in the year of 20 25
Personally known to me __✓__ or _____ identified by the following document:

Number/Reference: _____
Type: _____
Notary Public for State of: NJ
Commission Expiration: 10/23/2025

_____
Notary Public (Legal Signature)

NAOMI H. WEINSHENKER
NOTARY PUBLIC OF NEW JERSEY
Commission # 50141466
My Commission Expires 10/23/2025



REF: **00384**

# EXHIBIT C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

☒

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2024**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**Commission File Number: 1-12672**
**AVALONBAY COMMUNITIES, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | **77-0404318** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**4040 Wilson Blvd., Suite 1000**
**Arlington, Virginia 22203**
(Address of principal executive offices) (Zip code)

**(703) 329-6300**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol (s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | AVB | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ÿ    No o

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes o    No ÿ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ÿ    No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Yes ÿ    No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ☐    No ÿ

The aggregate market value of the registrant's Common Stock, par value $.01 per share, held by nonaffiliates of the registrant, as of June 30, 2024 was $29,566,349,751.

The number of shares of the registrant's Common Stock, par value $.01 per share, outstanding as of January 31, 2025 was 142,254,778.

**Documents Incorporated by Reference**

Portions of AvalonBay Communities, Inc.'s Proxy Statement for the 2025 annual meeting of stockholders, a definitive copy of which will be filed with the Securities and Exchange Commission within 120 days after the year end of the year covered by this Form 10-K, are incorporated by reference herein as portions of Part III of this Form 10-K.

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| | **PART I** | |
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 9 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 21 |
| ITEM 1C. | CYBERSECURITY | 21 |
| ITEM 2. | PROPERTIES | 23 |
| ITEM 3. | LEGAL PROCEEDINGS | 34 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 34 |
| | **PART II** | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 35 |
| ITEM 6. | [RESERVED] | 35 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 36 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 54 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 54 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 55 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 55 |
| ITEM 9B. | OTHER INFORMATION | 55 |
| ITEM 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 55 |
| | **PART III** | |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 56 |
| ITEM 11. | EXECUTIVE COMPENSATION | 56 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 56 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 57 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 57 |
| | **PART IV** | |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 58 |
| ITEM 16. | FORM 10-K SUMMARY | 58 |
| SIGNATURES | | 62 |

Table of Contents

# PART I

This Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Our actual results could differ materially from those set forth in each forward-looking statement. Certain factors that might cause such a difference are discussed in this report, including in the section entitled "Forward-Looking Statements" included in this Form 10-K. You should also review Item 1A. "Risk Factors" for a discussion of various risks that could adversely affect us.

## ITEM 1.  BUSINESS

### *General*

AvalonBay Communities, Inc. (the "Company," "we," "our" and "us" which terms, unless the context otherwise requires, refer to AvalonBay Communities, Inc. together with its subsidiaries), is a Maryland corporation that has elected to be treated as a real estate investment trust ("REIT") for federal income tax purposes. We develop, redevelop, acquire, own and operate apartment communities in New England, the New York/New Jersey metro area, the Mid-Atlantic, the Pacific Northwest, and Northern and Southern California, as well as in our expansion regions of Raleigh-Durham and Charlotte, North Carolina, Southeast Florida, Dallas and Austin, Texas, and Denver, Colorado. We focus on leading metropolitan areas that we believe are generally characterized by growing employment in high wage sectors of the economy, higher cost of home ownership and a diverse and vibrant quality of life. We believe these market characteristics have offered, and will continue to offer, the opportunity for superior risk-adjusted returns over the long-term on apartment community investments relative to other markets that do not have these characteristics.

At January 31, 2025, we owned or held a direct or indirect ownership interest in:

- 284 operating apartment communities containing 86,111 apartment homes in 11 states and the District of Columbia, of which 275 communities containing 83,389 apartment homes were consolidated for financial reporting purposes and nine communities containing 2,722 apartment homes were held by unconsolidated entities in which we hold an ownership interest.

- 21 wholly-owned development apartment communities that are under construction or completed and in lease-up and are expected to contain an aggregate of 7,305 apartment homes when completed.

- Rights to develop an additional 30 communities that, if developed as expected, will contain 9,336 apartment homes.

We generally obtain ownership in an apartment community by developing a new community on either vacant land or land with improvements that we raze, or by acquiring an existing community. In selecting sites for development or acquisition, we favor locations that are near expanding employment centers and convenient to transportation, recreation areas, entertainment, shopping and dining.

Our principal financial goal is to increase long-term shareholder value through the development, redevelopment, acquisition, ownership, operation and asset management and, when appropriate, disposition of apartment communities in our markets. To help meet this goal, we regularly (i) monitor our investment allocation by geographic market and product type, (ii) develop, redevelop and acquire interests in apartment communities in our selected markets, (iii) efficiently operate our communities to maximize resident satisfaction and shareholder return, (iv) selectively sell apartment communities that no longer meet our long-term strategy or when opportunities are presented to realize a portion of the value created through our investment and redeploy the proceeds from those sales and (v) maintain a capital structure that we believe is aligned with our business risks and allows us to maintain continuous access to cost-effective capital. We also seek to generate additional shareholder value from investments in other real estate-related ventures, including through our Structured Investment Program ("SIP"), our platform to provide mezzanine loans or preferred equity to third-party multifamily developers in our existing regions. We undertake our development and redevelopment activities primarily through in-house development and redevelopment teams, and buy and dispose of assets through our in-house investments platform. We believe that our organizational structure, which includes dedicated development and operational teams, and strong culture are key differentiators. We pursue our development, redevelopment, investment and operating activities with the purpose of "Creating a Better Way to Live."

We seek to be the leading rental housing company in select U.S. markets by delivering distinctive experiences that customers value, creating a workplace where associates thrive, and achieving superior results for shareholders. We focus on markets that are characterized by growing employment in high wage sectors of the economy, higher home prices and a diverse and vibrant quality of life. From an operating perspective, we seek to deliver seamless, personalized experiences for our residents on an efficient and effective basis by our resident-focused on-site associates that are supported by our centralized shared services operating organization and flexible technology platform that incorporates automation and artificial intelligence. We operate our apartment communities under four core brands:

- Avalon, our core "Avalon" brand, focuses on upscale apartment living and high end amenities and services;

- AVA targets customers in high energy, transit-served neighborhoods and generally feature smaller apartments, many of which are designed for roommate living, and a variety of active common spaces that encourage socialization.

- eaves by Avalon is targeted to the cost conscious, "value" segment primarily in suburban areas; and

- Kanso is designed to create an apartment living experience that offers simplicity without sacrifice at a more moderate price point, featuring high-quality apartment homes, limited-to-no community amenities and a low-touch, largely self- service operating model that leverages technology and smart access.

We believe that this branding differentiation allows us to target our product offerings to multiple customer groups and submarkets within our existing geographic footprint.

During the three years ended December 31, 2024, we:

- acquired 13 apartment communities, excluding unconsolidated investments;

- disposed of 21 apartment communities, excluding unconsolidated investments;

- realized our pro rata share of the gain from the sale of three communities owned by unconsolidated real estate entities; and

- completed the development of 22 apartment communities, including unconsolidated investments, and the redevelopment of two apartment communities.

A more detailed description of our unconsolidated real estate entities and the related investment activity can be found in Note 5, "Investments," of the Consolidated Financial Statements in Item 8 of this report and in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

A further discussion of our development, redevelopment, disposition, acquisition, operating and property management and related strategies follows.

*Development Strategy.* We select land for development and follow established procedures that we believe minimize both the cost and the risks of development. As one of the largest developers of multifamily rental apartment communities in our selected markets, we maintain regional offices to identify and support development opportunities through local market presence and access to local market information. In addition to our principal executive office in Arlington, Virginia, we also have regional offices, administrative offices or specialty offices, including offices that are in or near the following cities:

Table of Contents

- Austin, Texas;
- Bellevue, Washington;
- Boston, Massachusetts;
- Durham, North Carolina;
- Denver, Colorado;
- Fort Lauderdale, Florida;
- Irvine, California;
- Los Angeles, California;
- New York, New York;
- San Antonio, Texas;
- San Francisco, California;
- San Jose, California;
- Virginia Beach, Virginia; and
- Westfield, New Jersey.

After selecting a site for development, we usually negotiate for the right to acquire the site either through an option or a long-term conditional contract. Options and long-term conditional contracts generally allow us to acquire an interest in the site after the completion of entitlements and shortly before the start of construction, which reduces development-related risks and preserves capital. However, as a result of competitive market conditions for land suitable for development, we have sometimes acquired and held land prior to construction for extended periods while entitlements are obtained. When acquiring improved land with existing commercial uses prior to development, any rent received in excess of expenses from these operations, which we consider to be incidental, is accounted for as a reduction in our investment in the development pursuit and not as net income. Any expenses relating to these operations, in excess of any rents received, are recognized in net income. In addition, we have previously identified, and may again in the future identify, opportunities to increase value by expanding the density of certain existing operating communities. We have also participated, and may in the future participate, in master planned or other large multi-use developments where we commit to build infrastructure (such as roads) to be used by other participants or commit to act as construction manager or general contractor in building structures or spaces for third parties (such as unimproved ground floor commercial space, municipal garages or parks). Costs we incur in connection with these activities may be accounted for as additional invested capital in the community or we may earn fee income for providing these services. Particularly with large scale, urban in-fill developments, we may engage in significant environmental remediation efforts to prepare a site for construction. For further discussion of our Development Rights, refer to Item 2. "Properties" in this report.

We generally act as our own development manager, general contractor and construction manager directly (although we may use a wholly-owned subsidiary), and will elect to use a third-party developer or general contractor where we believe it is beneficial to do so, such as in our expansion regions where we may have limited resources or scale. We believe direct involvement in construction enables us to achieve higher construction quality, greater control over construction schedules and cost savings. Our development, property management and construction teams monitor construction progress to ensure quality workmanship and a smooth and timely transition into the leasing and operating phase.

Throughout this report, the term "development" is used to refer to the entire property development cycle, including pursuit of zoning approvals, procurement of architectural and engineering designs and the construction process. References to "construction" refer to the actual construction of the property, which is only one element of the development cycle.

*Redevelopment Strategy.*    When we undertake the redevelopment of a community, our goal is to renovate and/or rebuild an existing community so that our total investment is generally below replacement cost and the community is well positioned in the market to achieve attractive returns on our capital. In addition to large scale redevelopment where a community is classified as a redevelopment, we undertake smaller scale redevelopment activities related to the apartment interiors to enhance the resident experience at our operating communities. We have dedicated redevelopment teams and procedures that are intended to control both the cost and risks of redevelopment. Our redevelopment teams, which include redevelopment, construction and property management personnel, monitor redevelopment progress.

Throughout this report, the term "redevelopment" is used to refer to the entire redevelopment cycle, including planning and procurement of architectural and engineering designs, budgeting and actual renovation work. The actual renovation work is referred to as "reconstruction," which is only one element of the redevelopment cycle.

3

*Disposition Strategy*.    We sell assets that no longer meet our long-term strategy or when real estate market conditions are favorable, and we redeploy the proceeds from those sales to develop, redevelop and acquire communities and to rebalance our portfolio across or within geographic regions. This also allows us to realize a portion of the value created through our investments and provides additional liquidity by redeploying the net proceeds from our dispositions in lieu of raising that amount of capital externally. When we decide to sell a community, we generally solicit competing bids from unrelated parties for these individual assets and consider the sales price and other terms of each proposal.

*Acquisition Strategy*.    Our core competencies in development and redevelopment discussed above allow us to be selective in the acquisitions we target. Acquisitions allow us to achieve rapid penetration into markets in which we desire an increased presence. Acquisitions (and dispositions) also help us achieve our desired product mix or rebalance our portfolio. While we are primarily focused on acquisitions in our expansion regions of Raleigh-Durham and Charlotte, North Carolina, Southeast Florida, Dallas and Austin, Texas, and Denver, Colorado, we may pursue additional investments in our established regions based on market conditions.

*Operating & Property Management Strategy*.    We seek to increase operating income through innovative, proactive property management that will result in higher revenue from communities while constraining operating expenses. Our principal strategies to maximize operating income include:

- focusing on associate engagement and resident satisfaction;
- employing an innovative and continually evolving operating model that combines effective onsite associates with the capabilities of our centralized shared services center, technology platform and digital offerings and various automation technologies including the use of artificial intelligence ("AI");
- utilizing data science and our operating experience to optimize Net Operating Income ("NOI") from the portfolio, including making operating decisions that reduce customer acquisition, transaction and retention costs;
- staggering lease terms such that lease expirations are matched with seasonal demand; and
- delivering high occupancy with premium pricing for various customer segments.

Constraining growth in operating expenses is another way in which we seek to increase earnings growth. Growth in our portfolio and the resulting increase in revenue allows for fixed operating costs to be spread over a larger volume of revenue, thereby increasing operating margins. We constrain growth in operating expenses in a variety of ways, which include, but are not limited to, the following:

- purchase order controls, including acquiring goods and services from pre-approved vendors;
- national negotiated contracts and bulk purchases where possible;
- bidding third-party contracts on a volume basis;
- retaining residents through high levels of service, which reduces apartment turnover costs, marketing and vacant apartment utility costs;
- performing turnover work in-house or hiring third parties, generally considering the most cost-effective approach as well as expertise needed to perform the work;
- regular preventive maintenance to maximize resident safety and satisfaction and property and equipment life;
- centralization of lease renewal activity, as well as many community administration and support tasks at our shared service center;
- pursuing real estate tax appeals;
- installing high efficiency lighting and water fixtures, cogeneration systems and solar panels; and
- implementing technology for resident and prospect services such as package lockers and self-guided or virtual tours.

On-site property management teams receive bonuses based largely upon the revenue, expense, NOI, prospect conversion, resident retention and customer service metrics produced at their respective communities. We use and continuously seek ways to improve technology applications to help manage our communities, believing that technology applications can improve the delivery and efficiency of our services and aid in the accurate collection of financial and resident data, which will enable us to maximize revenue and control costs through careful leasing decisions, maintenance decisions and financial management.

We generally manage the operation and leasing activity of our communities directly (although we may use a wholly-owned subsidiary) both for ourselves and the joint ventures and partnerships of which we are a member or a partner. From time to time, we may engage a third party to manage leasing and/or maintenance activity at one or more of our communities, such as in our expansion regions where we may have limited resources or scale.

4

Table of Contents

From time to time we also pursue or arrange ancillary services for our residents to provide additional revenue sources or increase resident satisfaction. We provide such non-customary services to residents or share in the revenue or income from such services through a taxable REIT subsidiary ("TRS"), which is a subsidiary that is treated as a "C corporation" subject to federal income taxes. See "Tax Matters" below.

*Financing Strategy.*    Our financing strategy is to maintain a capital structure that provides financial flexibility to help ensure we can select cost-effective capital market options that are well matched to our business risks. We estimate that our short-term liquidity needs will be met from cash on hand, borrowings under our $2,250,000,000 revolving variable rate unsecured credit facility (the "Credit Facility") and our $500,000,000 unsecured commercial paper ("CP") note program (the "Commercial Paper Program") which is backstopped by our commitment to maintain available capacity under the Credit Facility for any amounts of CP outstanding, sales of current operating communities and/or issuance of additional debt or equity securities. A determination to engage in an equity or debt offering depends on a variety of factors such as general market and economic conditions, our short and long-term liquidity needs, the relative costs of debt and equity capital and growth opportunities. A summary of debt and equity activity for the last three years is reflected on our Consolidated Statement of Cash Flows of the Consolidated Financial Statements set forth in Item 8 of this report.

We have entered into, and may continue in the future to enter into, joint ventures (including limited liability companies or partnerships) through which we would develop and/or own an indirect economic interest of less than 100% of the community or communities owned directly by such joint ventures. Our decision to either hold an apartment community in fee simple or to have an indirect interest in the community through a joint venture is based on a variety of factors and considerations, including: (i) the economic and tax terms required by a seller of land or of a community; (ii) our desire to diversify our portfolio of communities by market, submarket and product type; (iii) our desire at times to preserve our capital resources to maintain liquidity or balance sheet strength; and (iv) our projection, in some circumstances, that we will achieve higher returns on our invested capital or reduce our risk if a joint venture vehicle is used. Investments in joint ventures are not limited to a specified percentage of our assets. Each joint venture agreement is individually negotiated, and our ability to operate and/or dispose of a community in our sole discretion may be limited to varying degrees depending on the terms of the joint venture agreement.

In addition, from time to time, we may offer shares of our equity securities, debt securities or options to purchase stock in exchange for property. We may also acquire properties in exchange for properties we currently own.

*Other Strategies and Activities.*    While we emphasize equity real estate investments in rental apartment communities, we have the ability to invest in other activities and to make non-equity investments, including the following:

- <u>Structured Investment Program</u>: while we generally invest in multifamily real estate through fee simple ownership or an equity investment in a joint venture, we operate an investment platform through which we provide mezzanine loans or preferred equity to third-party multifamily developers in our existing regions.

- <u>Commercial space</u>: we develop, own and lease commercial space at our communities when either (i) the highest and best use of the space is for commercial (e.g., street level in an urban area); (ii) we believe the commercial space will enhance the attractiveness of the community to residents; or (iii) some component of commercial space is required to obtain entitlements to build apartment homes.

- <u>Property technology and environmentally focused companies and investment management funds</u>: we have also invested, either through a wholly-owned TRS, or in an investment vehicle that has elected to be treated as a TRS, in companies (and in venture funds that invest in companies) that provide technology services to the real estate industry, and we have invested, through a TRS, in environmentally focused companies and investment management funds to further our sustainability efforts and learning.

- <u>For-sale real estate development</u>: we may also develop a property in conjunction with another real estate company that will own and operate the commercial or for-sale residential components of a mixed-use building or project that we help develop. We may from time to time, through a TRS, develop real estate and hold it for sale upon completion if we believe that this will be the best use or disposition opportunity for the property.

We have not engaged in trading, underwriting or agency distribution or sale of securities of other issuers and do not intend to do so. At all times we intend to make investments in a manner so as to qualify as a REIT unless, because of circumstances or changes in the Internal Revenue Code of 1986, as amended (the "Code") (or the Treasury Regulations thereunder), our Board of Directors determines that it is no longer in our best interest to qualify as a REIT.

We conduct many of the administrative functions associated with our property operations (including billing, collections, and response to resident inquiries) through an internally operated shared services center, rather than having on-site associates conduct such activities. We believe this centralized platform allows our on-site associates to focus more on current and prospective resident services, while at the same time enabling us to reduce costs, mitigate risk and increase our availability and responsiveness to our residents. Since mid-2023, we have provided various back-office, financial administrative support services for a third party leveraging the economies of scale at our center to produce an additional revenue stream.

*Tax Matters*

We filed an election with our 1994 federal income tax return to be taxed as a REIT under the Code and intend to maintain our qualification as a REIT in the future. As a REIT, with limited exceptions, such as those described under "Operating & Property Management Strategy" above, we will not be taxed under federal and certain state income tax laws at the corporate level on our taxable net income to the extent such taxable net income is distributed to our stockholders. We expect to make sufficient distributions to avoid income tax at the corporate level. While we believe that we are organized and qualified as a REIT and we intend to operate in a manner that will allow us to continue to qualify as a REIT, there can be no assurance that we will be successful in this regard. Qualification as a REIT involves the application of highly technical and complex provisions of the Code for which there are limited judicial and administrative interpretations and involves the determination of a variety of factual matters and circumstances not entirely within our control.

*Competition*

We face competition from other real estate investors, including insurance companies, pension and investment funds, REITs both in the multifamily as well as other sectors, and other well capitalized investors, to acquire and develop apartment communities and acquire land for future development. As an owner and operator of apartment communities, we also face competition for prospective residents from other operators whose communities may be perceived to offer a better location or better amenities or whose pricing may be perceived as a better value given the quality, location, terms and amenities that the prospective resident seeks. We also compete against condominiums and single-family homes that are for sale or rent, including those offered through online platforms. Although we often compete against large, sophisticated developers and operators for development opportunities and for prospective residents, real estate developers and operators of any size can provide effective competition for both real estate assets and potential residents.

*Regulatory Matters*

Compliance with various governmental regulations has an impact on our business, including our capital expenditures, earnings and competitive position, which can be material. We incur costs to monitor and take actions to comply with governmental regulations that are applicable to our business, which include, among others, federal securities laws and regulations, applicable stock exchange requirements, REIT and other tax laws and regulations, antitrust laws, privacy laws, environmental and health and safety laws and regulations, local zoning, usage and other regulations relating to real property, the Americans with Disabilities Act of 1990 and related laws and regulations.

*Environmental Regulations.* As a current or prior owner, operator or developer of real estate, we are subject to various federal, state and local environmental laws, regulations and ordinances and also could be liable to third parties resulting from environmental contamination or noncompliance at our communities. For some Development Communities, we undertake extensive environmental remediation to prepare the site for construction, which could be a significant portion of our total construction cost. Environmental remediation efforts could expose us to possible liabilities for accidents or improper handling of contaminated materials during construction.

*Regulations Relating to the Construction, Operation and Leasing of Our Communities*. The construction, operation and leasing of our communities is subject to federal, state and local laws and regulations, include zoning laws, building codes, requirements that our communities be accessible to persons with disabilities, fair housing laws, and, depending on the jurisdiction, regulations regarding the charging of rents and fees and increases in such amounts upon renewal of leases. Some laws relating to the setting of rents apply broadly, such as in California, where residential rent increases at renewal in communities older than fifteen years are limited to the lesser of 10% or 5% plus local consumer price index (CPI), and in New York, where laws regulate increases on those units that are subject to rent-control or rent-stabilization. In California, the Governor and local governments have the ability to enact (and have in recent years exercised such right, for example, in connection with wildfires) local or statewide states of emergency which limit our ability to increase new and renewal rents to no more than 10% over the rent in place on the date such state of emergency was declared, which has impacted some of our California communities. We have seen an increase in state and local governments in our markets implementing, considering or being urged by various

6

constituencies to consider new or modified rent control regulations, rent stabilization, or other laws that may limit or delay our ability to charge market rents, increase rents, use algorithmic pricing tools, charge ancillary fees, or evict tenants.

See Part I, Item 1A. "Risk Factors" for a discussion of material risks to us, including, to the extent material, to our competitive position and relating to governmental and environmental regulations, and see Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations," together with the Consolidated Financial Statements and the accompanying Notes to Consolidated Financial Statements included elsewhere in this report, for a discussion of material information relevant to an assessment of our financial condition and results of operations.

*Human Capital*

Attracting, motivating, developing, and retaining talented associates is important to our long-term success. We engage with our associates to understand our purpose, "Creating a Better Way to Live," our core values (a commitment to integrity, a spirit of caring and a focus on continuous improvement) and our cultural norms (we collaborate, excel, innovate, act like owners, are thoughtful and thorough, show appreciation, and champion inclusion and diversity).

At January 31, 2025, we had 2,988 employees, of which approximately 98% were employed on a full-time basis. Approximately 63% of our associates work on-site at our operating communities and the balance work on other matters. None of our associates are represented by a union.

We consider the following aspects of human capital management to be important:

*Inclusion and Diversity.* We value workforce diversity and an inclusive culture and believe that a diverse workplace will produce a variety of perspectives, motivate associates and help us understand and better serve our customers and the communities in which we do business. At January 31, 2025, 36% of our associates self-identified as White, 29% as Hispanic, 17% as Black, 7% as Asian, and 11% as other ethnicities, two or more ethnicities or did not respond. At January 31, 2025, 60% of our associates self-identified as male and 40% as female.

*Associate Engagement.* We monitor the engagement of our associates, receive feedback from our associates, and benchmark our performance by having a third party firm conduct anonymous associate perspective surveys each year. The results are discussed and presented both on a company-wide basis and within each functional group.

*Safety.* We take workplace safety seriously at our construction sites, our operating communities and our offices. Through our Construction Site Safety Observation program and our dedicated safety team, we monitor project-level safety performance metrics at our construction sites, and elements of compensation for our construction group and our CEO are based on safety compliance performance. Our maintenance associates are required to take monthly safety training on a variety of subjects, and our risk management group monitors incident reports from our offices and communities.

*Training.* To help our associates develop the skills they need to advance in their careers and succeed at AvalonBay, we train them in a variety of ways, including providing job aids and quick reference guides, web-based courses and videos, in-person and virtual, instructor-led training and on-the-job learning. Our learning management system, Workday Learning, offers approximately 600 courses providing functional, technical, management, ethics, compliance, cyber-awareness and safety training.

7

*Available Information*

We file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). You may obtain copies of our SEC filings, free of charge, from the SEC's website at www.sec.gov.

We maintain a website at www.avalonbay.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, including exhibits and amendments to those reports, filed or furnished pursuant to the Exchange Act are available free of charge in the "Investor Relations" section of our website as soon as reasonably practicable after the reports are filed with or furnished to the SEC. In addition, the charters of our Board's Nominating, Governance and Corporate Responsibility Committee, Audit Committee and Compensation Committee, as well as our Director Independence Standards, Corporate Governance Guidelines, Code of Business Conduct and Ethics, Policy Regarding Shareholder Rights Agreements, Policy Regarding Shareholder Approval of Future Severance Agreements, Senior Officer Stock Ownership Guidelines, Policy on Political Contributions and Government Relations, Compensation Recovery Policy, Insider Trading Policy, AvalonBay Sanctions Compliance and Anti-Corruption Policy and Environmental, Social, and Governance Reports, are available free of charge in that section of our website or by writing to AvalonBay Communities, Inc., 4040 Wilson Blvd., Suite 1000, Arlington, Virginia 22203, Attention: Chief Financial Officer. To the extent required by the rules of the SEC and the New York Stock Exchange (the "NYSE"), we will disclose amendments and waivers to the Code of Business Conduct and Ethics, and to the other documents as required by those documents and applicable laws, in the same place on our website. The information posted on our website is not incorporated into this Annual Report on Form 10-K.

**ITEM 1A.  RISK FACTORS**

Our operations involve various risks that could have adverse consequences, including those described below. This Item 1A. includes forward-looking statements. You should refer to our discussion of the qualifications and limitations on forward-looking statements in this Form 10-K.

**Risks related to investments through acquisitions, construction, development, and joint ventures**

***Development, redevelopment and construction risks could affect our profitability.*** We intend to continue to develop and redevelop apartment communities. These activities can include long planning and entitlement timelines and can involve complex and costly activities, including significant environmental remediation or construction work in high-density urban areas. These activities may expose us to the following risks, among others:

- we have recently abandoned, and may in the future abandon, opportunities that we have already begun to explore for a number of reasons, including changes in local market conditions or increases in construction or financing costs or we may impair land held for development, and as a result, we may fail to recover expenses already incurred in exploring those opportunities;
- occupancy rates and rents at a community may fail to meet our original expectations for a number of reasons, including changes in market and economic conditions beyond our control and the development by competitors of competing communities;
- we may be unable to obtain, or experience delays in obtaining, necessary zoning, occupancy or other required governmental or third party permits and authorizations, which could result in increased costs, or the delay or abandonment of opportunities;
- we may incur costs that exceed our original estimates due to increased material, labor or other costs or supply chain disruptions, including as a result of tariffs or changes in immigration laws or their enforcement, which could impact our overall return from our development, redevelopment or construction activity;
- we may be unable to complete construction of a community on schedule or for the originally projected cost resulting in increased construction and financing costs;
- we may incur liabilities to third parties during the development process, for example, in connection with managing existing improvements on the site prior to tenant terminations and demolition (such as commercial space) or in connection with providing services to third parties (such as the construction of shared infrastructure or other improvements); and
- we may incur liability if our communities are not constructed in compliance with the accessibility provisions of the Americans with Disabilities Acts, the Fair Housing Act or other federal, state or local requirements. Noncompliance could result in imposition of fines, an award of damages to private litigants and a requirement that we undertake structural modifications to remedy the noncompliance.

Refer to our "Risks related to liquidity and financing" section below for additional construction and development risks related to financing.

***Attractive investment opportunities may not be available, which could adversely affect our profitability.*** We expect that other real estate investors, including insurance companies, pension and investment funds, other REITs and other well-capitalized investors, will compete with us to acquire existing properties and to develop new properties. This competition could increase prices for properties of the type we would likely pursue and adversely affect our profitability for new investments.

***Acquisitions may not yield anticipated results.*** Our business strategy of acquiring communities involves the following risks, among others: (i) acquisitions may not perform as we expected; (ii) our estimate of the costs of operating, repositioning or redeveloping an acquisition may be inaccurate; and (iii) acquisitions may subject us to unknown liabilities.

***Failure to succeed in new markets, or with new brands and community formats, or in activities other than the development, ownership and operation of residential rental communities may have adverse consequences.*** We have engaged, and may continue from time to time to engage in development, acquisition and operating activity outside of our pre-existing market areas. Our historical experience in our existing markets in developing, owning and operating rental communities does not ensure that we will be able to operate successfully in new markets. We may be exposed to a variety of risks when we enter a new market, including an inability to accurately evaluate local apartment market conditions and an inability to obtain land for development or to identify appropriate acquisition opportunities. In order to more rapidly expand in our new markets, we have relied on third party developers to source and manage developments and on third party general contractors to manage construction more than we have in our existing markets. Relying on third parties to assist with and/or oversee development and

construction creates additional and different risks than when we manage these activities directly, including that the third party may not perform to our standards, may breach contractual arrangements, or may incur liquidity constraints.

We also may engage or have an interest in for-sale activity, such as the sale of our remaining residential condominium at The Park Loggia, a mixed-use development located in New York, New York. We may be unsuccessful at developing real estate with the intent to sell or in selling condominiums at originally underwritten values, or at all, as a disposition strategy for an asset, which could have an adverse effect on our results of operations.

We provide, through our internally operated shared service center, various back-office, financial administrative support services to a third party for a fee, and we may in the future provide such services to other third parties. There can be no assurance that we will be successful in providing such services, and the provision of such services creates additional sources of risk and potential liability for us with respect to the professional commitments and service levels we undertake when providing such services.

***We are exposed to risks associated with investment in technology and environmentally focused venture funds and companies.*** We have invested in, and may in the future invest in, venture funds that invest in companies seeking innovation through new processes and the application of technology to property operations, development, construction and energy management. We have also invested directly in, and may in the future invest directly in, companies that engage in these activities. While such investments give us a greater understanding of new and emerging technologies, such investments involve risks, including the possibility that our investments will decline substantially in value.

Our investments in technology companies, or in funds that invest in technology companies, are generally held through TRSs pursuant to which we will incur taxable gains upon the disposition of our interests. In addition, the value of these investments may be volatile and declines in value may impact our reported income even if we do not sell the investment.

***We are exposed to risks associated with investment in, and management of, joint ventures.*** At times we invest directly and indirectly in real estate as a partner or a co-venturer with other investors. Joint venture investments (including investments through partnerships or limited liability companies) involve risks, including the possibility that our partner might become insolvent or otherwise refuse to make capital contributions when due; that we may be responsible to our partner for indemnifiable losses or the debt and obligations of an investment; that our investments may lose all or some of their value; that our partner might have business goals that are inconsistent with ours which may result in the venture or investment being unable to implement certain decisions that we consider beneficial; that our partner may be in a position to take action or withhold consent contrary to our instructions or requests; that, in cases where we are the general partner or managing member, our partners holding a majority of the equity interests may remove us from such role in certain cases involving cause; and that we may be liable and/or our status as a REIT may be jeopardized if either the investments, or the REIT entities associated with the investments, fail to comply with various tax or other regulatory matters. Frequently, we and our partner may each have the right to trigger a buy-sell or similar arrangement that could cause us to sell our interest, acquire our partner's interest or force a sale of the asset, which could occur at a time when we otherwise would not have initiated such a transaction or on terms that are not most advantageous to us.

***Mezzanine debt and preferred equity investments could cause us to incur expenses, which could adversely affect our results of operations.*** We make mezzanine loans to borrowers and obtain preferred equity interests in projects owned by third party sponsors as part of our SIP. Some of these instruments may have some recourse to their borrower or sponsor, while others are limited to the collateral securing the loan or the right to remove the sponsor as manager of the venture in preferred equity investments. In the event of a default under these obligations, we may elect to take possession of the collateral securing these interests, or remove a sponsor from management of a preferred equity investment. Borrowers of mezzanine loans may contest our enforcement actions, including foreclosure, assignment in lieu of foreclosure, or other remedies, and sponsors may contest our removal actions. In addition, borrowers and sponsors may seek bankruptcy protection against such enforcement and/or bring claims for lender liability in response to actions to enforce their obligations to us. Declines in the value of the underlying properties may prevent us from realizing an amount equal to our investment upon foreclosure or other remedies even if we make substantial improvements or repairs to maximize such properties' investment potential.

We cannot be certain that our estimate of future credit losses will be adequate over time because of unanticipated adverse changes in the economy or events adversely affecting specific properties, assets, tenants, borrowers, industries in which our tenants and borrowers operate or markets in which our tenants and borrowers or their properties are located. The ultimate resolutions may differ from our expectation, and we could suffer losses that would have a material adverse effect on our financial performance, the trading price of our securities and our ability to pay dividends and distributions.

*We are exposed to risks associated with real estate assets that are subject to ground leases that may restrict our ability to finance, sell or otherwise transfer our interests in those assets, limit our use and expose us to loss if such agreements are breached by us or terminated.* We own assets that are subject to long-term ground leases. These ground leases may impose limitations on our use or improvement of the properties, restrict our ability to finance, sell or otherwise transfer our interests or restrict the leasing of the properties. These restrictions may limit our ability to timely sell or exchange the properties, impair the properties' value or negatively impact our ability to operate the properties. In addition, we could lose our interests in the properties if the ground leases are breached by us, terminated or lapse. As we get closer to the lease termination dates, the values of the properties could decrease if we are unable to agree upon an extension of the lease with the lessor. Certain of these ground leases have payments subject to annual escalations and/or periodic fair market value adjustments which could adversely affect our financial condition or results of operations.

*Land we hold with no current intent to develop may be subject to future impairment charges.* We own land parcels that we do not currently intend to develop. As discussed in Item 2. "Properties—Other Land and Real Estate Assets," in the event that the fair market value, less the cost to dispose of a parcel, changes such that it is less than the carrying basis of the parcel, we would be subject to an impairment charge, which would reduce our net income.

*Our various technology-related initiatives to improve our operating margins and customer experience may fail to perform as expected and may expose us to additional risks.* We have developed and may continue to develop initiatives that are intended to serve our customers better and operate more efficiently, including "smart home" technology; use of AI in correspondence with prospective, current and prior residents; and self-service options that are accessible to residents through smart devices or otherwise. Such initiatives have involved and may continue to involve our employees having new or different responsibilities and processes. We may incur significant costs and divert resources in connection with such initiatives, and these initiatives may not perform as expected, which could adversely affect our business, results of operations, cash flows and financial condition. Furthermore, future regulations could impose restrictions on the use of these technologies or require us to implement costly compliance measures. Competition from companies employing technology-related initiatives more effectively could also negatively impact our business. Finally, public perception of new technologies (including AI), such as concerns about data privacy and algorithmic bias, could affect customer acceptance of technology-driven services, which could harm our reputation and business.

<u>Risks related to liquidity and financing</u>

*Capital and credit market conditions may adversely affect our access to various sources of capital and/or the cost of capital, which could impact our business activities, dividends, earnings and common stock price, among other things.* In periods when the capital and credit markets experience significant volatility, the amounts, sources and cost of capital available to us may be adversely affected. We use external financing as one source of capital to fund construction and to refinance indebtedness as it matures. If sufficient sources of external financing are not available to us on cost-effective terms, we could be forced to limit our development and redevelopment activity and/or take other actions to fund our business activities and repayment of debt, such as selling assets, reducing our cash dividend or issuing equity or debt securities. If we are able and/or choose to access capital at a higher cost than we have experienced in recent years, our earnings per share and cash flows could be adversely affected. In addition, the price of our common stock may fluctuate significantly and/or decline in a high interest rate environment or a volatile economic environment, or if we dilute the interest of stockholders by issuing additional equity. Further, events involving limited liquidity, defaults, non-performance or other adverse developments that affect the lenders under our Credit Facility, the dealers under our Commercial Paper Program, financial institutions where we have deposits, transactional counterparties or other companies in the financial services industry generally, or concerns or rumors about any events of these kinds or other similar risks, could result in losses or defaults by these institutions or counterparties or could lead to market-wide liquidity problems. Disruptions and uncertainty with respect to financial institutions, including as a result of bank failures and liquidity concerns, may negatively impact our ability to refinance existing indebtedness and access additional financing at reasonable terms or at all or may cause us or our transactional counterparties to be unable to complete transactions as intended, all of which could have a material adverse effect on our financial condition and results of operations.

Table of Contents

***Insufficient cash flow could affect our debt financing and create refinancing risk.*** We are subject to the risks associated with debt financing, including the risk that our available cash will be insufficient to meet required payments of principal and interest on our debt. For us to continue to qualify as a REIT, we are required to annually distribute dividends generally equal to at least 90% of our REIT taxable income, which limits the amount of our cash flow available to meet required principal and interest payments. The principal outstanding balance on a portion of our debt will not be fully amortized prior to its maturity. We cannot assure you that we will have sufficient cash flows available to make all required principal payments. Therefore, we expect that we will generally need to refinance at least a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or that a refinancing will not be done on as favorable terms; either of these outcomes could have a material adverse effect on our financial condition and results of operations.

***Rising interest rates could increase interest costs and could affect the market price of our common stock, and efforts to hedge such risk could be ineffective and cause us to incur additional costs.*** Interest rates have increased in recent years, and may increase further. If interest rates maintain their existing levels or further increase, our interest costs on variable rate debt will rise, and our interest costs on newly issued fixed rate debt may be higher than on our existing debt, unless in each case we have hedged the risk of rising interest rates. In addition, an increase in market interest rates may lead purchasers of our common stock to demand a greater annual dividend yield, which could adversely affect the market price of our common stock.

We may use interest rate derivatives to manage our exposure to fluctuations in interest rates, such as by entering into interest rate contracts. For example, when we anticipate issuing debt securities, we may seek to limit our exposure to fluctuations in interest rates prior to debt issuance by entering into interest rate hedging contracts. Although these agreements may partially protect against rising interest rates, they also may reduce the benefits to us if interest rates decline. The interest rate derivatives we use, primarily to manage interest rate risk for our anticipated debt issuance activity, could result in a material charge to earnings if we do not issue the anticipated debt, or are otherwise unsuccessful in our hedging activities. In addition, our use of hedging arrangements may expose us to additional risks, including a risk that a counterparty to a hedging arrangement may default on the contract. There can be no assurance that our hedging activities will be effective at reducing the risks associated with interest rate fluctuations.

***Bond financing and zoning and other compliance requirements could limit our income, restrict the use of communities and cause favorable financing to become unavailable.*** We have financed some of our apartment communities with obligations issued by local government agencies because the interest paid to the holders of this debt is generally exempt from federal income taxes, which typically provides a more favorable interest rate for us. These obligations are commonly referred to as "tax-exempt bonds" and generally must be secured by mortgages on our communities. As a condition to obtaining (i) tax-exempt financing, (ii) favorable zoning or (iii) an agreement relating to property taxes in some jurisdictions, we will commit to make some of the apartments in a community available to households whose income does not exceed certain thresholds (e.g., 50% or 80% of area median income), or who meet other qualifying tests. As of December 31, 2024, 4.1% of our apartment homes at current operating communities were under income limitations such as these. These commitments, which may or may not expire, may limit our ability to raise rents, adversely affecting the value of communities subject to these restrictions. If we fail to observe these commitments, we could lose benefits (such as reduced property taxes) or face liabilities including liability for the benefits we received under tax exempt bonds, tax credits or agreements related to property taxes.

Our tax-exempt bonds may require us to obtain a guarantee from a financial institution of payment of the principal and interest on the bonds, such as a letter of credit, surety bond, guarantee agreement or other additional collateral. If the financial institution defaults in its guarantee obligations, or if we are unable to renew the applicable guarantee or otherwise post satisfactory collateral, a default will occur and the community could be foreclosed upon if we do not redeem the tax exempt bonds.

***Risks related to indebtedness.*** We have a Credit Facility and Commercial Paper Program with a syndicate of commercial banks as well as secured and unsecured notes. Our organizational documents do not limit the amount or percentage of indebtedness that may be incurred. Accordingly, subject to compliance with outstanding debt covenants, we could incur more debt, resulting in an increased risk of default on our obligations and an increase in debt service requirements that could adversely affect our financial condition and results of operations.

The mortgages on properties that are subject to secured debt, our Credit Facility, Commercial Paper Program and the indentures under which a substantial portion of our debt was issued contain customary restrictions, requirements and other limitations, as well as certain financial and operating covenants including maintenance of certain financial ratios. Maintaining compliance with these restrictions could limit our flexibility. A default in these requirements, if uncured, could result in a requirement that we repay indebtedness, which could materially adversely affect our liquidity and increase our financing costs. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for further discussion.

Table of Contents

A substantial portion of our debt is subject to prepayment penalties or premiums that we will be obligated to pay in the event that we elect to prepay the debt prior to the earlier of (i) its stated maturity or (ii) another stated date. If we elect to prepay a significant amount of outstanding debt, our prepayment penalties or payments under these provisions could materially adversely affect our results of operations.

***Failure to maintain our current credit ratings could adversely affect our cost of funds, related margins, liquidity and access to capital markets.*** There are two major debt rating agencies that routinely evaluate and rate our debt. Their ratings are based on a number of factors, which include their assessment of our financial strength, liquidity, capital structure, asset quality, amount of real estate under development, and sustainability of cash flow and earnings, among other factors. If market conditions change, we may not be able to maintain our current credit ratings, which could adversely affect our cost of funds and related margins, liquidity and access to capital markets.

***The form, timing and/or amount of dividend distributions in future periods may vary and be impacted by our revenue generation, other liquidity needs and economic and other considerations.*** The form, timing and/or amount of dividend distributions will be declared at the discretion of the Board of Directors and will depend on our rental revenue, actual cash from operations, our financial condition, capital requirements, the annual distribution requirements under the REIT provisions of the Code and other factors as the Board of Directors may consider relevant. The Board of Directors may modify our dividend policy from time to time.

***We may experience barriers to selling apartment communities that could limit financial flexibility.*** Difficulties in selling real estate at prices we find acceptable in a timely manner may limit our ability to quickly change or reduce the apartment communities in our portfolio in response to changes in economic, regulatory, or other conditions. Federal tax laws may also limit our ability to sell properties when desired. See "Risks related to our REIT or tax status or reliance on various tax regulations" section for more information on federal tax law risks. In addition, the capitalization rates/disposition yields at which apartment communities may be sold could also be higher than historic rates, thereby reducing our potential proceeds from sale.

***Increased scrutiny and changing expectations from regulators, investors, associates, residents and others regarding our environmental, social and governance practices and reporting, including those related to workplace inclusion and diversity (collectively, "Corporate Responsibility" or "CR"), could impact our business practices, cause us to incur additional costs and expose us to new risks.*** Corporate Responsibility practices and ratings are important to some investors and other stakeholders who may have differing and conflicting views as to their preferred approach to CR matters. Expectations regarding CR may impact our business practices and the price of our securities. Changing practices have in the past and may in the future include expanded mandatory and voluntary reporting, diligence, and disclosure on topics such as climate change, human capital, inclusion and diversity, labor, and risk oversight, and these could expand the nature, scope, and complexity of matters that we are required to control, assess and report on, which may prove difficult, expensive and time consuming. In addition, the adoption of increased government regulations and changes in investor preference related to CR matters may result in changes to our business practices, including increasing expenses or capital expenditures. We have communicated certain initiatives regarding CR matters and we may in the future communicate revised or additional initiatives. If our initiatives are unsuccessful or we fail to satisfy the expectations of investors, residents, employees and other stakeholders, our reputation could be adversely affected. In recent years, corporate initiatives relating to environmental, social and governance matters, including workplace inclusion and diversity, have attracted negative commentary and regulatory attention in the broader business sector. Legislation, regulatory initiatives, litigation, legal opinions, federal executive orders and increased scrutiny related to CR matters could expose the Company to additional compliance obligations, costs, and potential liabilities.

Table of Contents

**Risks related to operations of our communities**

*Laws, regulations and orders imposing rent control or rent stabilization, or limiting our rights as a landlord, could adversely affect our operations and revenue.* A number of states and municipalities have implemented or are seeking to implement rent control or rent stabilization laws and regulations or take other actions that could limit or delay our ability to raise rents, use algorithmic pricing tools, charge non-rent fees, screen and evict tenants for non-payment of rent or other lease violations. For example, the State of California has statewide rent control for communities older than fifteen years, limiting rent increases to the lesser of 10% or 5% plus local CPI, and the State of New York has rules for rent-controlled and rent-stabilized units that limit the way rent increases are calculated for renewal leases, basing increases solely on rent actually paid and eliminating the ability to increase the renewal rent to a higher "registered rent." Furthermore, in California the Governor has the ability to enact local or statewide states of emergency which limit our ability to increase new and renewal rents more than 10% over the rent in place on the date such state of emergency was declared, which has impacted some of our California communities. We have seen an increase in state and local governments in our markets implementing, considering or being urged by various constituencies to consider regulations of the types described above. Additionally, various federal agencies have engaged in efforts aimed at increasing fairness in the rental market. Current and future enactments of rent control or rent stabilization laws or other laws regulating rental housing may limit our ability to charge market rents, increase rents, use algorithmic pricing tools, charge non-rent fees, screen and evict tenants or recover increases in our operating expenses and could make it more difficult for us to dispose of properties in certain circumstances. Expenses associated with our investment in these communities, such as debt service, real estate taxes, insurance and maintenance costs, are generally not reduced when circumstances cause a reduction in rental income from the community.

*We face risks related to multifamily rental antitrust, regulatory scrutiny and new litigation.* Lawsuits, government investigations and proposed legislation relating to antitrust matters in the multifamily rental market are ongoing and may impact the Company, whether or not we are found directly liable for an antitrust violation. For example, a purported class action has been brought by private litigants against RealPage, Inc., a provider of revenue management systems, and numerous multifamily rental companies; while we were originally named as a defendant, the Company was voluntarily dismissed without prejudice from this case after explaining to plaintiffs' counsel why the Company believed that these cases were without merit as they pertained to the Company. Subsequently, on November 1, 2023, the District of Columbia filed a lawsuit in the Superior Court of the District of Columbia against RealPage, Inc. and 14 owners and/or operators of multifamily housing in the District of Columbia, including the Company, alleging that the defendants violated the District of Columbia Antitrust Act by unlawfully agreeing to use RealPage, Inc. revenue management systems and sharing sensitive data (the "D.C. Antitrust Litigation"). While we were initially dismissed from this case, the court later granted the District of Columbia leave to amend its original complaint, and the Company has filed a new motion to dismiss which has not been ruled on as of the date of this filing. Further, on January 15, 2025, the Office of the Attorney General of the State of Maryland filed a suit similar to the D.C. Antitrust Litigation in which a number of owners and/or operators of multifamily properties in the State of Maryland, including the Company, have been named (the "Maryland Antitrust Litigation"). While the Company intends to vigorously defend against the D.C. Antitrust Litigation and the Maryland Antitrust Litigation, given the early stage of the lawsuits, the Company is unable to predict the outcome or estimate the amount of loss, if any, that may result from the lawsuits. The Company is also aware that other governmental investigations and lawsuits regarding antitrust matters in the multifamily industry are ongoing, including an antitrust lawsuit brought by the U.S. Department of Justice, along with the attorneys general of ten states, against other multifamily rental providers to which the Company is not a party. Jurisdictions other than the District of Columbia and Maryland, or additional federal agencies, may also bring suits against multifamily rental providers. Regardless of whether the Company remains named in the D.C. Antitrust Litigation, the Maryland Antitrust Litigation or any other lawsuits or becomes the focus of any governmental investigation, the Company may incur substantial costs related to these lawsuits or investigations, whether as a defendant or as a third-party witness. As well, settlements by RealPage, Inc. or other defendants in such cases could impact the multifamily industry in ways that have an adverse effect on the Company. In addition, state and federal legislation has been introduced (and in San Francisco adopted) to regulate the use by multifamily apartment rental companies of third party algorithmic revenue management systems, and if legislation of this type passes, the impact on the Company is difficult to predict. Lawsuits, government investigations and new legislation related to antitrust matters may, among other things, be costly to comply with, result in negative publicity, require significant management time and attention and subject us to remedies or burdensome requirements that adversely affect our business.

*Noncompliance with applicable laws in the building and operation of our communities could adversely affect our operations or expose us to liability.* We must develop, construct and operate our communities in compliance with federal, state and local laws and regulations, some of which may conflict with one another or be subject to limited judicial or regulatory interpretations. These laws and regulations may include zoning laws, building codes, landlord/tenant laws and other laws generally applicable to business operations. Noncompliance with laws could expose us to liability. Lower revenue growth or significant unanticipated expenditures may result from our need to comply with changes in (i) laws imposing remediation requirements or

14

Table of Contents

other conditions, or (ii) other governmental rules and regulations or enforcement policies affecting the development, use and operation of our communities, including changes to building codes and fire and life-safety codes.

***Short-term leases expose us to the effects of declining market rents.*** Most of our apartment leases are for a term of one year or less. Because these leases generally permit the residents to leave at the end of the lease term without penalty, our rental revenues are impacted by declines in market rents more quickly than if our leases were for longer terms.

***Competition could limit our ability to lease apartment homes or increase or maintain rents.*** Our apartment communities compete with other apartment operators as well as rental housing alternatives, such as single-family homes for rent and short term furnished offerings such as those available from extended stay hotels or through online listing services. In addition, our residents and prospective residents also consider, as an alternative to renting, the purchase of a new or existing condominium or single-family home. Competitive residential housing could adversely affect our ability to lease apartment homes and to increase or maintain rental rates.

***Unfavorable changes in market and economic conditions could adversely affect occupancy, rental rates, operating expenses, and the overall market value of our real estate assets.*** Local conditions in our regions significantly affect occupancy, rental rates and the operating performance of our communities, and may be adversely affected by the following risks:

- corporate restructurings and/or layoffs, and industry slowdowns;
- an oversupply of, or a reduced demand for, apartment homes;
- a decline in household formation or employment or lack of employment growth;
- the inability or unwillingness of residents to pay rent increases; and
- economic conditions that could cause an increase in our operating expenses, such as increases in property taxes, utilities, compensation of on-site associates and routine maintenance.

***Risks related to the impact of a pandemic, epidemic or other health crisis on multifamily rental housing.*** The national and global impacts of a health crisis, such as the COVID-19 pandemic, may present material uncertainty and risk with respect to our financial condition, results of operations and cash flows. State, local, and federal entities may impose restrictions, for varying times and to varying degrees (as experienced during the COVID-19 pandemic), on our ability to enforce residents' contractual lease obligations, and this may affect our ability to enforce all of our remedies (such as pursuing collections, imposing late fees and seeking evictions) for the failure to pay rent and may result in foregone revenue. Our properties could also incur significant costs or losses related to shelter-in-place or stay-at-home orders, quarantines, infection, clean-up costs or other related factors, which may cause residents to move to locations other than our markets. Moreover, many of the risk factors set forth in this Form 10-K could be interpreted as heightened risks due to the impact of a pandemic, epidemic or other health crisis.

Further, emergency orders such as shutting down non-essential businesses, may disrupt our development and construction activity which may increase our construction costs and we may not achieve, on the schedule we originally planned, the cash flows that we expect when we begin leasing a completed property. We may also delay the start of construction of additional development communities which, if constructed and leased as originally planned, would have been a source of future additional cash flow.

The same factors as described immediately above may also impact our workforce. A disruption in the normal operations of our workforce, including impacts of illness among a substantial portion of our workforce, could also adversely affect our operations.

***Risks related to commercial leasing operations.*** Although we are primarily in the multifamily rental business, we also own and lease ancillary commercial space. Gross rental revenue provided by leased commercial space in our portfolio represented 1.4% of our total revenue in 2024. The long term nature of our commercial leases and characteristics of many of our tenants (small, local businesses) may subject us to certain risks. We may not be able to lease new space for rents that are consistent with our projections or at market rates. Also, when leases for our existing commercial space expire, the space may not be relet or the terms of reletting, including the cost of allowances and concessions to tenants, may be less favorable than the current lease terms. Our properties compete with other properties with commercial space. If our commercial tenants experience financial distress or bankruptcy, they may fail to comply with their contractual obligations, seek concessions in order to continue operations or cease their operations, which could adversely impact our results of operations and financial condition.

***Inflation and related volatility in the economy could negatively impact our residents and our results of operations.*** Although it has declined from its 2022 peak, inflation has remained elevated in 2023 and 2024 compared to pre-pandemic years, and may continue at the present level or increase. Inflation and its related impacts, including increased prices for services and goods and higher interest rates and wages, and any policy interventions by the U.S. government, could negatively impact our residents'

Table of Contents

ability to pay rents or our results of operations. Most of our apartment leases are for a term of one year or less, which we believe mitigates our exposure to inflation by permitting us to set rents commensurate with inflation (subject to rent regulations to the extent they apply and assuming our current or prospective residents will accept and can pay commensurate increased rents, of which there can be no assurance). However, inflation could outpace any increases in rent and adversely affect us. In addition, property taxes can be impacted by inflationary changes because taxes in some jurisdictions are regularly reassessed based on changes in the fair value of our properties. We may not be able to mitigate the effects of inflation and related impacts, and the duration and extent of any prolonged periods of inflation, and any related adverse effects on our results of operations and financial condition, are unknown at this time. Inflation may also cause increased volatility in financial markets, which could affect our ability to access the capital markets or impact the cost or timing at which we are able to do so.

Inflation, either caused by tariffs recently imposed or threatened by the new presidential administration or due to other causes, may also increase the costs to complete our development projects, including costs of materials, labor and services from third-party contractors and suppliers. Higher construction costs could adversely impact our investments in real estate assets and our expected yields on development projects.

### Risks related to our REIT or tax status or reliance on various tax regulations

***Failure to qualify as a REIT would cause us to be taxed as a corporation, which would significantly reduce funds available for distribution to stockholders.*** If we fail to qualify as a REIT for federal income tax purposes, we will be subject to regular federal corporate income tax on our taxable income. In addition, unless we are entitled to relief under applicable statutory provisions, we would be ineligible to make an election for treatment as a REIT for the four taxable years following the year we lose our qualification. The additional tax liability resulting from the failure to qualify as a REIT would significantly reduce or eliminate the amount of funds available for distribution to our stockholders. Furthermore, we would no longer be required to make distributions to our stockholders. Thus, our failure to qualify as a REIT could also impair our ability to expand our business and raise capital and would adversely affect the value of our common stock.

We believe that we are organized and qualified as a REIT, and we intend to operate in a manner that will allow us to continue to qualify as a REIT. However, we cannot assure you that we are qualified as a REIT, or that we will remain qualified in the future. This is because qualification as a REIT involves the application of highly technical and complex provisions of the Code for which there are only limited judicial and administrative interpretations and involves the determination of a variety of factual matters and circumstances not entirely within our control. Our qualification as a REIT depends on our satisfaction of certain asset, income, organizational, distribution, shareholder ownership and other requirements on a continuing basis. In addition, future legislation, new regulations, administrative interpretations or court decisions may significantly change the tax laws or the application of the tax laws with respect to qualification as a REIT for federal income tax purposes or the federal income tax consequences of such qualification. Additionally, our expanding range of investments (such as investments in mezzanine loans, preferred equity, and technology and environmentally focused venture funds and companies) may add additional REIT compliance challenges, some of which may involve determinations or circumstances that may be beyond our control.

Even if we qualify as a REIT, we will be subject to certain federal, state and local taxes on our income and property and on taxable income that we do not distribute to our stockholders. In addition, we hold certain assets and engage in certain activities through our TRSs that a REIT could not engage in directly. We also use TRSs to hold certain assets that we believe would be subject to the 100% prohibited transaction tax if sold at a gain outside of a TRS or to engage in activities that generate non-qualifying REIT income. Our TRSs are subject to federal income tax as regular corporations.

***Legislative or other actions affecting REITs could have a negative effect on us or our stockholders.*** The rules dealing with federal income taxation are constantly under review by persons involved in the legislative process and by the Internal Revenue Service ("IRS") and the U.S. Department of the Treasury. Changes to the tax laws, with or without retroactive legislation, could adversely affect us or our stockholders. New legislation, Treasury Regulations, administrative interpretations or court decisions could significantly and negatively affect our ability to qualify as a REIT, the federal income tax consequences of such qualification, or the federal income tax consequences of an investment in our Company. Also, the law relating to the tax treatment of other entities, or an investment in other entities, could change, making an investment in such other entities more attractive relative to an investment in a REIT.

***Our ownership of TRSs is subject to certain restrictions, and we will be required to pay a 100% penalty tax on certain income or deductions if transactions with our TRSs are not conducted on arm's-length terms.*** We have established several TRSs. The TRSs must pay federal income tax on their taxable income as regular corporations. While we will attempt to ensure that our dealings with our TRSs do not adversely affect our REIT qualification, we cannot provide assurances that it will successfully achieve that result. Furthermore, we may be subject to a 100% penalty tax, to the extent dealings between us and

16

our TRSs are not deemed to be arm's-length in nature. We intend that our dealings with our TRSs will be on an arm's-length basis. No assurances can be given, however, that the IRS will not assert a contrary position.

***Failure of one or more of our subsidiaries to qualify as a REIT could adversely affect our ability to qualify as a REIT.*** We have owned and may in the future own interests in subsidiaries that have elected (or will elect) to be taxed as REITs under the Code. These subsidiary REITs were or will be subject to the REIT qualification requirements and other limitations that are applicable to us. If any of our subsidiary REITs were to fail to qualify as a REIT, then (i) the subsidiary REIT would become subject to federal income tax, (ii) our ownership of shares in such subsidiary REIT would cease to be a qualifying asset for purposes of the asset tests applicable to REITs, and (iii) it is possible that we could also fail to qualify as a REIT.

***The tax imposed on REITs engaging in "prohibited transactions" may limit our ability to engage in transactions which would be treated as sales for federal income tax purposes.*** We may transfer or otherwise dispose of some of our properties. Under the Code, unless certain exceptions apply, any gain resulting from transfers of properties that we hold as inventory or primarily for sale to customers in the ordinary course of business could be treated as income from a prohibited transaction subject to a 100% penalty tax from the gain on the sale of the property, which could potentially adversely impact our status as a REIT unless we own the property through a TRS. Since we acquire properties for investment purposes, we do not believe that our occasional transfers or disposals of property should be treated as prohibited transactions. However, whether property is held for investment purposes depends on the facts and circumstances surrounding the particular transaction. The IRS may contend that certain of our transfers or disposals of properties are prohibited transactions. If the IRS were to argue successfully that a transfer or disposition of property was a prohibited transaction, then we would be required to pay a 100% penalty tax on any gain allocable to it from the prohibited transaction, and our ability to retain proceeds from real property sales may be jeopardized.

***We may face risks in connection with Section 1031 exchanges.*** We may dispose of real properties in transactions intended to qualify as "like-kind exchanges" under Section 1031 of the Code. If a transaction intended to qualify as a Section 1031 exchange is later determined to be taxable, we may face adverse consequences, and if the laws applicable to such transactions are amended or repealed, we may not be able to dispose of real properties on a tax-deferred basis.

***We may choose to pay dividends in our own stock, in which case, stockholders may be required to pay tax in excess of the cash they receive.*** We may distribute taxable dividends that are payable in part in our stock. Taxable stockholders receiving such dividends will be required to include the full amount of the dividend as income to the extent of our current and accumulated earnings and profits for federal income tax purposes. As a result, a U.S. stockholder may be required to pay tax with respect to such dividends in excess of the cash dividend received. If a U.S. stockholder sells the stock it receives as a dividend in order to pay this tax, the sales proceeds may be less than the amount included in income with respect to the dividend, depending on the market price of our stock at the time of the sale. Furthermore, with respect to non-U.S. stockholders, we may be required to withhold U.S. tax with respect to such dividends, including in respect of all or a portion of such dividend that is payable in stock. In addition, the trading price of our stock would experience downward pressure if a significant number of our stockholders sell shares of our stock in order to pay taxes owed on dividends.

### Risks that may not be insured in full or in part

***We are exposed to risks that are either uninsurable, not economically insurable or in excess of our insurance coverage, including risks discussed below.*** Insurance coverage for various risks can be costly and in limited supply. As a result, we may experience shortages in desired coverage levels if market conditions are such that insurance is not available or the cost of insurance makes it, in our view, economically impractical. Incidents that directly or indirectly damage our communities, both physically and financially, or cause losses that exceed our insurance coverage (including amounts payable by our captive insurance company) could have a material adverse effect on our business, financial condition and results of operations including increased maintenance, repair, and delays in construction. In addition, we would also continue to be obligated to repay any mortgage indebtedness or other obligations related to the community which could have a material adverse effect on our business and our financial condition and results of operations. The following risks are uninsurable or insurance coverage is limited due to premium rates (See Item 2. "Properties—Insurance and Risk of Uninsured Losses"):

- ***Earthquake risk.*** As further described in Item 2. "Properties—Insurance and Risk of Uninsured Losses," many of our West Coast communities are located in the general vicinity of active earthquake faults. Insurance coverage for earthquakes can be costly and in limited supply.

- ***Climate, severe or inclement weather or natural disaster risk.*** Many of our markets, particularly those located in coastal cities, are exposed to risks associated with inclement or severe weather including those arising from climate change such as hurricanes, severe winter storms and coastal flooding. Many of our properties are also located in areas,

17

Case 2:25-cv-02124-BRM-JBC    Document 1    Filed 03/28/25    Page 80 of 231 PageID: 80

such as Southern California or Texas, that are exposed to risks of drought, wildfire or other natural disasters, including those arising from climate change. For example, in Southern California, a series of wildfires affected the Los Angeles metropolitan area and San Diego in January 2025, forcing over 200,000 people to evacuate and resulting in the destruction or damage of thousands of homes and structures. Additionally, the 2024 hurricane season was particularly severe and saw landfall of two major hurricanes in Florida and significant damage from flooding in North Carolina. Although none of these events caused material damage to our properties, similar disasters could occur in the future.

• **Terrorism and other risk.** We have significant investments in metropolitan markets such as Metro New York/New Jersey and Washington, D.C., which have in the past been or may in the future be the target of actual or threatened terrorist attacks. We carry commercial general liability insurance, property insurance and terrorism insurance with respect to our communities on terms and in amounts we consider commercially reasonable. There are, however, certain types of losses (such as from acts of war) we do not insure, in full or in part, because they are either uninsurable or we believe the cost of insurance is economically impractical.

**We may incur costs related to climate change.** We may experience physical climate change impacts including extreme weather, sea level rise, the effects of declines in available water supplies and changes in precipitation, temperature and wildfire exposure, all of which may result in damage to, disruption of services at, and/or a decrease in demand for properties located in areas affected by these conditions. Should the impact of these conditions be material or occur for lengthy periods of time, our financial condition or results of operations may be adversely affected, and it may negatively impact the types and pricing of insurance we are able to procure.

In addition, we may experience transition risks associated with climate change. The implementation of new or changes in existing federal, state and local regulations based on concerns about climate change could result in increased capital expenditures or operating expenses on our existing properties (for example, required retrofitting of existing systems or increased utility costs) and our new development properties (for example, to improve energy efficiency, reduce greenhouse gas emissions and/or improve resistance to inclement weather) without a corresponding increase in revenue, resulting in adverse impacts to our results of operations. Further, laws and regulations at the federal, state and local level requiring climate-related disclosures, including the rules promulgated by the SEC and the legislation recently enacted in the state of California, may increase compliance and data collection costs if, and when, such laws and regulations become effective.

**We may incur costs due to environmental contamination or non-compliance.** Under various public health laws and regulations, we may be required, regardless of knowledge or responsibility, to investigate and remediate the presence or effects of hazardous or toxic substances such as asbestos, lead paint, chemical vapors from soils or groundwater, petroleum product releases, and natural substances such as methane and radon gas. We may be held liable under these laws or common law to a governmental entity or to third parties for property, personal injury or natural resources damages and for investigation and remediation costs incurred as a result of the contamination. These damages and costs may be substantial and may exceed any insurance coverage we have for such events. The presence of these substances, or the failure to properly remediate or contain the contamination, may adversely affect our ability to borrow against, develop, sell or rent the affected property. In addition, some environmental laws create or allow a government agency to impose a lien on the contaminated site in favor of the government for damages and costs it incurs as a result of the contamination.

The development, construction and operation of our communities are subject to environmental, health and safety regulations and permitting under various federal, state and local laws, regulations and ordinances, which regulate matters including wetlands protection, storm water runoff and wastewater discharge. These laws and regulations may impose restrictions on how our communities may be developed, and noncompliance with these laws and regulations may subject us to fines and penalties and may subject us to liability in connection with personal injury.

Certain laws and regulations govern the removal, encapsulation or disturbance of asbestos containing materials ("ACMs") when such materials are in poor condition or in the event of renovation or demolition of a building. These laws and the common law may impose liability for release of ACMs and may allow third parties to seek recovery from owners or operators of real properties for personal injury associated with exposure to ACMs. We are not aware that any ACMs were used in the construction of the communities we developed. ACMs were, however, used in the construction of a number of the communities that we have acquired. Although we implement an operations and maintenance program at each of the communities at which ACMs are detected, we may fail to adequately observe such program or a disturbance of ACMs may occur nevertheless, exposing us to liability. We are aware that some of our communities have lead paint and have implemented an operations and maintenance program at each of those communities.

Table of Contents

All of our stabilized operating communities, and all of the communities that we are currently developing, have been subjected to at least a Phase I or similar environmental assessment, which generally does not involve invasive techniques such as soil or groundwater sampling. These assessments, together with subsurface assessments conducted on some properties, have not revealed, and we are not otherwise aware of, any environmental conditions that we believe would have a material adverse effect on our business, assets, financial condition or results of operations. In connection with our ownership, operation and development of communities, we may undertake substantial remedial action in response to the presence of subsurface or other contaminants, including contaminants in soil, groundwater and soil vapor beneath or affecting our buildings. In some cases, an indemnity exists upon which we may be able to rely if environmental liability arises from the contamination or remediation costs exceed estimates. There can be no assurance, however, that all necessary remediation actions have been or will be undertaken at our properties or that we will be indemnified, in full or at all, in the event that environmental liability arises.

Mold growth may occur when excessive moisture accumulates in buildings or on building materials, particularly if the moisture problem remains undiscovered or is not addressed over a period of time. Certain molds may lead to adverse health effects, including allergic or other reactions. We cannot provide assurance that mold or excessive moisture will be detected and remediated in a timely manner. If a significant mold problem arises at one of our communities, we could be required to undertake a costly remediation program to contain or remove the mold from the affected community and could be exposed to other liabilities that may exceed any applicable insurance coverage.

Additionally, we have occasionally been involved in developing, managing, leasing and operating various properties for third parties. Consequently, we may be considered to have been an operator of such properties and, therefore, potentially liable for removal or remediation costs or other potential costs which relate to the release or presence of hazardous or toxic substances or petroleum products at such properties.

We cannot assure you that:

- the environmental assessments described above have identified all potential environmental liabilities;
- no prior owner created any material environmental condition not known to us or the consultants who prepared the assessments;
- no environmental liabilities have developed since the environmental assessments were prepared;
- the condition of land or operations in the vicinity of our communities, such as the presence of underground storage tanks, will not affect the environmental condition of our communities;
- future uses or conditions, including, without limitation, changes in applicable environmental laws and regulations, will not result in the imposition of environmental liability; and
- no environmental liabilities will arise at communities that we have sold for which we may have liability.

**General Risk Factors**

***The ability of our stockholders to control our policies and effect a change of control of our company is limited by certain provisions of our charter and bylaws and by Maryland law.*** There are provisions in our charter and bylaws that may discourage a third party from making a proposal to acquire us. These provisions include the following:

Our charter authorizes our Board of Directors to issue up to 50,000,000 shares of preferred stock without stockholder approval and to establish the preferences and rights, including voting rights, of any series of preferred stock issued. This could allow the Board to issue one or more classes or series of preferred stock that could discourage or delay a tender offer or a change in control.

To maintain our qualification as a REIT for federal income tax purposes, not more than 50% in value of our outstanding stock may be owned, directly or indirectly, by or for five or fewer individuals at any time during the last half of any taxable year. To maintain this qualification, and/or to address other concerns about concentrations of ownership of our stock, our charter generally prohibits ownership (directly, indirectly by virtue of the attribution provisions of the Code, or beneficially as defined in Section 13 of the Exchange Act) by any single stockholder of more than 9.8% of the issued and outstanding shares of any class or series of our stock. In general, under our charter, pension plans and mutual funds may directly and beneficially own up to 15% of the outstanding shares of any class or series of stock. Under our charter, our Board of Directors may in its sole discretion waive or modify the ownership limit for one or more persons, but it is not required to do so even if such waiver would not affect our qualification as a REIT. These ownership limits may prevent or delay a change in control and, as a result, could adversely affect our stockholders' ability to realize a premium for their shares of common stock.

As a Maryland corporation, we are subject to the provisions of the Maryland General Corporation Law which restricts some business combinations and requires compliance with statutory procedures before some mergers and acquisitions may occur,

19

Table of Contents

which may delay or prevent offers to acquire us even if they are in our stockholders' best interests. In addition, other provisions of the Maryland General Corporation Law permit the Board of Directors to make elections and to take actions without stockholder approval (such as classifying our Board such that the entire Board is not up for re-election annually) that, if made or taken, could have the effect of discouraging or delaying a change in control.

***Litigation could adversely affect our business.*** We are and may in the future become involved in legal proceedings, claims, actions, inquiries and/or investigations in connection with our operations, which may result in defense costs, settlements, fines and/or judgments against us, some of which are not, or cannot be, covered by insurance, including risks related to the multifamily rental antitrust litigation discussed elsewhere in this Form 10-K. Legal proceedings and other claims, if decided adversely to or settled by us, and not covered by insurance, could result in liability material to our financial condition, results of operations or cash flows. Likewise, regardless of outcome, legal proceedings and other claims may result in substantial costs and expenses, affect the availability or cost of some of our insurance coverage and significantly divert the attention of our management. With respect to any legal proceeding or other claim, there can be no assurance that we will be able to prevail, or achieve a favorable settlement or outcome, or that our insurance and/or any contractual indemnities will be enough to cover all of our defense costs or any resulting liabilities.

***Changes in U.S. accounting standards may materially and adversely affect the reporting of our operations.*** We follow accounting principles generally accepted in the United States ("GAAP"). GAAP is established by the Financial Accounting Standards Board ("FASB"), an independent body whose standards are recognized by the SEC as authoritative for publicly held companies. The FASB and the SEC create and interpret accounting standards and may change the interpretation and application of these standards that govern the preparation of our financial statements. These changes could have a material impact on our reported consolidated results of operations and financial position.

***We rely on information technology in our operations, and any breach, interruption or security failure of that technology, or any non-compliance with applicable laws with respect to the use of that technology, could have a negative impact on our business, results of operations, financial condition and/or reputation.*** We rely on information technology, including the internet, to process, transmit and store electronic information, and to manage or support a variety of business processes, including financial transactions, personally identifiable information ("PII"), and tenant and lease data. Our business requires us and some of our vendors to use and store PII and other confidential and sensitive information of our residents and employees. Privacy and information security laws and regulations for PII continue to evolve and may be inconsistent from one jurisdiction to another. Compliance with all such laws and regulations may increase our operating costs and adversely impact our ability to market our properties and services.

Information security risks have generally increased in recent years due to the rise in new technologies, such as ransomware and generative artificial intelligence, and the increased sophistication and activities of perpetrators of cyber-attacks, including as a result of the intensification of state-sponsored cybersecurity attacks during periods of geopolitical conflict. Cyber-attacks can include third parties gaining access to data using stolen or inferred credentials, computer malware, viruses, spamming, phishing attacks, ransomware, and other deliberate attacks and attempts to gain unauthorized access to our or our vendors' data or information technology systems. Although our and our vendors' information technology systems are essential to the operation of our business and our ability to perform day-to-day operations, even the most well-protected information, networks, systems and facilities remain potentially vulnerable because the techniques used in such attempted security breaches evolve and generally are not recognized until launched against a target, and in some cases are designed not to be detected and, in fact, may not be detected. Accordingly, we may be unable to implement adequate security barriers or other preventative measures, and thus it is impossible for us to entirely mitigate this risk. These threats, in turn, may lead to increased costs to protect our information systems, detect and respond to threats, and recover from cyber incidents. Our insurance program may not be adequate to cover all losses relating to such events.

There can be no assurance that we will be able to prevent unauthorized access to PII or to our network or business systems in general. Any failure in or breach of our operational or information security systems, or those of our vendors, as a result of cyber-attacks or other security incidents, could materially adversely impact our operations and financial position, including disruption of our operations caused by an inability to access network systems, disclosure or misuse of confidential or proprietary information (including PII of our residents and/or associates), damage to our reputation, and/or potentially significant legal and/or financial liabilities and penalties.

Various laws and regulations and interpretations thereof, as well as agreements with payment processors, require, or may require, us to comply with rules related to our business and our websites used by residents and prospective residents, including requirements related to accessibility of our websites to persons with disabilities and our handling and use of data, including personal data, that we collect. We could face liabilities for failure to comply with these requirements. Privacy laws and

regulations, such as the California Consumer Privacy Act as amended by the California Privacy Rights Act and the Texas Data Privacy and Security Act, related regulations and other U.S. state privacy laws, are evolving and may be subject to differing interpretations. We could incur costs to comply with stricter and more complex data privacy, data collection and information security laws and standards.

***Any material weaknesses identified in our internal control over financial reporting could have an impact on our Company.*** Section 404 of the Sarbanes-Oxley Act of 2002 requires us to evaluate and report on our internal control over financial reporting. One or more material weaknesses in our internal control over financial reporting could result in misstatements of our results of operations and related restatements, a decline in the price/value of our securities, or otherwise materially adversely affect our business, reputation, results of operations, financial condition or liquidity.

***Our success depends on key personnel whose continued service is not guaranteed.*** Our success depends in part on our ability to attract and retain the services of executive officers and other personnel. There is substantial competition for qualified personnel in the real estate industry, and the loss of our key personnel could adversely affect us.

## ITEM 1B.    UNRESOLVED STAFF COMMENTS

None.

## ITEM 1C.    CYBERSECURITY

Risk Management and Strategy

We have implemented and maintain a risk management framework designed to identify, assess, and mitigate risks from cybersecurity threats. We assess our cybersecurity program ("CSP"), as part of our enterprise risk management program, against the National Institute of Standards and Technology's Cybersecurity Framework ("NIST CSF") and also use as a model the Center for Internet Security ("CIS") control framework's Implementation Group 2 ("IG2"). We perform annual assessments against NIST CSF benchmarks and focus on continuous improvement over those criteria. We use a list of factors based on business risk tolerance and external compliance requirements to determine if a business asset, data, system, process, or service provider should be included within the scope of the CSP. Prior to contracting with an outside vendor that hosts our data, such as Company information, or PII of our associates or residents, or that integrates with our systems, our policy is to conduct a cybersecurity risk assessment, which includes, as appropriate, a due diligence questionnaire completed by the vendor, a System and Organization Controls 1 ("SOC1") report from major vendors and a review of the vendor's scope of access to our IT systems and data.

We utilize third-party service providers to enhance our CSP, including engaging them annually to assess our CSP against the NIST CSF. We use one or more third-party managed security solution providers, who provide us with threat intelligence information and managed threat detection and response capabilities. We have also engaged a third party to assist with associate cybersecurity training. Additionally, we have engaged outside breach response legal counsel to assist the Company with cybersecurity counseling and incident response.

Although we have not experienced any material cybersecurity incidents, a future incident could materially affect us. We rely on information technology to process, transmit and store electronic information, and to manage or support a variety of business processes, including financial transactions, PII, and resident and lease data. Our business requires us and some of our vendors to use and store PII and other confidential and sensitive information of our residents and associates. Any failure in or breach of our operational or information security systems or those of our vendors as a result of cyber-attacks or other security incidents could materially adversely impact our operations and financial position, including disruption of our operations caused by an inability to access network systems, disclosure or misuse of confidential or proprietary information (including PII of our residents and/or associates), damage to our reputation, and/or potentially significant legal and/or financial liabilities and penalties.

You should carefully review Part I, Item 1A. "Risk Factors" of this Form 10-K for a discussion of the risks to the Company related to cybersecurity.

Governance

Our cybersecurity team is led by our Senior Director of Cybersecurity, who has over 15 years of experience with IT and cybersecurity. The cybersecurity team reports to our Senior Vice President-Information Technology. The Senior Director of Cybersecurity and the Senior Vice President-Information Technology are part of, and work with, a management Cybersecurity Steering Committee ("CSC"), which meets regularly. The CSC works to ensure strategic alignment of the CSP with our

business objectives and priorities. The CSC is chaired by the Senior Director of Cybersecurity and is composed of our Chief Financial Officer, Chief Operating Officer, General Counsel and senior members of our finance, legal, IT, risk management and internal audit teams. The Company has designated an incident response team and defined criteria to guide responses to cybersecurity incidents.

The Audit Committee of our Board of Directors provides Board-level oversight of risks from cybersecurity threats. In addition to providing periodic reports, at least annually the Senior Director of Cybersecurity and the Senior Vice President-Information Technology meet with the Audit Committee regarding cybersecurity risks and assessments and related Company policies and initiatives. The Audit Committee and management have adopted a policy that categorizes cybersecurity incidents and sets out incident escalation procedures to the full Board of Directors.

22

**ITEM 2.   PROPERTIES**

Our real estate investments consist primarily of current operating apartment communities ("Current Communities"), consolidated and unconsolidated communities in various stages of development ("Development" communities and "Unconsolidated Development" communities) and Development Rights (as defined below). Our Current Communities are further classified as Same Store communities, Other Stabilized communities, Redevelopment communities and Unconsolidated communities. While we generally establish the classification of communities on an annual basis, we update the classification of communities during the calendar year to the extent that our plans with regard to the disposition or redevelopment of a community change, or if something occurs that materially impacts the operations of a community such as a casualty loss. The following is a description of each category:

Current Communities are categorized as Same Store, Other Stabilized, Redevelopment or Unconsolidated according to the following attributes:

• *Same Store* is composed of consolidated communities where a comparison of operating results from the prior year to the current year is meaningful as these communities were owned and had stabilized occupancy as of the beginning of the prior year. For the year ended December 31, 2024, Same Store communities are consolidated for financial reporting purposes, had stabilized occupancy as of January 1, 2023, did not conduct substantial redevelopment activities and are not held for sale as of December 31, 2024. A community is considered to have stabilized occupancy at the earlier of (i) attainment of 90% physical occupancy or (ii) the one-year anniversary of completion of development or redevelopment.

• *Other Stabilized* is composed of completed consolidated communities that we own and that are not Same Store but which have stabilized occupancy, as defined above, as of January 1, 2024, or which were acquired subsequent to January 1, 2023. Other Stabilized excludes communities that are conducting or conducted substantial redevelopment activities within the current year, as defined below.

• *Redevelopment* is composed of consolidated communities where substantial redevelopment occurred or is in progress. Redevelopment is considered substantial when (i) capital invested is expected to exceed the lesser of $5,000,000 or 10% of the community's pre-redevelopment basis and (ii) physical occupancy is below or is expected to be below 90% during, or as a result of, the redevelopment activity.

• *Unconsolidated* is composed of communities that we have an indirect ownership interest in through our investment interest in an unconsolidated joint venture.

Development is composed of consolidated communities that are either currently under construction, were under construction and were completed during the current year or where construction has been complete for less than one year and that do not have stabilized occupancy. These communities may be partially or fully complete and operating.

Development Rights are development opportunities in the early phase of the development process where we either have an option to acquire land or enter into a leasehold interest, where we are the buyer under a long-term conditional contract to purchase land, where we control the land through a ground lease or own land to develop a new community, or where we are the designated developer in a public-private partnership. We capitalize related pre-development costs incurred in pursuit of new developments for which we currently believe future development is probable.

We currently lease our corporate headquarters located in Arlington, Virginia, as well as our other regional and administrative offices, under operating leases.

As of December 31, 2024, communities that we owned or held a direct or indirect interest in were classified as follows:

| | Number of communities | Number of apartment homes |
|---|---|---|
| **Current Communities** | | |
| Same Store: | | |
| New England | 36 | 9,134 |
| Metro NY/NJ | 40 | 12,540 |
| Mid-Atlantic | 42 | 14,482 |
| Southeast Florida | 8 | 2,837 |
| Denver, CO | 6 | 1,539 |
| Pacific Northwest | 18 | 5,109 |
| Northern California | 39 | 12,045 |
| Southern California | 58 | 17,791 |
| Other Expansion Regions | 6 | 1,381 |
| Total Same Store | 253 | 76,858 |
| | | |
| Other Stabilized: | | |
| New England | 3 | 503 |
| Metro NY/NJ | 3 | 689 |
| Mid-Atlantic | 1 | 714 |
| Southeast Florida | — | — |
| Denver, CO | 2 | 653 |
| Pacific Northwest | — | — |
| Northern California | — | — |
| Southern California | 1 | 100 |
| Other Expansion Regions | 6 | 1,819 |
| Total Other Stabilized | 16 | 4,478 |
| | | |
| Redevelopment | — | — |
| | | |
| Unconsolidated | 9 | 2,722 |
| | | |
| Total Current | 278 | 84,058 |
| | | |
| Development | 28 | 9,460 |
| | | |
| Unconsolidated Development | — | — |
| | | |
| Total Communities | 306 | 93,518 |
| | | |
| Development Rights | 28 | 8,801 |

Our holdings under each of the above categories are discussed on the following pages.

24

Table of Contents

We generally establish the composition of our Same Store communities portfolio annually. Changes in the Same Store communities portfolios for the years ended December 31, 2024, 2023 and 2022 were as follows:

|  | Number of communities |
|---|---|
| Same Store communities as of December 31, 2021 | 237 |
| Communities added | 8 |
| Communities removed (1) | |
| Redevelopment communities | (1) |
| Disposed communities | (9) |
| Same Store communities as of December 31, 2022 | 235 |
| Communities added | 21 |
| Communities removed (1) | |
| Redevelopment communities | — |
| Disposed communities | (4) |
| Same Store communities as of December 31, 2023 | 252 |
| Communities added | 10 |
| Communities removed (1) | |
| Redevelopment communities | — |
| Disposed communities | (9) |
| Same Store communities as of December 31, 2024 | 253 |

_____

(1)    Communities were removed from our Same Store portfolio if we believed that planned activity for the upcoming year would result in that community's expected operations not being comparable to the prior year, including (i) when we intended to undertake a significant capital renovation, such that the community was classified as a Redevelopment community; (ii) when we intended to dispose of a community; or (iii) when a significant casualty loss occurred.

*Current Communities*

Our Current Communities include garden-style apartment communities consisting of multi-story buildings of stacked flats and/or townhome apartments in landscaped settings, as well as mid and high rise apartment communities consisting of larger elevator-served buildings of four or more stories, frequently with structured parking. As of January 31, 2025, our Current Communities consisted of the following:

|  | Number of communities | Number of apartment homes |
|---|---|---|
| Garden-style | 134 | 42,206 |
| Mid-rise | 122 | 35,607 |
| High-rise | 28 | 8,298 |
| Total Current Communities | 284 | 86,111 |

As discussed in Item 1. "Business," we operate under four core brands: *Avalon, AVA,* e*aves by Avalon* and *Kanso*. We believe that this branding differentiation allows us to target our product offerings to multiple customer groups and submarkets within our existing geographic footprint.

We also have an extensive and ongoing maintenance program to continually maintain and enhance our communities and apartment homes. The aesthetic appeal of our communities, and a service-oriented property management team that is focused on the specific needs of residents, enhances market appeal. We believe our mission of "Creating a Better Way to Live" helps us achieve higher rental rates and occupancy levels while minimizing resident turnover and operating expenses.

Table of Contents

Our Current Communities are located in the following geographic markets:

| | Number of communities at | | Number of apartment homes at | | Percentage of total apartment homes at | |
|---|---|---|---|---|---|---|
| | 1/31/2024 | 1/31/2025 | 1/31/2024 | 1/31/2025 | 1/31/2024 | 1/31/2025 |
| **New England** | **42** | **39** | **10,328** | **9,697** | **12.4 %** | **11.3 %** |
| **Metro NY/NJ** | **49** | **50** | **14,756** | **15,089** | **17.6 %** | **17.5 %** |
| New York City, NY | 14 | 14 | 5,089 | 5,089 | 6.1 % | 5.9 % |
| New York Suburban | 13 | 14 | 3,878 | 4,216 | 4.6 % | 4.9 % |
| New Jersey | 22 | 22 | 5,789 | 5,784 | 6.9 % | 6.7 % |
| **Mid-Atlantic** | **44** | **44** | **15,501** | **15,501** | **18.5 %** | **18.0 %** |
| Washington Metro | 36 | 35 | 12,784 | 12,347 | 15.3 % | 14.3 % |
| Baltimore, MD | 8 | 9 | 2,717 | 3,154 | 3.2 % | 3.7 % |
| **Southeast Florida** | **8** | **9** | **2,837** | **3,091** | **3.4 %** | **3.6 %** |
| **Denver, Colorado** | **6** | **8** | **1,539** | **2,192** | **1.8 %** | **2.5 %** |
| **Pacific Northwest** | **21** | **21** | **5,802** | **6,118** | **6.9 %** | **7.1 %** |
| **Northern California** | **41** | **41** | **12,446** | **12,857** | **14.9 %** | **14.9 %** |
| San Jose, CA | 12 | 12 | 4,723 | 4,727 | 5.7 % | 5.5 % |
| Oakland-East Bay, CA | 15 | 15 | 4,338 | 4,743 | 5.2 % | 5.5 % |
| San Francisco, CA | 14 | 14 | 3,385 | 3,387 | 4.0 % | 3.9 % |
| **Southern California** | **59** | **60** | **17,934** | **18,366** | **21.4 %** | **21.4 %** |
| Los Angeles, CA | 39 | 39 | 12,143 | 12,475 | 14.5 % | 14.5 % |
| Orange County, CA | 13 | 13 | 4,024 | 4,024 | 4.8 % | 4.7 % |
| San Diego, CA | 7 | 8 | 1,767 | 1,867 | 2.1 % | 2.2 % |
| **Other Expansion Regions** | **9** | **12** | **2,512** | **3,200** | **3.1 %** | **3.7 %** |
| North Carolina | 5 | 6 | 963 | 1,225 | 1.2 % | 1.4 % |
| Texas | 4 | 6 | 1,549 | 1,975 | 1.9 % | 2.3 % |
| | 279 | 284 | 83,655 | 86,111 | 100.0 % | 100.0 % |

We manage and operate substantially all of our Current Communities. During the year ended December 31, 2024, we completed construction of nine communities containing 2,981 apartment homes, acquired six communities containing 1,441 apartment homes and sold eight operating communities containing 1,532 apartment homes.

Of the Current Communities, as of January 31, 2025, we owned (directly or through wholly-owned subsidiaries):

- 275 operating communities, including 268 with a full fee simple or absolute ownership interest, and seven that are on land subject to a land lease. The land leases have various expiration dates from July 2046 to May 2123, and three of the land leases are used to support tax advantaged structures that ultimately allow us to purchase the land upon lease expiration. The Company has purchase options for all land leases expiring prior to 2062.

- A membership interest in five limited liability companies. One of the ventures, the NYTA MF Investors LLC, through subsidiaries owns a fee simple interest in three operating communities and a leasehold interest in two additional operating communities. The other four ventures each hold a fee simple interest in an operating community.

In addition to our Current Communities, we also hold, directly or through wholly-owned subsidiaries, a full fee simple ownership interest in our wholly-owned Development Communities.

26

As part of the Archstone Acquisition in 2013 (as defined in Item 1. "Business" in the Company's Form 10-K filed with the SEC on February 22, 2019), we acquired, and still own, 14 assets that had previously been contributed by third parties on a tax-deferred basis to an Archstone partnership in which the third parties received ownership interests. To protect the tax-deferred nature of the contribution, the third parties are entitled to cash payments if we trigger tax obligations to the third parties by selling, or failing to maintain sufficient levels of secured financing on, the contributed assets. Our tax protection payment obligations with respect to these assets don't expire until the death of a third party who contributed ownership interests to the Archstone partnership. After review and investigation of Archstone's tax and accounting records, we estimate that, had we sold or taken other triggering actions in 2024 with respect to all 14 assets, the aggregate amount of the tax protection payments that would have been triggered would have been approximately $43,815,000. At the present time, we do not intend to take actions that would cause us to be required to make tax protection payments with respect to any of these assets.

<u>Development Communities</u>

As of December 31, 2024, we owned or held a direct interest in 17 Development Communities under construction. We expect these Development Communities, when completed, to add a total of 6,004 apartment homes and 59,000 square feet of commercial space to our portfolio for a total capitalized cost, including land acquisition costs, of approximately $2,253,000,000. We cannot assure you that we will meet our schedule for construction completion or that we will meet our budgeted costs, either individually, or in the aggregate. You should carefully review Item 1A. "Risk Factors" for a discussion of the risks associated with development activity and our discussion under Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" (including the factors identified under "Forward-Looking Statements") for further discussion of development activity.

The following table presents a summary of the Development Communities.

27

Table of Contents

| | | Number of apartment homes | Projected total capitalized cost (1) ($ millions) | Construction start | Initial projected or actual occupancy | Estimated completion | Estimated stabilized operations (2) |
|---|---|---|---|---|---|---|---|
| 1. | Avalon West Windsor (3) West Windsor, NJ | 535 | $ 210 | Q2 2022 | Q2 2025 | Q2 2026 | Q4 2026 |
| 2. | Avalon Annapolis Annapolis, MD | 508 | 199 | Q3 2022 | Q3 2024 | Q3 2025 | Q2 2026 |
| 3. | Avalon Lake Norman (4) Mooresville, NC | 345 | 101 | Q1 2023 | Q2 2025 | Q1 2026 | Q3 2026 |
| 4. | Avalon Hunt Valley West Hunt Valley, MD | 322 | 107 | Q2 2023 | Q1 2025 | Q2 2026 | Q3 2026 |
| 5. | Avalon South Miami (3) South Miami, FL | 290 | 186 | Q3 2023 | Q3 2025 | Q1 2026 | Q3 2026 |
| 6. | Avalon Princeton on Harrison Princeton, NJ | 200 | 82 | Q3 2023 | Q1 2025 | Q2 2025 | Q1 2026 |
| 7. | Avalon Wayne Wayne, NJ | 473 | 171 | Q4 2023 | Q2 2025 | Q3 2026 | Q1 2027 |
| 8. | Avalon Parsippany Parsippany, NJ | 410 | 147 | Q4 2023 | Q3 2025 | Q2 2026 | Q4 2026 |
| 9. | Avalon Pleasanton I Pleasanton, CA | 82 | 58 | Q2 2024 | Q3 2025 | Q4 2025 | Q1 2026 |
| 10. | Avalon Roseland II Roseland, NJ | 533 | 199 | Q2 2024 | Q4 2025 | Q4 2026 | Q2 2027 |
| 11. | Avalon Quincy Adams Quincy, MA | 288 | 124 | Q2 2024 | Q1 2026 | Q3 2026 | Q2 2027 |
| 12. | Avalon Tech Ridge I Austin, TX | 444 | 120 | Q3 2024 | Q1 2026 | Q1 2027 | Q3 2027 |
| 13. | Avalon Carmel (4) Charlotte, NC | 360 | 123 | Q3 2024 | Q2 2026 | Q3 2026 | Q3 2027 |
| 14. | Avalon Plano (4) Plano, TX | 155 | 58 | Q3 2024 | Q2 2026 | Q2 2027 | Q4 2027 |
| 15. | Avalon Oakridge I Durham, NC | 459 | 149 | Q3 2024 | Q4 2026 | Q4 2027 | Q2 2028 |
| 16. | AVA Brewer's Hill Baltimore, MD | 418 | 134 | Q4 2024 | Q4 2026 | Q3 2027 | Q1 2028 |
| 17. | Kanso Hillcrest San Diego, CA | 182 | 85 | Q4 2024 | Q1 2027 | Q2 2027 | Q4 2027 |
| | **Total** | 6,004 | $ 2,253 | | | | |

(1) Projected total capitalized cost includes all capitalized costs projected to be or actually incurred to develop the respective Development Community, determined in accordance with GAAP, including land acquisition costs, construction costs, real estate taxes, capitalized interest and loan fees, permits, professional fees, allocated development overhead and other regulatory fees, as well as costs incurred for first generation commercial tenants such as tenant improvements and leasing commissions.

(2) Stabilized operations is defined as the earlier of (i) attainment of 90% or greater physical occupancy or (ii) the one-year anniversary of completion of development.

(3) Development Communities containing at least 10,000 square feet of commercial space include Avalon West Windsor (19,000 square feet) and Avalon South Miami (32,000 square feet).

(4) Communities being developed through our Developer Funding Program ("DFP"). The DFP utilizes third-party multifamily developers to source and construct communities which we own and operate.

28

Table of Contents

During the year ended December 31, 2024, we completed the development of the following wholly-owned communities:

| | | Number of apartment homes | Total capitalized cost (1) ($ millions) | Approximate rentable area (sq. ft.) | Total capitalized cost per sq. ft. | Quarter of completion |
|---|---|---|---|---|---|---|
| 1. | Avalon Amityville Amityville, NY | 338 | $ 135 | 322,103 | $ 419 | Q2 2024 |
| 2. | Avalon Montville Montville, NJ | 349 | 127 | 365,281 | $ 348 | Q2 2024 |
| 3. | Avalon Redmond Campus Redmond, WA | 214 | 89 | 187,175 | $ 475 | Q2 2024 |
| 4. | Avalon Bothell Commons I Bothell, WA | 467 | 236 | 491,661 | $ 480 | Q3 2024 |
| 5. | Kanso Milford Milford, MA | 162 | 63 | 179,056 | $ 352 | Q3 2024 |
| 6. | Avalon Westminster Promenade Westminster, CO | 312 | 114 | 269,401 | $ 423 | Q4 2024 |
| 7. | Avalon West Dublin Dublin, CA | 499 | 263 | 461,361 | $ 570 | Q4 2024 |
| 8. | Avalon Governor's Park Denver, CO | 304 | 138 | 244,578 | $ 564 | Q4 2024 |
| 9. | Avalon Durham (2) Durham, NC | 336 | 121 | 300,566 | $ 403 | Q4 2024 |
| | **Total** | 2,981 | $ 1,286 | | | |

(1) Total capitalized cost is as of December 31, 2024. We generally anticipate incurring additional costs associated with these communities that are customary for new developments.

(2) Community was developed through our DFP.

Unconsolidated Operating Communities

As of December 31, 2024, we had investments in the following unconsolidated real estate entities accounted for under the equity method of accounting. See Note 5, "Investments," of the Consolidated Financial Statements included elsewhere in this report. For joint ventures holding operating apartment communities as of December 31, 2024, detail of the real estate and associated indebtedness underlying our unconsolidated investments is presented in the following table (dollars in thousands).

| Unconsolidated Real Estate Investments | Company Ownership Percentage | # of Apartment Homes | Total Capitalized Cost | Debt (1) Principal Amount | Type | Interest Rate | Maturity Date |
|---|---|---|---|---|---|---|---|
| **NYTA MF Investors LLC** | | | | | | | |
| 1. Avalon Bowery Place I—New York, NY | | 206 | $ 217,504 | $ 93,800 | Fixed | 4.01 % | Jan 2029 |
| 2. Avalon Bowery Place II—New York, NY | | 90 | 91,691 | 39,639 | Fixed | 4.01 % | Jan 2029 |
| 3. Avalon Morningside—New York, NY (2) | | 295 | 216,153 | 111,295 | Fixed | 3.55 % | Jan 2029/May 2046 |
| 4. Avalon West Chelsea—New York, NY (3) | | 305 | 130,143 | 66,000 | Fixed | 4.01 % | Jan 2029 |
| 5. AVA High Line—New York, NY | | 405 | 122,839 | 84,000 | Fixed | 4.01 % | Jan 2029 |
| **Total NYTA MF Investors LLC** | 20.0 % | 1,301 | 778,330 | 394,734 | | 3.88 % | |
| | | | | | | | |
| **Other Operating Joint Ventures** | | | | | | | |
| 1. MVP I, LLC - Avalon at Mission Bay II - San Francisco, CA | 25.0 % | 313 | 130,073 | 103,000 | Fixed | 3.24 % | Jul 2025 |
| 2. Brandywine Apartments of Maryland, LLC - Brandywine - Washington, D.C. | 28.7 % | 305 | 20,093 | 18,368 | Fixed | 3.40 % | Jun 2028 |
| 3. Avalon Alderwood MF Member, LLC - Avalon Alderwood Place - Lynnwood, WA | 50.0 % | 328 | 111,223 | — | N/A | N/A | N/A |
| 4. Arts District Joint Venture - AVA Arts District - Los Angeles, CA (4) | 25.0 % | 475 | 287,953 | 155,968 | Variable | 6.91 % | Aug 2025 |
| **Total Other Joint Ventures** | | 1,421 | 549,342 | 277,336 | | 5.31 % | |
| | | | | | | | |
| **Total Unconsolidated Real Estate Investments (5)** | | 2,722 | $ 1,327,672 | $ 672,070 | | 4.47 % | |

Table of Contents

---

(1)  We have not guaranteed the debt of these unconsolidated investees with the exception of the construction loan associated with the Arts District Joint Venture. We bear no responsibility for the repayment unless otherwise disclosed.

(2)  Borrowing on this community is comprised of two mortgage loans. The interest rate is the weighted average interest rate as of December 31, 2024.

(3)  Borrowing on this dual-branded community is comprised of a single mortgage loan. This dual-branded community is subject to a leasehold interest which is not included in the total capitalized cost.

(4)  AVA Arts District completed development during the year ended December 31, 2024 and achieved stabilized residential operations. It contains 57,000 square feet of commercial space. The venture had drawn $155,968 of the $167,147 maximum borrowing capacity of the construction loan as of December 31, 2024. While we guarantee 30% of the venture's construction loan, any amounts payable under the guarantee are obligations of the venture partners in proportion to their ownership interest.

(5)  In addition to leasehold assets, there were net other assets of $38,506 as of December 31, 2024 associated with our unconsolidated real estate investments which are primarily cash and cash equivalents.

We had an equity interest of 28.6% in the Archstone Multifamily Partners AC LP (the "U.S. Fund") and because we achieved a threshold return for the fund, during the year ended December 31, 2023, we recognized income of $1,519,000 for our promoted interest, which is included in income from unconsolidated investments on the accompanying Consolidated Statements of Comprehensive Income. The U.S. Fund sold its final three communities in 2022 and completed its dissolution in 2023.

<u>Development Rights</u>

At December 31, 2024, we had $151,922,000 in acquisition and related capitalized costs for direct interests in seven land parcels we own. In addition, we had $43,675,000 in capitalized costs (including legal fees, design fees and related overhead costs) related to (i) 17 Development Rights for which we control the land parcel, typically through a conditional agreement or option to purchase or lease the land, as well as (ii) costs incurred for four Development Rights that we expect to construct as additional phases of our existing stabilized operating communities on land we own. Collectively, the land held for development and associated costs for deferred development rights relate to 28 Development Rights for which we expect to develop new apartment communities in the future. The Development Rights range from those beginning design and architectural planning to those that have completed site plans and drawings and can begin construction almost immediately. We estimate that the successful completion of all of these communities would ultimately add approximately 8,801 apartment homes to our portfolio. Substantially all of these apartment homes will offer features like those offered by the communities we currently own.

The Development Rights are in different stages of the due diligence and regulatory approval process. The decisions as to which of the Development Rights to invest in, if any, or to continue to pursue once an investment in a Development Right is made, are business judgments that we make after we perform financial, demographic and other analyses. In the event that we do not proceed with a Development Right, we generally would not recover any of the capitalized costs incurred in the pursuit of those communities, unless we were to recover amounts in connection with the sale of land; however, we cannot guarantee a recovery. Pre-development costs incurred in the pursuit of Development Rights, for which future development is not yet considered probable, are expensed as incurred. In addition, if the status of a Development Right changes, making future development no longer probable, any unrecoverable capitalized pre-development costs are charged to expense. During 2024, we incurred a charge of $18,341,000 for expensed transaction, development and other pursuit costs, net of recoveries, which include development pursuits that were not yet probable of future development at the time incurred, or for pursuits that we determined were no longer probable of being developed. The amount for 2024 includes a write-off of $8,947,000 related to one Development Right in Northern California that we determined was no longer probable.

You should carefully review Item 1A. "Risk Factors," for a discussion of the risks associated with Development Rights.

Land Acquisitions

We select land for development and follow established procedures that we believe minimize both the cost and the risks of development. During 2024, we acquired the following land parcels for an aggregate investment of $111,812,000.

| | | Estimated number of apartment homes | | Projected total capitalized cost (1) ($ millions) | | Date acquired |
|---|---|---|---|---|---|---|
| 1. | Avalon Parsippany (2) Parsippany, NJ | 410 | $ | 148 | | January 2024 |
| 2. | AVA Brewer's Hill (2) Baltimore, MD | 418 | | 134 | | March 2024 |
| 3. | Avalon Brier Creek Raleigh, NC | 400 | | 130 | | April 2024 |
| 4. | Avalon Roseland II (2) Roseland, NJ | 533 | | 199 | | April 2024 |
| 5. | Avalon Parker Parker, CO | 312 | | 122 | | May 2024 |
| 6. | Avalon Plano (2) (3) Plano, TX | 155 | | 58 | | July 2024 |
| 7. | Avalon Oakridge II Durham, NC | 373 | | 114 | | September 2024 |
| 8. | Kanso Hillcrest (2) San Diego, CA | 182 | | 85 | | November 2024 |
| | Total | 2,783 | $ | 990 | | |

(1) Projected total capitalized cost includes all capitalized costs incurred to date (if any) and projected to be incurred to develop the respective community, determined in accordance with GAAP, including land and related acquisition costs, construction costs, real estate taxes, capitalized interest and loan fees, permits, professional fees, allocated development overhead and other regulatory fees, as well as costs incurred for first generation commercial tenants such as tenant improvements and leasing commissions, net of projected proceeds for any planned sales of associated outparcels and other real estate.

(2) Communities are currently under construction.

(3) Community is being developed through our DFP.

Acquisition & Disposition Activity

We buy and sell assets based on our long-term investment criteria and target portfolio allocation. We also dispose of assets when capital and real estate markets allow us to realize a portion of the value created over our ownership periods, and we generally redeploy the proceeds from those sales to develop, redevelop and acquire communities. Pending such redeployment, we will generally use the proceeds from the sale of these communities to reduce amounts outstanding under our Credit Facility or Commercial Paper Program or retain the cash proceeds on our balance sheet until it is redeployed into acquisition, development or redevelopment activity. At times, we will set aside the proceeds from the sale of communities into a cash escrow account to facilitate a tax-deferred, like-kind exchange transaction. From January 1, 2024 to January 31, 2025, (i) we acquired six wholly-owned communities containing 1,441 apartment homes for an aggregate purchase price of $460,100,000 and (ii) we sold our interest in nine wholly-owned communities, containing 1,634 apartment homes, with an aggregate gross sales price of $791,300,000.

Insurance and Risk of Uninsured Losses

We maintain commercial general liability insurance and property insurance with respect to all of our communities, with insurance policies issued by a combination of third party insurers as well as a wholly-owned captive insurance company. These policies, along with other insurance policies we maintain, have policy specifications, insured and self-insured limits, exclusions and deductibles that we consider commercially reasonable. We utilize a wholly-owned captive insurance company to insure certain types and amounts of risks, which include property damage and resulting business interruption losses, general liability insurance and other construction related liability risks. The captive is utilized to insure other limited levels of risk, which may be in part reinsured by third party insurance. There are, however, certain types of losses (including, but not limited to, losses arising from nuclear liability, pandemic or acts of war) that are not insured, in full or in part, because they are either uninsurable or the cost of insurance makes it, in management's view, economically impractical. You should carefully review the discussion under Part I, Item 1A. "Risk Factors" of this Form 10-K for a discussion of risks associated with an uninsured property or casualty loss.

Our communities are insured for certain property damage and business interruption losses through a combination of community specific insurance policies and/or a master property insurance program which covers the majority of our communities. This master property program provides a $400,000,000 limit for any single occurrence and annually in the aggregate, subject to certain sub-limits and exclusions. Under the master property program, we are subject to various deductibles per occurrence, as well as additional self-insured retentions. In addition to our potential liability for the various policy self-insured retentions and deductibles, our captive insurance company is directly responsible for 100% of the first $25,000,000 of losses (per occurrence) and an additional $5,000,000 of losses (per occurrence) incurred by the master property insurance policy. Our master property insurance program includes coverage for losses resulting from customary perils, including but not limited to wildfires and windstorms. Limits, deductibles, self-insured retentions and coverages may increase or decrease annually during the insurance renewal process, which occurs on different dates throughout the calendar year.

Many of our West Coast communities are located within the general vicinity of active earthquake faults. Many of our communities are near, and thus susceptible to, the major fault lines in California, including the San Andreas Fault, the Hayward Fault or other geological faults that are known or unknown. We cannot assure you that an earthquake would not cause damage or losses greater than our current insured levels. We procure property damage and resulting business interruption insurance coverage with a loss limit of $175,000,000 for any single occurrence and in the annual aggregate for losses resulting from earthquakes, subject to deductibles and self-insured retentions. However, for any losses resulting from earthquakes at communities located in California or Washington, the loss limit is $200,000,000 for any single occurrence and in the annual aggregate, subject to deductibles and self-insured retentions. A portion of coverage is included in the aforementioned self-insurance limits underwritten through the captive.

Our Southeast Florida communities could be impacted by significant storm events like hurricanes. We include coverage for losses arising from these types of weather events within our master property insurance program. We cannot assure you that a significant storm event would not cause damage or losses greater than our current insured levels.

Our communities and construction sites are insured for third-party liability losses through a combination of community specific insurance policies and/or coverage provided under a master commercial general liability and umbrella/excess insurance program. The master commercial general liability and umbrella/excess insurance policies cover the majority of our communities and construction sites and are subject to certain coverage limitations and exclusions, which we believe are commercially reasonable. After applicable self-insured retentions borne by us, our captive insurance company is directly responsible for the first $2,000,000 of losses (per occurrence) covered by the master general liability insurance policy.

Just as with office buildings, transportation systems and government buildings, apartment communities could become targets of terrorism. Our communities are insured for terrorism related losses through the Terrorism Risk Insurance Program Reauthorization Act ("TRIPRA") program. This coverage extends to most of our casualty exposures (subject to deductibles and insured limits) and certain property insurance policies. We have also purchased private-market insurance for property damage due to terrorism with limits of $600,000,000 per occurrence and in the annual aggregate that includes certain coverages (not covered under TRIPRA) such as domestic-based terrorism. This insurance, often referred to as "non-certified" terrorism insurance, is subject to deductibles, limits and exclusions.

An additional consideration for insurance coverage and potential uninsured losses is mold growth or other environmental contamination. Mold growth may occur when excessive moisture accumulates in buildings or on building materials, particularly if the moisture problem remains undiscovered or is not addressed over a period of time. If a significant mold problem arises at one of our communities, we could be required to undertake a costly remediation program to contain or remove the mold from the affected community and could be exposed to other liabilities. For further discussion of the risks and our related prevention and remediation activities, please refer to the discussion under Part I, Item 1A. "Risk Factors - We may incur costs due to

environmental contamination or non-compliance" elsewhere in this report. We cannot provide assurance that we will have coverage under our existing policies for property damage or liability to third parties arising as a result of exposure to mold or a claim of exposure to mold at one of our communities.

We also maintain other insurance programs that provide coverage for events including but not limited to employee dishonesty, loss of data, and liability associated with management of certain employee benefit plans. These policies are subject to maximum loss limits and include coverage limitations or exclusions that may preclude us from fully recovering.

The amount or types of insurance we maintain may not be sufficient to cover all losses and we may change our policy limits, coverages, and self-insured retentions or deductibles at any time.

33

**ITEM 3.   LEGAL PROCEEDINGS**

As disclosed in Note 7, "Commitments and Contingencies" and Note 12, "Subsequent Events" of the Consolidated Financial Statements in Item 8 of this report, we are engaged in certain legal proceedings, and the disclosure set forth in Note 7, "Commitments and Contingencies" and Note 12, "Subsequent Events" relating to legal and other contingencies is incorporated herein by reference.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not Applicable.

34

Table of Contents

**PART II**

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock is traded on the NYSE under the ticker symbol AVB. On January 31, 2025, there were 663 holders of record of an aggregate of 142,254,778 shares of our outstanding common stock. The number of holders does not include individuals or entities who beneficially own shares but whose shares are held of record by a broker or clearing agency, but does include each such broker or clearing agency as one record holder.

At present, we expect to continue our policy of paying regular quarterly cash dividends. However, the form, timing and/or amount of dividend distributions will be declared at the discretion of the Board of Directors and will depend on actual cash from operations, our financial condition, capital requirements, the annual distribution requirements under the REIT provisions of the Code and other factors as the Board of Directors may consider relevant. The Board of Directors may modify our dividend policy from time to time.

In February 2025, we announced that our Board of Directors declared a dividend on our common stock for the first quarter of 2025 of $1.75 per share, a 2.9% increase over the Company's prior quarterly dividend of $1.70 per share. The dividend will be payable on April 15, 2025 to all common stockholders of record as of March 31, 2025.

*Issuer Purchases of Equity Securities*

| Period | Total Number of Shares Purchased (1) | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares that May Yet be Purchased Under the Plans or Programs (in thousands) (2) |
|---|---|---|---|---|
| October 1 - October 31, 2024 | 130 | $ 222.06 | — | $ 314,237 |
| November 1 - November 30, 2024 | 550 | $ 218.15 | — | $ 314,237 |
| December 1 - December 31, 2024 | 427 | $ 235.35 | — | $ 314,237 |
| Total | 1,107 | $ 225.24 | — | |

(1)   Consists of (i) shares surrendered to the Company in connection with exercise of stock options as payment of exercise price, as well as for taxes associated with the vesting of restricted share grants and the conversion of performance awards to shares of common stock and (ii) activity under the Stock Repurchase Program, if any, as indicated under Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs.

(2)   The Board of Directors approved the Stock Repurchase Program in July 2020, under which the Company may acquire shares of its common stock in open market or negotiated transactions up to an aggregate purchase price of $500,000,000. Purchases of common stock under the Stock Repurchase Program may be exercised from time to time in the Company's discretion and in such amounts as market conditions warrant. The timing and actual number of shares repurchased will depend on a variety of factors including price, corporate and regulatory requirements, market conditions and other corporate liquidity requirements and priorities. The Stock Repurchase Program does not have an expiration date and may be suspended or terminated at any time without prior notice.

Information regarding securities authorized for issuance under equity compensation plans is included in the section entitled Item 12. "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" in this Form 10-K.

**ITEM 6.   [RESERVED]**

**ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to help provide an understanding of our business, financial condition and results of operations. This MD&A should be read in conjunction with our Consolidated Financial Statements and the accompanying Notes to Consolidated Financial Statements included elsewhere in this report. This report, including the following MD&A, contains forward-looking statements regarding future events or trends that should be read in conjunction with the factors described under "Forward-Looking Statements" included in this report. Actual results or developments could differ materially from those projected in such statements as a result of the factors described under "Forward-Looking Statements" as well as the risk factors described in Part I, Item 1A. "Risk Factors" of this report.

Capitalized terms used without definition have the meanings provided elsewhere in this Form 10-K.

Executive Overview

*2024 Financial Highlights*

Net income attributable to common stockholders for the year ended December 31, 2024 was $1,081,994,000, an increase of $153,169,000, or 16.5%, from the prior year. The increase was primarily attributable to increases in NOI from communities over the prior year, increases in real estate sales and related gains, and increases in income from unconsolidated investments.

Same Store NOI attributable to our apartment rental operations, including parking and other ancillary residential revenue ("Residential"), for the year ended December 31, 2024 was $1,828,266,000, an increase of $48,643,000, or 2.7%, over the prior year. The increase was due to an increase in Same Store Residential revenue of $87,854,000, or 3.4%, partially offset by an increase in Same Store Residential property operating expenses of $39,211,000, or 5.0%, over 2023.

During 2024, excluding the equity capital raised through forward sales of our common shares not yet settled, we raised approximately $1,130,366,000 of gross capital through the sale of wholly-owned real estate and the issuance of unsecured notes. We believe that our current capital structure will continue to provide financial flexibility to access capital on attractive terms.

We believe our portfolio management activity through dispositions, development and acquisitions will continue to create long-term value. During 2024, we:

- sold eight wholly-owned communities containing an aggregate of 1,532 apartment homes and 24,000 square feet of commercial space for $726,200,000;

- completed the construction of nine wholly-owned communities containing an aggregate of 2,981 apartment homes for an aggregate total capitalized cost of $1,286,000,000;

- started the construction of nine wholly-owned communities which in the aggregate are expected to contain 2,921 apartment homes when completed, which are expected to be completed for an estimated total capitalized cost of $1,053,000,000; and

- acquired six wholly-owned communities containing an aggregate of 1,441 apartment homes for an aggregate purchase price of $460,100,000.

During 2024, we issued $400,000,000 principal amount of fixed rate unsecured notes and repaid $300,000,000 principal amount of our fixed rate unsecured notes.

We believe that our balance sheet strength, as measured by our current level of indebtedness, our current ability to service interest and other fixed charges, and our current moderate use of financial encumbrances (such as secured financing), provide us with adequate access to liquidity from the capital markets. We expect to be able to meet our reasonably foreseeable liquidity needs, as they arise, through a combination of one or more of the following sources: existing cash on hand; operating cash flows; the settlement of the outstanding equity forwards; borrowings under our Credit Facility and Commercial Paper Program; the issuance of corporate securities (which could include unsecured debt, preferred equity and/or additional common equity after considering the outstanding equity forwards); the sale of apartment communities; secured debt; or through the formation of joint ventures. See the discussion under "Liquidity and Capital Resources."

Table of Contents

Communities Overview

As of December 31, 2024, we owned or held a direct or indirect ownership interest in 306 communities containing 93,518 homes in 12 states and the District of Columbia, of which 17 communities were under development. We have an indirect interest in nine of the 306 communities which were owned by entities that were not consolidated for financial reporting purposes. In addition, we held a direct or indirect ownership interest in Development Rights to develop an additional 28 communities that, if developed as expected, will contain an estimated 8,801 apartment homes.

Our real estate investments consist primarily of Current Communities, Development communities, Unconsolidated Development communities and Development Rights. Our Current Communities are further classified as Same Store communities, Other Stabilized communities, Redevelopment communities and Unconsolidated communities.

Same Store communities are consolidated communities that were owned and had stabilized occupancy as of the beginning of the prior year, allowing for a meaningful comparison of operating results between years. Other Stabilized communities are generally all other completed consolidated communities that have stabilized occupancy at the beginning of the current year or were acquired during the year. Redevelopment communities are consolidated communities where substantial redevelopment is in progress or is probable to begin during the current year. Unconsolidated communities are communities in which we have an indirect ownership interest through our investment interest in an unconsolidated joint venture. A more detailed description of our reportable segments and other related operating information can be found in Note 8, "Segment Reporting," of our Consolidated Financial Statements.

Although each of these categories is important to our business, we generally evaluate overall operating, industry and market trends based on the operating results of Same Store communities, for which a detailed discussion can be found in "Results of Operations" as part of our discussion of overall operating results. We evaluate our current and future cash needs and future operating potential based on acquisition, disposition, development, redevelopment and financing activities within Other Stabilized, Redevelopment and Development communities. Discussions related to current and future cash needs and financing activities can be found under "Liquidity and Capital Resources."

NOI of our current operating communities is one of the financial measures that we use to evaluate the performance of our communities. NOI is affected by the demand and supply dynamics within our markets, our rental rates and occupancy levels and our ability to control operating costs. Our overall financial performance is also impacted by the general availability and cost of capital and the performance of newly developed, redeveloped and acquired apartment communities.

Results of Operations

Our results of operations are driven by our operating platform and are primarily affected by both overall and individual geographic market conditions and apartment fundamentals and are reflected in changes in Same Store NOI; NOI derived from acquisitions, development completions and development under construction and in lease-up; loss of NOI related to disposed communities; and capital market and financing activity. See also Part I, Item 1A, "Risk Factors." Discussion of our operating results for 2023 and comparison to 2022 can be found in Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-K filed with the SEC on February 23, 2024. A comparison of our operating results for 2024 and 2023 follows (dollars in thousands).

Table of Contents

| | For the year ended December 31, | | December 31, 2024 vs. 2023 | |
| | 2024 | 2023 | $ Change | % Change |
|---|---|---|---|---|
| Revenue: | | | | |
| Rental and other income | $ 2,906,676 | $ 2,760,187 | $ 146,489 | 5.3 % |
| Management, development and other fees | 7,081 | 7,722 | (641) | (8.3)% |
| Total revenue | 2,913,757 | 2,767,909 | 145,848 | 5.3 % |
| Expenses: | | | | |
| Direct property operating expenses, excluding property taxes | 576,115 | 539,297 | 36,818 | 6.8 % |
| Property taxes | 327,611 | 306,794 | 20,817 | 6.8 % |
| Total community operating expenses | 903,726 | 846,091 | 57,635 | 6.8 % |
| | | | | |
| Property management and other indirect operating expenses | (169,731) | (142,041) | (27,690) | (19.5)% |
| Expensed transaction, development and other pursuit costs, net of recoveries | (18,341) | (33,479) | 15,138 | 45.2 % |
| Interest expense, net | (226,589) | (205,992) | (20,597) | (10.0)% |
| Loss on extinguishment of debt, net | — | (150) | 150 | 100.0 % |
| Depreciation expense | (846,853) | (816,965) | (29,888) | (3.7)% |
| General and administrative expense | (77,697) | (76,534) | (1,163) | (1.5)% |
| Casualty and impairment loss | (2,935) | (9,118) | 6,183 | 67.8 % |
| Income from unconsolidated investments | 50,682 | 13,454 | 37,228 | 276.7 % |
| Gain on sale of communities | 363,300 | 287,424 | 75,876 | 26.4 % |
| Other real estate activity | 753 | 174 | 579 | 332.8 % |
| Income before income taxes | 1,082,620 | 938,591 | 144,029 | 15.3 % |
| Income tax expense | (445) | (10,153) | 9,708 | 95.6 % |
| Net income | 1,082,175 | 928,438 | 153,737 | 16.6 % |
| | | | | |
| Net (income) loss attributable to noncontrolling interests | (181) | 387 | (568) | N/A (1) |
| | | | | |
| Net income attributable to common stockholders | $ 1,081,994 | $ 928,825 | $ 153,169 | 16.5 % |

_____

(1)    Percent change is not meaningful.

*Net income attributable to common stockholders* increased $153,169,000, or 16.5%, to $1,081,994,000 in 2024 from 2023, primarily due to increases in (i) NOI from communities, (ii) real estate sales and related gains, and (iii) income from unconsolidated investments in the current year.

*NOI.* We define NOI as total property revenue less direct property operating expenses (including property taxes), and excluding corporate-level income (including management, development and other fees), property management and other indirect operating expenses, net of corporate income, expensed transaction, development and other pursuit costs, net of recoveries, interest expense, net, loss on extinguishment of debt, net, general and administrative expense, income from unconsolidated investments, depreciation expense, income tax expense (benefit), casualty and impairment loss, gain on sale of communities, other real estate activity and net operating income from real estate assets sold or held for sale. Management considers NOI to be an important and appropriate supplemental performance measure to net income because it helps both investors and management to understand the core operations of a community or communities prior to the allocation of any corporate-level property management overhead or financing-related costs. NOI reflects the operating performance of a community and allows for an easier comparison of the operating performance of individual assets or groups of assets. In addition, because prospective buyers of real estate have different financing and overhead structures, with varying marginal impact to overhead as a result of acquiring real estate, NOI is considered by many in the real estate industry to be a useful measure for determining the value of a real estate asset or group of assets.

NOI does not represent cash generated from operating activities in accordance with GAAP, and NOI should not be considered an alternative to net income as an indication of our performance. NOI should also not be considered an alternative to net cash flow from operating activities, as determined by GAAP, as a measure of liquidity, nor is NOI indicative of cash available to

38

Table of Contents

fund cash needs. Residential NOI represents results attributable to our apartment rental operations, including parking and other ancillary residential revenue. Reconciliations of NOI and Residential NOI for the years ended December 31, 2024 and 2023 to net income for each year are as follows (dollars in thousands):

| | For the year ended December 31, | |
| | 2024 | 2023 |
| --- | --- | --- |
| Net income | $ 1,082,175 | $ 928,438 |
| Property management and other indirect operating expenses, net of corporate income | 162,594 | 134,312 |
| Expensed transaction, development and other pursuit costs, net of recoveries | 18,341 | 33,479 |
| Interest expense, net | 226,589 | 205,992 |
| Loss on extinguishment of debt, net | — | 150 |
| General and administrative expense | 77,697 | 76,534 |
| Income from unconsolidated investments | (50,682) | (13,454) |
| Depreciation expense | 846,853 | 816,965 |
| Income tax expense | 445 | 10,153 |
| Casualty and impairment loss | 2,935 | 9,118 |
| Gain on sale of communities | (363,300) | (287,424) |
| Other real estate activity | (753) | (174) |
| Net operating income from real estate assets sold or held for sale | (28,463) | (57,646) |
| NOI | 1,974,431 | 1,856,443 |
| | | |
| Commercial NOI (1) | (33,213) | (32,654) |
| Residential NOI | $ 1,941,218 | $ 1,823,789 |

_____

(1)  Represents results attributable to the commercial and other non-residential operations at our communities ("Commercial").

The Residential NOI changes for 2024 as compared to 2023 consist of changes in the following categories (dollars in thousands):

| | For the year ended December 31, 2024 |
| --- | --- |
| Same Store | $ 48,643 |
| Other Stabilized | 27,392 |
| Development / Redevelopment | 41,394 |
| Total | $ 117,429 |

The 2.7% increase in our Same Store Residential NOI in 2024 is due to an increase in Residential revenue of $87,854,000, or 3.4%, partially offset by an increase in Residential property operating expenses of $39,211,000, or 5.0%, over 2023.

Increases in inflation can result in an increase in our operating costs both at our communities and at the corporate level. Most of our apartment leases are for a term of one year or less. In an inflationary environment, this may allow us to realize increased rents upon renewal of existing leases or the beginning of new leases. Short-term leases generally reduce our risk from the adverse effect of inflation, although these leases also permit residents to leave at the end of their lease term. In addition, inflation could cause our construction costs and cost of other capitalized expenditures to increase, impacting the expected economic return of, and expected operating results for, current and planned development activity.

*Rental and other income* increased $146,489,000, or 5.3%, in 2024 compared to the prior year primarily due to the increased revenue from our Same Store communities, discussed below.

Consolidated Communities —The weighted average number of occupied apartment homes for consolidated communities increased to 79,240 apartment homes for 2024, compared to 77,667 homes for 2023. The weighted average monthly revenue per occupied apartment home increased to $3,081 for 2024 compared to $2,955 in 2023.

Same Store Communities — The following table presents the change in Same Store Residential revenue, including the

Table of Contents

attribution of the change between average revenue per occupied home and Economic Occupancy for the year ended December 31, 2024 (dollars in thousands).

| | Residential revenue | | | | Average monthly revenue per occupied home | | | Economic Occupancy (1) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | $ Change | % Change | | | % Change | | | % Change |
| | | | | For the year ended December 31, | | | | | | |
| | 2024 | 2023 | 2024 to 2023 | 2024 to 2023 | 2024 | 2023 | 2024 to 2023 | 2024 | 2023 | 2024 to 2023 |
| New England | $ 356,399 | $ 341,506 | $ 14,893 | 4.4 % | $ 3,370 | $ 3,226 | 4.5 % | 96.5 % | 96.6 % | (0.1)% |
| Metro NY/NJ | 534,673 | 516,038 | 18,635 | 3.6 % | 3,717 | 3,582 | 3.8 % | 95.6 % | 95.7 % | (0.1)% |
| Mid-Atlantic | 414,044 | 400,487 | 13,557 | 3.4 % | 2,510 | 2,419 | 3.8 % | 94.9 % | 95.3 % | (0.4)% |
| Southeast Florida | 95,809 | 94,070 | 1,739 | 1.8 % | 2,897 | 2,852 | 1.6 % | 96.7 % | 96.9 % | 0.2 % |
| Denver, CO | 40,691 | 40,166 | 525 | 1.3 % | 2,329 | 2,265 | 2.8 % | 94.6 % | 96.0 % | (1.4)% |
| Pacific Northwest | 164,655 | 158,115 | 6,540 | 4.1 % | 2,789 | 2,705 | 3.1 % | 96.3 % | 95.3 % | 1.0 % |
| Northern California | 425,214 | 418,540 | 6,674 | 1.6 % | 3,072 | 3,019 | 1.8 % | 95.8 % | 96.0 % | (0.2)% |
| Southern California | 589,204 | 563,661 | 25,543 | 4.5 % | 2,877 | 2,755 | 4.4 % | 95.9 % | 95.9 % | — % |
| Other Expansion Regions | 32,727 | 32,979 | (252) | (0.8)% | 2,101 | 2,094 | 0.3 % | 94.0 % | 95.0 % | (1.0)% |
| Total Same Store | $ 2,653,416 | $ 2,565,562 | $ 87,854 | 3.4 % | $ 3,004 | $ 2,902 | 3.5 % | 95.8 % | 95.9 % | (0.1)% |

(1) Economic Occupancy is defined as gross potential revenue less vacancy loss, as a percentage of gross potential revenue. Gross potential revenue is determined by valuing occupied homes at contract rates and vacant homes at market rents. Vacancy loss is determined by valuing vacant units at market rents. Economic Occupancy considers that apartment homes of different sizes and locations within a community have different economic impacts on a community's gross revenue.

The following table details the increase in Same Store Residential revenue by component for the year ended December 31, 2024, compared to the prior year:

| | For the year ended December 31, 2024 |
|---|---|
| Residential revenue | |
| Lease rates | 2.2 % |
| Economic Occupancy | (0.1)% |
| Other rental revenue | 0.9 % |
| Uncollectible lease revenue (excluding rent relief) | 0.5 % |
| Rent relief | (0.1)% |
| Total Residential revenue | 3.4 % |

The increase for Same Store Residential revenue for the year ended December 31, 2024, as compared to the prior year was impacted by uncollectible lease revenue, inclusive of amounts received from government rent relief programs. Same Store uncollectible lease revenue decreased for the year ended December 31, 2024 as compared to the prior year by $10,582,000, resulting in a 0.4% increase in Same Store Residential revenue. Uncollectible lease revenue was impacted by a decrease in government rent relief of $3,967,000 for the year ended December 31, 2024 from the prior year. Adjusting to remove the impact of rent relief, uncollectible lease revenue as a percentage of Same Store Residential revenue decreased to 1.8% in the year ended December 31, 2024 from 2.4% in the year ended December 31, 2023.

We use concessions periodically as a means to increase leasing velocity, providing our new and existing residents an upfront incentive to enter into a new lease, or extend an existing lease. During 2024, concessions granted for our Same Store communities increased over the prior year by $562,000 to $17,288,000. We amortize concessions on a straight-line basis over the life of the respective leases (generally one year), reducing the income recognized over the lease term. For the year ended December 31, 2024, amortized concessions increased by $927,000, partially offsetting the increase in revenue as compared to the prior year. The remaining net unamortized balance of Same Store residential concessions as of December 31, 2024 and 2023 was $2,358,000 and $187,000, respectively.

*Management, development and other fees* decreased $641,000, or 8.3%, in 2024, compared to the prior year, primarily due to reduced third-party development fees, partially offset by an increase in fees for third-party back-office, financial administrative support services in the current year.

Table of Contents

*Direct property operating expenses, excluding property taxes,* increased $36,818,000, or 6.8%, in 2024 compared to the prior year, primarily due to the addition of newly developed and acquired apartment communities as well as increased Residential operating expenses at our Same Store communities as discussed below, partially offset by dispositions.

Same Store Residential direct property operating expenses, excluding property taxes, increased $25,326,000, or 5.0%, in 2024 compared to the prior year, primarily due to the implementation of our bulk internet offering, increased trash removal costs, water and sewer costs, and repairs and maintenance costs.

*Property taxes* increased $20,817,000, or 6.8%, in 2024 compared to the prior year, primarily due to increases for our Same Store Residential portfolio and the addition of newly developed and acquired apartment communities, partially offset by decreased property taxes from dispositions.

Same Store Residential property taxes increased $13,885,000, or 4.9%, in 2024 compared to the prior year, primarily due to increased assessments across the portfolio, a higher level of successful appeals in the prior year and the expiration of property tax incentive programs primarily at certain of our properties in New York City. The expiration of property tax incentive programs represents $5,364,000 or 39% of the 4.9% increase in property taxes for the year ended December 31, 2024.

*Property management and other indirect operating expenses, net of corporate income* increased $27,690,000, or 19.5%, in 2024, primarily due to costs related to our shared services model and increased costs related to investments in technology and process related spend for initiatives to improve future efficiency in services for residents and prospects, and increased advocacy costs.

*Expensed transaction, development and other pursuit costs, net of recoveries* includes costs incurred for write downs and abandonment of Development Rights and development pursuits not yet considered probable for development, as well as costs related to abandoned acquisition and disposition pursuits, offset by any recoveries of costs incurred. In periods of increased acquisition and pursuit activity, periods of economic downturn or when there is limited access to capital, these costs can be volatile and may vary significantly from year to year. In addition, the timing for potential recoveries will not always align with the timing for expensing an abandoned pursuit. Expensed transaction, development and other pursuit costs, net of recoveries, decreased $15,138,000 in 2024 compared to the prior year due to a decrease in write-offs for development rights that we determined are no longer probable. The amount for 2024 includes a write-off of $8,947,000 related to one Development Right in Northern California, and the amount for 2023 includes write-offs of $27,455,000 related to seven Development Rights in Northern and Southern California and the Mid-Atlantic that we determined were no longer probable.

*Interest expense, net* increased $20,597,000, or 10.0%, in 2024 compared to the prior year. This category includes interest costs adjusted for capitalized interest related to development and redevelopment activity, amortization of premium/discount on debt, deferred hedging gains and losses from qualifying hedges, interest income and any mark-to-market impact from derivatives not in qualifying hedge relationships. The increase in 2024 was primarily due to increases in amounts of unsecured indebtedness and decreases in interest income compared to the prior year due to lower cash amounts invested. The increases in 2024 are also due to decreased capitalized interest compared to the prior year.

*Depreciation expense* increased $29,888,000, or 3.7%, in 2024 compared to the prior year, primarily due to the addition of newly developed and acquired apartment communities, partially offset by dispositions.

*General and administrative expense* increased $1,163,000, or 1.5%, in 2024 as compared to the prior year, primarily due to an increase in legal and professional fees, partially offset by decreased compensation expense, including severance.

*Casualty and impairment loss* for the year ended December 31, 2024 of $2,935,000 was due to flooding and water damage at communities in California from extensive rainfall and a fire at a community in New Jersey.

*Income from unconsolidated investments* increased $37,228,000 in 2024 compared to the prior year, primarily due to realized and unrealized property technology investments gains, partially offset by the recognition of $1,519,000 of our promoted interest associated with the achievement of a threshold return with the U.S. Fund in the prior year.

41

Table of Contents

*Gain on sale of communities* increased in 2024 compared to the prior year. The amount of gain realized in a given period depends on many factors, including the number of communities sold, the size and carrying value of the communities sold, expected operating performance of the communities and the market conditions in the local area. The gains of $363,300,000 and $287,424,000 in 2024 and 2023, respectively, were primarily due to the sale of eight and four wholly-owned communities in 2024 and 2023, respectively.

*Income tax expense* of $10,153,000 for 2023 was primarily related to The Park Loggia.

Non-GAAP Financial Measures — Reconciliation of FFO and Core FFO

FFO and FFO adjusted for non-core items, or "Core FFO," as defined below, are generally considered by management to be appropriate supplemental measures of our operating and financial performance.

Consistent with the definition adopted by the Board of Governors of the National Association of Real Estate Investment Trusts® ("Nareit"), we calculate Funds from Operations Attributable to Common Stockholders ("FFO") as net income or loss attributable to common stockholders computed in accordance with GAAP, adjusted for:

- gains or losses on sales of previously depreciated operating communities;
- cumulative effect of a change in accounting principle;
- impairment write-downs of depreciable real estate assets;
- write-downs of investments in affiliates due to a decrease in the value of depreciable real estate assets held by those affiliates;
- depreciation of real estate assets; and
- similar adjustments for unconsolidated partnerships and joint ventures, including those from a change in control.

FFO can help with the comparison of the operating and financial performance of a real estate company between periods or as compared to different companies because the adjustments such as (i) gains or losses on sales of previously depreciated property or (ii) real estate depreciation may impact comparability as the amount and timing of these or similar items can vary among owners of identical assets in similar condition based on historical cost accounting and useful life estimates. By further adjusting for items that we do not consider part of our core business operations, Core FFO can help with the comparison of our core operating performance year over year. We believe that, in order to understand our operating results, FFO and Core FFO should be considered in conjunction with net income as presented in the Consolidated Statements of Comprehensive Income included elsewhere in this report.

We calculate Core FFO as FFO, adjusted for:

- joint venture gains (if not adjusted through FFO), non-core costs and promoted interests from partnerships;
- casualty and impairment losses or gains, net on non-depreciable real estate or other investments;
- gains or losses from early extinguishment of consolidated borrowings;
- expensed transaction, development and other pursuit costs, net of recoveries;
- legal recoveries, settlement proceeds, and certain legal costs;
- property and casualty insurance proceeds;
- gains or losses on sales of assets not subject to depreciation and other investment gains or losses;
- advocacy contributions, representing payments to promote our business interests;
- hedge ineffectiveness or gains or losses from derivatives not designated as hedges for accounting purposes;
- changes to expected credit losses associated with the lending commitments under the SIP;
- severance related costs;
- executive transition compensation costs;
- net for-sale condominium activity, including gains, marketing, operating and administrative costs and imputed carry cost; and
- income taxes.

FFO and Core FFO do not represent (i) net income in accordance with GAAP, and therefore should not be considered an alternative to net income, which remains the primary measure, as an indication of our performance, or (ii) cash generated from operating activities in accordance with GAAP, and therefore should not be considered an alternative to net cash flows from operating activities, as determined by GAAP, as a measure of liquidity. In addition, FFO and Core FFO are not necessarily indicative of cash available to fund cash needs and may not be comparable to FFO and Core FFO as calculated by other REITs.

Table of Contents

The following is a reconciliation of net income attributable to common stockholders to FFO attributable to common stockholders and to Core FFO attributable to common stockholders for the years ended December 31, 2024 and 2023 (dollars in thousands, except per share amounts).

| | For the year ended December 31, | |
| | 2024 | 2023 |
|---|---|---|
| Net income attributable to common stockholders | $ 1,081,994 | $ 928,825 |
| Depreciation - real estate assets, including joint venture adjustments | 843,224 | 811,717 |
| Distributions to noncontrolling interests | — | 25 |
| Gain on sale of previously depreciated real estate | (363,300) | (287,424) |
| Casualty loss and impairment on real estate | 2,935 | 9,118 |
| FFO attributable to common stockholders | $ 1,564,853 | $ 1,462,261 |
| | | |
| Adjusting items: | | |
| Unconsolidated entity gains, net (1) | (33,137) | (4,161) |
| Joint venture promote (2) | — | (1,519) |
| Structured Investment Program loan reserve (3) | (1,057) | 1,186 |
| Loss on extinguishment of consolidated debt | — | 150 |
| Hedge accounting activity | 61 | 566 |
| Advocacy contributions | 19,156 | 1,625 |
| Executive transition compensation costs | 304 | 1,244 |
| Severance related costs | 1,787 | 2,625 |
| Expensed transaction, development and other pursuit costs, net of recoveries (4) | 13,649 | 30,583 |
| Other real estate activity | (753) | (174) |
| For-sale condominium imputed carry cost (5) | 84 | 602 |
| Legal settlements and costs (6) | 3,002 | 457 |
| Income tax expense (7) | 445 | 10,153 |
| Core FFO attributable to common stockholders | $ 1,568,394 | $ 1,505,598 |
| | | |
| Weighted average common shares outstanding - diluted | 142,458,604 | 141,643,788 |
| | | |
| Earnings per common share - diluted | $ 7.60 | $ 6.56 |
| FFO per common share - diluted | $ 10.98 | $ 10.32 |
| Core FFO per common share - diluted | $ 11.01 | $ 10.63 |

_____

(1)  Amounts consist primarily of net unrealized gains on technology investments.

(2)  Amount is for recognition of our promoted interest in the U.S. Fund.

(3) Reflects changes to expected credit losses associated with our lending commitments primarily under the SIP. The timing and amount of actual losses that will be incurred, if any, is to be determined at the maturity of each respective lending agreement.

(4) Amounts for 2024 and 2023 include a write-off of $8,947 for one Development Right in Northern California and write-offs of $27,455 related to seven Development Rights in Northern and Southern California and the Mid-Atlantic, respectively, that we determined were no longer probable.

(5) Represents the imputed carry cost of for-sale residential condominiums at The Park Loggia. We compute this adjustment by multiplying the total capitalized cost of completed and unsold for-sale residential condominiums by our weighted average unsecured debt effective interest rate.

(6) Amount for 2024 includes legal costs associated with various antitrust litigation matters.

(7) Amount for 2023 is primarily for the recognition of taxes associated with The Park Loggia.

Table of Contents

Liquidity and Capital Resources

We employ a disciplined approach to our liquidity and capital management. When we source capital, we take into account both our view of the most cost-effective alternative available and our desire to maintain a balance sheet that provides us with flexibility. Our principal focus on near-term and intermediate-term liquidity is to ensure we have adequate capital to fund:

- development and redevelopment activity in which we are currently engaged or in which we plan to engage;
- the minimum dividend payments on our common stock required to maintain our REIT qualification under the Code;
- regularly scheduled principal and interest payments and principal payments either at maturity or opportunistically before maturity;
- normal recurring operating and corporate overhead expenses; and
- investment in our operating platform, including strategic investments.

Factors affecting our liquidity and capital resources are our cash flows from operations, financing activities and investing activities (including dispositions) as well as general economic and market conditions. Cash flows from operations are determined by operating activities and factors including but not limited to (i) the number of apartment homes currently owned, (ii) rental rates, (iii) occupancy levels, (iv) uncollectible lease revenue levels or interruptions in collections caused by market conditions and (v) operating expenses with respect to apartment homes. The timing and type of capital markets activity in which we engage is affected by changes in the capital markets environment, such as changes in interest rates or the availability of cost-effective capital. Our plans for development, redevelopment, non-routine capital expenditure, acquisition and disposition activity are affected by market conditions and capital availability. We frequently review our liquidity needs, especially in periods with volatile market conditions, as well as the adequacy of cash flows from operations and other expected liquidity sources to meet these needs.

We had cash, cash equivalents and restricted cash of $267,076,000 at December 31, 2024, a decrease of $263,884,000 from $530,960,000 at December 31, 2023. The following discussion relates to changes in cash, cash equivalents and restricted cash due to operating, investing and financing activities.

A presentation of GAAP based cash flow metrics is as follows (dollars in thousands):

|  | For the year ended December 31, | |
|  | 2024 | 2023 |
|---|---|---|
| Net cash provided by operating activities | $ 1,607,878 | $ 1,560,029 |
| Net cash used in investing activities | $ (996,864) | $ (928,955) |
| Net cash used in financing activities | $ (874,898) | $ (834,359) |

- Net cash provided by operating activities increased primarily due to increases in NOI.

- Net cash used in investing activities was primarily due to (i) the investment of $951,101,000 in the development and redevelopment of communities, (ii) acquisition of six wholly-owned communities for $464,419,000 and (iii) capital expenditures of $198,026,000 for our wholly-owned communities and non-real estate assets. These amounts were partially offset by net proceeds from the disposition of eight wholly-owned communities.

- Net cash used in financing activities was primarily due to (i) payment of cash dividends in the amount of $961,914,000, and (ii) the repayment of the $300,000,000 fixed rate unsecured notes. These amounts were partially offset by the proceeds from the issuance of unsecured notes in the amount of $398,788,000.

Table of Contents

*Variable Rate Unsecured Credit Facility*

The $2,250,000,000 Credit Facility matures in September 2026. The interest rate that would be applicable to borrowings under the Credit Facility is 5.19% at January 31, 2025 and is composed of (i) the Secured Overnight Financing Rate ("SOFR"), applicable to the period of borrowing for a particular draw of funds from the facility (e.g., one month to maturity, three months to maturity, etc.), plus (ii) the current borrowing spread to SOFR of 0.805% per annum, which consists of a 0.10% SOFR adjustment plus 0.705% per annum, assuming a daily SOFR borrowing rate. The borrowing spread to SOFR can vary from SOFR plus 0.63% to SOFR plus 1.38% based upon the rating of our unsecured senior notes. There is also an annual facility commitment fee of 0.12% of the borrowing capacity under the facility, which can vary from 0.095% to 0.295% based upon the rating of our unsecured senior notes. The Credit Facility contains a sustainability-linked pricing component which provides for interest rate margin and commitment fee reductions or increases by meeting or missing targets related to environmental sustainability, specifically greenhouse gas emission reductions, with the adjustment determined annually. The annual determination under the sustainability-linked pricing component occurred in July 2024, maintaining reductions of approximately 0.02% to the interest rate margin and 0.005% to the commitment fee due to our achievement of sustainability targets.

The availability on the Credit Facility as of January 31, 2025 is as follows (dollars in thousands):

|  | January 31, 2025 |
|---|---|
| Credit Facility commitment | $2,250,000 |
| Credit Facility outstanding | — |
| Commercial paper outstanding | (170,000) |
| Letters of credit outstanding (1) | (964) |
| Total Credit Facility available | $ 2,079,036 |

_____

(1)   In addition, we had $47,592 outstanding in additional letters of credit unrelated to the Credit Facility as of January 31, 2025.

*Commercial Paper Program*

We have a Commercial Paper Program with the maximum aggregate face or principal amount outstanding at any one time not to exceed $500,000,000. Under the terms of the Commercial Paper Program, we may issue, from time to time, unsecured commercial paper notes with varying maturities of less than one year. The Commercial Paper Program is backstopped by our commitment to maintain available borrowing capacity under the Credit Facility in an amount equal to actual borrowings under the Commercial Paper Program. As of January 31, 2025, we had $170,000,000 outstanding under the Commercial Paper Program at a weighted average contractual interest rate of 4.55%.

*Secured and Unsecured Borrowings— Financial Covenants and Early Repayment Provisions*

We are subject to financial covenants contained in the Credit Facility and the indentures under which our unsecured notes were issued. The principal financial covenants include the following:

•   limitations on the amount of total and secured debt in relation to our overall capital structure;
•   limitations on the amount of our unsecured debt relative to the undepreciated basis of real estate assets that are not encumbered by property-specific financing; and
•   minimum levels of debt service coverage.

We were in compliance with these covenants at December 31, 2024.

In addition, some of our secured and unsecured borrowings include yield maintenance, defeasance, or prepayment penalty provisions, which could result in us incurring an additional charge in the event of a full or partial prepayment of outstanding principal before the scheduled maturity. These provisions in our borrowings are generally consistent with other similar types of debt instruments issued during the same time period in which our borrowings were issued.

Table of Contents

*Continuous Equity Offering Program*

Under our continuous equity program (the "CEP"), we may sell (and/or enter into forward sale agreements for the sale of) up to $1,000,000,000 of our common stock from time to time. Actual sales will depend on a variety of factors to be determined, including market conditions, the trading price of our common stock and our determinations of the appropriate funding sources. We expect that, if entered into, we will physically settle each forward sale agreement on one or more dates prior to the maturity date of that particular forward sale agreement, and to receive aggregate net cash proceeds at settlement equal to the number of shares underlying the particular forward agreement multiplied by the forward sale price. However, we may also elect to cash settle or net share settle a forward sale agreement. In connection with each forward sale agreement, we will pay the forward seller, in the form of a reduced initial forward sale price, a commission of up to 1.5% of the sales prices of all borrowed shares of common stock sold. During 2024 and through January 31, 2025, we entered into forward contracts under the CEP to sell 367,113 shares of common stock for approximate proceeds, net of fees, of $80,687,000, based on the gross weighted average price of $223.27 per share, with settlement of the forward contracts to occur on one or more dates not later than December 31, 2025. The final proceeds will be determined on the date(s) of settlement and are subject to certain customary adjustments for our dividends and a daily interest factor. As of January 31, 2025, we had $623,997,000 remaining authorized for issuance under this program, after consideration of the forward contracts.

*Forward Equity Offering*

In addition to the CEP, during the year ended December 31, 2024, we completed an underwritten public offering of 3,680,000 shares of our common stock at a discount to the closing price of $226.52 per share, net of offering fees, offered in connection with forward contracts entered into with certain financial institutions acting as forward purchasers. Assuming full physical settlement of the forward contracts, which we expect to occur no later than December 31, 2025, we will receive approximate proceeds, net of offering fees and discounts, of $808,606,000, based on the initial forward price. The final proceeds will be determined on the date(s) of settlement and are subject to certain customary adjustments for our dividends and a daily interest factor.

*Stock Repurchase Program*

We have a stock repurchase program under which we may acquire shares of our common stock in open market or negotiated transactions up to an aggregate purchase price of $500,000,000 (the "Stock Repurchase Program"). Purchases of common stock under the Stock Repurchase Program may be exercised at our discretion with the timing and number of shares repurchased depending on a variety of factors including price, corporate and regulatory requirements and other corporate liquidity requirements and priorities. The Stock Repurchase Program does not have an expiration date and may be suspended or terminated at any time without prior notice. During the year ended December 31, 2024 through January 31, 2025, we had no repurchases of shares under this program. As of January 31, 2025, we had $314,237,000 remaining authorized for purchase under this program.

*Interest Rate Swap Agreements*

The following derivative activity occurred during the year ended December 31, 2024:

- In connection with the issuance of our $400,000,000 unsecured notes in May 2024 maturing in 2034, we terminated $250,000,000 of forward interest rate swap agreements designated as cash flow hedges of the interest rate variability on the issuance of unsecured notes, receiving $16,839,000 which will be recognized over the life of the unsecured notes as a reduction in the effective interest rate. Of the $250,000,000 forward interest rate swap agreements that terminated, $50,000,000 were entered into during 2024. The Company has deferred these gains in accumulated other comprehensive income on the accompanying Consolidated Balance Sheets, and is recognizing the impact as a component of interest expense, net, over the term of the respective hedged debt.

- In addition to the activity above, we entered into and had outstanding $100,000,000 of forward interest rate swap agreements to reduce the impact of variability in interest rates on a portion of our anticipated future debt issuance activity through December 31, 2025. We expect to cash settle the swaps and either pay or receive cash for the then current fair value. Assuming the Company issues the debt as expected, the hedging impact from these positions will then be recognized over the life of the issued debt as a yield adjustment.

*Future Financing and Capital Needs—Debt Maturities and Material Obligations*

46

Table of Contents

One of our principal long-term liquidity needs is the repayment of long-term debt at maturity. For both our unsecured and secured notes, a portion of the principal of these notes may be repaid prior to maturity. Early retirement of our unsecured or secured notes could result in gains or losses on extinguishment. We may use capital from a variety of sources to repay debt at maturity, including proceeds received from the dispositions of our operating communities or other direct and indirect investments in real estate and cash from operations. If we do not have funds on hand sufficient to repay our indebtedness as it becomes due, it will be necessary for us to refinance or otherwise provide liquidity to satisfy the debt at maturity. This refinancing may be accomplished by uncollateralized private or public debt offerings, equity issuances, including through the settlement of the outstanding equity forwards, additional debt financing that is secured by mortgages on individual communities or groups of communities or borrowings under our Credit Facility or Commercial Paper Program. In addition, to the extent we have amounts outstanding under the Commercial Paper Program, we are obligated to repay the short-term indebtedness at maturity through either current cash on hand or by incurring other indebtedness, including by way of borrowing under our Credit Facility. Although we believe we will have the capacity to meet our currently anticipated liquidity needs, we cannot assure you that capital from additional debt financing or debt or equity offerings will be available or, if available, that they will be on terms we consider satisfactory.

In May 2024, we issued $400,000,000 principal amount of unsecured notes in a public offering under our existing shelf registration statement for proceeds net of underwriting fees of approximately $396,188,000, before considering the impact of other offering costs. The notes mature in June 2034 and were issued at a 5.35% interest rate, resulting in a 5.05% effective rate including the impact of offering costs and hedging activity.

The following table details our consolidated debt obligations, including the effective interest rate and contractual maturity dates, and principal payments for periodic amortization and maturities for the next five years, excluding our Credit Facility and Commercial Paper Program and amounts outstanding related to communities classified as held for sale at December 31, 2024 and 2023 (dollars in thousands). We are not directly or indirectly (as borrower or guarantor) obligated in any material respect to pay principal or interest on the indebtedness of any unconsolidated entities in which we have an equity or other interest, other than as disclosed related to the AVA Arts District construction loan (see "Unconsolidated Operating Communities" for further discussion of the construction loan).

| Debt | Effective interest rate (1) | Principal maturity date | | Balance Outstanding (2) | | Scheduled Maturities | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 12/31/2023 | 12/31/2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Thereafter |
| **Tax-exempt bonds** | | | | | | | | | | | |
| *Variable rate* | | | | | | | | | | | |
| Avalon Acton | 4.66 % | Jul-2040 | (3) | $ 45,000 | $ 45,000 | $ — | $ — | $ — | $ — | $ — | $ 45,000 |
| Avalon Clinton North | 5.31 % | Nov-2038 | (3) | 126,400 | 126,400 | — | — | 700 | 2,800 | 3,000 | 119,900 |
| Avalon Clinton South | 5.31 % | Nov-2038 | (3) | 104,500 | 104,500 | — | — | 600 | 2,300 | 2,400 | 99,200 |
| Avalon Midtown West | 5.28 % | May-2029 | (3) | 76,600 | 69,800 | 8,100 | 8,100 | 8,900 | 9,800 | 34,900 | — |
| Avalon San Bruno I | 5.20 % | Dec-2037 | (3) | 57,650 | 55,250 | 2,200 | 2,600 | 2,700 | 2,900 | 3,100 | 41,750 |
| | | | | 410,150 | 400,950 | 10,300 | 10,700 | 12,900 | 17,800 | 43,400 | 305,850 |
| **Conventional loans** | | | | | | | | | | | |
| *Fixed rate* | | | | | | | | | | | |
| $300 million unsecured notes | — % | Nov-2024 | (4) | 300,000 | — | | | | | | |
| $525 million unsecured notes | 3.55 % | Jun-2025 | (3) | 525,000 | 525,000 | 525,000 | — | — | — | — | — |
| $300 million unsecured notes | 3.62 % | Nov-2025 | | 300,000 | 300,000 | 300,000 | — | — | — | — | — |
| $475 million unsecured notes | 3.35 % | May-2026 | | 475,000 | 475,000 | — | 475,000 | — | — | — | — |
| $300 million unsecured notes | 3.01 % | Oct-2026 | | 300,000 | 300,000 | — | 300,000 | — | — | — | — |
| $350 million unsecured notes | 3.95 % | Oct-2046 | | 350,000 | 350,000 | — | — | — | — | — | 350,000 |
| $400 million unsecured notes | 3.50 % | May-2027 | | 400,000 | 400,000 | — | — | 400,000 | — | — | — |
| $300 million unsecured notes | 4.09 % | Jul-2047 | | 300,000 | 300,000 | — | — | — | — | — | 300,000 |
| $450 million unsecured notes | 3.32 % | Jan-2028 | | 450,000 | 450,000 | — | — | — | 450,000 | — | — |
| $300 million unsecured notes | 3.97 % | Apr-2048 | | 300,000 | 300,000 | — | — | — | — | — | 300,000 |
| $450 million unsecured notes | 3.66 % | Jun-2029 | | 450,000 | 450,000 | — | — | — | — | 450,000 | — |
| $700 million unsecured notes | 2.69 % | Mar-2030 | | 700,000 | 700,000 | — | — | — | — | — | 700,000 |
| $600 million unsecured notes | 2.65 % | Jan-2031 | | 600,000 | 600,000 | — | — | — | — | — | 600,000 |
| $700 million unsecured notes | 2.16 % | Jan-2032 | | 700,000 | 700,000 | — | — | — | — | — | 700,000 |
| $400 million unsecured notes | 2.03 % | Dec-2028 | | 400,000 | 400,000 | — | — | — | 400,000 | — | — |
| $350 million unsecured notes | 4.38 % | Feb-2033 | | 350,000 | 350,000 | — | — | — | — | — | 350,000 |
| $400 million unsecured notes | 5.19 % | Dec-2033 | | 400,000 | 400,000 | — | — | — | — | — | 400,000 |
| $400 million unsecured notes | 5.05 % | Jun-2034 | | — | 400,000 | — | — | — | — | — | 400,000 |

| Debt | Effective interest rate (1) | Principal maturity date | Balance Outstanding (2) | | Scheduled Maturities | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12/31/2023 | 12/31/2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Thereafter |
| Avalon Walnut Creek | 4.00 % | Jul-2066 | 4,501 | 4,681 | — | — | — | — | — | 4,681 |
| eaves Los Feliz | 3.68 % | Jun-2027 | 41,400 | 41,400 | — | — | 41,400 | — | — | — |
| eaves Woodland Hills | 3.67 % | Jun-2027 | 111,500 | 111,500 | — | — | 111,500 | — | — | — |
| Avalon Russett | 3.77 % | Jun-2027 | 32,200 | 32,200 | — | — | 32,200 | — | — | — |
| Avalon San Bruno III | 2.38 % | Mar-2027 | 51,000 | 51,000 | — | — | 51,000 | — | — | — |
| Avalon Cerritos | 3.34 % | Aug-2029 | 30,250 | 30,250 | — | — | — | — | 30,250 | — |
| Avalon West Plano | 5.97 % | May-2029 | 63,041 | 62,448 | 1,065 | 1,111 | 1,159 | 1,202 | 57,911 | — |
| | | | 7,633,892 | 7,733,479 | 826,065 | 776,111 | 637,259 | 851,202 | 538,161 | 4,104,681 |
| Total indebtedness - excluding Credit Facility and Commercial Paper | | | $ 8,044,042 | $ 8,134,429 | $ 836,365 | $ 786,811 | $ 650,159 | $ 869,002 | $ 581,561 | $ 4,410,531 |

(1)  Rates are as of December 31, 2024 and include credit enhancement fees, facility fees, trustees' fees, the impact of interest rate hedges, offering costs, mark to market amortization and other fees.

(2)  Balances outstanding represent total amounts due at maturity, and exclude deferred financing costs and debt discount for the unsecured notes of $41,216 and $43,848 as of December 31, 2024 and 2023, respectively, deferred financing costs and debt discount associated with secured notes of $15,964 and $18,372 as of December 31, 2024 and 2023, respectively, as reflected on our Consolidated Balance Sheets included elsewhere in this report.

(3)  Financed by variable rate debt, but interest rate is capped through an interest rate protection agreement.

(4)  During 2024, we repaid this borrowing at par at its scheduled maturity date.

In addition to consolidated debt, we have scheduled contractual obligations associated with (i) ground leases for land underlying current operating or development communities and commercial and parking facilities and (ii) office leases for our corporate headquarters and regional offices of $16,433,000 for 2025, $16,843,000 for 2026 and $486,656,000 thereafter.

*Future Financing and Capital Needs—Portfolio and Capital Markets Activity*

We invest in various real estate and real estate related investments, which include (i) the acquisition, development and redevelopment of communities both wholly-owned and through the formation of joint ventures, (ii) other indirect investments in real estate through the SIP, all as discussed further below and (iii) investments in other real estate-related ventures through direct and indirect investments in property technology and environmentally focused companies and investment management funds.

In 2025, we expect to continue to meet our liquidity needs from one or more of a variety of internal and external sources, which may include (i) settlement of our outstanding equity forward contracts, (ii) real estate dispositions, (iii) cash balances on hand as well as cash generated from our operating activities, (iv) borrowing capacity under the Credit Facility, (v) borrowings under the Commercial Paper Program and (vi) secured and unsecured debt financings. Additional sources of liquidity in 2025 may include the issuance of common and preferred equity, including the issuance of additional shares of our common stock under the CEP. Our ability to obtain additional financing will depend on a variety of factors, such as market conditions, the general availability of credit, the overall availability of credit to the real estate industry, our credit ratings and credit capacity, as well as the perception of lenders regarding our long or short-term financial prospects.

Before beginning new construction or reconstruction activity, including activity related to communities owned by unconsolidated joint ventures, we plan to source sufficient capital to complete these undertakings, although we cannot assure you that we will be able to obtain such financing. In the event that financing cannot be obtained, we may abandon Development Rights, write off associated pre-development costs that were capitalized and/or forego reconstruction activity. In such instances, we will not realize the increased revenues and earnings that we expected from such Development Rights or reconstruction activity and significant losses could be incurred.

48

Table of Contents

From time to time, we use joint ventures to hold or develop individual real estate assets. We generally employ joint ventures to mitigate asset concentration or market risk and secondarily as a source of liquidity. We may also use joint ventures related to mixed-use land development opportunities and new markets where our partners bring development and operational expertise and/or experience to the venture. Each joint venture or partnership agreement has been individually negotiated, and our ability to operate and/or dispose of a community in our sole discretion may be limited to varying degrees depending on the terms of the joint venture or partnership agreement. We cannot assure you that we will achieve our objectives through joint ventures.

In addition, we may invest, through mezzanine loans or preferred equity investments, in multifamily development projects being undertaken by third parties. In these cases, we do not expect to acquire the underlying real estate but rather to earn a return on our investment (through interest or fixed rate preferred equity returns) and a return of the invested capital generally following completion of construction either on or before a set due date.

In evaluating our allocation of capital within our markets, we sell assets that do not meet our long-term investment criteria or when capital and real estate markets allow us to realize a portion of the value created over our ownership periods and redeploy the proceeds from those sales to develop, redevelop and acquire communities. Because the proceeds from the sale of communities may not be immediately redeployed into revenue-generating assets that we develop, redevelop or acquire, the immediate effect of a sale of a community for a gain is to increase net income, but reduce future total revenues, total expenses and NOI until such time as the proceeds have been redeployed into revenue generating assets. We believe that the temporary absence of future cash flows from communities sold will not have a material impact on our ability to fund future liquidity and capital resource needs.

<u>Investments</u>

We invest in consolidated real estate entities, unconsolidated investments in real estate ventures and direct and indirect investments in property technology and environmentally focused companies through investment management funds.

*Consolidated Investments*

During the year ended December 31, 2024, we acquired the following communities (dollars in thousands). See Note 5, "Investments," of the Consolidated Financial Statements included elsewhere in this report for further discussion.

| Community name | Location | Apartment homes | | Purchase price |
|---|---|---|---|---|
| Avalon at Pier 121 | Lewisville, TX | 300 | $ | 62,100 |
| Avalon Perimeter Park | Morrisville, NC | 262 | | 66,500 |
| Avalon Cherry Hills | Englewood, CO | 306 | | 95,000 |
| AVA Balboa Park | San Diego, CA | 100 | | 51,000 |
| Avalon Townhomes at Bee Cave | Bee Cave, TX | 126 | | 49,000 |
| Avalon Lowry | Denver, CO | 347 | | 136,500 |
| Total acquisitions | | 1,441 | $ | 460,100 |

In 2025, the Company entered into agreements to acquire a total of eight apartment communities in the Company's Texas expansion market. The communities contain a total of 2,701 apartment homes and will be acquired for an aggregate purchase price of $618,500,000. The consideration will take the form of cash and DownREIT units as described in Note 12, "Subsequent Events," of the Consolidated Financial Statements included elsewhere in this report for further discussion.

During the year ended December 31, 2024, we sold eight wholly-owned communities containing an aggregate of 1,532 apartment homes (dollars in thousands). See Note 6, "Real Estate Disposition Activities," of the Consolidated Financial Statements included elsewhere in this report for further discussion.

Table of Contents

| Community name | Location | Period of sale | Apartment homes | Gross sales price | Gain on disposition | Commercial square feet |
|---|---|---|---|---|---|---|
| AVA Belltown | Seattle, WA | Q2 2024 | 100 | $ 34,000 | $ 22,673 | 1,000 |
| AVA North Hollywood | Los Angeles, CA | Q2 2024 | 156 | 62,100 | 874 | 11,000 |
| Avalon Hackensack at Riverside | Hackensack, NJ | Q2 2024 | 226 | 85,600 | 44,834 | — |
| AVA Theater District | Boston, MA | Q3 2024 | 398 | 212,000 | 77,254 | — |
| Avalon Darien | Darien, CT | Q3 2024 | 189 | 120,000 | 95,732 | — |
| Avalon New Canaan | New Canaan, CT | Q4 2024 | 104 | 75,000 | 60,302 | — |
| Avalon Berkeley | Berkeley, CA | Q4 2024 | 94 | 32,000 | 7,420 | — |
| AVA Ballard | Seattle, WA | Q4 2024 | 265 | 105,500 | 54,119 | 12,000 |
| Total asset sales | | | 1,532 | $ 726,200 | $ 363,208 | 24,000 |

In January 2025, the Company sold Avalon Wilton on River Road, located in Wilton, CT, containing 102 apartment homes for $65,100,000. This sale marks the Company's exit from the Connecticut market.

*Unconsolidated Operating Communities*

During the year ended December 31, 2024, we had the following investments in and activity for our unconsolidated real estate and property technology and environmentally focused investments. See Note 5, "Investments," of the Consolidated Financial Statements included elsewhere in this report for further discussion.

- Arts District Joint Venture was formed to develop, own, and operate AVA Arts District, an apartment community located in Los Angeles, CA, which completed construction in 2024 and contains 475 apartment homes and 57,000 square feet of commercial space when completed. We have a 25% ownership interest in the venture. As of December 31, 2024, excluding costs incurred in excess of equity in the underlying net assets of the venture, we have an equity investment of $29,932,000 in the venture. The venture has drawn $155,968,000 of $167,147,000 maximum borrowing capacity of the construction loan as of December 31, 2024. While we guarantee 30% of the venture's construction loan, any amounts payable under the guarantee are obligations of the venture partners in proportion to their ownership interest.

- We invested $11,196,000 in various property technology and environmentally focused companies directly and indirectly through investment management funds during the year ended December 31, 2024. As of December 31, 2024, we have invested $58,122,000 and have $62,494,000 of remaining equity commitments to contribute to these investment management funds, with the timing and amount for these commitments to be fulfilled dependent on if, and when, investment opportunities are identified by the respective funds. During the year ended December 31, 2024, we recognized realized and unrealized gains of $33,137,000 related to these investments, included as a component of income from unconsolidated investments on the Consolidated Statements of Comprehensive Income.

Structured Investment Program

During the year ended December 31, 2024, we did not enter into any additional commitments under the SIP. As of January 31, 2025, we had funded $188,605,000 for seven outstanding commitments having an aggregate funding commitment of $191,585,000 under the SIP. As of January 31, 2025, our investment commitments had a weighted average rate of return of 11.5% and a weighted average initial maturity date of December 2026. See Note 5, "Investments," of the Consolidated Financial Statements included elsewhere in this report.

You should carefully review Part I, Item 1A. "Risk Factors" of this Form 10-K for a discussion of the risks associated with our investment activity.

Forward-Looking Statements

This Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. The Company's forward-looking statements generally use the words "believe," "expect," "anticipate," "intend," "estimate," "assume," "project," "plan," "may," "shall," "will," "pursue" and other similar expressions that indicate future events and trends and do not report historical matters. These statements, among other things, address the Company's intent, belief or expectations with respect to:

- development, redevelopment, acquisition or disposition of communities;
- the timing and cost of completion of communities under development or redevelopment;
- the timing of lease-up, occupancy and stabilization of communities;
- the pursuit of land for future development;
- the anticipated operating performance of our communities;
- cost, yield, revenue, NOI and earnings estimates;
- the impact of landlord-tenant laws and rent regulations, including rent caps;
- our expansion into new regions;
- our declaration or payment of dividends;
- our joint venture activities;
- our policies regarding investments, indebtedness, acquisitions, dispositions, financings and other matters;
- our qualification as a REIT under the Code;
- the real estate markets in regions where we operate and in general;
- the availability of debt and equity financing;
- interest rates;
- inflation, tariffs and other economic conditions, and their potential impacts;
- trends affecting our financial condition or results of operations;
- regulatory changes that may affect us; and
- the impact of legal proceedings.

We cannot assure the future results or outcome of the matters described in these statements; rather, these statements merely reflect our current expectations of the outcomes of the matters discussed. We do not undertake a duty to update these forward-looking statements, and therefore they may not represent our estimates and assumptions after the date of this report. You should not rely on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, some of which are beyond our control. These risks, uncertainties and other factors may cause our actual results, performance or achievements to differ materially from the anticipated future results, performance or achievements expressed or implied by these forward-looking statements. You should carefully review the discussion under Part I, Item 1A. "Risk Factors" in this Form 10-K for further discussion of risks associated with forward-looking statements.

Some of the factors that could cause our actual results, performance or achievements to differ materially from those expressed or implied by these forward-looking statements include, but are not limited to, the following:

- we may fail to secure development opportunities due to an inability to reach agreements with third parties to obtain land at attractive prices or to obtain desired zoning and other local approvals;
- we may abandon or defer development opportunities for a number of reasons, including changes in local market conditions which make development less desirable, increases in costs of development, increases in the cost of capital or lack of capital availability, resulting in losses;
- construction costs of a community may exceed original estimates;
- we may not complete construction and lease-up of communities under development or redevelopment on schedule, resulting in increased interest costs and construction costs and a decrease in expected rental revenues;
- occupancy rates and market rents may be adversely affected by competition and local economic and market conditions which are beyond our control;
- our cash flows from operations and access to cost-effective capital may be insufficient for the development of our pipeline, which could limit our pursuit of opportunities;
- an outbreak of disease or other public health event may affect the multifamily industry and general economy;
- our cash flows may be insufficient to meet required payments of principal and interest, and we may be unable to refinance existing indebtedness or the terms of such refinancing may not be as favorable as the terms of existing indebtedness;
- we may be unsuccessful in our management of joint ventures and the REIT vehicles that are used with certain joint ventures;

51

Table of Contents

- we may experience a casualty loss, natural disaster or severe weather event, including those caused by climate change;
- new or existing laws and regulations implementing rent control or rent stabilization, or otherwise limiting our ability to increase rents, charge fees or evict tenants, may impact our revenue or increase our costs;
- our expectations, estimates and assumptions as of the date of this filing regarding legal proceedings are subject to change;
- the possibility that we may choose to pay dividends in our stock instead of cash, which may result in stockholders having to pay taxes with respect to such dividends in excess of the cash received, if any; and
- investments made under the SIP may not be repaid as expected or the development may not be completed on schedule, which could require us to engage in litigation, foreclosure actions, and/or first party project completion to recover our investment, which may not be recovered in full or at all in such event.

<u>Critical Accounting Policies and Estimates</u>

The preparation of financial statements in conformity with GAAP requires management to use judgment in the application of accounting policies, including making estimates and assumptions. If our judgment or interpretation of the facts and circumstances relating to various transactions had been different, or different assumptions were made, it is possible that different accounting policies would have been applied, resulting in different financial results or a different presentation of our financial statements. Below is a discussion of the accounting policies that we consider critical to an understanding of our financial condition and operating results that may require complex or significant judgment in their application or require estimates about matters which are inherently uncertain. A discussion of our significant accounting policies, including further discussion of the accounting policies described below, can be found in Note 1, "Organization, Basis of Presentation and Significant Accounting Policies," of our Consolidated Financial Statements.

*Cost Capitalization*

We capitalize costs during the development of assets. Capitalization begins when we determine that development of a future asset is probable and continues until the asset, or a portion of the asset, is delivered and is ready for its intended use. For redevelopment efforts, we capitalize costs either (i) in advance of taking apartment homes out of service when significant renovation of the common area has begun and continue until the redevelopment is completed, or (ii) when an apartment home is taken out of service for redevelopment and continue until the redevelopment is completed and the apartment home is available for a new resident. Rental income and operating expenses incurred during the initial lease-up or post-redevelopment lease-up period are fully recognized in earnings as they accrue.

During the development and redevelopment efforts we capitalize all direct costs and indirect costs which have been incurred as a result of the development and redevelopment activities. These costs include interest and related loan fees, property taxes as well as other direct and indirect costs. Interest is capitalized for any project-specific financing, as well as for general corporate financing to the extent of our aggregate investment in the projects. Indirect project costs, which include personnel and office and administrative costs that are clearly associated with our development and redevelopment efforts, are also capitalized. Capitalized indirect costs associated with our development and redevelopment activities are comprised primarily of compensation related costs for associates dedicated to our development and redevelopment efforts and total $50,343,000 and $50,996,000 for 2024 and 2023, respectively. The estimation of the direct and indirect costs to capitalize as part of our development and redevelopment activities requires judgment and, as such, we believe cost capitalization to be a critical accounting estimate.

There may be a change in our operating expenses in the event that there are changes in accounting guidance governing capitalization or changes to our levels of development or redevelopment activity. If changes in the accounting guidance limit our ability to capitalize costs or if we reduce our development and redevelopment activities without a corresponding decrease in indirect project costs, there may be an increase in our operating expenses.

We capitalize pre-development costs incurred in pursuit of Development Rights. These costs include legal fees, design fees and related overhead costs. Future development of these pursuits is dependent upon various factors, including zoning and regulatory approval, rental market conditions, construction costs and availability of capital. Pre-development costs incurred for pursuits for which future development is not yet considered probable are expensed as incurred. In addition, if the status of a Development Right changes, making future development no longer probable, any capitalized pre-development costs are written off with a charge to expense.

Due to the subjectivity in determining whether a pursuit will result in the development of an apartment community, and therefore should be capitalized, the accounting for pursuit costs is a critical accounting estimate. As of December 31, 2024, capitalized pursuit costs associated with Development Rights totaled $43,675,000.

Table of Contents

*Abandoned Pursuit Costs & Asset Impairment*

We evaluate our direct and indirect investments in real estate and other long-lived assets for impairment when potential indicators of impairment exist. If events or circumstances indicate that the carrying amount of a property may not be recoverable, we assess its recoverability by comparing the carrying amount of the property to its estimated undiscounted future cash flows. If the carrying amount exceeds the aggregate undiscounted future cash flows, we recognize an impairment loss to the extent the carrying amount exceeds the estimated fair value of the property. We assess land held for development for impairment if our intent changes with respect to the development of the land. We evaluate our unconsolidated investments for impairment, considering both the carrying value of the investment, estimated expected proceeds that it would receive if the entity were dissolved and the net assets were liquidated, as well as our proportionate share of any impairment of assets held by unconsolidated investments.

The assessment of impairment can involve subjectivity in determining if indicators are present and in estimating the future undiscounted cash flows or the fair value of an asset. Estimates of the undiscounted cash flows are sensitive to significant assumptions including future rental revenues, operating expenses, and our intent and ability to hold the related asset, which could be impacted by our expectations about the future.

We expense costs related to abandoned pursuits, which include the abandonment of Development Rights and costs related to development pursuits not yet considered probable for development, as well as costs incurred in pursuing the acquisition or disposition of assets for which such acquisition and disposition activity did not occur, of which we expensed $18,341,000, $33,479,000 and $16,565,000 of these costs during the years ended December 31, 2024, 2023 and 2022, respectively. These costs are included in expensed transaction, development and other pursuit costs, net of recoveries on the accompanying Consolidated Statements of Comprehensive Income. These costs can vary greatly, and the costs incurred in any given period may be significantly different in future years.

Our focus on value creation through real estate development presents an impairment risk in the event of a future deterioration of the real estate and/or capital markets or a decision by us to reduce or cease development. We cannot predict the occurrence of future events that may cause an impairment assessment to be performed, or the likelihood of any future impairment charges, if any. You should also review Item 1A. "Risk Factors" in this Form 10-K.

53

Table of Contents

**ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risks from our financial instruments primarily from changes in market interest rates. Our financial instruments do not expose us to significant risk from foreign currency exchange rates or commodity or equity prices. We monitor interest rate risk as an integral part of our overall risk management, which recognizes the unpredictability of financial markets and seeks to reduce the potentially adverse effect on our results of operations. Our operating results are affected by changes in interest rates, primarily in short-term SOFR and the SIFMA index as a result of borrowings under our Credit Facility and Commercial Paper Program, outstanding bonds and unsecured notes with variable interest rates. In addition, the fair value of our fixed rate unsecured and secured notes are impacted by changes in market interest rates.

We currently use interest rate protection agreements in the form of interest rate cap agreements for our risk management objectives, as well as for compliance with the requirements of certain lenders, and not for trading or speculative purposes. In addition, we may use interest rate swap agreements for our risk management objectives. During the year ended December 31, 2024, in connection with the issuance of our $400,000,000 unsecured notes in May 2024 maturing in 2034, we terminated $250,000,000 of forward interest rate swap agreements designated as cash flow hedges of the interest rate variability on the issuance of unsecured notes, receiving payments of $16,839,000 which will be recognized over the life of the unsecured notes as a reduction in the effective interest rate.

In addition, we have interest rate caps that serve to effectively limit the amount of interest rate expense we would incur on our outstanding floating rate borrowings. Further discussion of the financial instruments impacted and our exposure is presented below.

As of December 31, 2024 and 2023, we had $400,950,000 and $410,150,000, respectively, in variable rate debt outstanding, with no amounts outstanding under our Credit Facility or Commercial Paper Program. If interest rates on the variable rate debt had been 100 basis points higher throughout 2024 and 2023, our annual interest incurred would have increased by approximately $4,102,000 and $5,428,000, respectively, based on balances outstanding during the applicable years.

Because the counterparties providing the interest rate cap and swap agreements are major financial institutions which have an A or better credit rating by the Standard & Poor's Ratings Group or equivalent, we do not believe there is exposure at this time to a default by a counterparty provider.

In addition, changes in interest rates affect the fair value of our fixed rate debt, computed using quoted market prices for our unsecured notes or a discounted cash flow model for our secured notes, considering our current market yields, which impacts the fair value of our aggregate indebtedness. As of December 31, 2024, we had outstanding debt of $8,134,429,000 with an estimated aggregate fair value of $7,456,236,000 at December 31, 2024. Contractual fixed rate debt represented $7,104,942,000 of the fair value at December 31, 2024. If interest rates had been 100 basis points higher as of December 31, 2024, the fair value of this fixed rate debt would have decreased by approximately $403,558,000.

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The response to this Item 8 is included as a separate section of this Annual Report on Form 10-K. See Item 15.

Table of Contents

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.    CONTROLS AND PROCEDURES**

(a)  Evaluation of Disclosure Controls and Procedures. As required by Rule 13a-15 under the Exchange Act, as of the end of the period covered by this report, the Company carried out an evaluation under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. We continue to review and document our disclosure controls and procedures, including our internal controls and procedures for financial reporting, and may from time to time make changes aimed at enhancing their effectiveness and to ensure that our systems evolve with our business.

(b)  Management's Report on Internal Control Over Financial Reporting. Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2024 based on the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 Framework (COSO). Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2024.

Our internal control over financial reporting as of December 31, 2024 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.

(c)  There were no changes to the internal control over financial reporting of the Company identified in connection with the Company's evaluation referred to above that occurred during the fourth quarter of 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.    OTHER INFORMATION**

During the three months ended December 31, 2024, none of the Company's directors or officers (as defined in Rule 16a-1(f) of the Exchange Act) adopted, terminated or modified a Rule 10b5-1 trading arrangement or non-Rule 10b5-1 trading arrangement (as such terms are defined in Item 408 of Regulation S-K).

**ITEM 9C.    DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

**PART III**

**ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by Item 10 pertaining to directors and executive officers of the Company and the Company's Code of Conduct and insider trading policies and procedures is incorporated herein by reference to the Company's Proxy Statement to be filed with the SEC within 120 days after the end of the year covered by this Form 10-K with respect to the Annual Meeting of Stockholders scheduled to be held on May 21, 2025.

The Company has insider trading policies and procedures (the "Insider Trading Policy") that govern the purchase, sale and other dispositions of its securities by directors, officers, and employees, as well as by the Company itself. We believe these policies and procedures are reasonably designed to promote compliance with insider trading laws, rules and regulations and applicable listing standards. A copy of our Insider Trading Policy is filed as Exhibit 19.1 to this Form 10-K.

**ITEM 11.  EXECUTIVE COMPENSATION**

The information required by Item 11 pertaining to executive compensation is incorporated herein by reference to the Company's Proxy Statement to be filed with the SEC within 120 days after the end of the year covered by this Form 10-K with respect to the Annual Meeting of Stockholders scheduled to be held on May 21, 2025.

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by Item 12 pertaining to security ownership of management and certain beneficial owners of the Company's common stock is incorporated herein by reference to the Company's Proxy Statement to be filed with the SEC within 120 days after the end of the year covered by this Form 10-K with respect to the Annual Meeting of Stockholders scheduled to be held on May 21, 2025, to the extent not set forth below.

The Company maintains the Second Amended and Restated 2009 Equity Incentive Plan (the "Plan") and the 1996 Non-Qualified Employee Stock Purchase Plan (the "ESPP"), pursuant to which common stock or other equity awards may be issued or granted to eligible persons.

The following table gives information about equity awards under the Plan and the ESPP as of December 31, 2024:

| | (a) | (b) | (c) |
|---|---|---|---|
| | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
| **Plan category** | | | |
| Equity compensation plans approved by security holders (1) | 854,951 (2) | $ 181.84 (3) | 4,957,465 |
| Equity compensation plans not approved by security holders (4) | — | N/A | 550,002 |
| Total | 854,951 | $ 181.84 (3) | 5,507,467 |

(1)   Consists of the Plan.

(2)   Includes 83,843 deferred restricted stock units granted under the Plan, which, subject to vesting requirements, will convert in the future to common stock on a one-for-one basis. Also includes the maximum number of shares that may be issued upon settlement of outstanding Performance Awards awarded to officers and maturing on December 31, 2024, 2025 and 2026. Does not include 182,382 shares of restricted stock that are outstanding and that are already reflected in the Company's outstanding shares.

(3)   Excludes performance awards and deferred units granted under the Plan, which, subject to vesting requirements, will convert in the future to common stock on a one-for-one basis.

(4)   Consists of the ESPP.

The ESPP, which was adopted by the Board of Directors on October 29, 1996, has not been approved by our shareholders. A further description of the ESPP appears in Note 9, "Stock-Based Compensation Plans," of the Consolidated Financial Statements set forth in Item 8 of this report.

Table of Contents

**ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by Item 13 pertaining to certain relationships and related transactions is incorporated herein by reference to the Company's Proxy Statement to be filed with the SEC within 120 days after the end of the year covered by this Form 10-K with respect to the Annual Meeting of Stockholders to be held on May 21, 2025.

**ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by Item 14 pertaining to the fees paid to and services provided by the Company's principal accountant is incorporated herein by reference to the Company's Proxy Statement to be filed with the SEC within 120 days after the end of the year covered by this Form 10-K with respect to the Annual Meeting of Stockholders to be held on May 21, 2025. Our independent public accounting firm is Ernst & Young LLP, Tysons, Virginia, PCAOB Auditor ID 42.

**PART IV**

**ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**15(a)(1)** *Financial Statements*

**Index to Financial Statements**

Consolidated Financial Statements and Financial Statement Schedule:

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of December 31, 2024 and 2023 | F-4 |
| Consolidated Statements of Comprehensive Income for the years ended December 31, 2024, 2023 and 2022 | F-5 |
| Consolidated Statements of Equity for the years ended December 31, 2024, 2023 and 2022 | F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2024, 2023 and 2022 | F-7 |
| Notes to Consolidated Financial Statements | F-10 |

**15(a)(2)** *Financial Statement Schedule*

| | |
|---|---|
| Schedule III—Real Estate and Accumulated Depreciation | F-39 |

All other schedules for which provision is made in the applicable accounting regulation of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and therefore have been omitted.

**15(a)(3)** *Exhibits*

The exhibits listed on the accompanying Index to Exhibits are filed as a part of this report.

**ITEM 16.   FORM 10-K SUMMARY**

Not Applicable.

Table of Contents

**INDEX TO EXHIBITS**

| Exhibit No. | | Description |
| --- | --- | --- |
| 3(i).1 | — | Articles of Amendment and Restatement of Articles of Incorporation of the Company, dated as of June 4, 1998. (Incorporated by reference to Exhibit 3(i).1 to Form 10-K of the Company filed March 1, 2007.) |
| 3(i).2 | — | Articles of Amendment, dated as of October 2, 1998. (Incorporated by reference to Exhibit 3(i).2 to Form 10-K of the Company filed March 1, 2007.) |
| 3(i).3 | — | Articles of Amendment, dated as of May 22, 2013. (Incorporated by reference to Exhibit 3(i).3 to Form 8-K of the Company filed May 22, 2013.) |
| 3(i).4 | — | Articles of Amendment, dated as of May 14, 2020. (Incorporated by reference to Exhibit 3(i).4 to Form 8-K of the Company filed May 15, 2020.) |
| 3(i).5 | — | Composite restatement of Articles of Amendment and Restatement of Articles of Incorporation of the Company, dated as of June 4, 1998, as amended by the Articles of Amendment, dated as of October 2, 1998, the Articles of Amendment, dated as of May 22, 2013, and the Articles of Amendment, dated as of May 14, 2020. (Incorporated by reference to Exhibit 3(i).5 to Form 10-Q of the Company filed November 3, 2023.) |
| 3(ii).1 | — | Amended and Restated Bylaws of the Company, as adopted by the Board of Directors on October 30, 2023. (Incorporated by reference to Exhibit 3.1 to Form 8-K of the Company filed October 30, 2023.) |
| 4.1 | — | Indenture for Senior Debt Securities, dated as of January 16, 1998, between the Company and State Street Bank and Trust Company, as Trustee. (Incorporated by reference to Exhibit 4.1 to Registration Statement on Form S-3 of the Company (File No. 333-139839), filed January 8, 2007.) |
| 4.2 | — | Amended and Restated Third Supplemental Indenture, dated as of July 10, 2000 between the Company and State Street Bank and Trust Company, as Trustee. (Incorporated by reference to Exhibit 4.4 to Registration Statement on Form S-3 of the Company (File No. 333-139839), filed January 8, 2007.) |
| 4.3 | — | Fourth Supplemental Indenture, dated as of September 18, 2006, between the Company and U.S. Bank National Association as Trustee. (Incorporated by reference to Exhibit 4.5 to Registration Statement on Form S-3 of the Company (File No. 333-139839), filed January 8, 2007.) |
| 4.4 | — | Fifth Supplemental Indenture, dated as of November 21, 2014, between the Company and the Bank of New York Mellon, as Trustee. (Incorporated by reference to Exhibit 4.1 to Form 8-K of the Company filed November 21, 2014.) |
| 4.5 | — | Indenture for Debt Securities, dated as of February 23, 2018, between the Company and The Bank of New York Mellon, as Trustee (Incorporated by reference to Exhibit 4.1 to Form 8-K of the Company filed September 15, 2021.) |
| 4.6 | — | First Supplemental Indenture, dated as March 26, 2018, between the Company and the Bank of New York Mellon, as Trustee, (Incorporated by reference to Exhibit 4.8 to Form 10-Q of the Company filed May 4, 2018.) |
| 4.7 | — | Second Supplemental Indenture, dated as of May 29, 2018, between the Company and the Bank of New York Mellon, as Trustee, (Incorporated by reference to Exhibit 4.3 to Form 8-K of the Company, filed May 29, 2018.) |
| 4.8 | — | Indenture for Debt Securities, dated as of February 23, 2024, between the Company and U.S. Bank Trust Company, National Association. (Incorporated by reference to Exhibit 4.8 to Form 10-K of the Company filed February 23, 2024.) |
| 4.9 | — | First Supplemental Indenture, dated as of May 14, 2024, between the Company and U.S. Bank Trust Company, National Association, including the form of 5.350% Senior Notes due 2034 (Incorporated by reference to Exhibit 4.2 to Form 8-K of the Company filed May 14, 2024.) |
| 4.10 | — | Dividend Reinvestment and Stock Purchase Plan of the Company. (Incorporated by reference to the prospectus contained in the Registration Statement on Form S-3DPOS of the Company (File No. 333-87063), filed February 23, 2018.) |
| 4.11 | — | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934. (Incorporated by reference to Exhibit 4.10 to Form 10-K of the Company filed February 23, 2024.) |

Table of Contents

| | | |
|---|---|---|
| 4.12 | — | Form of 2.050% Senior Notes due 2032 (Incorporated by reference to Exhibit 4.4 to Form 8-K of the Company filed September 15, 2021.) |
| 4.13 | — | Form of 1.900% Senior Notes due 2028 (Incorporated by reference to Exhibit 4.4 to Form 8-K of the Company filed November 18, 2021.) |
| 4.14 | — | Form of 5.000% Senior Notes due 2033 (Incorporated by reference to Exhibit 4.4 to Form 8-K of the Company filed December 7, 2022.) |
| 4.15 | — | Form of 5.300% Senior Notes due 2033 (Incorporated by reference to Exhibit 4.4 to Form 8-K of the Company filed December 7, 2023.) |
| 10.1+ | — | AvalonBay Communities, Inc. Second Amended and Restated 2009 Equity Incentive Plan, as restated to reflect the First Amendment, Second Amendment, Third Amendment and Fourth Amendment thereto. (Incorporated by reference to Exhibit 10.1 to Form 10-K of the Company filed February 24, 2023.) |
| 10.2+ | — | Form of Stock Grant and Restricted Stock Agreement for use with officers and associates. (Filed herewith.) |
| 10.3+ | — | Form of Incentive Stock Option/Non-Qualified Stock Option Agreement for use with officers and associates. (Filed herewith.) |
| 10.4+ | — | 2024 Amended and Restated Directors Deferred Compensation Program. (Incorporated by reference to Exhibit 10.4 to Form 10-K of the Company filed February 23, 2024.) |
| 10.5+ | — | Form of Director Restricted Stock Agreement. (Incorporated by reference to Exhibit 10.5 to Form 8-K of the Company filed February 22, 2018.) |
| 10.6+ | — | Form of Director Restricted Unit Agreement (deferred stock award) (2018). (Incorporated by reference to Exhibit 10.6 of Form 8-K of the Company filed February 22, 2018.) |
| 10.7+ | — | Form of Director Restricted Stock Unit Agreement (2024). (Incorporated by reference to Exhibit 10.7 to Form 10-K of the Company filed February 23, 2024.) |
| 10.8+ | — | Form of Agreement for Grant of Performance-Based Restricted Stock Units with attached Award Terms (subject to changes in the following: weightings; target, threshold and maximum levels of achievement; and metrics used). (Incorporated by reference to Exhibit 10.7 to Form 10-K of the Company filed February 24, 2023.) |
| 10.9+ | — | Form of Indemnification Agreement between the Company and its Directors. (Filed herewith.) |
| 10.10+ | — | The Company's Officer Severance Plan, as amended and restated on February 25, 2021. (Incorporated by reference to Exhibit 10.2 to Form 10-Q of the Company filed May 5, 2021.) |
| 10.11 | — | Sixth Amended and Restated Revolving Loan Agreement, dated as of September 27, 2022, among the Company, as Borrower, Bank of America, N.A., as administrative agent, an issuing bank and a bank, JPMorgan Chase Bank, N.A., as an issuing bank, a bank and a syndication agent, Wells Fargo Bank, N.A., as an issuing bank, a bank and a syndication agent, the co-documentation agents named therein, JPMorgan Chase Bank, N.A., BofA Securities, Inc., and Wells Fargo Securities, LLC as joint bookrunners and joint lead arrangers, and the other bank parties signatory thereto. (Incorporated by reference to Exhibit 10.1 to Form 8-K of the Company filed September 29, 2022.) |
| 10.12+ | — | Amended and Restated AvalonBay Communities, Inc. Deferred Compensation Plan, effective as of January 1, 2011. (Incorporated by reference to Exhibit 10.1 to Form 10-Q of the Company filed August 6, 2010.) |
| 10.13+ | — | First Amendment to Amended and Restated AvalonBay Communities, Inc. Deferred Compensation Plan, effective as of November 7, 2011. (Incorporated by reference to Exhibit 10.28 to Form 10-K of the Company filed February 24, 2017.) |

| 10.14+ | — | Second Amendment to Amended and Restated AvalonBay Communities, Inc. Deferred Compensation Plan, effective as of November 15, 2012. (Incorporated by reference to Exhibit 10.29 to Form 10-K of the Company filed February 24, 2017.) |
| 10.15 | — | Archstone Residual JV, LLC Limited Liability Company Agreement. (Incorporated by reference to Exhibit 10.3 to Form 8-K of the Company filed March 5, 2013.) |
| 10.16 | — | Archstone Parallel Residual JV, LLC Limited Liability Company Agreement. (Incorporated by reference to Exhibit 10.4 to Form 8-K of the Company filed March 5, 2013.) |
| 10.17 | — | Archstone Parallel Residual JV 2, LLC Limited Liability Company Agreement. (Incorporated by reference to Exhibit 10.5 to Form 8-K of the Company filed March 5, 2013.) |
| 10.18 | — | Legacy Holdings JV, LLC Limited Liability Company Agreement. (Incorporated by reference to Exhibit 10.6 to Form 8-K of the Company filed March 5, 2013.) |
| 10.19+ | — | Employment Agreement between the Company and Benjamin W. Schall, dated as of December 4, 2020 (Incorporated by reference to Exhibit 10.1 to Form 8-K of the Company filed December 10, 2020.) |
| 10.20+ | — | Form of Incentive Stock Option/Non-Qualified Stock Option Agreement for use with officers and associates for 2021 Supplemental Awards. (Incorporated by reference to Exhibit 10.3 to Form 10-Q of the Company filed May 5, 2021.) |
| 10.21+ | — | Form of Agreement for Grant of Performance-Based Restricted Stock Units with attached Award Terms and noted variations for Mr. Naughton's 2022-2024 award (subject to changes in the following for future agreements: metrics used; target, threshold and maximum levels of achievement for each metric; and weightings between the metrics). (Incorporated by reference to Exhibit 10.1 to Form 10-Q of the Company filed May 4, 2022.) |
| 19.1 | — | AvalonBay Communities, Inc. Insider Trading Policy. (Filed herewith.) |
| 21.1 | — | Schedule of Subsidiaries of the Company. (Filed herewith.) |
| 23.1 | — | Consent of Ernst & Young LLP. (Filed herewith.) |
| 31.1 | — | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (Chief Executive Officer). (Filed herewith.) |
| 31.2 | — | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (Chief Financial Officer). (Filed herewith.) |
| 32 | — | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chief Executive Officer and Chief Financial Officer). (Furnished herewith.) |
| 97 | — | AvalonBay Communities, Inc. Compensation Recovery Policy. (Incorporated by reference to Exhibit 97 to Form 10-K of the Company filed February 23, 2024.) |
| 101 | — | Financial materials from AvalonBay Communities, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2024 formatted in Inline XBRL (Extensible Business Reporting Language) including: (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Comprehensive Income, (iii) the Consolidated Statements of Equity, (iv) the Consolidated Statements of Cash Flows and (v) Notes to the Consolidated Financial Statements. (Filed herewith.) |
| 104 | — | Cover Page Interactive Data File (embedded within the Inline XBRL document). (Filed herewith.) |

---

+    Management contract or compensatory plan or arrangement required to be filed or incorporated by reference as an exhibit to this Form 10-K pursuant to Item 15(a)(3) of Form 10-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**AvalonBay Communities, Inc.**

Date: February 27, 2025    By:    /s/ BENJAMIN W. SCHALL

*Benjamin W. Schall, Director, Chief Executive Officer and President*
*(Principal Executive Officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | | |
|---|---|---|
| Date: February 27, 2025 | By: | /s/ BENJAMIN W. SCHALL |
| | | Benjamin W. Schall, Director, Chief Executive Officer and President (Principal Executive Officer) |
| Date: February 27, 2025 | By: | /s/ KEVIN P. O'SHEA |
| | | Kevin P. O'Shea, Chief Financial Officer (Principal Financial Officer) |
| Date: February 27, 2025 | By: | /s/ KERI A. SHEA |
| | | Sean T. Willson, Senior Vice President - Corporate Controller (Principal Accounting Officer) |
| Date: February 27, 2025 | By: | /s/ GLYN F. AEPPEL |
| | | Glyn F. Aeppel, Director |
| Date: February 27, 2025 | By: | /s/ TERRY S. BROWN |
| | | Terry S. Brown, Director |
| Date: February 27, 2025 | By: | /s/ RONALD L. HAVNER, JR. |
| | | Ronald L. Havner, Jr., Director |
| Date: February 27, 2025 | By: | /s/ STEPHEN P. HILLS |
| | | Stephen P. Hills, Director |
| Date: February 27, 2025 | By: | /s/ CHRISTOPHER B. HOWARD |
| | | Christopher B. Howard, Director |
| Date: February 27, 2025 | By: | /s/ RICHARD J. LIEB |
| | | Richard J. Lieb, Director |
| Date: February 27, 2025 | By: | /s/ NNENNA LYNCH |
| | | Nnenna Lynch, Director |
| Date: February 27, 2025 | By: | /s/ CHARLES E. MUELLER, JR. |
| | | Charles E. Mueller, Jr., Director |
| Date: February 27, 2025 | By: | /s/ TIMOTHY J. NAUGHTON |
| | | Timothy J. Naughton, Director (Chairman of the Board of Directors) |
| Date: February 27, 2025 | By: | /s/ SUSAN SWANEZY |
| | | Susan Swanezy, Director |

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of AvalonBay Communities, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of AvalonBay Communities, Inc. (the Company) as of December 31, 2024 and 2023, the related consolidated statements of comprehensive income, equity and cash flows for each of the three years in the period ended December 31, 2024, and the related notes and financial statement schedule listed in the Index at Item 15(a)(2) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2024 and 2023, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2024, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2024, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 27, 2025 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosure to which it relates.

F-1

Table of Contents

*Description of the Matter*

**Valuation of Deferred Development Costs and Land Held for Development**

As of December 31, 2024, the Company's deferred development costs and land held for development totaled $43.7 million and $151.9 million, respectively, collectively "Development Rights". As discussed in Footnote 1 of the consolidated financial statements, the Company capitalizes costs associated with its development activities to the basis of land held when future development is probable, or if the Company has either not yet acquired the land or if the project is subject to a leasehold interest, the costs are capitalized as deferred development costs. Future development is dependent upon various factors, including zoning and regulatory approvals, rental market conditions, construction costs and the availability of capital.

Auditing the valuation of deferred development costs and land held for development involved a high degree of subjectivity as management's assessment of the probability that future development will occur was highly judgmental and subject to the various factors affecting future development discussed above. The Company's assessment of probability of future development included an analysis of the likelihood of factors outside their control that could prevent the development from occurring and factors that could cause the Company to decide not to pursue or complete the development.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's process to assess the valuation of deferred development costs and land held for development. For example, we tested controls over the Company's pursuit monitoring process and management's review of the probability assessment related to future development.

Our procedures included, among others, evaluating the Company's determination that the future development is probable. We performed procedures to test the accuracy and completeness of the information included in the Company's qualitative analysis by agreeing data to underlying agreements, communications, minutes of management's quarterly development meetings, and third-party evidence, where available. We further assessed the likelihood of the Company's ability to obtain zoning and regulatory approvals for developments by considering, among other things, the Company's prior experience with other development projects and the current status of the future projects for which pursuit or development rights costs were capitalized or land was held for development. We also met with executives who lead the Company's development team to further understand the probability of future development.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2002.

Tysons, Virginia
February 27, 2025

F-2

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of AvalonBay Communities, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited AvalonBay Communities, Inc.'s internal control over financial reporting as of December 31, 2024, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, AvalonBay Communities, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2024, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2024 and 2023, the related consolidated statements of comprehensive income, equity and cash flows for each of the three years in the period ended December 31, 2024, and the related notes and financial statement schedule listed in the Index at Item 15(a)(2) and our report dated February 27, 2025 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Tysons, Virginia
February 27, 2025

F-3

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(Dollars in thousands, except per share data)**

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| ASSETS | | |
| Real estate: | | |
| Land and improvements | $ 4,888,146 | $ 4,720,331 |
| Buildings and improvements | 20,454,276 | 19,438,195 |
| Furniture, fixtures and equipment | 1,387,506 | 1,238,330 |
| | 26,729,928 | 25,396,856 |
| Less accumulated depreciation | (8,164,411) | (7,521,962) |
| Net operating real estate | 18,565,517 | 17,874,894 |
| Construction in progress, including land | 1,042,673 | 1,268,915 |
| Land held for development | 151,922 | 199,062 |
| Real estate assets held for sale, net | 6,950 | — |
| Total real estate, net | 19,767,062 | 19,342,871 |
| Cash and cash equivalents | 108,576 | 397,890 |
| Restricted cash | 158,500 | 133,070 |
| Unconsolidated investments | 227,320 | 220,145 |
| Deferred development costs | 43,675 | 53,122 |
| Prepaid expenses and other assets | 540,950 | 396,442 |
| Right of use lease assets | 154,654 | 134,674 |
| Total assets | $ 21,000,737 | $ 20,678,214 |
| LIABILITIES AND EQUITY | | |
| Unsecured notes, net | $ 7,358,784 | $ 7,256,152 |
| Variable rate unsecured credit facility and commercial paper, net | — | — |
| Mortgage notes payable, net | 718,465 | 725,670 |
| Dividends payable | 244,967 | 238,072 |
| Payables for construction | 85,954 | 87,703 |
| Accrued expenses and other liabilities | 356,987 | 310,868 |
| Lease liabilities | 173,282 | 153,232 |
| Accrued interest payable | 58,377 | 57,911 |
| Resident security deposits | 62,829 | 63,815 |
| Total liabilities | 9,059,645 | 8,893,423 |
| Commitments and contingencies | | |
| Redeemable noncontrolling interests | — | 1,473 |
| Equity: | | |
| Preferred stock, $0.01 par value; $25 liquidation preference; 50,000,000 shares authorized at December 31, 2024 and December 31, 2023; zero shares issued and outstanding at December 31, 2024 and December 31, 2023 | — | — |
| Common stock, $0.01 par value; 280,000,000 shares authorized at December 31, 2024 and December 31, 2023; 142,254,022 and 142,025,456 shares issued and outstanding at December 31, 2024 and December 31, 2023, respectively | 1,422 | 1,420 |
| Additional paid-in capital | 11,314,116 | 11,287,626 |
| Accumulated earnings less dividends | 591,250 | 478,156 |
| Accumulated other comprehensive income | 34,304 | 16,116 |
| Total equity | 11,941,092 | 11,783,318 |
| Total liabilities and equity | $ 21,000,737 | $ 20,678,214 |

See accompanying notes to Consolidated Financial Statements.

**AVALONBAY COMMUNITIES, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(Dollars in thousands, except per share data)**

| | For the year ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Revenue: | | | |
| Rental and other income | $ 2,906,676 | $ 2,760,187 | $ 2,587,113 |
| Management, development and other fees | 7,081 | 7,722 | 6,333 |
|    Total revenue | 2,913,757 | 2,767,909 | 2,593,446 |
| | | | |
| Expenses: | | | |
| Operating expenses, excluding property taxes | 745,846 | 681,338 | 630,154 |
| Property taxes | 327,611 | 306,794 | 288,960 |
| Expensed transaction, development and other pursuit costs, net of recoveries | 18,341 | 33,479 | 16,565 |
| Interest expense, net | 226,589 | 205,992 | 230,074 |
| Loss on extinguishment of debt, net | — | 150 | 1,646 |
| Depreciation expense | 846,853 | 816,965 | 814,978 |
| General and administrative expense | 77,697 | 76,534 | 74,064 |
| Casualty and impairment loss | 2,935 | 9,118 | — |
|    Total expenses | 2,245,872 | 2,130,370 | 2,056,441 |
| | | | |
| Income from unconsolidated investments | 50,682 | 13,454 | 53,394 |
| Gain on sale of communities | 363,300 | 287,424 | 555,558 |
| Other real estate activity | 753 | 174 | 5,127 |
| | | | |
| Income before income taxes | 1,082,620 | 938,591 | 1,151,084 |
| Income tax expense | (445) | (10,153) | (14,646) |
| | | | |
| Net income | 1,082,175 | 928,438 | 1,136,438 |
| Net (income) loss attributable to noncontrolling interests | (181) | 387 | 337 |
| | | | |
| Net income attributable to common stockholders | $ 1,081,994 | $ 928,825 | $ 1,136,775 |
| | | | |
| Other comprehensive income: | | | |
| Gain on cash flow hedges | 18,659 | 13,332 | 23,647 |
| Cash flow hedge (gains) losses reclassified to earnings | (471) | 1,360 | 3,883 |
| Comprehensive income | $ 1,100,182 | $ 943,517 | $ 1,164,305 |
| | | | |
| Earnings per common share - basic: | | | |
|    Net income attributable to common stockholders | $ 7.61 | $ 6.56 | $ 8.13 |
| | | | |
| Earnings per common share - diluted: | | | |
|    Net income attributable to common stockholders | $ 7.60 | $ 6.56 | $ 8.12 |

See accompanying notes to Consolidated Financial Statements.

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**
**(Dollars in thousands)**

| | Shares issued | | Preferred stock | Common stock | Additional paid-in capital | Accumulated earnings less dividends | Accumulated other comprehensive (loss) income | Total equity |
|---|---|---|---|---|---|---|---|---|
| | Preferred stock | Common stock | | | | | | |
| Balance at December 31, 2021 | — | 139,751,926 | $ — | $ 1,398 | $ 10,716,980 | $ 240,821 | $ (26,106) | $ 10,933,093 |
| Net income attributable to common stockholders | — | — | — | — | — | 1,136,775 | — | 1,136,775 |
| Gain on cash flow hedges, net | — | — | — | — | — | — | 23,647 | 23,647 |
| Cash flow hedge losses reclassified to earnings | — | — | — | — | — | — | 3,883 | 3,883 |
| Noncontrolling interest activity | — | — | — | — | (489) | (105) | — | (594) |
| Dividends declared to common stockholders ($6.36 per share) | — | — | — | — | — | (890,809) | — | (890,809) |
| Issuance of common stock, net of withholdings | — | 164,938 | — | 2 | 4,577 | (1,461) | — | 3,118 |
| Stock-based compensation expense | — | — | — | — | 44,440 | — | — | 44,440 |
| Balance at December 31, 2022 | — | 139,916,864 | — | 1,400 | 10,765,508 | 485,221 | 1,424 | 11,253,553 |
| Net income attributable to common stockholders | — | — | — | — | — | 928,825 | — | 928,825 |
| Gain on cash flow hedges, net | — | — | — | — | — | — | 13,332 | 13,332 |
| Cash flow hedge losses reclassified to earnings | — | — | — | — | — | — | 1,360 | 1,360 |
| Noncontrolling interest activity | — | — | — | — | — | (1,217) | — | (1,217) |
| Dividends declared to common stockholders ($6.60 per share) | — | — | — | — | — | (935,305) | — | (935,305) |
| Issuance of common stock, net of withholdings | — | 2,120,392 | — | 20 | 485,029 | 1,635 | — | 486,684 |
| Repurchase of common stock, including repurchase costs | — | (11,800) | — | — | (908) | (1,003) | — | (1,911) |
| Stock-based compensation expense | — | — | — | — | 37,997 | — | — | 37,997 |
| Balance at December 31, 2023 | — | 142,025,456 | — | 1,420 | 11,287,626 | 478,156 | 16,116 | 11,783,318 |
| Net income attributable to common stockholders | — | — | — | — | — | 1,081,994 | — | 1,081,994 |
| Gain on cash flow hedges, net | — | — | — | — | — | — | 18,659 | 18,659 |
| Cash flow hedge gains reclassified to earnings | — | — | — | — | — | — | (471) | (471) |
| Noncontrolling interest activity | — | — | — | — | (77) | — | — | (77) |
| Dividends declared to common stockholders ($6.80 per share) | — | — | — | — | — | (969,345) | — | (969,345) |
| Issuance of common stock, net of withholdings | — | 228,566 | — | 2 | (9,875) | 445 | — | (9,428) |
| Stock-based compensation expense | — | — | — | — | 36,442 | — | — | 36,442 |
| Balance at December 31, 2024 | — | 142,254,022 | $ — | $ 1,422 | $ 11,314,116 | $ 591,250 | $ 34,304 | $ 11,941,092 |

See accompanying notes to Consolidated Financial Statements.

F-6

Table of Contents

**AVALONBAY COMMUNITIES, INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in thousands)**

|  | For the year ended December 31, | | |
|---|---|---|---|
|  | **2024** | **2023** | **2022** |
| Cash flows from operating activities: | | | |
| Net income | $ 1,082,175 | $ 928,438 | $ 1,136,438 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation expense | 846,853 | 816,965 | 814,978 |
| Amortization of deferred financing costs and debt discount | 13,280 | 12,732 | 11,218 |
| Loss on extinguishment of debt, net | — | 150 | 1,646 |
| Amortization of stock-based compensation | 25,373 | 27,142 | 33,864 |
| Equity in (income) loss of, and return on, unconsolidated investments and noncontrolling interests, net of eliminations | (21,693) | 5,332 | 5,255 |
| Casualty and impairment loss | 1,415 | 4,622 | — |
| Expensed transaction, development and other pursuit costs, net of recoveries | 18,341 | 33,479 | 5,599 |
| Cash flow hedge (gains) losses reclassified to earnings | (471) | 1,360 | 3,883 |
| Gain on sale of real estate assets | (364,159) | (287,987) | (600,958) |
| (Decrease) increase in prepaid expenses and other assets | (31,158) | 5,777 | (7,167) |
| Increase in accrued expenses, other liabilities, accrued interest payable and resident security deposits | 37,922 | 12,019 | 17,176 |
| Net cash provided by operating activities | 1,607,878 | 1,560,029 | 1,421,932 |
| | | | |
| Cash flows from investing activities: | | | |
| Development/redevelopment of real estate assets including land acquisitions and deferred development costs | (951,101) | (901,847) | (921,203) |
| Acquisition of real estate assets | (464,419) | (215,889) | (536,838) |
| Capital expenditures - existing real estate assets | (193,348) | (178,312) | (160,313) |
| Capital expenditures - non-real estate assets | (4,678) | (18,962) | (14,392) |
| (Decrease) increase in payables for construction | (1,749) | 14,901 | 9,080 |
| Proceeds from sale of real estate and for-sale condominiums, net of selling costs | 711,279 | 467,096 | 1,051,383 |
| Note receivable lending | (90,088) | (82,802) | (29,352) |
| Note receivable payments | 237 | 253 | 4,021 |
| Distributions from unconsolidated entities and investment sale proceeds | 11,178 | 5,468 | 51,464 |
| Unconsolidated investments | (14,175) | (18,861) | (14,269) |
| Net cash used in investing activities | (996,864) | (928,955) | (560,419) |
| | | | |
| Cash flows from financing activities: | | | |
| Issuance of common stock, net | 10,535 | 496,706 | 20,020 |
| Repurchase of common stock, net | — | (1,911) | — |
| Dividends paid | (961,914) | (922,657) | (889,607) |
| Repayments of mortgage notes payable, including prepayment penalties | (9,793) | (47,000) | (43,332) |
| Issuance of unsecured notes | 398,788 | 399,756 | 348,565 |
| Repayment of unsecured notes | (300,000) | (750,000) | (100,000) |
| Payment of deferred financing costs | (3,763) | (3,964) | (14,301) |
| Receipt for termination of forward interest rate swaps | 16,839 | 8,331 | 26,869 |
| Payments related to tax withholding for share-based compensation | (16,883) | (10,639) | (16,989) |
| Noncontrolling interests and joint venture transactions | (8,707) | (2,981) | (2,281) |
| Net cash used in financing activities | (874,898) | (834,359) | (671,056) |
| | | | |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (263,884) | (203,285) | 190,457 |
| | | | |
| Cash, cash equivalents and restricted cash, beginning of year | 530,960 | 734,245 | 543,788 |
| Cash, cash equivalents and restricted cash, end of year | $ 267,076 | $ 530,960 | $ 734,245 |
| | | | |
| Cash paid during the year for interest, net of amount capitalized | $ 213,253 | $ 187,523 | $ 212,241 |

See accompanying notes to Consolidated Financial Statements.

Table of Contents

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported with the Consolidated Statements of Cash Flows (dollars in thousands):

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Cash and cash equivalents | $ 108,576 | $ 397,890 | $ 613,189 |
| Restricted cash | 158,500 | 133,070 | 121,056 |
| Cash, cash equivalents and restricted cash reported in the Consolidated Statements of Cash Flows | $ 267,076 | $ 530,960 | $ 734,245 |

Supplemental disclosures of non-cash investing and financing activities:

During the year ended December 31, 2024:

- As described in Note 4, "Equity," the Company issued 250,806 shares of common stock as part of the Company's stock-based compensation plans, of which 146,725 shares related to the conversion of performance awards to shares of common stock, and the remaining 104,081 shares valued at $18,020,000 were issued in connection with new stock grants; 12,290 shares valued at $1,972,000 were issued in conjunction with the conversion of deferred stock awards; 3,533 shares valued at $690,000 were issued through the Company's dividend reinvestment plan; 94,288 shares valued at $16,892,000 were withheld to satisfy employees' tax withholding and other liabilities; and 4,408 restricted shares with an aggregate value of $801,000 were forfeited.

- Common stock dividends declared but not paid totaled $243,479,000.

- The Company recorded (i) an increase to prepaid expenses and other assets of $18,659,000 and a corresponding adjustment to accumulated other comprehensive income; and (ii) reclassified $471,000 of cash flow hedge gains from other comprehensive income to interest expense, net, to record the impact of the Company's derivative and hedging activity.

- The Company recorded $25,719,000 of lease liabilities and offsetting right of use lease assets related to the execution of one new ground lease for a development right.

During the year ended December 31, 2023:

- The Company issued 153,162 shares of common stock as part of the Company's stock based compensation plans, of which 60,016 shares related to the conversion of performance awards to shares of common stock, and the remaining 93,146 shares valued at $16,552,000 were issued in connection with new stock grants; 3,454 shares valued at $619,000 were issued through the Company's dividend reinvestment plan; 62,937 shares valued at $10,639,000 were withheld to satisfy employees' tax withholding and other liabilities; and 2,119 restricted shares with an aggregate value of $413,000 were forfeited.

- Common stock dividends declared but not paid totaled $236,133,000.

- The Company recorded (i) an increase to prepaid expenses and other assets of $13,332,000 and a corresponding adjustment to accumulated other comprehensive income; and (ii) reclassified $1,360,000 of cash flow hedge losses from other comprehensive income to interest expense, net, to record the impact of the Company's derivative and hedging activity.

- The Company assumed a $63,041,000 fixed rate mortgage loan in conjunction with the acquisition of Avalon West Plano.

During the year ended December 31, 2022:

- The Company issued 140,528 shares of common stock as part of the Company's stock based compensation plans, of which 54,053 shares related to the conversion of performance awards to common stock, and the remaining 86,475 shares valued at $20,056,000 were issued in connection with new stock grants; 2,810 shares valued at $593,000 were issued through the Company's dividend reinvestment plan; 72,783 shares valued at $16,989,000 were withheld to satisfy employees' tax withholding and other liabilities; and 3,701 restricted shares with an aggregate value of $791,000 were forfeited.

- Common stock dividends declared but not paid totaled $224,222,000.

Table of Contents

- The Company recorded an increase of $105,000 in redeemable noncontrolling interest with a corresponding decrease to accumulated earnings less dividends to adjust the redemption value associated with the put options held by joint venture partners and DownREIT partnership units.

- The Company reclassified $3,883,000 of cash flow hedge losses from other comprehensive income to interest expense, net, to record the impact of the Company's derivative and hedging activity.

See accompanying notes to Consolidated Financial Statements.

F-9

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1. <u>Organization, Basis of Presentation and Significant Accounting Policies</u>

*Organization and Basis of Presentation*

AvalonBay Communities, Inc. (the "Company," which term, unless the context otherwise requires, refers to AvalonBay Communities, Inc. together with its subsidiaries), is a Maryland corporation that has elected to be treated as a real estate investment trust ("REIT") for federal income tax purposes under the Internal Revenue Code of 1986, as amended (the "Code"). The Company develops, redevelops, acquires, owns and operates multifamily communities in New England, the New York/New Jersey metro area, the Mid-Atlantic, the Pacific Northwest, and Northern and Southern California, as well as in the Company's expansion regions of Raleigh-Durham and Charlotte, North Carolina, Southeast Florida, Dallas and Austin, Texas, and Denver, Colorado.

At December 31, 2024, the Company owned or held a direct or indirect ownership interest in 306 apartment communities containing 93,518 apartment homes in 12 states and the District of Columbia, of which 17 communities were under construction. The Company also owned or held a direct or indirect ownership interest in land or rights to land on which the Company expects to develop an additional 28 communities that, if developed as expected, will contain an estimated 8,801 apartment homes (unaudited).

Capitalized terms used without definition have meanings provided elsewhere in this Form 10-K.

*Principles of Consolidation*

The accompanying Consolidated Financial Statements include the accounts of the Company and its wholly-owned subsidiaries, certain joint venture partnerships, and any variable interest entities that qualify for consolidation. All significant intercompany balances and transactions have been eliminated in consolidation.

The Company accounts for joint venture entities and subsidiary partnerships in accordance with the consolidation guidance. The Company determines first whether to follow the variable interest entity ("VIE") or the voting interest entity ("VOE") model for each joint venture entity. The Company then evaluates whether it should consolidate the venture. Under the VIE model, the Company consolidates an investment when it has control to direct the activities of the venture and the obligation to absorb losses or the right to receive benefits that could potentially be significant to the VIE. The Company's maximum exposure for its VIEs is limited to its investments in the respective VIEs and its portion of any loan guarantee. Under the VOE model, the Company consolidates an investment when (i) it controls the investment through ownership of a majority voting interest if the investment is not a limited partnership or (ii) it controls the investment through its ability to remove the other partners in the investment, at its discretion, when the investment is a limited partnership.

The Company generally uses the equity method of accounting or net asset value ("NAV") for its unconsolidated investments, including when the Company holds a noncontrolling limited partner interest in a joint venture. Any investment in excess of the Company's cost basis at acquisition or formation of an equity method venture, will be recorded as a component of the Company's investment in the joint venture and recognized over the life of the underlying fixed assets of the venture as a reduction to its equity in income from the venture. Investments in which the Company has little or no influence are accounted for using the measurement alternative with the carrying amount of the investment adjusted to fair value when there is an observable transaction indicating a change in fair value.

F-10

*Real Estate*

Operating real estate assets are stated at cost and consist of land and improvements, buildings and improvements, furniture, fixtures and equipment, and other costs incurred during their development, redevelopment and acquisition. Significant expenditures which improve or extend the life of an existing asset and that will benefit the Company for periods greater than a year, are capitalized. Expenditures for maintenance and repairs are charged to expense as incurred.

Project costs related to the development, construction and redevelopment of real estate projects (including interest and related loan fees, property taxes and other direct costs) are capitalized as a cost of the project. Indirect project costs that relate to several projects are capitalized and allocated to the projects to which they relate. Indirect costs not clearly related to development, construction and redevelopment activity are expensed as incurred. For development, capitalization (i) begins when the Company has determined that development of the future asset is probable, (ii) can be suspended if there is no current development activity underway, but future development is still probable and (iii) ends when the asset, or a portion of an asset, is ready for its intended use, or the Company's intended use changes such that capitalization is no longer appropriate.

For land parcels acquired for development improved with operating real estate, the Company generally manages the improvements until all tenant obligations have been satisfied or eliminated through negotiation, and construction of new apartment communities is ready to begin. Revenue from incidental operations received from the current improvements on land parcels in excess of any incremental costs are recorded as a reduction of total capitalized costs of the respective Development Right and not as part of net income. Incidental operating costs in excess of incidental operating income are expensed in the period incurred.

For redevelopment efforts, the Company capitalizes costs either (i) in advance of taking homes out of service when significant renovation of the common area has begun until the redevelopment is completed, or (ii) when an apartment home is taken out of service for redevelopment until the redevelopment is completed and the apartment home is available for a new resident. Rental income and operating costs incurred during the initial lease-up or post-redevelopment lease-up period are recognized in earnings.

The Company accounts for real estate acquisitions as either an asset acquisition or a business combination. Under either model, the Company identifies and determines the fair value of any assets acquired, liabilities assumed and any noncontrolling interest in the acquiree. The Company generally views acquisitions of operating communities as asset acquisitions, which results in the capitalization of acquisition costs and the allocation of purchase price to the assets acquired and liabilities assumed, based on the relative fair value of the respective assets and liabilities.

Typical assets acquired and liabilities assumed include land, building, furniture, fixtures and equipment, debt and identified intangible assets and liabilities, consisting of the value of above or below market leases and in-place leases. The Company utilizes various sources to determine fair value, including its own analysis of recently acquired and existing comparable properties in its portfolio and other market data. The purchase price allocation to tangible assets is reflected in real estate assets and depreciated over their estimated useful lives. Any purchase price allocation to intangible assets, other than in-place lease intangibles, is included in prepaid expenses and other assets on the accompanying Consolidated Balance Sheets and amortized over the term of the acquired intangible asset. The Company values land based on a market approach, looking to recent sales of similar properties, adjusting for differences due to location, the state of entitlement as well as the shape and size of the parcel. Improvements to land are valued using a replacement cost approach and consider the structures and amenities included for the communities and is reduced by estimated depreciation. The value for furniture, fixtures and equipment is also determined based on a replacement cost approach, considering costs for both items in the apartment homes as well as common areas and is adjusted for estimated depreciation. The fair value of buildings is estimated using the replacement cost approach, assuming the buildings were vacant at acquisition. The replacement cost approach considers the composition of structures acquired, adjusted for depreciation which considers industry standard information and estimated useful life of the acquired property. The value of the lease-related intangibles considers the estimated cost of leasing the apartment homes as if the acquired building(s) were vacant, as well as the value of the current leases relative to market-rate leases. The in-place lease value is determined using an average total lease-up time, the number of apartment homes and net revenues generated during the lease-up time. Net revenues use market rent considering actual leasing and industry rental rate data. The value of current leases relative to a market-rate lease is based on market comparables. Given the heterogeneous nature of multifamily real estate, the fair values for the land, debt, real estate assets and in-place leases incorporate significant unobservable inputs and therefore are considered to be Level 3 prices within the fair value hierarchy. Consideration for acquisitions is typically in the form of cash unless otherwise disclosed.

Depreciation is generally calculated on a straight-line basis over the estimated useful lives of the assets, which for buildings and related improvements range from seven years to 30 years and for furniture, fixtures and equipment range from three years to seven years.

Table of Contents

*Income Taxes*

The Company elected to be treated as a REIT for federal income tax purposes for its tax year ended December 31, 1994 and has not revoked such election. A REIT is a corporate entity which holds real estate interests and can deduct from its federally taxable income qualifying dividends it pays if it meets a number of organizational and operational requirements, including a requirement that it distribute at least 90% of its adjusted taxable income to stockholders. Therefore, as a REIT, the Company generally will not be subject to corporate level federal income tax on its taxable income if it annually distributes 100% of its taxable income to its stockholders.

The states in which the Company operates have similar tax provisions which recognize the Company as a REIT for state income tax purposes. Management believes that all such conditions for the exemption from income taxes on ordinary income have been or will be met for the periods presented. Accordingly, no provision for federal and state income taxes has been made. If the Company fails to qualify as a REIT in any taxable year, it will be subject to federal corporate income taxes at regular corporate rates and may not be able to qualify as a corporate REIT for four subsequent taxable years. Even if the Company qualifies for taxation as a REIT, the Company may be subject to certain state and local taxes on its income and property, and to federal income and excise taxes on its undistributed taxable income and in certain other instances.

Taxable income from activities performed through taxable REIT subsidiaries ("TRS") is subject to federal, state and local income taxes. The Company recognized income tax expense of $445,000, $10,153,000 and $14,646,000 in 2024, 2023 and 2022, respectively, with amounts in 2023 and 2022 primarily due to dispositions at The Park Loggia. As of December 31, 2024 and 2023, the Company did not have any unrecognized tax positions. The Company does not believe that there will be any material changes in its unrecognized tax positions over the next 12 months. The Company is subject to examination by the respective taxing authorities for the tax years 2021 through 2023.

The following summarizes the tax components of the Company's common dividends declared for the years ended December 31, 2024, 2023 and 2022 (unaudited):

|  | 2024 | 2023 | 2022 |
|---|---|---|---|
| Ordinary income | 90 % | 83 % | 82 % |
| 20% capital gain | 4 % | 11 % | 15 % |
| Unrecaptured §1250 gain | 6 % | 6 % | 3 % |
| Total | 100 % | 100 % | 100 % |

*Deferred Financing Costs*

Deferred financing costs include expenditures necessary to obtain debt financing and are amortized on a straight-line basis, which approximates the effective interest method, over the shorter of the loan term or the related credit enhancement facility, if applicable. Unamortized financing costs are charged to earnings when debt is retired before the maturity date. Accumulated amortization of deferred financing costs for unsecured notes was $34,074,000 and $34,494,000 as of December 31, 2024 and 2023, respectively, and related to mortgage notes payable was $2,482,000 and $2,262,000 as of December 31, 2024 and 2023, respectively. Deferred financing costs, except for costs associated with line-of-credit arrangements, are presented as a direct deduction from the related debt liability. Accumulated amortization of deferred financing costs for the Company's Credit Facility was $7,345,000 and $4,081,000 as of December 31, 2024 and 2023, respectively, and deferred financing costs net of accumulated amortization was included in prepaid expenses and other assets on the accompanying Consolidated Balance Sheets.

*Cash, Cash Equivalents and Restricted Cash*

Cash and cash equivalents includes all cash and liquid investments with an original maturity of three months or less from the date acquired. Restricted cash includes principal reserve funds that are restricted for the repayment of specified secured financing, amounts the Company has designated for planned 1031 exchange activity and resident security deposits. The majority of the Company's cash, cash equivalents and restricted cash are held at major commercial banks.

*Comprehensive Income*

Comprehensive income, as reflected on the Consolidated Statements of Comprehensive Income, is defined as all changes in equity during each period except for those resulting from investments by or distributions to shareholders. Accumulated other

F-12

Table of Contents

comprehensive income (loss), as reflected on the Consolidated Statements of Equity, reflects the effective portion of the cumulative changes in the fair value of derivatives in qualifying cash flow hedge relationships.

*Earnings per Common Share*

Basic earnings per common share is computed by dividing net income attributable to common stockholders by the weighted average number of shares outstanding during the period. All outstanding unvested restricted share awards contain rights to non-forfeitable dividends and participate in undistributed earnings with common stockholders and, accordingly, are considered participating securities that are included in the two-class method of computing basic earnings per common share. Both the unvested restricted shares and other potentially dilutive common shares, and the related impact to earnings, are considered when calculating earnings per common share on a diluted basis. Diluted earnings per common share was computed using the treasury stock method for performance awards, options and participating securities. The Company's earnings per common share are determined as follows (dollars in thousands, except per share data):

| | For the year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2024 | | 2023 | | 2022 |
| Basic and diluted shares outstanding | | | | | | |
| Weighted average common shares—basic | | 142,000,934 | | 141,307,186 | | 139,634,294 |
| Weighted average DownREIT units outstanding | | — | | 3,503 | | 7,500 |
| Effect of dilutive securities | | 457,670 | | 333,099 | | 333,293 |
| Weighted average common shares—diluted | | 142,458,604 | | 141,643,788 | | 139,975,087 |
| | | | | | | |
| Calculation of Earnings per Common Share—basic | | | | | | |
| Net income attributable to common stockholders | $ | 1,081,994 | $ | 928,825 | $ | 1,136,775 |
| Net income allocated to unvested restricted shares | | (2,069) | | (1,663) | | (2,091) |
| Net income attributable to common stockholders—basic | $ | 1,079,925 | $ | 927,162 | $ | 1,134,684 |
| | | | | | | |
| Weighted average common shares—basic | | 142,000,934 | | 141,307,186 | | 139,634,294 |
| | | | | | | |
| Earnings per common share—basic | $ | 7.61 | $ | 6.56 | $ | 8.13 |
| | | | | | | |
| Calculation of Earnings per Common Share—diluted | | | | | | |
| Net income attributable to common stockholders | $ | 1,081,994 | $ | 928,825 | $ | 1,136,775 |
| Add: noncontrolling interests of DownREIT unitholders in consolidated partnerships, including discontinued operations | | — | | 25 | | 48 |
| Net income attributable to common stockholders—diluted | $ | 1,081,994 | $ | 928,850 | $ | 1,136,823 |
| | | | | | | |
| Weighted average common shares—diluted | | 142,458,604 | | 141,643,788 | | 139,975,087 |
| | | | | | | |
| Earnings per common share—diluted | $ | 7.60 | $ | 6.56 | $ | 8.12 |

Certain options to purchase shares of common stock in the amounts of 9,793, 303,784 and 291,881 were outstanding as of December 31, 2024, 2023 and 2022, respectively, but were not included in the computation of diluted earnings per common share because such options were anti-dilutive for the period.

*Expensed Transaction, Development and Other Pursuit Costs*

The Company capitalizes costs associated with its development activities to the basis of land held when future development is probable, or if the Company has either not yet acquired the land or if the project is subject to a leasehold interest, the costs are capitalized as deferred development costs ("Development Rights"). Future development of these Development Rights is dependent upon various factors, including zoning and regulatory approval, rental market conditions, construction costs and the availability of capital. Costs incurred for pursuits for which future development is not yet considered probable are expensed as incurred. In addition, if the Company determines a Development Right is no longer probable, the Company recognizes any necessary expense to write down its basis in the Development Right. The Company expensed costs related to development pursuits not yet considered probable for development and the abandonment of Development Rights, as well as costs incurred in

F-13

Table of Contents

pursuing the acquisition or disposition of assets for which such acquisition and disposition activity did not occur, in the amounts of $18,341,000, $33,479,000 and $16,565,000 during the years ended December 31, 2024, 2023 and 2022, respectively. These costs are included in expensed transaction, development and other pursuit costs, net of recoveries on the accompanying Consolidated Statements of Comprehensive Income. The amount for 2024 includes a write-off of $8,947,000 related to one Development Right in Northern California that the Company determined was no longer probable. The amount for 2023 includes write-offs of $27,455,000 related to seven Development Rights that the Company determined were no longer probable. The amount for 2022 includes write-offs of $10,073,000 related to three Development Rights that the Company determined were no longer probable. These costs can vary greatly, and the costs incurred in any given period may be significantly different in future periods.

*Casualty and Impairment of Long-Lived Assets*

The Company evaluates its real estate and other long-lived assets for impairment when potential indicators of impairment exist. Such assets are stated at cost, less accumulated depreciation and amortization, unless the carrying amount of the asset is not recoverable. If events or circumstances indicate that the carrying amount of an asset may not be recoverable, the Company assesses its recoverability by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the aggregate undiscounted future cash flows, the Company recognizes an impairment loss to the extent the carrying amount exceeds the estimated fair value of the asset. Based on periodic tests of recoverability of long-lived assets, for the years ended December 31, 2024, 2023 and 2022, the Company did not recognize any material impairment losses. During the years ended December 31, 2024 and 2023, the Company recognized a charge of $2,935,000 and $9,118,000, respectively, for the property and casualty damage to certain of the Company's communities, reported as casualty and impairment loss on the accompanying Consolidated Statements of Comprehensive Income. The charges for the year ended December 31, 2024, related to flooding and water damage at communities in California from extensive rainfall and a fire at a community in New Jersey. The charges for the year ended December 31, 2023, related to damage to certain communities in the Northeast and California regions from severe weather.

The Company assesses its portfolio of land held for both development and investment for impairment if the intent of the Company changes with respect to either the development of, or the expected holding period for, the land. For the years ended December 31, 2024, 2023 and 2022, the Company did not recognize any impairment charges on its investment in land.

The Company evaluates its unconsolidated investments for other than temporary impairment, considering both whether the carrying value of the investment exceeds the fair value, and the Company's intent and ability to hold the investment to recover its carrying value. The Company also evaluates its proportionate share of any impairment of assets held by unconsolidated investments. The Company did not recognize any other than temporary impairment losses during the years ended December 31, 2024, 2023 or 2022.

*Assets Held for Sale and Discontinued Operations*

The Company presents the assets and liabilities of any communities which have been sold, or otherwise qualify as held for sale, separately in the accompanying Consolidated Balance Sheets. In addition, the results of operations for those assets that meet the definition of discontinued operations are presented as such in the accompanying Consolidated Statements of Comprehensive Income. Real estate assets held for sale are measured at the lower of the carrying amount or the fair value less the cost to sell. Upon the classification of an asset as held for sale, no further depreciation is recorded. Disposals representing a strategic shift in operations (e.g., a disposal of a major geographic area, a major line of business or a major equity method investment) are presented as discontinued operations, and for those assets qualifying for classification as discontinued operations, the specific components of net income presented as discontinued operations include net operating income, depreciation expense and interest expense, net. For periods prior to the asset qualifying for discontinued operations, the Company reclassifies the results of operations to discontinued operations. In addition, the net gain or loss (including any impairment loss) on the eventual disposal of assets held for sale will be presented as discontinued operations when recognized. A change in presentation for held for sale or discontinued operations has no impact on the Company's financial condition or results of operations. The Company combines the operating, investing and financing portions of cash flows attributable to discontinued operations with the respective cash flows from continuing operations on the accompanying Consolidated Statements of Cash Flows. The Company had one real estate asset that qualified as held for sale at December 31, 2024.

*Derivative Instruments and Hedging Activities*

The Company enters into interest rate swap and interest rate cap agreements (collectively, "Hedging Derivatives") for interest rate risk management purposes and in conjunction with certain variable rate secured debt to satisfy lender requirements. The Company does not enter into Hedging Derivatives for trading or other speculative purposes. The Company assesses the

Table of Contents

effectiveness of qualifying cash flow and fair value hedges, both at inception and on an ongoing basis. The fair values of Hedging Derivatives that are in an asset position are recorded in prepaid expenses and other assets. The fair values of Hedging Derivatives that are in a liability position are included in accrued expenses and other liabilities. Fair value changes for derivatives that are not in qualifying hedge relationships are reported as a component of interest expense, net. For the Hedging Derivatives that qualify as effective cash flow hedges, the Company records the cumulative changes in the Hedging Derivatives' fair value in accumulated other comprehensive income. Amounts recorded in accumulated other comprehensive income will be reclassified into earnings in the periods in which earnings are affected by the hedged cash flow. The effective portion of the change in fair value of the Hedging Derivatives that qualify as effective fair value hedges is reported as an adjustment to the carrying amount of the corresponding hedged item. Receipts or payments associated with the gains and losses on the Company's cash flow hedges are presented as a component of cash flows from financing activities in the period the hedges are terminated and the payments for the Company's derivatives that are not qualifying for hedging relationships are presented as a component of cash flows from operating activities. See Note 11, "Fair Value," for further discussion of derivative financial instruments.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make certain estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements and the reported amounts of revenue and expenses during the reporting periods. Actual results could differ from those estimates.

*Reclassifications*

Certain reclassifications have been made to amounts in prior years' financial statements and notes to the financial statements to conform to current year presentations as a result of changes in held for sale classification, disposition activity and segment classification. In addition, there was a reclassification of software development costs from Furniture, fixtures and equipment to Prepaid expenses and other assets on the Consolidated Balance Sheet during the current year.

*Leases*

The Company is party to leases as both a lessor and a lessee, primarily as follows:

- lessor of residential and commercial space within its apartment communities; and
- lessee under (i) ground leases for land underlying current operating or development communities and certain commercial and parking facilities and (ii) office leases for its corporate headquarters and regional offices.

Lessee Considerations

The Company assesses whether a contract is or contains a lease based on whether the contract conveys the right to control the use of an identified asset, including specified portions of larger assets, for a period of time in exchange for consideration.

The Company's leases include both fixed and variable lease payments that are based on an index or rate such as the consumer price index (CPI) or percentage rents based on total sales. Variable lease payments are generally not included in the lease liability, but recognized as variable lease expense in the period in which they are incurred.

For leases that have options to extend the term or terminate the lease early, the Company only factored the impact of such options into the lease term if the option was considered reasonably certain to be exercised. The Company determined the discount rate associated with its ground and office leases on a lease-by-lease basis using the Company's actual borrowing rates as well as indicative market pricing for longer term rates and taking into consideration the remaining term of the lease agreements. For leases that are 12 months or less, the Company elected the practical expedient to recognize the lease payments on a straight-line basis.

Lessor Considerations

The Company's residential and commercial leases at its apartment communities are operating leases. For leases that include rent concessions and/or fixed and determinable rent increases, rental income is recognized on a straight-line basis over the noncancellable term of the lease, which, for residential leases, is generally one year. Some of the Company's commercial leases have renewal options which the Company will only include in the lease term if, at the commencement of the lease, it is reasonably certain that the lessee will exercise this option.

Table of Contents

For the Company's leases, which are comprised of a lease component and common area maintenance as a non-lease component, the Company determined that (i) the leases are operating leases, (ii) the lease component is the predominant component and (iii) all components of its operating leases share the same timing and pattern of transfer.

*Revenue and Gain Recognition*

The Company recognizes revenue for the transfer of goods and services to customers for consideration that the Company expects to receive. The majority of the Company's revenue is derived from residential and commercial rental and other lease income, which are accounted for as discussed above, under "Leases". The Company's revenue streams that are not accounted for as residential and commercial rental and other lease income include:

- Management fees - The Company has investment interests in real estate joint ventures, for which the Company may manage (i) the venture, (ii) the associated operating communities owned by the ventures and/or (iii) the construction, development or redevelopment of those communities. For these activities, the Company receives asset management, property management, development and/or redevelopment fee revenue. The performance obligation is the management of the venture, community or other defined task such as the development or redevelopment of the community. While the individual activities that comprise the performance obligation of the management fees can vary day to day, the nature of the overall performance obligation to provide management service is the same and considered by the Company to be a series of services that have the same pattern of transfer to the customer and the same method to measure progress toward satisfaction of the performance obligation. The Company also provides various third party back-office, financial administrative support services. The Company recognizes revenue for fees as earned.

- Non-lease related revenue - The Company recognizes revenue for items not considered to be components of a lease as earned.

- Gains or losses on sales of real estate - The Company accounts for the sale of real estate and any related gain recognition in accordance with the accounting guidance applicable to sales of real estate, which establishes standards for recognition of profit on all real estate sales transactions. The Company recognizes the sale, and associated gain or loss from the disposition when the criteria for the sale of an asset have been met, which include when (i) a contract exists and (ii) the buyer obtained control of the nonfinancial asset that was sold.

The following table details the Company's revenue disaggregated by reportable operating segment, further discussed in Note 8, "Segment Reporting," for the years ended December 31, 2024, 2023 and 2022. The segments are classified based on the individual community's status at December 31, 2024 for the years ended December 31, 2024 and 2023, and at December 31, 2023 for the year ended December 31, 2022. Segment information for total revenue excludes real estate assets that were sold from January 1, 2022 through December 31, 2024, or otherwise qualify as held for sale as of December 31, 2024, as described in Note 6, "Real Estate Disposition Activities." (dollars in thousands):

F-16

Table of Contents

| | Same Store | Other Stabilized Communities | Development/ Redevelopment Communities | Non-allocated (1) | Total |
|---|---|---|---|---|---|
| **For the year ended December 31, 2024** | | | | | |
| Management, development and other fees and other ancillary items | $ — | $ — | $ — | $ 7,081 | $ 7,081 |
| Non-lease related revenue (2) | 10,769 | 5,571 | 485 | — | 16,825 |
| Total non-lease revenue | 10,769 | 5,571 | 485 | 7,081 | 23,906 |
| | | | | | |
| Lease income (3) | 2,669,423 | 112,987 | 65,399 | — | 2,847,809 |
| | | | | | |
| Total revenue | $ 2,680,192 | $ 118,558 | $ 65,884 | $ 7,081 | $ 2,871,715 |
| | | | | | |
| **For the year ended December 31, 2023** | | | | | |
| Management, development and other fees and other ancillary items | $ — | $ — | $ — | $ 7,722 | $ 7,722 |
| Non-lease related revenue (2) | 12,752 | 4,697 | 128 | — | 17,577 |
| Total non-lease revenue | 12,752 | 4,697 | 128 | 7,722 | 25,299 |
| | | | | | |
| Lease income (3) | 2,578,264 | 73,628 | 6,042 | — | 2,657,934 |
| | | | | | |
| Total revenue | $ 2,591,016 | $ 78,325 | $ 6,170 | $ 7,722 | $ 2,683,233 |
| | | | | | |
| **For the year ended December 31, 2022** | | | | | |
| Management, development and other fees and other ancillary items | $ — | $ — | $ — | $ 6,333 | $ 6,333 |
| Non-lease related revenue (2) | 11,048 | 2,990 | 165 | — | 14,203 |
| Total non-lease revenue | 11,048 | 2,990 | 165 | 6,333 | 20,536 |
| | | | | | |
| Lease income (3) | 2,322,395 | 90,315 | 29,569 | — | 2,442,279 |
| | | | | | |
| Total revenue | $ 2,333,443 | $ 93,305 | $ 29,734 | $ 6,333 | $ 2,462,815 |

(1)  Represents third-party property management, developer fees and miscellaneous income and other ancillary items which are not allocated to a reportable segment.

(2)  Amounts include revenue streams related to leasing activities that are not considered components of a lease, and revenue streams not related to leasing activities including, but not limited to, application fees, renters insurance fees and vendor revenue sharing.

(3)  Represents residential and commercial rental and other lease income, as discussed above, under "Leases".

Due to the nature and timing of the Company's identified revenue streams, there were no material amounts of outstanding or unsatisfied performance obligations as of December 31, 2024.

*Uncollectible Lease Revenue Reserves*

The Company assesses the collectability of its lease revenue and receivables on an ongoing basis by (i) assessing the probability of receiving all lease amounts due on a lease-by-lease basis, (ii) fully reserving for those leases where collection of substantially all of the remaining lease payments is not probable and (iii) subsequently, will only recognize revenue to the extent cash is received. If the Company determines that collection of the remaining lease payments becomes probable at a future date, the Company will recognize the cumulative revenue that would have been recorded under the original lease agreement.

Table of Contents

In addition to the specific reserves recognized, the Company also evaluates its lease receivables for collectability at a portfolio level. The Company recognizes a reserve on a portfolio level when the uncollectible revenue is probable and reasonably estimable. The Company applies this reserve to the Company's revenue and receivables not addressed as part of the specific reserve.

The Company recorded an aggregate offset to income for uncollectible lease revenue, net of amounts received from government rent relief programs, for its residential and commercial portfolios of $47,046,000, $57,906,000 and $49,147,000 for the years ended December 31, 2024, 2023 and 2022, respectively.

*Recently Issued and Adopted Accounting Standards*

In November 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-07, Segment Reporting - Improvements to Reportable Segment Disclosures, which requires disclosure of significant segment expenses provided to the chief operating decision maker ("CODM"). The Company adopted the guidance as of January 1, 2024, and it did not have a material effect on the Company's consolidated financial statements (see Note 8, "Segment Reporting").

In December 2023, the FASB issued ASU 2023-09, Improvements to Income Tax Disclosures, which requires (i) a tabular rate reconciliation of the reported income tax expense (benefit) from continuing operations into specific categories, (ii) separate disclosure for any reconciling items within certain categories above a quantitative threshold, (iii) disclosure of income taxes paid disaggregated by federal, state and material jurisdictions and (iv) disclosure of income tax expense from continuing operations disaggregated by federal and state. The new standard will be effective for annual periods beginning January 1, 2025. The Company is assessing the standard and does not expect the standard to have a material effect on the Company's consolidated financial statements.

In November 2024, the FASB issued ASU 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures, which requires the disaggregation for certain expenses presented on the face of an entity's income statement in the entity's disclosures. Additionally, it requires the disclosure of selling expenses and descriptions of amounts not separately disaggregated. The new standard will be effective for annual reporting periods beginning after December 15, 2026, and interim reporting periods beginning after December 15, 2027. The Company is assessing the standard and does not expect the standard to have a material effect on the Company's consolidated financial statements.

Table of Contents

## 2. Interest Capitalized

The Company capitalizes interest during the development and redevelopment of real estate assets. Capitalized interest associated with the Company's development or redevelopment activities totaled $43,185,000, $47,133,000 and $34,854,000 for the years ended December 31, 2024, 2023 and 2022, respectively.

## 3. Debt

The Company's debt, which consists of unsecured notes, mortgage notes payable, the Credit Facility and the Commercial Paper Program, each as defined below, as of December 31, 2024 and 2023 is summarized below. The following amounts and discussion do not include the mortgage notes related to the communities classified as held for sale, if any, as of December 31, 2024 and 2023, as shown in the accompanying Consolidated Balance Sheets (dollars in thousands) (see Note 6, "Real Estate Disposition Activities"). The weighted average interest rates in the following table for secured and unsecured notes include costs of financing such as credit enhancement fees, trustees' fees, the impact of interest rate hedges and mark-to-market adjustments.

| | | December 31, 2024 | | | December 31, 2023 | |
|---|---|---|---|---|---|---|
| Fixed rate unsecured notes | $ | 7,400,000 | 3.4 % | $ | 7,300,000 | 3.3 % |
| Fixed rate mortgage notes payable—conventional and tax-exempt | | 333,479 | 3.9 % | | 333,892 | 3.9 % |
| Variable rate mortgage notes payable—conventional and tax-exempt | | 400,950 | 5.2 % | | 410,150 | 5.5 % |
| Total mortgage notes payable and unsecured notes | | 8,134,429 | 3.5 % | | 8,044,042 | 3.5 % |
| Credit Facility | | — | — % | | — | — % |
| Commercial paper | | — | — % | | — | — % |
| Total principal outstanding | | 8,134,429 | 3.5 % | | 8,044,042 | 3.5 % |
| Less deferred financing costs and debt discount (1) | | (57,180) | | | (62,220) | |
| Total | $ | 8,077,249 | | $ | 7,981,822 | |

(1) Excludes deferred financing costs and debt discount associated with the Credit Facility and Commercial Paper Program which are included in prepaid expenses and other assets on the accompanying Consolidated Balance Sheets.

The Company has a $2,250,000,000 revolving variable rate unsecured credit facility with a syndicate of banks (the "Credit Facility") which matures in September 2026. The interest rate that would be applicable to borrowings under the Credit Facility was 5.30% at December 31, 2024 and was composed of (i) the Secured Overnight Financing Rate ("SOFR"), applicable to the period of borrowing for a particular draw of funds from the facility (e.g., one month to maturity, three months to maturity, etc.), plus (ii) the current borrowing spread to SOFR of 0.805% per annum, which consisted of a 0.10% SOFR adjustment plus 0.705% per annum, assuming a daily SOFR borrowing rate. The borrowing spread to SOFR can vary from SOFR plus 0.63% to SOFR plus 1.38% based upon the rating of the Company's unsecured senior notes. There is also an annual facility commitment fee of 0.12% of the borrowing capacity under the facility, which can vary from 0.095% to 0.295% based upon the rating of the Company's unsecured senior notes. The Credit Facility contains a sustainability-linked pricing component which provides for interest rate margin and commitment fee reductions or increases by meeting or missing targets related to environmental sustainability, specifically greenhouse gas emission reductions, with the adjustment determined annually. The annual determination under the sustainability-linked pricing component occurred in July 2024, maintaining reductions of approximately 0.02% to the interest rate margin and 0.005% to the commitment fee due to our achievement of sustainability targets.

The Company has an unsecured commercial paper note program (the "Commercial Paper Program") with the maximum aggregate face or principal amount outstanding at any one time not to exceed $500,000,000. Under the terms of the Commercial Paper Program, the Company may issue, from time to time, unsecured commercial paper notes with varying maturities of less than one year. The Commercial Paper Program is backstopped by the Company's commitment to maintain available borrowing capacity under the Credit Facility in an amount equal to actual borrowings under the Commercial Paper Program.

The availability on the Company's Credit Facility as of December 31, 2024 and 2023, respectively, was as follows (dollars in thousands):

|  | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Credit Facility commitment | $ 2,250,000 | $ 2,250,000 |
| Credit Facility outstanding | — | — |
| Commercial paper outstanding | — | — |
| Letters of credit outstanding (1) | (1,714) | (1,914) |
| Total Credit Facility available | $ 2,248,286 | $ 2,248,086 |

_____

(1) In addition, the Company had $45,910 and $58,116 outstanding in additional letters of credit unrelated to the Credit Facility as of December 31, 2024 and 2023, respectively.

During the year ended December 31, 2024:

- In May 2024, the Company issued $400,000,000 principal amount of unsecured notes in a public offering under its existing shelf registration statement for proceeds net of underwriting fees of approximately $396,188,000, before considering the impact of other offering costs. The notes mature in June 2034 and were issued at a 5.35% interest rate, resulting in a 5.05% effective rate including the impact of offering costs and hedging activity.

- In November 2024, the Company repaid $300,000,000 principal amount of its 3.50% unsecured notes at par at maturity.

In the aggregate, secured notes payable mature at various dates from March 2027 through July 2066, and are secured by certain apartment communities (with a net carrying value of $1,245,662,000, excluding communities classified as held for sale, as of December 31, 2024).

Scheduled payments and maturities of secured notes payable and unsecured notes outstanding at December 31, 2024 were as follows (dollars in thousands):

| Year | Secured notes principal payments and maturities | Unsecured notes maturities | Stated interest rate of unsecured notes |
|---|---|---|---|
| 2025 | $ 11,365 | $ 525,000 | 3.45 % |
|  |  | 300,000 | 3.50 % |
| 2026 | 11,811 | 475,000 | 2.95 % |
|  |  | 300,000 | 2.90 % |
| 2027 | 250,159 | 400,000 | 3.35 % |
| 2028 | 19,002 | 450,000 | 3.20 % |
|  |  | 400,000 | 1.90 % |
| 2029 | 131,561 | 450,000 | 3.30 % |
| 2030 | 9,000 | 700,000 | 2.30 % |
| 2031 | 9,600 | 600,000 | 2.45 % |
| 2032 | 10,400 | 700,000 | 2.05 % |
| 2033 | 11,900 | 350,000 | 5.00 % |
|  |  | 400,000 | 5.30 % |
| 2034 | 12,800 | 400,000 | 5.35 % |
| Thereafter | 256,831 | 350,000 | 3.90 % |
|  |  | 300,000 | 4.15 % |
|  |  | 300,000 | 4.35 % |
|  | $ 734,429 | $ 7,400,000 |  |

F-20

Table of Contents

The Company's unsecured notes are redeemable at the Company's option, in whole or in part, generally at a redemption price equal to the greater of (i) 100% of their principal amount or (ii) the sum of the present value of the remaining scheduled payments of principal and interest discounted at a rate equal to the yield on U.S. Treasury securities with a comparable maturity plus a spread between 10 and 30 basis points depending on the specific series of unsecured notes, plus accrued and unpaid interest to the redemption date.

The Company is subject to financial covenants contained in the Credit Facility and the indentures under which the unsecured notes were issued. The principal financial covenants include the following:

- limitations on the amount of total and secured debt in relation to the Company's overall capital structure;
- limitations on the amount of the Company's unsecured debt relative to the undepreciated basis of real estate assets that are not encumbered by property-specific financing; and
- minimum levels of debt service coverage.

The Company was in compliance with these covenants at December 31, 2024.

4. Equity

As of December 31, 2024 and 2023, the Company's charter had authorized for issuance a total of 280,000,000 shares of common stock and 50,000,000 shares of preferred stock.

During the year ended December 31, 2024, the Company:

i.   issued 41,619 shares of common stock in connection with stock options exercised;
ii.  issued 3,533 shares of common stock through the Company's dividend reinvestment plan;
iii. issued 250,806 shares of common stock in connection with restricted stock grants and the conversion of performance awards to shares of common stock;
iv.  issued 12,290 shares of common stock in connection with the conversion of deferred stock awards;
v.   issued 19,014 shares of common stock through the Employee Stock Purchase Plan;
vi.  withheld 94,288 shares of common stock to satisfy employees' tax withholding and other liabilities; and
vii. canceled 4,408 shares of restricted common stock upon forfeiture.

Deferred compensation granted under the Company's Second Amended and Restated 2009 Equity Incentive Plan (the "Plan") for the year ended December 31, 2024 does not impact the Company's Consolidated Financial Statements until recognized as compensation cost.

The Company has a continuous equity program (the "CEP") under which the Company may sell (and/or enter into forward sale agreements for the sale of) up to $1,000,000,000 of its common stock from time to time. Actual sales will depend on a variety of factors to be determined by the Company, including market conditions, the trading price of the Company's common stock and the Company's determinations of the appropriate funding sources. The Company expects that, if entered into, it will physically settle each forward sale agreement on one or more dates specified by the Company on or prior to the maturity date of that particular forward sale agreement, in which case the Company will receive aggregate net cash proceeds at settlement equal to the number of shares underlying the particular forward agreement multiplied by the forward sale price. However, the Company may also elect to cash settle or net share settle a forward sale agreement. In connection with each forward sale agreement, the Company will pay the forward seller, in the form of a reduced initial forward sale price, a commission of up to 1.5% of the sales prices of all borrowed shares of common stock sold. During the year ended December 31, 2024, the Company entered into forward contracts under the CEP to sell 367,113 shares of common stock for approximate proceeds, net of fees, of $80,687,000, based on the gross weighted average price of $223.27 per share, with settlement of the forward contracts expected to occur on one or more dates not later than December 31, 2025. The final proceeds will be determined on the date(s) of settlement and are subject to certain customary adjustments for the Company's dividends and a daily interest factor. During the years ended December 31, 2023 and 2022, the Company had no sales under this program. In addition, during the year ended December 31, 2022, the Company settled the outstanding forward contracts entered into in December 2021 under this program, selling 68,577 shares of common stock for $229.34 per share and net proceeds of $15,727,000. As of December 31, 2024, the Company had $623,997,000 remaining authorized for issuance under the CEP, after consideration of the forward contracts.

F-21

Table of Contents

In addition, during the year ended December 31, 2024, the Company completed an underwritten public offering of 3,680,000 shares of its common stock at a discount to the closing price of $226.52 per share, net of offering fees, offered in connection with forward contracts entered into with certain financial institutions acting as forward purchasers. Assuming full physical settlement of the forward contracts, which the Company expects to occur no later than December 31, 2025, the Company will receive approximate proceeds, net of offering fees and discounts of $808,606,000, based on the initial forward price. The final proceeds will be determined on the date(s) of settlement and are subject to certain customary adjustments for the Company's dividends and a daily interest factor. During the year ended December 31, 2023, the Company settled the outstanding forward contracts entered into in April 2022 (the "Equity Forward"), issuing 2,000,000 shares of common stock, net of offering fees and discounts, for $491,912,000 or $245.96 per share.

The Company has a stock repurchase program under which the Company may acquire shares of its common stock in open market or negotiated transactions up to an aggregate purchase price of $500,000,000 (the "Stock Repurchase Program"). Purchases of common stock under the Stock Repurchase Program may be exercised at the Company's discretion with the timing and number of shares repurchased depending on a variety of factors including price, corporate and regulatory requirements and other corporate liquidity requirements and priorities. The Stock Repurchase Program does not have an expiration date and may be suspended or terminated at any time without prior notice. During the years ended December 31, 2024 and 2022, the Company had no repurchases of shares under this program. During the year ended December 31, 2023, the Company had repurchased 11,800 shares of common stock at an average price of $161.96 under this program. As of December 31, 2024, the Company had $314,237,000 remaining authorized for purchase under this program.

5. Investments

*Investments in Consolidated Real Estate Entities*

Details regarding communities acquired in 2024, 2023 and 2022, are summarized in the following table (dollars in thousands):

| Community name | Location | Number of communities | Apartment homes | Purchase price | Commercial square feet |
|---|---|---|---|---|---|
| Avalon at Pier 121 | Lewisville, TX | 1 | 300 | $ 62,100 | — |
| Avalon Perimeter Park | Morrisville, NC | 1 | 262 | 66,500 | — |
| Avalon Cherry Hills | Englewood, CO | 1 | 306 | 95,000 | — |
| AVA Balboa Park | San Diego, CA | 1 | 100 | 51,000 | 1,700 |
| Avalon Townhomes at Bee Cave | Bee Cave, TX | 1 | 126 | 49,000 | — |
| Avalon Lowry | Denver, CO | 1 | 347 | 136,500 | — |
| Total 2024 acquisitions | | 6 | 1,441 | $ 460,100 | 1,700 |
| Total 2023 acquisitions | | 3 | 1,131 | $ 277,200 | — |
| Total 2022 acquisitions | | 4 | 1,313 | $ 536,200 | 16,000 |

The Company accounted for these purchases as asset acquisitions and recorded the acquired assets and assumed liabilities, including identifiable intangibles, at their relative fair values based on the purchase price and acquisition costs incurred. The Company uses third-party pricing or internal models for the value of the land, a valuation model for the value of the building, and an internal model to determine the fair value of the remaining real estate assets and in-place leases. Given the heterogeneous nature of multifamily real estate, the fair values for the land, building, real estate assets and in-place leases incorporated significant unobservable inputs and therefore are considered to be Level 3 prices within the fair value hierarchy.

*Structured Investment Program*

The Company operates a Structured Investment Program (the "SIP"), an investment platform through which the Company provides mezzanine loans or preferred equity to third-party multifamily developers. As of December 31, 2024, the Company had seven commitments to fund up to $191,585,000 in the aggregate. The Company's investment commitments have a weighted average rate of return of 11.5% and a weighted average initial maturity date of December 2026. At December 31, 2024, the Company had funded $186,549,000 of these commitments. The Company recognized interest income of $16,022,000 and $6,189,000 for the years ended December 31, 2024 and 2023, respectively, from the SIP. The Company recognized no interest income during the year ended December 31, 2022 from the SIP. Interest income and any change in the expected credit loss are

F-22

Table of Contents

included as a component of income from unconsolidated investments, on the accompanying Consolidated Statements of Comprehensive Income.

The Company evaluates each SIP commitment to determine the classification as a loan or an investment in a real estate development project. As of December 31, 2024, all of the SIP commitments are classified as loans. The Company includes amounts outstanding under the SIP as a component of prepaid expenses and other assets on the accompanying Consolidated Balance Sheets. The Company evaluates the credit risk for each commitment on an ongoing basis, estimating the reserve for credit losses using relevant available information from internal and external sources. Market-based historical credit loss data provides the basis for the estimation of expected credit losses, with adjustments, if necessary, for differences in current commitment-specific risk characteristics, such as the amount of equity capital provided by a borrower, amount of senior debt secured by the project, nature of the real estate being developed or other factors.

*Unconsolidated Investments*

The Company accounts for its investments in unconsolidated entities under the equity method of accounting, NAV, or under the measurement alternative, as discussed in Note 1, "Organization, Basis of Presentation and Significant Accounting Policies," under Principles of Consolidation. As of December 31, 2024, the Company had investments in five unconsolidated entities with real estate holdings, with ownership interest percentages ranging from 20.0% to 50.0%, coupled with other unconsolidated investments including property technology and environmentally focused companies and investment management funds. The significant accounting policies of the unconsolidated investments are consistent with those of the Company in all material respects. Certain of these investments are subject to various buy-sell provisions or other rights which are customary in real estate joint venture agreements. The Company and its partners in these entities may initiate these provisions to either sell the Company's interest or acquire the interest from the Company's partner. The Company is responsible for the day-to-day operations of the unconsolidated communities below and is the management agent subject to the terms of management agreements for all communities except for Brandywine Apartments of Maryland, LLC, which is managed by a third party.

The following presents the Company's activities in unconsolidated investments for the years ended December 31, 2024, 2023 and 2022:

*Archstone Multifamily Partners AC LP (the "U.S. Fund")*—The Company acquired its interest in the U.S. Fund as part of the Archstone Acquisition in 2013 (as defined in Note 5, "Investments in Real Estate Entities," of the Consolidated Financial Statements in Item 8 in the Company's Form 10-K filed February 22, 2019). The Company was the general partner of the U.S. Fund and had a 28.6% combined general partner and limited partner equity interest. During 2022, the U.S. Fund sold its final three communities and the Company's proportionate share of the gains in accordance with GAAP was $38,144,000. In conjunction with achieving a threshold return under provisions of the U.S. Fund, the Company received incentive distributions for its promoted interest. During the years ended December 31, 2023 and 2022, the Company recognized income of $1,519,000 and $4,690,000, respectively, for its promoted interest, which is included in income from unconsolidated investments on the accompanying Consolidated Statements of Comprehensive Income. During 2023, the Company completed the dissolution of the U.S. Fund.

*Archstone Multifamily Partners AC JV LP (the "AC JV")*—The Company had a 20.0% equity interest in the AC JV, and acquired its interest as part of the Archstone Acquisition. During 2022, the Company completed the dissolution of the AC JV.

*Legacy JV*—As part of the Archstone Acquisition the Company entered into a limited liability company agreement with Equity Residential, through which it assumed obligations of Archstone in the form of preferred interests, some of which are governed by tax protection arrangements (the "Legacy JV"). The Company has a 40.0% interest in the Legacy JV. During the years ended December 31, 2024, 2023 and 2022, the Legacy JV redeemed certain of the preferred interests and paid accrued dividends, for which the Company contributed $1,320,000, $940,000 and $860,000, respectively. At December 31, 2024, the remaining preferred interests had an aggregate liquidation value of $32,817,000, the Company's 40.0% share of which was included in accrued expenses and other liabilities in the accompanying Consolidated Balance Sheets.

F-23

Table of Contents

*NYTA MF Investors LLC ("NYC Joint Venture")*—During 2018, the Company contributed five wholly-owned communities containing an aggregate of 1,301 apartment homes and 58,000 square feet of commercial space, located in New York City, NY, to a newly formed joint venture with the intent to own and operate the communities. The Company retained a 20.0% equity interest in the venture with the partners sharing in returns in accordance with their ownership interests. NYC Joint Venture has outstanding $394,734,000 fixed rate mortgage loans that are payable by the venture. The Company has not guaranteed the debt of NYC Joint Venture, nor does the Company have any obligation to fund this debt should NYC Joint Venture be unable to do so. At December 31, 2024, the Company has an equity investment of $53,678,000 (net of distributions) in the NYC Joint Venture.

*MVP I, LLC*—During 2004, the Company entered into a joint venture agreement with an unrelated third-party to develop Avalon at Mission Bay II, an apartment community located in San Francisco, CA, which completed construction during 2006 and contains 313 apartment homes. The Company has a 25.0% equity interest in the venture. MVP I, LLC has an outstanding $103,000,000 fixed rate mortgage loan that is payable by the venture. The Company has not guaranteed the debt of MVP I, LLC, nor does the Company have any obligation to fund this debt should MVP I, LLC be unable to do so. The Company has fully recovered its basis as of December 31, 2024.

*Brandywine Apartments of Maryland, LLC ("Brandywine")*— The Company acquired its interest in Brandywine as part of the Archstone Acquisition. Brandywine owns a 305 apartment home community located in Washington, D.C. Brandywine is comprised of five members who hold various interests in the joint venture, with the Company having a 28.7% equity interest in Brandywine. Brandywine had an outstanding $18,368,000 fixed rate mortgage loan that is payable by the venture. The Company has not guaranteed the debt of Brandywine, nor does the Company have any obligation to fund this debt should Brandywine be unable to do so. At December 31, 2024, the Company had an equity investment of $13,924,000 (net of distributions) in Brandywine.

*Avalon Alderwood MF Member, LLC*—During 2019, the Company entered into a joint venture to develop, own, and operate Avalon Alderwood Place, an apartment community located in Lynnwood, WA, which completed construction during 2022 and contains 328 apartment homes. The Company has a 50.0% interest in the venture and, as of December 31, 2024, the Company has a total equity investment of $50,926,000. The venture is a VIE, though the Company is not the primary beneficiary because it shares control with its venture partner. The Company and its venture partner share decision making authority for all significant aspects of the venture's activities including, but not limited to, changes in the ownership or capital structure, and the operating budget.

*Arts District Joint Venture*—During 2020, the Company entered into a joint venture to develop, own, and operate AVA Arts District, an apartment community located in Los Angeles, CA, which completed construction in the current year and contains 475 apartment homes and 57,000 square feet of commercial space. As of December 31, 2024, the Company has a 25.0% interest in the venture, and excluding costs incurred in excess of equity in the underlying net assets of the venture, has an equity investment of $29,932,000. The venture has drawn $155,968,000 of $167,147,000 maximum borrowing capacity of the construction loan as of December 31, 2024. The Company has provided the lender a payment guarantee for 30% of the venture's construction loan maximum borrowing capacity of $167,147,000. Any amounts payable under the 30% construction loan guarantee by the Company are obligations of the venture partners in proportion to their ownership interest, and in the event the Company is obligated to perform under its construction loan guarantee, its joint venture partner is obligated to reimburse the Company for 75% of amounts paid. The venture is an unconsolidated VIE as the Company is not the primary beneficiary due to shared control and decision making with its venture partner. The Company and its venture partner share decision making authority for all significant aspects of the venture's activities including, but not limited to, changes in the ownership, changes to the development plan or budget, and major operating decisions including annual business plans.

*Property Technology and Environmental Investments*—The Company has invested $58,122,000 in various property technology and environmentally focused companies directly and indirectly through investment management funds. The Company's interest in each individual investment is minor such that the Company does not have influence over operating or financial policies of the investments. In addition, as of December 31, 2024, the Company has $62,494,000 in outstanding equity commitments, with the timing and amount for these commitments to be fulfilled dependent on if, and when, investment opportunities are identified by the respective funds. During the years ended December 31, 2024, 2023 and 2022, the Company recognized realized and unrealized gains of $33,137,000, $4,161,000 and $8,315,000, respectively, related to these investments, which was reported as a component of income from unconsolidated investments on the accompanying Consolidated Statements of Comprehensive Income.

Table of Contents

## 6. Real Estate Disposition Activities

Details regarding the real estate sales, which resulted in a gain in accordance with GAAP of $363,300,000, excluding for-sale residential condominiums at The Park Loggia, are summarized in the following table (dollars in thousands):

| Community name | Location | Period of sale | Apartment homes | Gross sales price | Net cash proceeds | Commercial square feet |
|---|---|---|---|---|---|---|
| AVA Belltown | Seattle, WA | Q2 2024 | 100 | $ 34,000 | $ 32,343 | 1,000 |
| AVA North Hollywood | Los Angeles, CA | Q2 2024 | 156 | 62,100 | 57,215 | 11,000 |
| Avalon Hackensack at Riverside | Hackensack, NJ | Q2 2024 | 226 | 85,600 | 83,878 | — |
| AVA Theater District | Boston, MA | Q3 2024 | 398 | 212,000 | 209,893 | — |
| Avalon Darien | Darien, CT | Q3 2024 | 189 | 120,000 | 118,029 | — |
| Avalon New Canaan | New Canaan, CT | Q4 2024 | 104 | 75,000 | 74,113 | — |
| Avalon Berkeley | Berkeley, CA | Q4 2024 | 94 | 32,000 | 31,033 | — |
| AVA Ballard | Seattle, WA | Q4 2024 | 265 | 105,500 | 100,115 | 12,000 |
| Other real estate | multiple | 2024 | N/A | — | 784 | — |
| Total of 2024 asset sales | | | 1,532 | $ 726,200 | $ 707,403 | 24,000 |
| Total of 2023 asset sales | | | 987 | $ 446,000 | $ 440,209 | 27,000 |
| Total of 2022 asset sales | | | 2,062 | $ 953,135 | $ 934,117 | — |

As of December 31, 2024, the Company had one real estate asset that qualified as held for sale.

*The Park Loggia*

The Park Loggia, located in New York, NY, contains 172 for-sale residential condominiums and 66,000 square feet of commercial space. The Company sold one, six and 40 residential condominiums at The Park Loggia, for gross proceeds of $4,166,000, $25,387,000 and $126,848,000 resulting in a loss in accordance with GAAP of $76,000 and $73,000 and gain in accordance with GAAP of $2,217,000 during the years ended December 31, 2024, 2023 and 2022, respectively. The Company incurred $30,000, $389,000 and $2,129,000 during the years ended December 31, 2024, 2023 and 2022, respectively, in marketing, operating and administrative costs. All amounts are included in other real estate activity on the accompanying Consolidated Statements of Comprehensive Income. As of December 31, 2024, there was one residential condominium remaining to be sold. As of December 31, 2024 and 2023, the unsold for-sale residential condominium at The Park Loggia had an aggregate carrying value of $2,743,000 and $6,603,000, respectively, presented in prepaid expenses and other assets on the accompanying Consolidated Balance Sheets.

## 7. Commitments and Contingencies

*Employment Agreements and Arrangements*

The standard restricted stock, option and performance award agreements used by the Company in its compensation program provide that upon an employee's termination without cause or the employee's Retirement (as defined in the agreement), (i) all outstanding stock options and restricted shares of stock held by the employee will vest, and the employee will have up to 12 months or until the fifth anniversary of the grant date, if later, or until the option expiration date, if earlier, to exercise any options then held and (ii) a pro rata share (based on the portion of the performance period that has been completed) of performance awards that have completed at least one year of their performance period shall vest, with settlement to occur at the end of the performance period in accordance with achievement thereunder. Under the agreements, Retirement generally means a termination of employment and other business relationships, other than for cause, after attainment of age 50, provided certain conditions are met, including that (i) the employee has worked for the Company for at least 10 years, (ii) the employee's age at Retirement plus years of employment with the Company equals at least 70 and (iii) the employee provides at least six months written notice of intent to retire.

If a sale event (as defined in the agreement) of the Company occurs, all outstanding multiyear performance awards will vest at their target value and will settle. The Company also has an Officer Severance Program (the "Program"). Under the Program, in the event an officer who is not otherwise covered by a severance arrangement is terminated (other than for cause), or chooses to

F-25

terminate his or her employment for good reason (as defined in the agreement), in either case in connection with or within 24 months following a sale event (as defined in the agreement) of the Company, such officer will generally receive a cash lump sum payment equal to a multiple of the officer's covered compensation (base salary plus annual cash bonus). The multiple is one time for vice presidents and senior vice presidents, two times for executive vice presidents and three times for the chief executive officer. The officer's restricted stock, options and performance awards would also vest. Costs related to the Program are deferred and recognized over the requisite service period when considered by management to be probable and estimable.

*Legal Contingencies*

The Company recognizes a loss associated with contingent legal matters when the loss is probable and estimable.

In 2022 and early 2023, the Company was named as a defendant in cases brought by private litigants alleging antitrust violations by RealPage, Inc. and owners and/or operators of multifamily housing which utilize revenue management systems provided by RealPage, Inc. The Company engaged with the plaintiffs' counsel to explain why it believed that these cases were without merit as they pertained to the Company. Following these discussions, the plaintiffs filed a notice of voluntary dismissal in July 2023, which resulted in the Company being dismissed without prejudice from these cases. Subsequently, on November 1, 2023, the District of Columbia filed a lawsuit in the Superior Court of the District of Columbia against RealPage, Inc. and 14 owners and/or operators of multifamily housing in the District of Columbia, including the Company, alleging that the defendants violated the District of Columbia Antitrust Act by unlawfully agreeing to use RealPage, Inc. revenue management systems and sharing sensitive data. On May 29, 2024, the Superior Court granted the Company's motion to dismiss with prejudice as it pertains to the Company. The District of Columbia subsequently filed a motion asking the court to reconsider its ruling, and on December 23, 2024, the court ruled in the District's favor, giving the District leave to amend its original complaint and name AvalonBay as a defendant. See also Note 12, "Subsequent Events."

With the exception of the Maryland Antitrust Litigation, as discussed in Note 12, "Subsequent Events", the Company is not currently a defendant of any other cases with allegations similar to those above.

The Company is involved in various other claims and/or administrative proceedings that arise in the ordinary course of its business. While no assurances can be given, the Company does not currently believe that any of these other outstanding litigation matters, individually or in the aggregate, will have a material adverse effect on its financial condition or results of operations.

In addition, the Company accounts for recoveries from legal matters as a reduction in the legal and related costs incurred associated with the matter, with recoveries in excess of these costs reported as a gain or, where appropriate, a reduction in the net cost basis of a community to which the suit related. During the year ended December 31, 2022, the Company recognized $6,000,000 in legal settlement proceeds related to a construction defect at a community, reported as a component of general and administrative expense on the accompanying Consolidated Statements of Comprehensive Income. There were no material receipts during the years ended December 31, 2024 and 2023.

*Lease Obligations*

The Company owns seven apartment communities, two commercial properties and one development right located on land subject to ground leases expiring between July 2046 and May 2123. The Company has purchase options for all ground leases expiring prior to 2062. The ground leases for six of the seven apartment communities, the two commercial properties and the one development right are operating leases, with rental expense recognized on a straight-line basis over the lease term. During the year ended December 31, 2024, the Company entered into a new ground lease, expiring May 2123, for a development right, resulting in minimum lease payments over the term of the lease of $155,600,000 and a lease liability balance of $25,675,000 as of December 31, 2024. In addition, the Company is party to 13 leases for its corporate and regional offices with varying terms through 2031, all of which are operating leases.

As of December 31, 2024 and 2023, the Company had total operating lease assets of $126,572,000 and $106,146,000, respectively, and lease obligations of $153,333,000 and $133,220,000, respectively, reported as components of right of use lease assets and lease liabilities, respectively, on the accompanying Consolidated Balance Sheets. The Company incurred costs of $16,298,000, $16,342,000 and $15,667,000 for the years ended December 31, 2024, 2023 and 2022, respectively, related to operating leases.

Table of Contents

The Company has one apartment community located on land subject to a ground lease and four leases for portions of parking garages adjacent to apartment communities, that are finance leases. As of December 31, 2024 and 2023, the Company had total finance lease assets of $28,082,000 and $28,528,000, respectively, and total finance lease obligations of $19,949,000 and $20,012,000, respectively, reported as components of right of use lease assets and lease liabilities on the accompanying Consolidated Balance Sheets.

The following table details the weighted average remaining lease term and discount rates for the Company's ground and office leases:

| | |
|---|---|
| Weighted-average remaining lease term - finance leases | 21 years |
| Weighted-average remaining lease term - operating leases | 50 years |
| Weighted-average discount rate - finance leases | 4.63 % |
| Weighted-average discount rate - operating leases | 5.15 % |

The following table details the future minimum payments of the Company's current leases as of December 31, 2024 (dollars in thousands):

| | Operating Leases (1) | | Financing Leases | |
|---|---|---|---|---|
| 2025 | $ | 15,344 | $ | 1,089 |
| 2026 | | 15,752 | | 1,091 |
| 2027 | | 15,484 | | 1,095 |
| 2028 | | 14,536 | | 1,096 |
| 2029 | | 13,577 | | 1,099 |
| Thereafter | | 405,106 | | 34,663 |
| Total | | 479,799 | | 40,133 |
| Less discount for time value | | (326,466) | | (20,184) |
| Lease liability | $ | 153,333 | $ | 19,949 |

## 8. Segment Reporting

The Company's reportable operating segments include Same Store, Other Stabilized and Development/Redevelopment. Annually as of January 1, the Company determines which of its communities fall into each of these categories and generally maintains that classification throughout the year for the purpose of reporting segment operations, unless disposition or redevelopment plans regarding a community change.

- *Same Store* is composed of consolidated communities where a comparison of operating results from the prior year to the current year is meaningful as these communities were owned and had stabilized occupancy as of the beginning of the respective prior year. For the year ended December 31, 2024, Same Store communities are consolidated for financial reporting purposes, had stabilized occupancy as of January 1, 2023, are not conducting or are not probable to conduct substantial redevelopment activities and are not held for sale as of December 31, 2024 or probable for disposition to unrelated third parties within the fiscal year. A community is considered to have stabilized occupancy at the earlier of (i) attainment of 90% physical occupancy or (ii) the one year anniversary of completion of development or redevelopment.

Table of Contents

- *Other Stabilized* is composed of completed consolidated communities that the Company owns and that are not Same Store but that had stabilized occupancy, as defined above, as of January 1, 2024, or which were acquired during the years ended December 31, 2024 or 2023. Other Stabilized excludes communities that are conducting or are probable to conduct substantial redevelopment activities within the fiscal year.

- *Development/Redevelopment* is composed of (i) consolidated communities that are either currently under construction, or were under construction during the fiscal year, which may be partially or fully complete and operating, (ii) consolidated communities where substantial redevelopment is in progress or is probable to begin during the fiscal year and (iii) communities that have been complete for less than one year and did not have stabilized occupancy, as defined above, as of January 1, 2024.

In addition, the Company owns land for future development and has other corporate assets that are not allocated to an operating segment.

The Company's segment disclosures present the measure(s) used by the CODM for assessing each segment's performance. The Company's CODM is comprised of several members of its executive management team, including its Chief Executive Officer and President, Chief Financial Officer, Chief Investment Officer, Chief Operating Officer, and Executive Vice President- Portfolio and Asset Management. The CODM uses net operating income ("NOI") as the primary financial measure for Same Store communities and Other Stabilized communities. NOI is defined by the Company as total property revenue less direct property operating expenses (including property taxes), and excluding corporate-level income (including management, development and other fees), property management and other indirect operating expenses, net of corporate income, expensed transaction, development and other pursuit costs, net of recoveries, interest expense, net, loss on extinguishment of debt, net, general and administrative expense, income from unconsolidated investments, depreciation expense, income tax expense (benefit), casualty and impairment loss, gain on sale of communities, other real estate activity, and net operating income from real estate assets sold or held for sale. The CODM evaluates the Company's financial performance on a consolidated residential and commercial basis. The commercial results attributable to the non-apartment components of the Company's mixed-use communities and other nonresidential operations represent 1.7%, 1.8% and 2.1% of total NOI for the years ended December 31, 2024, 2023 and 2022, respectively. Although the Company considers NOI a useful measure of a community's or communities' operating performance, NOI should not be considered an alternative to net income or net cash flow from operating activities, as determined in accordance with GAAP. NOI excludes a number of income and expense categories as detailed in the reconciliation of NOI to net income and consistent with how the Company's CODM evaluates total NOI.

A reconciliation of NOI to net income for years ended December 31, 2024, 2023 and 2022 is as follows (dollars in thousands):

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | 2024 | 2023 | 2022 |
| Net income | $ 1,082,175 | $ 928,438 | $ 1,136,438 |
| Property management and other indirect operating expenses, net of corporate income | 162,594 | 134,312 | 114,200 |
| Expensed transaction, development and other pursuit costs, net of recoveries | 18,341 | 33,479 | 16,565 |
| Interest expense, net | 226,589 | 205,992 | 230,074 |
| Loss on extinguishment of debt, net | — | 150 | 1,646 |
| General and administrative expense | 77,697 | 76,534 | 74,064 |
| Income from unconsolidated investments | (50,682) | (13,454) | (53,394) |
| Depreciation expense | 846,853 | 816,965 | 814,978 |
| Income tax expense | 445 | 10,153 | 14,646 |
| Casualty and impairment loss | 2,935 | 9,118 | — |
| Gain on sale of communities | (363,300) | (287,424) | (555,558) |
| Other real estate activity | (753) | (174) | (5,127) |
| Net operating income from real estate assets sold or held for sale | (28,463) | (57,646) | (87,116) |
| Net operating income | $ 1,974,431 | $ 1,856,443 | $ 1,701,416 |

F-28

Table of Contents

The following is a summary of NOI from real estate assets sold or held for sale for the periods presented (dollars in thousands):

| | For the year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2024 | | 2023 | | 2022 |
| Rental income from real estate assets sold or held for sale | $ | 42,042 | $ | 84,676 | $ | 130,631 |
| Operating expenses from real estate assets sold or held for sale | | (13,579) | | (27,030) | | (43,515) |
| Net operating income from real estate assets sold or held for sale | $ | 28,463 | $ | 57,646 | $ | 87,116 |

The primary performance measure for communities under development or redevelopment depends on the stage of completion. While under development, management monitors actual construction costs against budgeted costs as well as lease-up pace and rent levels compared to budget.

The following table details the Company's segment information as of the dates specified (dollars in thousands). The segments are classified based on the individual community's status at December 31, 2024 for the years ended December 31, 2024 and 2023 and at December 31, 2023, for the year ended December 31, 2022. Segment information for the years ended December 31, 2024, 2023 and 2022 has been adjusted to exclude the real estate assets that were sold from January 1, 2022 through December 31, 2024, or otherwise qualify as held for sale as of December 31, 2024, as described in Note 6, "Real Estate Disposition Activities."

Table of Contents

**For the year ended December 31, 2024**

| | Same Store | Other Stabilized | Development / Redevelopment | Total (1) (2) |
|---|---|---|---|---|
| Total Revenue | $ 2,680,192 | $ 118,558 | $ 65,884 | $ 2,864,634 |
| Same Store Operating Expense | | | | |
| Property Taxes | (301,696) | | | (301,696) |
| Payroll | (152,572) | | | (152,572) |
| Repairs & Maintenance | (147,183) | | | (147,183) |
| Utilities | (109,297) | | | (109,297) |
| Office Operations | (63,480) | | | (63,480) |
| Insurance | (39,591) | | | (39,591) |
| Marketing | (15,202) | | | (15,202) |
| Same Store Operating Expense | (829,021) | — | — | (829,021) |
| Non-Same Store Operating Expense | — | (38,230) | (22,952) | (61,182) |
| Total Expenses | (829,021) | (38,230) | (22,952) | (890,203) |
| Total NOI | $ 1,851,171 | $ 80,328 | $ 42,932 | $ 1,974,431 |
| Gross Real Estate (3) (4) | $ 23,419,850 | $ 1,749,380 | $ 2,485,000 | 27,654,230 |

**For the year ended December 31, 2023**

| | Same Store | Other Stabilized | Development / Redevelopment | Total (1) (2) |
|---|---|---|---|---|
| Total Revenue | $ 2,591,016 | $ 78,325 | $ 6,170 | $ 2,675,511 |
| Same Store Operating Expense | | | | |
| Property Taxes | (287,648) | | | (287,648) |
| Payroll | (152,645) | | | (152,645) |
| Repairs & Maintenance | (141,110) | | | (141,110) |
| Utilities | (93,716) | | | (93,716) |
| Office Operations | (63,823) | | | (63,823) |
| Insurance | (35,919) | | | (35,919) |
| Marketing | (14,781) | | | (14,781) |
| Same Store Operating Expense | (789,642) | — | — | (789,642) |
| Non-Same Store Operating Expense | — | (24,585) | (4,841) | (29,426) |
| Total Expenses | (789,642) | (24,585) | (4,841) | (819,068) |
| Total NOI | $ 1,801,374 | $ 53,740 | $ 1,329 | $ 1,856,443 |
| Gross Real Estate (3) (4) | $ 23,182,172 | 1,269,463 | 1,600,314 | 26,051,949 |

**For the year ended December 31, 2022**

| | Same Store | Other Stabilized | Development / Redevelopment | Total (1) (2) |
|---|---|---|---|---|
| Total Revenue | $ 2,333,443 | $ 93,305 | $ 29,734 | $ 2,456,482 |
| Same Store Operating Expense | | | | |
| Property Taxes | (260,505) | | | (260,505) |
| Payroll | (148,462) | | | (148,462) |
| Repairs & Maintenance | (126,137) | | | (126,137) |
| Utilities | (76,227) | | | (76,227) |
| Office Operations | (63,188) | | | (63,188) |
| Insurance | (29,910) | | | (29,910) |
| Marketing | (13,747) | | | (13,747) |
| Same Store Operating Expense | (718,176) | — | — | (718,176) |
| Non-Same Store Operating Expense | — | (25,750) | (11,047) | (36,797) |
| Total Expenses | (718,176) | (25,750) | (11,047) | (754,973) |
| Total NOI | $ 1,615,267 | $ 67,462 | $ 18,687 | $ 1,701,416 |
| Gross Real Estate (3) (4) | $ 22,197,772 | 1,515,963 | 1,574,649 | 25,288,384 |

F-30

Table of Contents

(1)    Does not include non-allocated revenue and non-allocated gross real estate. Non-allocated revenue represents third-party property management, developer fees and miscellaneous income and other ancillary items which are not allocated to a reportable segment. Non-allocated revenue is $7,081, $7,722 and $6,333 for the years ended December 31, 2024, 2023 and 2022, respectively.

(2)    Does not include non-allocated gross real estate including the for-sale residential condominiums at The Park Loggia, as discussed in Note 6, "Real Estate Disposition Activities," and land held for development. Non-allocated gross real estate is $118,342, $70,822 and $122,886 for the years ended December 31, 2024, 2023 and 2022, respectively. Land held for development gross real estate is $151,922, $199,062 and $179,204 for the years ended December 31, 2024, 2023 and 2022, respectively.

(3)    Does not include gross real estate either sold or classified as held for sale subsequent to December 31, 2024, 2023 and 2022 of $25,288, $543,000 and $280,889, respectively.

(4)    Gross real estate for the Company's Same Store includes capitalized additions of approximately $236,592, $188,507 and $209,607 in 2024, 2023 and 2022, respectively.

## 9. Stock-Based Compensation Plans

The Company's Plan includes an authorization to issue shares of the Company's common stock, par value $0.01 per share. At December 31, 2024, the Company had 4,957,465 shares remaining available to issue under the Plan, exclusive of shares that may be issued to satisfy currently outstanding awards such as stock options or performance awards. The Plan provides for equity awards to associates, officers, non-employee directors and other key personnel of the Company and its subsidiaries in the form of restricted stock, restricted stock units, stock options that qualify as incentive stock options ("ISOs") under Section 422 of the Code, non-qualified stock options, stock appreciation rights and performance awards, among others. The Plan expires in 2027, however before its expiration the Company expects to amend the plan or adopt a new plan to allow for continued grants of equity awards.

The Company's share-based compensation framework includes annual restricted stock awards and multi-year performance awards (the "Performance Awards"). The annual restricted stock vests over a three-year period at one-third per year. For annual restricted stock awards, in lieu of restricted stock, an officer may elect to receive up to 100% of the award value, in increments of 25%, in the form of stock options, which vests consistent with the restricted stock awards. Annually, the Company grants a target number of performance awards, with the ultimate award determined by the total shareholder return of the Company's common stock and/or operating performance metrics, measured over a performance period of three years. Performance units earned at the end of the measurement period are settled in fully vested shares of common stock and a payment of a cash amount representing accrued dividends on earned performance awards. The Company granted supplemental stock options in February 2021, that have a ten-year term and cliff vested on March 1, 2023. The options were granted at an exercise price that equaled the closing stock price on the grant date with recipients having 12 months to exercise the option if terminated without cause and will have until the expiration date to exercise the options if they retire.

For Performance Awards, after the first year of the performance period, if an employee's employment terminates on account of death, disability, retirement, or termination without cause, the remaining target grant will be pro-rated based on the employee's service time during the performance period. The final payout is based on actual performance, at which time the units will be converted into shares and a payment of a cash amount for accrued dividends based on actual performance. For other terminating events, performance awards are generally forfeited.

Information with respect to stock options granted under the Plan is as follows:

F-31

| | Options | | Weighted average exercise price per option |
|---|---|---|---|
| Options Outstanding, December 31, 2021 | 299,149 | $ | 178.71 |
| Granted (1) | 9,793 | | 236.14 |
| Exercised | (8,670) | | 135.78 |
| Forfeited | (6,459) | | 180.32 |
| Options Outstanding, December 31, 2022 | 293,813 | $ | 181.85 |
| Granted (1) | 15,744 | | 177.83 |
| Exercised | (5,773) | | 163.56 |
| Forfeited | — | | — |
| Options Outstanding, December 31, 2023 | 303,784 | $ | 181.99 |
| Granted (1) | 13,759 | | 172.11 |
| Exercised | (41,619) | | 179.89 |
| Forfeited | — | | — |
| Expired | (5,062) | | 180.32 |
| Options Outstanding, December 31, 2024 | 270,862 | $ | 181.84 |
| Options Exercisable: | | | |
| December 31, 2022 | 6,533 | $ | 165.51 |
| December 31, 2023 | 279,894 | $ | 180.97 |
| December 31, 2024 | 246,877 | $ | 181.82 |

(1)  All options are from recipient elections to receive a portion of earned restricted stock awards in the form of stock options.

The Company used the Black-Scholes Option Pricing model to determine the grant date fair value of options. The assumptions used are as follows:

| | 2024 |
|---|---|
| Dividend yield | 4.5 % |
| Estimated volatility | 29.7 % |
| Risk free rate | 4.31 % |
| Expected life of options | 5 years |
| Estimated fair value | $35.32 |

The following summarizes the exercise prices and contractual lives of options outstanding as of December 31, 2024:

| The Plan Number of Options | Range—Exercise Price | | | Weighted Average Remaining Contractual Term (in years) |
|---|---|---|---|---|
| 261,069 | $172.00 | - | $181.99 | 6.4 |
| 9,793 | $236.00 | - | $245.99 | 7.1 |
| 270,862 | | | | |

Options outstanding at December 31, 2024 had an intrinsic value of $10,486,000. Options exercisable had an intrinsic value of $9,528,000 and had a weighted average contractual life of 6.2 years. The intrinsic value of options exercised under the Plan during 2024, 2023 and 2022 was $1,394,000, $113,000 and $602,000, respectively.

F-32

Information with respect to performance awards granted is as follows:

| | Performance awards | | Weighted average grant date fair value per award |
|---|---|---|---|
| Outstanding at December 31, 2021 | 284,522 | $ | 214.73 |
| Granted (1) | 72,783 | | 254.75 |
| Change in awards based on performance (2) | (20,356) | | 200.92 |
| Converted to shares of common stock | (54,053) | | 217.33 |
| Forfeited | (3,829) | | 230.36 |
| Outstanding at December 31, 2022 | 279,067 | $ | 225.46 |
| Granted (3) | 90,215 | | 193.85 |
| Change in awards based on performance (2) | (31,345) | | 241.49 |
| Converted to shares of common stock | (60,016) | | 238.71 |
| Forfeited | (2,719) | | 212.05 |
| Outstanding at December 31, 2023 | 275,202 | $ | 210.52 |
| Granted (4) | 95,782 | | 185.97 |
| Change in awards based on performance (2) | 30,375 | | 216.50 |
| Converted to shares of common stock | (146,725) | | 201.07 |
| Forfeited | (4,511) | | 201.41 |
| Outstanding at December 31, 2024 | 250,123 | $ | 207.55 |

---

(1)    The shares of common stock earned was based on the total shareholder return metrics for the Company's common stock for 39,972 performance awards and financial metrics related to operating performance, net asset value and leverage metrics of the Company for 32,811 performance awards.

(2)    Represents the change in the number of performance awards earned based on performance achievement.

(3)    The shares of common stock that may be earned is based on the total shareholder return metrics for the Company's common stock for 49,611 performance awards and financial metrics related to operating performance and leverage metrics of the Company for 40,604 performance awards.

(4)    The shares of common stock that may be earned is based on the total shareholder return metrics for the Company's common stock for 52,683 performance awards and financial metrics related to operating performance and leverage metrics of the Company for 43,099 performance awards.

The Company used a Monte Carlo model to assess the compensation cost associated with the portion of the performance awards granted for which achievement will be determined by using total shareholder return measures. The assumptions used are as follows:

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Dividend yield | 3.9% | 3.7% | 2.7% |
| Estimated volatility over the life of the plan (1) | 20.5% - 22.8% | 22.9% - 26.1% | 16.1% - 36.8% |
| Risk free rate | 3.92% - 4.59% | 4.35% - 4.61% | 0.72% - 1.68% |
| Estimated performance award value based on total shareholder return measure | $189.47 | $206.97 | $271.98 |

---

(1)    Estimated volatility over the life of the plan is using 50% historical volatility and 50% implied volatility.

For the portion of the performance awards granted for which achievement will be determined by using financial metrics, the compensation cost was based on an average grant date value of $175.54, $177.83 and $233.94, for the years ended December 31, 2024, 2023 and 2022, respectively, and the Company's estimate of corporate achievement for the financial metrics.

Information with respect to restricted stock granted is as follows:

| | Restricted stock shares | Weighted average grant date fair value per share | | Restricted stock shares converted from performance awards |
|---|---|---|---|---|
| Outstanding at December 31, 2021 | 157,066 | $ | 192.90 | 74,627 |
| Granted | 86,475 | | 231.93 | — |
| Vested | (78,212) | | 197.51 | (48,171) |
| Forfeited | (3,615) | | 218.19 | (86) |
| Outstanding at December 31, 2022 | 161,714 | $ | 210.97 | 26,370 |
| Granted | 93,146 | | 177.70 | — |
| Vested | (79,450) | | 207.93 | (26,370) |
| Forfeited | (2,119) | | 194.78 | — |
| Outstanding at December 31, 2023 | 173,291 | $ | 194.68 | — |
| Granted | 104,081 | | 173.14 | — |
| Vested | (90,582) | | 194.89 | — |
| Forfeited | (4,408) | | 181.73 | — |
| Outstanding at December 31, 2024 | 182,382 | $ | 182.59 | — |

Total employee stock-based compensation cost recognized in income was $25,390,000, $27,417,000 and $34,131,000 for the years ended December 31, 2024, 2023 and 2022, respectively, and total capitalized stock-based compensation cost was $11,117,000, $10,906,000 and $10,431,000 for the years ended December 31, 2024, 2023 and 2022, respectively. At December 31, 2024, there was a total unrecognized compensation cost of $29,021,000 for unvested restricted stock, stock options and performance awards, which is expected to be recognized over a weighted average period of 1.7 years. The Company reverses any previously recognized compensation cost for forfeitures as they occur.

*Employee Stock Purchase Plan*

In October 1996, the Company adopted the 1996 Non-Qualified Employee Stock Purchase Plan (as amended, the "ESPP"). Initially, 1,000,000 shares of common stock were reserved for issuance, and as of December 31, 2024, there are 550,002 shares remaining available for issuance under the ESPP. Employees of the Company generally are eligible to participate in the ESPP if, as of the last day of the applicable purchase period, they have been employed by the Company for at least one calendar month. Under the ESPP, eligible employees can acquire shares of the Company's common stock through payroll deductions, subject to maximum purchase limitations, during two purchase periods. The first purchase period begins January 1 and ends June 10, and the second purchase period begins July 1 and ends December 10. The purchase price for common stock under the plan is 85% of the lesser of the fair market value of the Company's common stock on the first or the last day of the applicable purchase period. The offering dates, purchase dates and duration of purchase periods may be changed if the change is announced prior to the beginning of the affected date or purchase period. The Company issued 19,014, 23,059 and 20,837 shares and recognized compensation expense of $859,000, $911,000 and $564,000 under the ESPP for the years ended December 31, 2024, 2023 and 2022, respectively. The Company accounts for transactions under the ESPP using the fair value method prescribed by accounting guidance applicable to entities that use employee share purchase plans.

10. Related Party Arrangements

*Unconsolidated Entities*

The Company manages unconsolidated real estate entities and provides other real estate related services to third parties, for which it receives asset management, property management, construction, development and redevelopment fee revenue. From these entities, the Company earned fees of $7,081,000, $7,722,000 and $6,333,000 for the years ended December 31, 2024, 2023 and 2022, respectively. In addition, the Company had outstanding receivables associated with its property and construction management roles of $1,680,000 and $7,946,000 as of December 31, 2024 and 2023, respectively.

*Director Compensation*

Directors of the Company who are also employees receive no additional compensation for their services as a director. Following each annual meeting of stockholders, non-employee directors receive (i) a number of shares of restricted stock (or deferred stock units) having a value of $190,000 and (ii) a cash payment of $100,000, payable in equal quarterly installments of

$25,000. The number of shares of restricted stock (or deferred stock units) is calculated based on the closing price on the day of the award. Non-employee directors may elect to receive all or a portion of cash payments in the form of deferred stock units. Additionally, the non-executive Chairman receives an additional annual fee of $250,000 payable in equal quarterly installments of $62,500, the Lead Independent Director receives in the aggregate an additional annual fee of $50,000 payable in equal quarterly installments of $12,500, the non-employee director serving as the chairperson of the Audit Committee receives an additional annual fee of $30,000 per year payable in equal quarterly installments of $7,500, the non-employee director serving as the chairperson of the Compensation Committee receives an additional annual fee of $25,000 per year payable in equal quarterly installments of $6,250 and the Nominating, Governance and Corporate Responsibility and Investment and Finance Committee chairpersons receive an additional annual fee of $20,000 payable in equal quarterly installments of $5,000.

The Company recorded non-employee director compensation expense relating to restricted stock grants and deferred stock units in the amount of $2,397,000, $2,446,000 and $2,228,000 for the years ended December 31, 2024, 2023 and 2022, respectively, as a component of general and administrative expense. Deferred compensation relating to these restricted stock grants and deferred stock units to non-employee directors was $786,000, $799,000 and $794,000 on December 31, 2024, 2023 and 2022, respectively, reported as a component of prepaid expenses and other assets on the accompanying Consolidated Balance Sheets.

## 11. Fair Value

### Financial Instruments Carried at Fair Value

*Derivative Financial Instruments*

Hedging Derivatives are carried at fair value in the Company's financial statements. The Company minimizes its credit risk on these transactions by dealing with major, creditworthy financial institutions which have an A or better credit rating by the Standard & Poor's Ratings Group or equivalent, and monitors the credit ratings of counterparties and the exposure of the Company to any single entity. The Company believes the likelihood of realizing losses from counterparty nonperformance is remote. The Company determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, such as interest rate, term to maturity and volatility. The Hedging Derivatives credit valuation adjustments associated with its derivatives use Level 3 inputs, such as estimates of current credit spreads, which the Company concluded are not significant. As a result, the Company determined that its derivative valuations are classified in Level 2 of the fair value hierarchy.

The following table summarizes the consolidated derivative positions at December 31, 2024 (dollars in thousands):

|  | Non-designated Hedges | Cash Flow Hedges |
|---|---|---|
|  | Interest Rate Caps | Interest Rate Swaps |
| Notional balance | $ 391,846 | $ 100,000 |
| Weighted average interest rate (1) | 5.2 % | N/A |
| Weighted average capped/swapped interest rate | 6.7 % | 3.2 % |
| Earliest maturity date | February 2026 | June 2025 |
| Latest maturity date | January 2027 | January 2026 |

(1)   For debt hedged by interest rate caps, represents the weighted average interest rate on the hedged debt prior to any impact of the associated interest rate caps.

The following derivative activity occurred during the year ended December 31, 2024:

- In connection with the issuance of the Company's $400,000,000 unsecured notes in May 2024 maturing in 2034, the Company terminated $250,000,000 of forward interest rate swap agreements designated as cash flow hedges of the interest rate variability on the issuance of unsecured notes, receiving payments of $16,839,000 which will be recognized over the life of the unsecured notes as a reduction in the effective interest rate. Of the $250,000,000 forward interest rate swap agreements terminated, $50,000,000 were entered into during the year ended December 31, 2024. The Company has deferred these gains in accumulated other comprehensive income on the accompanying Consolidated Balance Sheets, and is recognizing the impact as a component of interest expense, net, over the term of the respective hedged debt.

Table of Contents

- In addition to the activity above, the Company entered into and had outstanding $100,000,000 of forward interest rate swap agreements to reduce the impact of variability in interest rates on a portion of the Company's anticipated future debt issuance activity through December 31, 2025. The Company expects to cash settle the swaps and either pay or receive cash for the then current fair value. Assuming the Company issues the debt as expected, the hedging impact from these positions will then be recognized over the life of the issued debt as a yield adjustment.

The Company had certain derivatives not designated as hedges during the years ended December 31, 2024, 2023 and 2022, for which fair value changes during each of the respective years were not material.

Cash flow hedge gains reclassified from accumulated other comprehensive income into earnings were $471,000 for the year ended December 31, 2024. Cash flow hedge losses reclassified from accumulated other comprehensive income into earnings were $1,360,000 and $3,883,000 for the years ended December 31, 2023 and 2022, respectively.

The Company anticipates reclassifying approximately $1,094,000 of net hedging gains from accumulated other comprehensive income into earnings within the next 12 months as an offset to the hedged item during this period.

Financial Instruments Not Carried at Fair Value

*Cash, Cash Equivalents and Restricted Cash*

Cash, cash equivalent and restricted cash balances are held with various financial institutions within accounts designed to preserve principal. The Company monitors credit ratings of these financial institutions and the concentration of cash, cash equivalents and restricted cash balances with any one financial institution and believes the likelihood of realizing material losses related to cash, cash equivalent and restricted cash balances is remote. Cash, cash equivalents and restricted cash are carried at their face amounts, which reasonably approximate their fair values and are Level 1 within the fair value hierarchy.

*Other Financial Instruments*

Rents and other receivables and prepaid expenses, accounts and construction payable and accrued expenses and other liabilities are carried at their face amounts, which reasonably approximate their fair values. The Company determined that its notes receivables approximate fair value, because interest rates, yields and other terms are consistent with interest rates, yields and other terms currently available for similar instruments and are considered to be a Level 2 price within the fair value hierarchy.

*Equity Securities*

The Company has direct equity investments in property technology and environmentally focused companies. These investments are accounted for using the measurement alternative and are valued at the market price of observable transactions.

*Indebtedness*

The Company values its fixed rate unsecured notes using quoted market prices, a Level 1 price within the fair value hierarchy. The Company values its mortgage notes payable and any outstanding amounts under the Credit Facility and Commercial Paper Program using a discounted cash flow analysis on the expected cash flows of each instrument. This analysis reflects the contractual terms of the instrument, including the period to maturity, and uses observable market-based inputs, including interest rate curves. The process also considers credit valuation adjustments to appropriately reflect the Company's nonperformance risk. The Company has concluded that the value of its mortgage notes payable and any outstanding amounts under the Credit Facility and Commercial Paper Program are Level 2 prices as the majority of the inputs used to value its positions fall within Level 2 of the fair value hierarchy.

Financial Instruments Measured/Disclosed at Fair Value on a Recurring Basis

The following tables summarize the classification between the three levels of the fair value hierarchy of the Company's financial instruments measured/disclosed at fair value on a recurring basis (dollars in thousands):

| Description | | Total Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|---|
| | | | **December 31, 2024** | | | | | |
| **Assets** | | | | | | | | |
| Investments | | | | | | | | |
| Notes Receivable, net | $ | 223,896 | $ | — | $ | 223,896 | $ | — |
| Non-Designated Hedges | | | | | | | | |
| Interest Rate Caps | | 24 | | — | | 24 | | — |
| Interest Rate Swaps - Assets | | 6,821 | | — | | 6,821 | | — |
| **Total Assets** | $ | 230,741 | $ | — | $ | 230,741 | $ | — |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Indebtedness | | | | | | | | |
| Fixed rate unsecured notes | $ | 6,796,066 | $ | 6,796,066 | $ | — | $ | — |
| Mortgage notes payable and Commercial Paper Program | | 660,170 | | | | 660,170 | | — |
| **Total Liabilities** | $ | 7,456,236 | $ | 6,796,066 | $ | 660,170 | $ | — |
| | | | **December 31, 2023** | | | | | |
| **Assets** | | | | | | | | |
| Investments | | | | | | | | |
| Notes Receivable, net | $ | 118,127 | $ | — | $ | 118,127 | $ | — |
| Non-Designated Hedges | | | | | | | | |
| Interest Rate Caps | | 85 | | — | | 85 | | — |
| Interest Rate Swaps - Assets | | 5,163 | | — | | 5,163 | | — |
| **Total Assets** | $ | 123,375 | $ | — | $ | 123,375 | $ | — |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Interest Rate Swaps - Liabilities | $ | 162 | $ | — | $ | 162 | $ | — |
| Indebtedness | | | | | | | | |
| Fixed rate unsecured notes | | 6,716,631 | | 6,716,631 | | — | | — |
| Mortgage notes payable and Commercial Paper Program | | 644,313 | | — | | 644,313 | | — |
| **Total Liabilities** | $ | 7,361,106 | $ | 6,716,631 | $ | 644,475 | $ | — |

F-37

## 12. Subsequent Events

The Company has evaluated subsequent events, through the date on which this Form 10-K was filed, the date on which these financial statements were issued, and identified the items below for discussion. In 2025, the Company had the following activity:

- In January 2025, the Company sold Avalon Wilton on River Road, located in Wilton, CT, containing 102 apartment homes for $65,100,000. This sale marks the Company's exit from the Connecticut market.

- On January 9, 2025, the District of Columbia filed an amended complaint in the D.C. Antitrust Litigation, which included the Company as a defendant, and the Company has filed a motion to dismiss, which has not been ruled on yet as of this date. While the Company intends to vigorously defend against the D.C. Antitrust Litigation, given the early stage of the lawsuit, the Company is unable to predict the outcome or estimate the amount of loss, if any, that may result from the lawsuit.

- On January 15, 2025, the Office of the Attorney General of the State of Maryland filed a suit similar to the D.C. Antitrust Litigation in which a number of owners and/or operators of multifamily properties in the State of Maryland, including the Company, have been named. While the Company intends to vigorously defend against the Maryland Antitrust Litigation, given the early stage of the lawsuit, the Company is unable to predict the outcome or estimate the amount of loss, if any, that may result from the lawsuit.

- The Company entered into agreements to acquire a total of eight apartment communities in the Company's Texas expansion market. The first agreement is to acquire two apartment communities containing 857 apartment homes in Austin, TX for an aggregate cash purchase price of $187,000,000, with an expected closing on or about March 31, 2025. The second agreement is to acquire, through a newly formed partnership (the "DownREIT"), six apartment communities containing a total of 1,844 homes in the Dallas-Fort Worth metropolitan area for $431,500,000, with the consideration composed of a cash payment of between $193,000,000 and $220,000,000 with the balance of the consideration in the form of limited partnership interests, the "DownREIT units", valued at $225 per unit. The DownREIT units will be entitled to receive quarterly distributions at the same rate as quarterly dividends on a share of the Company's common stock. Beginning on the one-year anniversary of the closing date, holders of DownREIT units may present some or all of their units for redemption, being entitled to receive a cash amount per unit that is related to the then fair market value of the Company's common stock, except that in lieu of such cash redemption the Company may elect to acquire units presented for redemption in exchange for an equal number of shares of the Company's common stock. The acquisition of the six properties through the DownREIT is expected to close in the second quarter of 2025.

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION**
**December 31, 2024**
**(Dollars in thousands)**

| | | | Initial Cost | | Costs Subsequent to Acquisition / Construction | Total Cost | | | | | Total Cost, Net of Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | | |
| | | | | | | 2024 | | | | | | 2023 | 2024 | |
| Community | City and state | # of homes | Land and Improvements | Building / Construction in Progress & Improvements | | Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | | | Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SAME STORE** | | | | | | | | | | | | | | |
| **NEW ENGLAND** | | | | | | | | | | | | | | |
| Avalon at Lexington | Lexington, MA | 198 | $ 2,124 | $ 12,561 | $ 17,402 | $ 2,124 | $ 29,963 | $ 32,087 | $ 22,690 | $ 9,397 | $ 9,525 | $ — | 1994 |
| eaves Wilmington | Wilmington, MA | 204 | 2,129 | 17,563 | 11,176 | 2,129 | 28,739 | 30,868 | 21,912 | 8,956 | 9,537 | — | 1999 |
| eaves Quincy | Quincy, MA | 245 | 1,743 | 14,662 | 18,169 | 1,743 | 32,831 | 34,574 | 24,267 | 10,307 | 11,013 | — | 1986/1995 |
| eaves Wilmington West | Wilmington, MA | 120 | 3,318 | 13,465 | 5,576 | 3,318 | 19,041 | 22,359 | 13,728 | 8,631 | 9,274 | — | 2002 |
| Avalon at The Pinehills | Plymouth, MA | 192 | 6,876 | 30,313 | 10,858 | 6,876 | 41,171 | 48,047 | 24,282 | 23,765 | 25,089 | — | 2004 |
| eaves Peabody | Peabody, MA | 286 | 4,645 | 18,919 | 18,119 | 4,645 | 37,038 | 41,683 | 23,901 | 17,782 | 18,513 | — | 1962/2004 |
| Avalon at Bedford Center | Bedford, MA | 139 | 4,258 | 20,551 | 6,130 | 4,258 | 26,681 | 30,939 | 18,701 | 12,238 | 13,597 | — | 2006 |
| Avalon at Chestnut Hill | Chestnut Hill, MA | 204 | 14,572 | 45,868 | 19,228 | 14,572 | 65,096 | 79,668 | 36,561 | 43,107 | 42,399 | — | 2007 |
| Avalon at Lexington Hills | Lexington, MA | 387 | 8,691 | 78,502 | 20,773 | 8,691 | 99,275 | 107,966 | 60,505 | 47,461 | 49,422 | — | 2008 |
| Avalon Acton | Acton, MA | 380 | 13,124 | 48,630 | 13,506 | 13,124 | 62,136 | 75,260 | 35,767 | 39,493 | 42,212 | 45,000 | 2008 |
| Avalon at the Hingham Shipyard | Hingham, MA | 235 | 12,218 | 41,516 | 16,043 | 12,218 | 57,559 | 69,777 | 34,592 | 35,185 | 36,942 | — | 2009 |
| Avalon Acton II | Acton, MA | 86 | 1,723 | 29,375 | 2 | 1,723 | 29,377 | 31,100 | 4,634 | 26,466 | 27,592 | — | 2021 |
| Avalon Northborough | Northborough, MA | 382 | 8,144 | 52,178 | 11,286 | 8,144 | 63,464 | 71,608 | 33,061 | 38,547 | 39,859 | — | 2009 |
| Avalon Exeter (1) | Boston, MA | 187 | — | 109,978 | 4,687 | — | 114,665 | 114,665 | 41,502 | 73,163 | 76,238 | — | 2014 |
| Avalon Natick | Natick, MA | 407 | 15,645 | 64,845 | 5,693 | 15,645 | 70,538 | 86,183 | 28,327 | 57,856 | 59,989 | — | 2013 |
| Avalon at Assembly Row | Somerville, MA | 195 | 8,599 | 52,454 | 9,215 | 8,599 | 61,669 | 70,268 | 23,716 | 46,552 | 48,360 | — | 2015 |
| AVA Somerville | Somerville, MA | 250 | 10,944 | 56,457 | 8,235 | 10,944 | 64,692 | 75,636 | 24,885 | 50,751 | 52,496 | — | 2015 |
| AVA Back Bay | Boston, MA | 271 | 9,034 | 36,536 | 53,915 | 9,034 | 90,451 | 99,485 | 56,832 | 42,653 | 45,312 | — | 1968/1998 |
| Avalon at Prudential Center II | Boston, MA | 266 | 8,776 | 35,479 | 66,539 | 8,776 | 102,018 | 110,794 | 58,584 | 52,210 | 55,229 | — | 1968/1998 |
| Avalon at Prudential Center I | Boston, MA | 243 | 8,002 | 32,349 | 58,209 | 8,002 | 90,558 | 98,560 | 51,299 | 47,261 | 49,935 | — | 1968/1998 |
| eaves Burlington | Burlington, MA | 203 | 7,714 | 32,499 | 10,617 | 7,714 | 43,116 | 50,830 | 18,593 | 32,237 | 33,627 | — | 1988/2012 |
| Avalon Burlington | Burlington, MA | 312 | 15,600 | 63,549 | 20,049 | 15,600 | 83,598 | 99,198 | 33,874 | 65,324 | 65,744 | — | 1989/2013 |
| Avalon Marlborough | Marlborough, MA | 350 | 15,367 | 59,723 | 4,722 | 15,367 | 64,445 | 79,812 | 21,560 | 58,252 | 59,831 | — | 2015 |
| Avalon North Station | Boston, MA | 503 | 22,796 | 247,270 | 1,254 | 22,796 | 248,524 | 271,320 | 66,675 | 204,645 | 212,709 | — | 2017 |
| Avalon Framingham | Framingham, MA | 180 | 9,315 | 34,604 | 797 | 9,315 | 35,401 | 44,716 | 11,562 | 33,154 | 34,220 | — | 2015 |
| Avalon Quincy | Quincy, MA | 395 | 14,694 | 79,655 | 1,613 | 14,694 | 81,268 | 95,962 | 23,354 | 72,608 | 75,117 | — | 2017 |
| Avalon Easton | South Easton, MA | 290 | 3,170 | 60,785 | 1,874 | 3,170 | 62,659 | 65,829 | 17,022 | 48,807 | 50,814 | — | 2017 |
| Avalon Residences at the Hingham Shipyard | Hingham, MA | 190 | 8,998 | 55,366 | 1,083 | 8,998 | 56,449 | 65,447 | 13,199 | 52,248 | 54,091 | — | 2019 |
| Avalon Sudbury | Sudbury, MA | 250 | 20,280 | 66,529 | 1,301 | 20,280 | 67,830 | 88,110 | 16,367 | 71,743 | 73,754 | — | 2019 |
| Avalon Saugus | Saugus, MA | 280 | 17,808 | 72,196 | 1,591 | 17,808 | 73,787 | 91,595 | 15,891 | 75,704 | 78,449 | — | 2019 |

F-39

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost — Land and Improvements | Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost 2024 — Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon Norwood | Norwood, MA | 198 | $ 9,478 | $ 51,762 | $ 328 | $ 9,478 | $ 52,090 | $ 61,568 | $ 10,614 | $ 50,954 | $ 52,943 | $ — | 2020 |
| Avalon Marlborough II | Marlborough, MA | 123 | 5,523 | 36,175 | 63 | 5,523 | 36,238 | 41,761 | 6,015 | 35,746 | 37,343 | — | 2020 |
| Avalon Easton II | South Easton, MA | 44 | 570 | 14,090 | 3 | 570 | 14,093 | 14,663 | 1,688 | 12,975 | 13,506 | — | 2021 |
| Avalon Woburn | Woburn, MA | 350 | 21,576 | 97,848 | 1,094 | 21,576 | 98,942 | 120,518 | 12,242 | 108,276 | 111,969 | — | 2022 |
| AVA North Point | Cambridge, MA | 265 | 31,263 | 83,829 | 551 | 31,263 | 84,380 | 115,643 | 19,307 | 96,336 | 99,358 | — | 2018/2019 |
| Avalon Bear Hill | Waltham, MA | 324 | 27,350 | 98,537 | 28,342 | 27,350 | 126,879 | 154,229 | 55,941 | 98,288 | 102,066 | — | 1999/2013 |
| **TOTAL NEW ENGLAND** | | **9,134** | **$ 376,067** | **$ 1,966,618** | **$ 450,043** | **$ 376,067** | **$ 2,416,661** | **$ 2,792,728** | **$ 983,650** | **$ 1,809,078** | **$ 1,878,074** | **$ 45,000** | |
| **METRO NY/NJ** | | | | | | | | | | | | | |
| **New York City, NY** | | | | | | | | | | | | | |
| Avalon Riverview (3) | Long Island City, NY | 372 | $ — | $ 94,061 | $ 19,316 | $ — | $ 113,377 | $ 113,377 | $ 83,944 | $ 29,433 | $ 30,568 | $ — | 2002 |
| Avalon Riverview North (3) | Long Island City, NY | 602 | — | 165,932 | 20,442 | — | 186,374 | 186,374 | 104,788 | 81,586 | 86,853 | — | 2008 |
| AVA Fort Greene | Brooklyn, NY | 631 | 83,038 | 216,802 | 12,951 | 83,038 | 229,753 | 312,791 | 114,772 | 198,019 | 205,038 | — | 2010 |
| AVA DoBro | Brooklyn, NY | 500 | 76,127 | 206,762 | 1,950 | 76,127 | 208,712 | 284,839 | 63,795 | 221,044 | 227,187 | — | 2017 |
| Avalon Willoughby Square | Brooklyn, NY | 326 | 49,635 | 134,840 | 1,323 | 49,635 | 136,163 | 185,798 | 39,707 | 146,091 | 150,409 | — | 2017 |
| Avalon Brooklyn Bay | Brooklyn, NY | 180 | 9,690 | 84,361 | 822 | 9,690 | 85,183 | 94,873 | 22,599 | 72,274 | 74,893 | — | 2018 |
| Avalon Midtown West | New York, NY | 550 | 154,730 | 191,891 | 41,995 | 154,730 | 233,886 | 388,616 | 94,992 | 293,624 | 301,207 | 69,800 | 1998/2013 |
| Avalon Clinton North | New York, NY | 339 | 84,069 | 111,729 | 11,981 | 84,069 | 123,710 | 207,779 | 52,790 | 154,989 | 158,577 | 126,400 | 2008/2013 |
| Avalon Clinton South | New York, NY | 288 | 71,421 | 94,948 | 6,383 | 71,421 | 101,331 | 172,752 | 44,285 | 128,467 | 131,292 | 104,500 | 2007/2013 |
| **Total New York City, NY** | | **3,788** | **$ 528,710** | **$ 1,301,326** | **$ 117,163** | **$ 528,710** | **$ 1,418,489** | **$ 1,947,199** | **$ 621,672** | **$ 1,325,527** | **$ 1,366,024** | **$ 300,700** | |
| **New York - Suburban** | | | | | | | | | | | | | |
| Avalon Commons (2) | Smithtown, NY | 312 | $ 4,679 | $ 27,811 | $ 18,337 | $ 4,679 | $ 46,148 | $ 50,827 | $ 34,630 | $ 16,197 | $ 14,581 | $ — | 1997 |
| Avalon Melville | Melville, NY | 494 | 9,228 | 50,059 | 27,347 | 9,228 | 77,406 | 86,634 | 57,954 | 28,680 | 29,818 | — | 1997 |
| Avalon White Plains | White Plains, NY | 407 | 15,391 | 137,312 | 4,951 | 15,391 | 142,263 | 157,654 | 75,367 | 82,287 | 85,578 | — | 2009 |
| Avalon Rockville Centre I | Rockville Centre, NY | 349 | 32,212 | 78,806 | 7,947 | 32,212 | 86,753 | 118,965 | 42,051 | 76,914 | 80,063 | — | 2012 |
| Avalon Garden City | Garden City, NY | 204 | 18,205 | 49,301 | 2,531 | 18,205 | 51,832 | 70,037 | 22,187 | 47,850 | 49,279 | — | 2013 |
| Avalon Huntington Station | Huntington Station, NY | 303 | 21,899 | 58,429 | 3,442 | 21,899 | 61,871 | 83,770 | 22,259 | 61,511 | 62,972 | — | 2014 |
| Avalon Great Neck | Great Neck, NY | 191 | 14,777 | 65,412 | 786 | 14,777 | 66,198 | 80,975 | 18,503 | 62,472 | 64,333 | — | 2017 |
| Avalon Rockville Centre II | Rockville Centre, NY | 165 | 7,534 | 50,981 | 723 | 7,534 | 51,704 | 59,238 | 14,112 | 45,126 | 46,758 | — | 2017 |
| Avalon Somers | Baldwin Place, NY | 152 | 5,608 | 40,591 | 51 | 5,608 | 40,642 | 46,250 | 10,951 | 35,299 | 36,579 | — | 2018 |
| Avalon Yonkers | Yonkers, NY | 590 | 28,324 | 173,748 | 78 | 28,324 | 173,826 | 202,150 | 29,553 | 172,597 | 178,057 | — | 2021 |
| Avalon Westbury | Westbury, NY | 396 | 69,620 | 49,350 | 15,809 | 69,620 | 65,159 | 134,779 | 34,817 | 99,962 | 101,385 | — | 2006/2013 |
| **Total New York - Suburban** | | **3,563** | **$ 227,477** | **$ 781,800** | **$ 82,002** | **$ 227,477** | **$ 863,802** | **$ 1,091,279** | **$ 362,384** | **$ 728,895** | **$ 749,403** | **$ —** | |
| **New Jersey** | | | | | | | | | | | | | |
| Avalon Cove | Jersey City, NJ | 504 | $ 8,760 | $ 82,422 | $ 36,304 | $ 8,760 | $ 118,726 | $ 127,486 | $ 97,240 | $ 30,246 | $ 33,173 | $ — | 1997 |

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost | | | 2024 | | | | | 2023 | 2024 | | |
| | | | Land and Improvements | Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost | | | | | Total Cost, Net of Accumulated Depreciation | | |
| | | | | | | Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| eaves West Windsor | West Windsor, NJ | 512 | $ 5,585 | $ 21,752 | $ 36,652 | $ 5,585 | $ 58,404 | $ 63,989 | $ 40,726 | $ 23,263 | $ 24,499 | $ — | 1988/1993 |
| Avalon at Edgewater I | Edgewater, NJ | 168 | 5,982 | 24,389 | 11,491 | 5,982 | 35,880 | 41,862 | 25,485 | 16,377 | 17,384 | — | 2002 |
| Avalon at Florham Park | Florham Park, NJ | 270 | 6,647 | 34,906 | 18,662 | 6,647 | 53,568 | 60,215 | 38,036 | 22,179 | 23,180 | — | 2001 |
| Avalon North Bergen | North Bergen, NJ | 164 | 8,984 | 30,994 | 1,658 | 8,984 | 32,652 | 41,636 | 14,366 | 27,270 | 28,298 | — | 2012 |
| Avalon at Wesmont Station I | Wood-Ridge, NJ | 266 | 14,682 | 41,610 | 5,435 | 14,682 | 47,045 | 61,727 | 20,566 | 41,161 | 42,133 | — | 2012 |
| Avalon at Wesmont Station II | Wood-Ridge, NJ | 140 | 6,502 | 16,851 | 934 | 6,502 | 17,785 | 24,287 | 7,378 | 16,909 | 17,524 | — | 2013 |
| Avalon Bloomingdale | Bloomingdale, NJ | 174 | 3,006 | 27,801 | 1,396 | 3,006 | 29,197 | 32,203 | 11,273 | 20,930 | 21,732 | — | 2014 |
| Avalon Wharton | Wharton, NJ | 247 | 2,273 | 48,609 | 1,732 | 2,273 | 50,341 | 52,614 | 17,783 | 34,831 | 36,634 | — | 2015 |
| Avalon Bloomfield Station (1) | Bloomfield, NJ | 224 | 10,701 | 36,430 | 2,473 | 10,701 | 38,903 | 49,604 | 12,888 | 36,716 | 37,961 | — | 2015 |
| Avalon Roseland | Roseland, NJ | 136 | 11,288 | 34,868 | 1,252 | 11,288 | 36,120 | 47,408 | 12,060 | 35,348 | 36,281 | — | 2015 |
| Avalon Princeton | Princeton, NJ | 280 | 26,461 | 68,003 | 2,179 | 26,461 | 70,182 | 96,643 | 20,774 | 75,869 | 77,831 | — | 2017 |
| Avalon Union | Union, NJ | 202 | 11,695 | 36,315 | 1,874 | 11,695 | 38,189 | 49,884 | 11,903 | 37,981 | 38,919 | — | 2016 |
| Avalon Hoboken | Hoboken, NJ | 217 | 37,237 | 94,990 | 3,375 | 37,237 | 98,365 | 135,602 | 35,951 | 99,651 | 102,490 | — | 2008/2016 |
| Avalon Maplewood | Maplewood, NJ | 235 | 15,179 | 49,425 | 3,065 | 15,179 | 52,490 | 67,669 | 14,974 | 52,695 | 54,149 | — | 2018 |
| Avalon Boonton | Boonton, NJ | 350 | 3,595 | 89,407 | 2,055 | 3,595 | 91,462 | 95,057 | 19,510 | 75,547 | 78,339 | — | 2019 |
| Avalon Teaneck | Teaneck, NJ | 248 | 12,588 | 60,257 | 139 | 12,588 | 60,396 | 72,984 | 12,471 | 60,513 | 62,773 | — | 2020 |
| Avalon Piscataway | Piscataway, NJ | 360 | 14,329 | 75,897 | 1,473 | 14,329 | 77,370 | 91,699 | 18,095 | 73,604 | 75,411 | — | 2019 |
| Avalon Old Bridge | Old Bridge, NJ | 252 | 6,895 | 64,907 | 693 | 6,895 | 65,600 | 72,495 | 10,673 | 61,822 | 64,494 | — | 2021 |
| Avalon at Edgewater II | Edgewater, NJ | 240 | 8,605 | 60,809 | 329 | 8,605 | 61,138 | 69,743 | 15,672 | 54,071 | 55,853 | — | 2018 |
| **Total New Jersey** | | **5,189** | **$ 220,994** | **$ 1,000,642** | **$ 133,171** | **$ 220,994** | **$ 1,133,813** | **$ 1,354,807** | **$ 457,824** | **$ 896,983** | **$ 929,058** | **$ —** | |
| **TOTAL METRO NY/NJ** | | **12,540** | **$ 977,181** | **$ 3,083,768** | **$ 332,336** | **$ 977,181** | **$ 3,416,104** | **$ 4,393,285** | **$ 1,441,880** | **$ 2,951,405** | **$ 3,044,485** | **300,700** | |
| | | | | | | | | | | | | | |
| **MID-ATLANTIC** | | | | | | | | | | | | | |
| **Washington Metro/Baltimore, MD** | | | | | | | | | | | | | |
| Avalon at Foxhall (2) | Washington, D.C. | 308 | $ 6,848 | $ 27,614 | $ 27,641 | $ 6,848 | $ 55,255 | $ 62,103 | $ 45,229 | $ 16,874 | $ 18,123 | — | 1982/1994 |
| Avalon at Gallery Place | Washington, D.C. | 203 | 8,800 | 39,658 | 7,353 | 8,800 | 47,011 | 55,811 | 33,431 | 22,380 | 22,933 | — | 2003 |
| AVA H Street | Washington, D.C. | 138 | 7,425 | 25,282 | 1,530 | 7,425 | 26,812 | 34,237 | 11,060 | 23,177 | 23,334 | — | 2013 |
| Avalon The Albemarle | Washington DC | 234 | 25,140 | 55,945 | 8,135 | 25,140 | 64,080 | 89,220 | 30,539 | 58,681 | 60,875 | — | 1966/2013 |
| eaves Tunlaw Gardens | Washington, D.C. | 166 | 16,430 | 24,602 | 1,706 | 16,430 | 26,308 | 42,738 | 11,950 | 30,788 | 31,231 | — | 1944/2013 |
| The Statesman | Washington, D.C. | 281 | 38,140 | 38,732 | 4,137 | 38,140 | 42,869 | 81,009 | 20,620 | 60,389 | 61,871 | — | 1961/2013 |
| eaves Glover Park | Washington, D.C. | 120 | 9,580 | 28,082 | 1,532 | 9,580 | 29,614 | 39,194 | 13,789 | 25,405 | 26,198 | — | 1953/2013 |
| AVA Van Ness | Washington, D.C. | 269 | 22,890 | 61,701 | 23,324 | 22,890 | 85,025 | 107,915 | 33,784 | 74,131 | 76,501 | — | 1978/2013 |
| Avalon First and M | Washington, D.C. | 469 | 43,700 | 156,300 | 4,115 | 43,700 | 160,415 | 204,115 | 66,823 | 137,292 | 142,421 | — | 2012/2013 |
| AVA NoMa | Washington, D.C. | 438 | 25,246 | 114,933 | 2,595 | 25,246 | 117,528 | 142,774 | 34,236 | 108,538 | 111,563 | — | 2018 |
| eaves Washingtonian Center | North Potomac, MD | 288 | 4,047 | 18,553 | 9,822 | 4,047 | 28,375 | 32,422 | 23,605 | 8,817 | 8,892 | — | 1996 |
| eaves Columbia Town Center I | Columbia, MD | 392 | 8,802 | 35,536 | 17,794 | 8,802 | 53,330 | 62,132 | 33,957 | 28,175 | 28,778 | — | 1986/1993 |
| Avalon at Grosvenor Station | North Bethesda, MD | 497 | 29,159 | 52,993 | 12,951 | 29,159 | 65,944 | 95,103 | 44,836 | 50,267 | 50,315 | — | 2004 |

F-41

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost Land and Improvements | Initial Cost Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost Land and Improvements | Total Cost Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon at Traville | Rockville, MD | 520 | $ 14,365 | $ 55,398 | $ 11,930 | $ 14,365 | $ 67,328 | $ 81,693 | $ 47,210 | $ 34,483 | $ 36,097 | $ — | 2004 |
| AVA Wheaton | Wheaton, MD | 319 | 6,494 | 69,027 | 343 | 6,494 | 69,370 | 75,864 | 19,023 | 56,841 | 58,982 | — | 2018 |
| Kanso Twinbrook | Rockville, MD | 238 | 9,151 | 56,955 | 53 | 9,151 | 57,008 | 66,159 | 8,546 | 57,613 | 59,823 | — | 2021 |
| Avalon Hunt Valley | Hunt Valley, MD | 332 | 10,872 | 62,974 | 1,036 | 10,872 | 64,010 | 74,882 | 18,511 | 56,371 | 57,901 | — | 2017 |
| Avalon Laurel (2) | Laurel, MD | 344 | 10,130 | 61,685 | 4,210 | 10,130 | 65,895 | 76,025 | 18,473 | 57,552 | 56,200 | — | 2020 |
| Avalon Towson | Towson, MD | 371 | 12,906 | 98,279 | 32 | 12,906 | 98,311 | 111,217 | 17,471 | 93,746 | 97,691 | — | 2020 |
| Avalon Fairway Hills - Meadows | Columbia, MD | 192 | 2,323 | 9,297 | 9,542 | 2,323 | 18,839 | 21,162 | 13,275 | 7,887 | 7,475 | — | 1987/1996 |
| Avalon Fairway Hills - Woods | Columbia, MD | 336 | 3,958 | 15,839 | 17,016 | 3,958 | 32,855 | 36,813 | 22,948 | 13,865 | 14,722 | — | 1987/1996 |
| Avalon Arundel Crossing II | Linthicum Heights, MD | 310 | 12,208 | 72,422 | 986 | 12,208 | 73,408 | 85,616 | 20,996 | 64,620 | 66,852 | — | 2018/2018 |
| Avalon 555 President | Baltimore, MD | 400 | 13,168 | 121,773 | 84 | 13,168 | 121,857 | 135,025 | 21,282 | 113,743 | 118,797 | — | 2021 |
| Kanso Silver Spring | Silver Spring, MD | 151 | 3,471 | 42,108 | 1,856 | 3,471 | 43,964 | 47,435 | 10,022 | 37,413 | 38,923 | — | 2009/2019 |
| Avalon Foundry Row | Owings Mills, MD | 437 | 11,132 | 86,261 | 5 | 11,132 | 86,266 | 97,398 | 12,118 | 85,280 | 88,864 | — | 2022 |
| Avalon Arundel Crossing | Linthicum Heights, MD | 384 | 9,933 | 111,114 | 777 | 9,933 | 111,891 | 121,824 | 20,862 | 100,962 | 105,866 | — | 2020/2021 |
| Avalon Russett | Laurel, MD | 238 | 10,200 | 49,834 | 6,437 | 10,200 | 56,271 | 66,471 | 25,479 | 40,992 | 41,769 | 32,200 | 1999/2013 |
| eaves Fair Lakes | Fairfax, VA | 420 | 6,096 | 24,400 | 16,364 | 6,096 | 40,764 | 46,860 | 33,232 | 13,628 | 15,311 | — | 1989/1996 |
| AVA Ballston | Arlington, VA | 344 | 7,291 | 29,177 | 28,870 | 7,291 | 58,047 | 65,338 | 40,322 | 25,016 | 25,825 | — | 1990 |
| eaves Fairfax City | Fairfax, VA | 141 | 2,152 | 8,907 | 6,004 | 2,152 | 14,911 | 17,063 | 11,577 | 5,486 | 5,860 | — | 1988/1997 |
| Avalon Tysons Corner (2) | Tysons Corner, VA | 558 | 13,851 | 43,397 | 25,232 | 13,851 | 68,629 | 82,480 | 48,808 | 33,672 | 29,733 | — | 1996 |
| Avalon at Arlington Square | Arlington, VA | 842 | 22,041 | 90,296 | 41,915 | 22,041 | 132,211 | 154,252 | 85,469 | 68,783 | 70,724 | — | 2001 |
| eaves Fairfax Towers | Falls Church, VA | 415 | 17,889 | 74,727 | 17,382 | 17,889 | 92,109 | 109,998 | 42,776 | 67,222 | 70,003 | — | 1978/2011 |
| Avalon Mosaic | Fairfax, VA | 531 | 33,490 | 75,801 | 3,527 | 33,490 | 79,328 | 112,818 | 29,585 | 83,233 | 85,273 | — | 2014 |
| Avalon Potomac Yard | Alexandria, VA | 323 | 24,225 | 84,530 | 2,094 | 24,225 | 86,624 | 110,849 | 31,065 | 79,784 | 82,277 | — | 2014/2016 |
| Avalon Clarendon | Arlington, VA | 300 | 22,573 | 99,297 | 8,198 | 22,573 | 107,495 | 130,068 | 38,282 | 91,786 | 94,587 | — | 2002/2016 |
| Avalon Dunn Loring | Vienna, VA | 440 | 29,377 | 120,884 | 2,343 | 29,377 | 123,227 | 152,604 | 39,524 | 113,080 | 116,566 | — | 2012/2017 |
| eaves Tysons Corner (2) | Vienna, VA | 217 | 16,030 | 47,572 | 3,051 | 16,030 | 50,623 | 66,653 | 24,637 | 42,016 | 43,403 | — | 1980/2013 |
| Avalon Courthouse Place | Arlington, VA | 564 | 56,550 | 185,632 | 13,819 | 56,550 | 199,451 | 256,001 | 86,376 | 169,625 | 175,646 | — | 1999/2013 |
| Avalon Arlington North | Arlington, VA | 228 | 21,600 | 59,076 | 10,173 | 21,600 | 69,249 | 90,849 | 26,281 | 64,568 | 66,737 | — | 2014 |
| Avalon Reston Landing | Reston, VA | 400 | 26,710 | 86,934 | 13,433 | 26,710 | 100,367 | 127,077 | 49,089 | 77,988 | 81,597 | — | 2000/2013 |
| Avalon Falls Church | Falls Church, VA | 384 | 39,544 | 66,160 | 5,223 | 39,544 | 71,383 | 110,927 | 22,513 | 88,414 | 86,209 | — | 2016 |
| **TOTAL MID-ATLANTIC** | | **14,482** | **$ 715,937** | **$ 2,689,687** | **$ 374,570** | **$ 715,937** | **$ 3,064,257** | **$ 3,780,194** | **$ 1,289,611** | **$ 2,490,583** | **$ 2,563,729** | **$ 32,200** | |
| | | | | | | | | | | | | | |
| **SOUTHEAST FLORIDA** | | | | | | | | | | | | | |
| Avalon 850 Boca | Boca Raton, FL | 370 | $ 21,430 | $ 117,895 | $ 2,576 | $ 21,430 | $ 120,471 | $ 141,901 | $ 35,345 | $ 106,556 | $ 110,254 | $ — | 2017/2017 |
| Avalon Doral | Doral, FL | 350 | 23,375 | 93,027 | (61) | 23,375 | 92,966 | 116,341 | 14,060 | 102,281 | 105,597 | — | 2020 |
| Avalon West Palm Beach | West Palm Beach, FL | 290 | 9,597 | 94,119 | 4,461 | 9,597 | 98,580 | 108,177 | 26,177 | 82,000 | 84,017 | — | 2018/2018 |
| Avalon Bonterra | Hialeah, FL | 314 | 16,655 | 73,977 | 1,158 | 16,655 | 75,135 | 91,790 | 20,811 | 70,979 | 73,720 | — | 2018/2019 |
| Avalon Toscana | Margate, FL | 240 | 9,213 | 51,480 | 1,229 | 9,213 | 52,709 | 61,922 | 12,965 | 48,957 | 51,019 | — | 2016/2019 |

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost Land and Improvements | Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon Fort Lauderdale | Fort Lauderdale, FL | 243 | $ 20,029 | $ 126,505 | $ 2,880 | $ 20,029 | $ 129,385 | $ 149,414 | $ 18,929 | $ 130,485 | $ 135,558 | $ — | 2020/2021 |
| Avalon Miramar | Miramar, FL | 380 | 17,959 | 116,276 | 823 | 17,959 | 117,099 | 135,058 | 19,996 | 115,062 | 119,360 | — | 2018/2021 |
| Avalon Miramar Park Place | Miramar, FL | 650 | 50,919 | 245,728 | 1,043 | 50,919 | 246,771 | 297,690 | 39,457 | 258,233 | 267,871 | — | 2022/2020 |
| TOTAL SOUTHEAST FLORIDA | | 2,837 | $ 169,177 | $ 919,007 | $ 14,109 | $ 169,177 | $ 933,116 | $ 1,102,293 | $ 187,740 | $ 914,553 | $ 947,396 | $ — | |
| **DENVER,CO** | | | | | | | | | | | | | |
| Avalon Denver West | Lakewood, CO | 252 | $ 8,047 | $ 69,373 | $ 2,387 | $ 8,047 | $ 71,760 | $ 79,807 | $ 21,907 | $ 57,900 | $ 59,841 | $ — | 2016/2017 |
| Avalon Castle Rock at the Meadows | Castle Rock, CO | 240 | 8,527 | 65,325 | 1,090 | 8,527 | 66,415 | 74,942 | 18,397 | 56,545 | 58,371 | — | 2018/2018 |
| Avalon Red Rocks | Littleton, CO | 256 | 4,461 | 71,477 | 549 | 4,461 | 72,026 | 76,487 | 20,219 | 56,268 | 58,355 | — | 2018/2018 |
| Avalon Southlands | Aurora, CO | 338 | 5,101 | 86,653 | 682 | 5,101 | 87,335 | 92,436 | 23,768 | 68,668 | 71,356 | — | 2018/2019 |
| AVA RiNo | Denver, CO | 246 | 15,152 | 71,666 | — | 15,152 | 71,666 | 86,818 | 8,289 | 78,529 | 81,358 | — | 2022 |
| Avalon Flatirons | Lafayette, CO | 207 | 7,390 | 88,438 | 418 | 7,390 | 88,856 | 96,246 | 11,573 | 84,673 | 87,889 | — | 2020/2022 |
| TOTAL DENVER, CO | | 1,539 | $ 48,678 | $ 452,932 | $ 5,126 | $ 48,678 | $ 458,058 | $ 506,736 | $ 104,153 | $ 402,583 | $ 417,170 | $ — | |
| **PACIFIC NORTHWEST** | | | | | | | | | | | | | |
| **Seattle, WA** | | | | | | | | | | | | | |
| Avalon at Bear Creek | Redmond, WA | 264 | $ 6,786 | $ 27,641 | $ 10,172 | $ 6,786 | $ 37,813 | $ 44,599 | $ 31,304 | $ 13,295 | $ 14,044 | $ — | 1998/1998 |
| Avalon Bellevue | Bellevue, WA | 201 | 6,664 | 24,119 | 8,132 | 6,664 | 32,251 | 38,915 | 24,210 | 14,705 | 16,079 | — | 2001 |
| eaves RockMeadow | Bothell, WA | 206 | 4,777 | 19,765 | 7,380 | 4,777 | 27,145 | 31,922 | 20,657 | 11,265 | 11,405 | — | 2000/2000 |
| Avalon ParcSquare | Redmond, WA | 124 | 3,789 | 15,139 | 5,854 | 3,789 | 20,993 | 24,782 | 16,100 | 8,682 | 8,256 | — | 2000/2000 |
| Avalon Meydenbauer | Bellevue, WA | 368 | 12,697 | 77,450 | 9,388 | 12,697 | 86,838 | 99,535 | 48,733 | 50,802 | 52,836 | — | 2008 |
| Avalon Towers Bellevue (3) | Bellevue, WA | 397 | — | 123,029 | 8,844 | — | 131,873 | 131,873 | 63,549 | 68,324 | 71,663 | — | 2011 |
| AVA Queen Anne | Seattle, WA | 203 | 12,081 | 41,618 | 2,233 | 12,081 | 43,851 | 55,932 | 19,797 | 36,135 | 37,425 | — | 2012 |
| Avalon Alderwood I | Lynnwood, WA | 367 | 12,294 | 55,627 | 1,407 | 12,294 | 57,034 | 69,328 | 20,395 | 48,933 | 50,500 | — | 2015 |
| AVA Capitol Hill | Seattle, WA | 249 | 20,613 | 59,986 | 1,756 | 20,613 | 61,742 | 82,355 | 20,306 | 62,049 | 63,829 | — | 2016 |
| Avalon Esterra Park | Redmond, WA | 482 | 23,178 | 112,986 | 1,974 | 23,178 | 114,960 | 138,138 | 34,280 | 103,858 | 107,376 | — | 2017 |
| Avalon Alderwood II | Lynnwood, WA | 124 | 5,072 | 21,418 | 248 | 5,072 | 21,666 | 26,738 | 6,361 | 20,377 | 20,991 | — | 2018 |
| Avalon Newcastle Commons I | Newcastle, WA | 378 | 9,649 | 111,600 | 1,957 | 9,649 | 113,557 | 123,206 | 30,124 | 93,082 | 96,521 | — | 2017 |
| Avalon Belltown Towers | Seattle, WA | 274 | 24,638 | 121,064 | 1,413 | 24,638 | 122,477 | 147,115 | 26,031 | 121,084 | 125,497 | — | 2019 |
| AVA Esterra Park | Redmond, WA | 323 | 16,405 | 74,568 | 113 | 16,405 | 74,681 | 91,086 | 16,898 | 74,188 | 76,695 | — | 2019 |
| Avalon Newcastle Commons II | Newcastle, WA | 293 | 6,982 | 99,969 | 208 | 6,982 | 100,177 | 107,159 | 14,434 | 92,725 | 96,417 | — | 2021 |
| Avalon North Creek | Bothell, WA | 316 | 13,498 | 69,013 | 97 | 13,498 | 69,110 | 82,608 | 14,600 | 68,008 | 70,524 | — | 2020 |
| eaves Redmond Campus | Redmond, WA | 374 | 15,665 | 84,852 | 29,388 | 15,665 | 114,240 | 129,905 | 50,811 | 79,094 | 82,813 | — | 1991/2013 |
| Archstone Redmond Lakeview | Redmond, WA | 166 | 10,250 | 28,163 | 5,981 | 10,250 | 34,144 | 44,394 | 17,669 | 26,725 | 27,919 | — | 1987/2013 |
| TOTAL PACIFIC NORTHWEST | | 5,109 | $ 205,038 | $ 1,168,007 | $ 96,545 | $ 205,038 | $ 1,264,552 | $ 1,469,590 | $ 476,259 | $ 993,331 | $ 1,030,790 | $ — | |

F-43

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost: Land and Improvements | Initial Cost: Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost: Land and Improvements | Total Cost: Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation (2024) | Total Cost, Net of Accumulated Depreciation (2023) | Encumbrances (2024) | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NORTHERN CALIFORNIA** | | | | | | | | | | | | | |
| **San Jose, CA** | | | | | | | | | | | | | |
| Avalon Campbell | Campbell, CA | 348 | 11,830 | 47,825 | 16,213 | 11,830 | 64,038 | 75,868 | 50,750 | 25,118 | 26,846 | — | 1995 |
| eaves San Jose | San Jose, CA | 442 | 12,920 | 53,047 | 20,867 | 12,920 | 73,914 | 86,834 | 53,435 | 33,399 | 35,666 | — | 1985/1996 |
| Avalon on the Alameda | San Jose, CA | 307 | 6,119 | 50,214 | 15,090 | 6,119 | 65,304 | 71,423 | 51,285 | 20,138 | 22,240 | — | 1999 |
| Avalon Silicon Valley | Sunnyvale, CA | 714 | 20,713 | 99,573 | 41,333 | 20,713 | 140,906 | 161,619 | 105,580 | 56,039 | 59,113 | — | 1998 |
| Avalon Mountain View | Mountain View, CA | 248 | 9,755 | 39,387 | 13,452 | 9,755 | 52,839 | 62,594 | 43,710 | 18,884 | 20,758 | — | 1986 |
| eaves Creekside | Mountain View, CA | 300 | 6,546 | 26,263 | 23,413 | 6,546 | 49,676 | 56,222 | 37,710 | 18,512 | 20,143 | — | 1962/1997 |
| Avalon at Cahill Park | San Jose, CA | 218 | 4,765 | 47,600 | 5,289 | 4,765 | 52,889 | 57,654 | 39,583 | 18,071 | 19,848 | — | 2002 |
| Avalon Towers on the Peninsula | Mountain View, CA | 211 | 9,560 | 56,136 | 16,868 | 9,560 | 73,004 | 82,564 | 49,363 | 33,201 | 34,617 | — | 2002 |
| Avalon Morrison Park | San Jose, CA | 250 | 13,837 | 64,521 | 2,090 | 13,837 | 66,611 | 80,448 | 25,221 | 55,227 | 57,299 | — | 2014 |
| Avalon Willow Glen | San Jose, CA | 412 | 46,060 | 85,637 | 5,564 | 46,060 | 91,201 | 137,261 | 44,832 | 92,429 | 95,551 | — | 2002/2013 |
| eaves West Valley | San Jose, CA | 873 | 90,890 | 138,555 | 11,317 | 90,890 | 149,872 | 240,762 | 71,451 | 169,311 | 174,470 | — | 1970/2013 |
| eaves Mountain View at Middlefield | Mountain View, CA | 404 | 64,070 | 73,438 | 14,821 | 64,070 | 88,259 | 152,329 | 46,178 | 106,151 | 110,005 | — | 1969/2013 |
| **Total San Jose, CA** | | **4,727** | **297,065** | **782,196** | **186,317** | **297,065** | **968,513** | **1,265,578** | **619,098** | **646,480** | **676,556** | **—** | |
| | | | | | | | | | | | | | |
| **Oakland - East Bay, CA** | | | | | | | | | | | | | |
| Avalon Fremont | Fremont, CA | 308 | 10,746 | 43,399 | 31,906 | 10,746 | 75,305 | 86,051 | 48,992 | 37,059 | 39,436 | — | 1992/1994 |
| eaves Dublin (2) | Dublin, CA | 204 | 5,276 | 19,642 | 27,254 | 5,276 | 46,896 | 52,172 | 25,551 | 26,621 | 14,594 | — | 1989/1997 |
| eaves Pleasanton | Pleasanton, CA | 456 | 11,610 | 46,552 | 54,062 | 11,610 | 100,614 | 112,224 | 58,406 | 53,818 | 52,044 | — | 1988/1994 |
| eaves Union City | Union City, CA | 208 | 4,249 | 16,820 | 6,001 | 4,249 | 22,821 | 27,070 | 19,353 | 7,717 | 7,903 | — | 1973/1996 |
| eaves Fremont | Fremont, CA | 237 | 6,581 | 26,583 | 13,352 | 6,581 | 39,935 | 46,516 | 32,157 | 14,359 | 15,628 | — | 1985/1994 |
| Avalon Union City | Union City, CA | 439 | 14,732 | 104,024 | 7,955 | 14,732 | 111,979 | 126,711 | 58,088 | 68,623 | 71,867 | — | 2009 |
| Avalon Walnut Creek (3) | Walnut Creek, CA | 422 | — | 148,846 | 8,215 | — | 157,061 | 157,061 | 77,412 | 79,649 | 84,385 | 4,681 | 2010 |
| Avalon Dublin Station | Dublin, CA | 253 | 7,772 | 72,142 | 2,454 | 7,772 | 74,596 | 82,368 | 27,827 | 54,541 | 56,225 | — | 2014 |
| Avalon Dublin Station II | Dublin, CA | 252 | 7,762 | 76,587 | 1,596 | 7,762 | 78,183 | 85,945 | 23,732 | 62,213 | 63,881 | — | 2016 |
| Avalon Public Market (1) | Emeryville, CA | 289 | 27,394 | 149,011 | (2,963) | 27,394 | 146,048 | 173,442 | 28,117 | 145,325 | 150,880 | — | 2020 |
| Avalon Walnut Creek II (3) | Walnut Creek, CA | 200 | — | 111,073 | 2,461 | — | 113,534 | 113,534 | 18,774 | 94,760 | 98,785 | — | 2020 |
| Avalon Walnut Creek | Walnut Creek, CA | 510 | 30,320 | 86,475 | 15,494 | 30,320 | 101,969 | 132,289 | 45,125 | 87,164 | 89,379 | — | 1987/2013 |
| Avalon Walnut Ridge I | Walnut Creek, CA | 106 | 9,860 | 20,630 | 5,494 | 9,860 | 26,124 | 35,984 | 11,443 | 24,541 | 25,192 | — | 2000/2013 |
| Avalon Walnut Ridge II | Walnut Creek, CA | 360 | 27,190 | 60,209 | 11,593 | 27,190 | 71,802 | 98,992 | 32,710 | 66,282 | 68,241 | — | 1989/2013 |
| **Total Oakland - East Bay, CA** | | **4,244** | **163,492** | **981,993** | **184,874** | **163,492** | **1,166,867** | **1,330,359** | **507,687** | **822,672** | **838,440** | **4,681** | |
| | | | | | | | | | | | | | |
| **San Francisco, CA** | | | | | | | | | | | | | |
| AVA Nob Hill | San Francisco, CA | 185 | 5,403 | 21,567 | 12,489 | 5,403 | 34,056 | 39,459 | 25,989 | 13,470 | 13,732 | — | 1990/1995 |
| eaves Foster City | Foster City, CA | 290 | 7,852 | 31,445 | 17,454 | 7,852 | 48,899 | 56,751 | 37,706 | 19,045 | 19,576 | — | 1973/1994 |
| eaves Pacifica | Pacifica, CA | 220 | 6,125 | 24,792 | 6,107 | 6,125 | 30,899 | 37,024 | 26,665 | 10,359 | 11,048 | — | 1971/1995 |

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost — Land and Improvements | Initial Cost — Building/Construction in Progress & Improvements | Costs Subsequent to Acquisition/Construction | Total Cost — Land and Improvements | Total Cost — Building/Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation 2024 | Total Cost, Net of Accumulated Depreciation 2023 | Encumbrances 2024 | Year of Completion/Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon Sunset Towers | San Francisco, CA | 243 | $ 3,561 | $ 21,313 | $ 17,915 | $ 3,561 | $ 39,228 | $ 42,789 | $ 29,787 | $ 13,002 | $ 14,142 | $ — | 1961/1996 |
| Avalon at Mission Bay I | San Francisco, CA | 250 | 14,029 | 78,452 | 11,820 | 14,029 | 90,272 | 104,301 | 66,712 | 37,589 | 39,717 | — | 2003 |
| Avalon at Mission Bay III | San Francisco, CA | 260 | 28,687 | 119,156 | 2,031 | 28,687 | 121,187 | 149,874 | 63,247 | 86,627 | 90,364 | — | 2009 |
| Avalon Ocean Avenue | San Francisco, CA | 173 | 5,544 | 50,906 | 3,715 | 5,544 | 54,621 | 60,165 | 23,938 | 36,227 | 37,777 | — | 2012 |
| AVA 55 Ninth | San Francisco, CA | 273 | 20,267 | 97,321 | 1,822 | 20,267 | 99,143 | 119,410 | 37,257 | 82,153 | 85,383 | — | 2014 |
| Avalon Hayes Valley | San Francisco, CA | 182 | 12,595 | 81,228 | 1,540 | 12,595 | 82,768 | 95,363 | 28,039 | 67,324 | 69,869 | — | 2015 |
| Avalon Dogpatch | San Francisco, CA | 326 | 23,523 | 180,698 | 835 | 23,523 | 181,533 | 205,056 | 46,162 | 158,894 | 164,414 | — | 2018 |
| Avalon San Bruno I | San Bruno, CA | 300 | 40,780 | 71,352 | 7,368 | 40,780 | 78,720 | 119,500 | 37,665 | 81,835 | 84,122 | 55,250 | 2004/2013 |
| Avalon San Bruno II | San Bruno, CA | 185 | 23,787 | 46,609 | 2,972 | 23,787 | 49,581 | 73,368 | 21,243 | 52,125 | 53,227 | — | 2007/2013 |
| Avalon San Bruno III | San Bruno, CA | 187 | 33,303 | 65,255 | 2,117 | 33,303 | 67,372 | 100,675 | 28,791 | 71,884 | 73,424 | 51,000 | 2010/2013 |
| **Total San Francisco, CA** | | **3,074** | **$ 225,456** | **$ 890,094** | **$ 88,185** | **$ 225,456** | **$ 978,279** | **$ 1,203,735** | **$ 473,201** | **$ 730,534** | **$ 756,795** | **$ 106,250** | |
| **TOTAL NORTHERN CALIFORNIA** | | **12,045** | **$ 686,013** | **$ 2,654,283** | **$ 459,376** | **$ 686,013** | **$ 3,113,659** | **$ 3,799,672** | **$ 1,599,986** | **$ 2,199,686** | **$ 2,271,791** | **$ 110,931** | |
| **SOUTHERN CALIFORNIA** | | | | | | | | | | | | | |
| **Los Angeles, CA** | | | | | | | | | | | | | |
| AVA Burbank | Burbank, CA | 750 | $ 22,483 | $ 28,078 | $ 59,108 | $ 22,483 | $ 87,186 | $ 109,669 | $ 61,596 | $ 48,073 | $ 47,224 | $ — | 1961/1997 |
| Avalon Woodland Hills | Woodland Hills, CA | 663 | 23,828 | 40,329 | 89,549 | 23,828 | 129,878 | 153,706 | 73,009 | 80,697 | 82,691 | — | 1989/1997 |
| eaves Warner Center (2) | Woodland Hills, CA | 228 | 7,045 | 12,974 | 18,090 | 7,045 | 31,064 | 38,109 | 23,286 | 14,823 | 12,227 | — | 1979/1998 |
| Avalon Glendale (3) | Glendale, CA | 223 | — | 42,564 | 4,521 | — | 47,085 | 47,085 | 33,662 | 13,423 | 14,636 | — | 2003 |
| Avalon Burbank | Burbank, CA | 401 | 14,053 | 56,814 | 32,377 | 14,053 | 89,191 | 103,244 | 58,956 | 44,288 | 44,329 | — | 1988/2002 |
| Avalon Camarillo | Camarillo, CA | 249 | 8,446 | 40,239 | 5,492 | 8,446 | 45,731 | 54,177 | 28,653 | 25,524 | 26,472 | — | 2006 |
| Avalon Wilshire | Los Angeles, CA | 125 | 5,459 | 41,174 | 7,869 | 5,459 | 49,043 | 54,502 | 30,231 | 24,271 | 26,124 | — | 2007 |
| Avalon Encino | Encino, CA | 132 | 12,789 | 49,062 | 5,168 | 12,789 | 54,230 | 67,019 | 29,008 | 38,011 | 38,842 | — | 2008 |
| Avalon Warner Place | Canoga Park, CA | 210 | 7,920 | 44,823 | 4,087 | 7,920 | 48,910 | 56,830 | 27,297 | 29,533 | 31,232 | — | 2008 |
| AVA Little Tokyo | Los Angeles, CA | 280 | 14,734 | 93,977 | 2,750 | 14,734 | 96,727 | 111,461 | 34,411 | 77,050 | 79,899 | — | 2015 |
| eaves Phillips Ranch | Pomona, CA | 503 | 9,796 | 41,675 | 17,506 | 9,796 | 59,181 | 68,977 | 26,694 | 42,283 | 41,537 | — | 1989/2011 |
| eaves San Dimas Canyon | San Dimas, CA | 102 | 1,916 | 7,803 | 3,224 | 1,916 | 11,027 | 12,943 | 5,411 | 7,532 | 7,640 | — | 1978/2011 |
| AVA Pasadena | Pasadena, CA | 84 | 8,400 | 11,532 | 6,865 | 8,400 | 18,387 | 26,787 | 7,750 | 19,037 | 19,238 | — | 1973/2012 |
| eaves Cerritos | Artesia, CA | 151 | 8,305 | 21,195 | 3,267 | 8,305 | 24,462 | 32,767 | 10,406 | 22,361 | 23,100 | — | 1973/2012 |
| Avalon Playa Vista | Los Angeles, CA | 309 | 30,900 | 71,944 | 10,551 | 30,900 | 82,495 | 113,395 | 38,120 | 75,275 | 77,685 | — | 2006/2012 |
| Avalon San Dimas | San Dimas, CA | 162 | 9,141 | 30,726 | 3,711 | 9,141 | 34,437 | 43,578 | 11,859 | 31,719 | 30,005 | — | 2014 |
| Avalon Glendora | Glendora, CA | 281 | 18,311 | 64,303 | 1,429 | 18,311 | 65,732 | 84,043 | 21,457 | 62,586 | 64,455 | — | 2016 |
| Avalon West Hollywood | West Hollywood, CA | 294 | 35,214 | 118,926 | 2,584 | 35,214 | 121,510 | 156,724 | 33,905 | 122,819 | 126,390 | — | 2017 |
| Avalon Mission Oaks | Camarillo, CA | 160 | 9,600 | 38,666 | 2,034 | 9,600 | 40,700 | 50,300 | 15,829 | 34,471 | 35,291 | — | 2014 |
| Avalon Chino Hills | Chino Hills, CA | 331 | 16,617 | 79,829 | 1,682 | 16,617 | 81,511 | 98,128 | 22,663 | 75,465 | 77,760 | — | 2017 |
| AVA Hollywood at La Pietra Place | Los Angeles, CA | 695 | 99,309 | 272,596 | 2,499 | 99,309 | 275,095 | 374,404 | 48,530 | 325,874 | 336,203 | — | 2021 |

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost — Land and Improvements | Initial Cost — Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost — Land and Improvements | Total Cost — Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | 2024 Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon Cerritos | Cerritos, CA | 132 | $ 8,869 | $ 52,025 | $ 665 | $ 8,869 | $ 52,690 | $ 61,559 | $ 12,448 | $ 49,111 | $ 50,789 | $ 30,250 | 2017/2019 |
| Avalon Monrovia | Monrovia, CA | 154 | 12,125 | 56,202 | 374 | 12,125 | 56,576 | 68,701 | 7,918 | 60,783 | 62,904 | — | 2021 |
| Avalon Simi Valley | Simi Valley, CA | 500 | 42,020 | 77,521 | 10,470 | 42,020 | 87,991 | 130,011 | 40,302 | 89,709 | 92,163 | — | 2007/2013 |
| AVA Studio City II | Studio City, CA | 101 | 4,626 | 23,840 | 7,347 | 4,626 | 31,187 | 35,813 | 13,486 | 22,327 | 23,370 | — | 1991/2013 |
| Avalon Studio City | Studio City, CA | 276 | 15,756 | 81,361 | 17,011 | 15,756 | 98,372 | 114,128 | 44,667 | 69,461 | 72,739 | — | 2002/2013 |
| Avalon Calabasas | Calabasas, CA | 600 | 42,720 | 112,911 | 25,819 | 42,720 | 138,730 | 181,450 | 74,665 | 106,785 | 111,007 | — | 1988/2013 |
| Avalon Oak Creek | Agoura Hills, CA | 338 | 43,540 | 83,625 | 10,657 | 43,540 | 94,282 | 137,822 | 49,769 | 88,053 | 90,522 | — | 2004/2013 |
| Avalon Santa Monica on Main | Santa Monica, CA | 133 | 32,000 | 63,612 | 14,294 | 32,000 | 77,906 | 109,906 | 32,915 | 76,991 | 79,077 | — | 2007/2013 |
| eaves Old Town Pasadena | Pasadena, CA | 96 | 9,110 | 16,316 | 6,743 | 9,110 | 23,059 | 32,169 | 10,080 | 22,089 | 22,719 | — | 1972/2013 |
| eaves Thousand Oaks | Thousand Oaks, CA | 158 | 13,950 | 21,574 | 6,198 | 13,950 | 27,772 | 41,722 | 15,637 | 26,085 | 26,892 | — | 1992/2013 |
| eaves Los Feliz | Los Angeles, CA | 263 | 18,940 | 46,201 | 12,644 | 18,940 | 58,845 | 77,785 | 26,613 | 51,172 | 52,846 | 41,400 | 1989/2013 |
| AVA Toluca Hills (2) | Los Angeles, CA | 1,151 | 86,450 | 170,276 | 95,364 | 86,450 | 265,640 | 352,090 | 102,318 | 249,772 | 248,197 | — | 1973/2013 |
| eaves Woodland Hills | Woodland Hills, CA | 891 | 68,940 | 96,808 | 24,026 | 68,940 | 120,834 | 189,774 | 60,028 | 129,746 | 131,151 | 111,500 | 1971/2013 |
| Avalon Thousand Oaks Plaza | Thousand Oaks, CA | 148 | 12,810 | 24,045 | 4,194 | 12,810 | 28,239 | 41,049 | 13,499 | 27,550 | 27,450 | — | 2002/2013 |
| Avalon Pasadena | Pasadena, CA | 120 | 10,240 | 33,038 | 5,743 | 10,240 | 38,781 | 49,021 | 16,612 | 32,409 | 33,453 | — | 2004/2013 |
| AVA Studio City I | Studio City, CA | 450 | 17,658 | 94,249 | 34,908 | 17,658 | 129,157 | 146,815 | 54,024 | 92,791 | 96,708 | — | 1987/2013 |
| **Total Los Angeles, CA** | | **12,000** | $ 806,973 | $ 2,275,192 | $ 563,606 | $ 806,973 | $ 2,838,798 | $ 3,645,771 | $ 1,225,117 | $ 2,420,654 | $ 2,475,704 | $ 183,150 | |
| | | | | | | | | | | | | | |
| **Orange County, CA** | | | | | | | | | | | | | |
| AVA Newport | Costa Mesa, CA | 145 | $ 1,975 | $ 3,814 | $ 11,792 | $ 1,975 | $ 15,606 | $ 17,581 | $ 10,478 | $ 7,103 | $ 6,696 | $ — | 1956/1996 |
| eaves Mission Viejo | Mission Viejo, CA | 166 | 2,517 | 9,241 | 6,979 | 2,517 | 16,220 | 18,737 | 13,024 | 5,713 | 5,748 | — | 1984/1996 |
| eaves South Coast | Costa Mesa, CA | 258 | 4,709 | 16,063 | 15,755 | 4,709 | 31,818 | 36,527 | 24,428 | 12,099 | 13,043 | — | 1973/1996 |
| eaves Rancho Santa Margarita | Rancho Santa Margarita, CA | 302 | 4,607 | 16,895 | 15,861 | 4,607 | 32,756 | 37,363 | 24,362 | 13,001 | 13,626 | — | 1990/1997 |
| eaves Huntington Beach | Huntington Beach, CA | 304 | 4,871 | 19,729 | 13,791 | 4,871 | 33,520 | 38,391 | 28,606 | 9,785 | 10,354 | — | 1971/1997 |
| Avalon Irvine I | Irvine, CA | 279 | 9,911 | 67,504 | 9,080 | 9,911 | 76,584 | 86,495 | 39,040 | 47,455 | 49,535 | — | 2010 |
| Avalon Irvine II | Irvine, CA | 179 | 4,358 | 40,890 | 1,807 | 4,358 | 42,697 | 47,055 | 17,651 | 29,404 | 30,843 | — | 2013 |
| eaves Lake Forest | Lake Forest, CA | 225 | 5,199 | 21,117 | 8,662 | 5,199 | 29,779 | 34,978 | 14,489 | 20,489 | 21,201 | — | 1975/2011 |
| Avalon Baker Ranch | Lake Forest, CA | 430 | 31,689 | 98,004 | 1,623 | 31,689 | 99,627 | 131,316 | 33,927 | 97,389 | 100,111 | — | 2015 |
| Avalon Irvine III | Irvine, CA | 156 | 11,607 | 43,973 | 719 | 11,607 | 44,692 | 56,299 | 13,898 | 42,401 | 43,554 | — | 2016 |
| Avalon Brea Place | Brea, CA | 653 | 72,925 | 220,193 | 38 | 72,925 | 220,231 | 293,156 | 25,816 | 267,340 | 275,756 | — | 2022 |
| eaves Seal Beach | Seal Beach, CA | 549 | 46,790 | 104,129 | 34,702 | 46,790 | 138,831 | 185,621 | 56,813 | 128,808 | 133,471 | — | 1971/2013 |
| Avalon Huntington Beach | Huntington Beach, CA | 378 | 13,055 | 105,981 | 1,430 | 13,055 | 107,411 | 120,466 | 31,757 | 88,709 | 92,157 | — | 2017 |
| **Total Orange County, CA** | | **4,024** | $ 214,213 | $ 767,533 | $ 122,239 | $ 214,213 | $ 889,772 | $ 1,103,985 | $ 334,289 | $ 769,696 | $ 796,095 | $ — | |
| | | | | | | | | | | | | | |
| **San Diego, CA** | | | | | | | | | | | | | |
| AVA Pacific Beach | San Diego, CA | 564 | $ 9,922 | $ 40,580 | $ 45,027 | $ 9,922 | $ 85,607 | $ 95,529 | $ 61,955 | $ 33,574 | $ 35,778 | $ — | 1969/1997 |
| eaves Mission Ridge | San Diego, CA | 200 | 2,710 | 10,924 | 16,894 | 2,710 | 27,818 | 30,528 | 22,093 | 8,435 | 8,784 | — | 1960/1997 |

Table of Contents

AVALONBAY COMMUNITIES, INC.
REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)
December 31, 2024
(Dollars in thousands)

| Community | City and state | # of homes | Initial Cost Land and Improvements | Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | Total Cost Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation (2024) | Total Cost, Net of Accumulated Depreciation (2023) | Encumbrances | Year of Completion / Acquisition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| eaves San Marcos | San Marcos, CA | 184 | $ 3,277 | $ 13,385 | $ 9,605 | $ 3,277 | $ 22,990 | $ 26,267 | $ 9,254 | $ 17,013 | $ 15,757 | $ — | 1988/2011 |
| eaves Rancho Penasquitos | San Diego, CA | 250 | 6,692 | 27,143 | 13,603 | 6,692 | 40,746 | 47,438 | 19,603 | 27,835 | 29,195 | — | 1986/2011 |
| Avalon Vista | Vista, CA | 221 | 12,689 | 43,328 | 1,268 | 12,689 | 44,596 | 57,285 | 15,502 | 41,783 | 43,039 | | 2015 |
| eaves La Mesa | La Mesa, CA | 168 | 9,490 | 29,412 | 5,020 | 9,490 | 34,432 | 43,922 | 18,022 | 25,900 | 26,452 | — | 1989/2013 |
| Avalon La Jolla Colony | San Diego, CA | 180 | 16,760 | 29,234 | 11,233 | 16,760 | 40,467 | 57,227 | 19,117 | 38,110 | 39,520 | — | 1987/2013 |
| **Total San Diego, CA** | | **1,767** | **$ 61,540** | **$ 194,006** | **$ 102,650** | **$ 61,540** | **$ 296,656** | **$ 358,196** | **$ 165,546** | **$ 192,650** | **$ 198,525** | **$ —** | |
| TOTAL SOUTHERN CALIFORNIA | | 17,791 | $ 1,082,726 | $ 3,236,731 | $ 788,495 | $ 1,082,726 | $ 4,025,226 | $ 5,107,952 | $ 1,724,952 | $ 3,383,000 | $ 3,470,324 | $ 183,150 | |
| | | | | | | | | | | | | | |
| **OTHER EXPANSION REGIONS** | | | | | | | | | | | | | |
| **North Carolina** | | | | | | | | | | | | | |
| Avalon South End | Charlotte, NC | 265 | $ 13,723 | $ 90,017 | $ 4,019 | $ 13,723 | $ 94,036 | $ 107,759 | $ 15,261 | $ 92,498 | $ 95,961 | $ — | 2020/2021 |
| AVA South End | Charlotte, NC | 164 | 9,367 | 45,277 | 2,441 | 9,367 | 47,718 | 57,085 | 6,801 | 50,284 | 51,367 | — | 2013/2021 |
| Avalon Hawk (1) | Charlotte, NC | 71 | 2,564 | 44,255 | 3 | 2,564 | 44,258 | 46,822 | 5,443 | 41,379 | 43,118 | — | 2021/2021 |
| Avalon Highland Creek | Charlotte, NC | 260 | 4,586 | 73,014 | 157 | 4,586 | 73,171 | 77,757 | 9,086 | 68,671 | 71,893 | — | 2022/2022 |
| **Total North Carolina** | | **760** | **$ 30,240** | **$ 252,563** | **$ 6,620** | **$ 30,240** | **$ 259,183** | **$ 289,423** | **$ 36,591** | **$ 252,832** | **$ 262,339** | **$ —** | |
| | | | | | | | | | | | | | |
| **Texas** | | | | | | | | | | | | | |
| Avalon Lakeside | Flower Mound, TX | 425 | $ 15,073 | $ 102,992 | $ 533 | $ 15,073 | $ 103,525 | $ 118,598 | $ 19,021 | $ 99,577 | $ 103,640 | $ — | 2015/2021 |
| Avalon Addison | Addison, TX | 196 | 11,174 | 59,132 | 615 | 11,174 | 59,747 | 70,921 | 7,395 | 63,526 | 65,262 | — | 1995/2022 |
| **Total Texas** | | **621** | **$ 26,247** | **$ 162,124** | **$ 1,148** | **$ 26,247** | **$ 163,272** | **$ 189,519** | **$ 26,416** | **$ 163,103** | **$ 168,902** | | |
| TOTAL OTHER EXPANSION REGIONS | | 1,381 | $ 56,487 | $ 414,687 | $ 7,768 | $ 56,487 | $ 422,455 | $ 478,942 | $ 63,007 | $ 415,935 | $ 431,241 | $ — | |
| | | | | | | | | | | | | | |
| TOTAL SAME STORE | | 76,858 | $ 4,317,304 | $ 16,585,720 | $ 2,528,368 | $ 4,317,304 | $ 19,114,088 | $ 23,431,392 | $ 7,871,238 | $ 15,560,154 | $ 16,055,000 | $ 671,981 | |

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost Land and Improvements | Initial Cost Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | 2024 Total Cost Land and Improvements | 2024 Total Cost Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances | Year Con... Ac... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OTHER STABILIZED** | | | | | | | | | | | | | |
| AVA Balboa Park | San Diego, CA | 100 | $ 10,537 | $ 40,644 | $ 12 | $ 10,537 | $ 40,656 | $ 51,193 | $ 880 | $ 50,313 | $ — | | 20 |
| Avalon Cherry Hills | Englewood, CO | 306 | 9,798 | 85,418 | 30 | 9,798 | 85,448 | 95,246 | 3,391 | 91,855 | — | — | 20 |
| Avalon Lowry | Denver, CO | 347 | 15,382 | 121,429 | — | 15,382 | 121,429 | 136,811 | 600 | 136,211 | | | 20 |
| Avalon North Andover | North Andover, MA | 221 | 13,617 | 63,000 | 1 | 13,617 | 63,001 | 76,618 | 4,733 | 71,885 | 73,317 | — | 20 |
| Avalon Brighton | Boston, MA | 180 | 11,160 | 77,866 | 335 | 11,160 | 78,201 | 89,361 | 5,214 | 84,147 | 86,355 | | |
| Avalon Mooresville | Mooresville, NC | 203 | 3,770 | 48,939 | 171 | 3,770 | 49,110 | 52,880 | 3,392 | 49,488 | 51,437 | — | 20 |
| Avalon Perimeter Park | Morrisville, NC | 262 | 11,533 | 55,411 | 26 | 11,533 | 55,437 | 66,970 | 2,484 | 64,486 | — | | 20 |
| Avalon Somerville Station | Somerville, NJ | 374 | 16,663 | 98,452 | 356 | 16,663 | 98,808 | 115,471 | 8,702 | 106,769 | 109,877 | | |
| The Park Loggia Commercial | New York, NY | N/A | 77,393 | 76,410 | 10,558 | 77,393 | 86,968 | 164,361 | 16,194 | 148,167 | 151,200 | — | |
| Avalon Harrison | Harrison, NY | 143 | 14,380 | 75,858 | 565 | 14,380 | 76,423 | 90,803 | 7,560 | 83,243 | 85,632 | | |
| Avalon Heather Isle | Island Park, NY | 172 | 18,751 | 76,479 | — | 18,751 | 76,479 | 95,230 | 6,763 | 88,467 | 87,814 | — | |
| Avalon Frisco at Main | Frisco, TX | 360 | 11,919 | 71,954 | 802 | 11,919 | 72,756 | 84,675 | 7,213 | 77,462 | 80,364 | — | 20 |
| Avalon West Plano | Carrollton, TX | 568 | 14,100 | 123,693 | 908 | 14,100 | 124,601 | 138,701 | 14,001 | 124,700 | 132,876 | 62,448 | 20 |
| Avalon at Pier 121 | Lewisville, TX | 300 | 8,418 | 54,048 | 76 | 8,418 | 54,124 | 62,542 | 3,170 | 59,372 | — | | 20 |
| Avalon Townhomes at Bee Cave | Bee Cave, TX | 126 | 7,955 | 41,282 | — | 7,955 | 41,282 | 49,237 | 489 | 48,748 | — | | 20 |
| AVA Ballston Square | Arlington, VA | 714 | 71,640 | 240,201 | 40,066 | 71,640 | 280,267 | 351,907 | 114,814 | 237,093 | 243,879 | — | 19 |
| Avalon North on River Rd (4) | Wilton, CT | 102 | 2,116 | 14,664 | 8,480 | 2,116 | 23,144 | 25,260 | 18,309 | 6,951 | 7,685 | — | |
| **TOTAL OTHER STABILIZED** | | **4,478** | **$ 319,132** | **$ 1,365,748** | **$ 62,386** | **$ 319,132** | **$ 1,428,134** | **$ 1,747,266** | **$ 217,909** | **$ 1,529,357** | **$ 1,110,436** | **$ 62,448** | |
| | | | | | | | | | | | | | |
| **TOTAL CURRENT COMMUNITIES (5)** | | **81,336** | **$ 4,636,436** | **$ 17,951,468** | **$ 2,590,754** | **$ 4,636,436** | **$ 20,542,222** | **$ 25,178,658** | **$ 8,089,147** | **$ 17,089,511** | **$ 17,165,436** | **$ 734,429** | |
| | | | | | | | | | | | | | |
| **DEVELOPMENT (4)** | | | | | | | | | | | | | |
| Avalon West Dublin | Dublin, CA | 499 | $ 39,070 | $ 221,025 | $ — | $ 39,070 | $ 221,025 | $ 260,095 | $ 6,236 | $ 253,859 | $ 239,840 | $ — | |
| Avalon Pleasanton - Phase 1 | Pleasanton, CA | 82 | — | 20,275 | | — | 20,275 | 20,275 | — | 20,275 | | | |
| Kanso Hillcrest | San Diego, CA | 182 | — | 15,807 | | — | 15,807 | 15,807 | — | 15,807 | | | |
| Avalon Westminster Promenade | Westminster, CO | 312 | 6,282 | 107,568 | — | 6,282 | 107,568 | 113,850 | 1,131 | 112,719 | 91,833 | — | |
| Avalon Governor's Park | Denver, CO | 304 | 10,298 | 125,111 | — | 10,298 | 125,111 | 135,409 | 645 | 134,764 | 106,898 | — | |
| Avalon Merrick Park | Miami, FL | 254 | 23,779 | 79,155 | — | 23,779 | 79,155 | 102,934 | 4,829 | 98,105 | 93,451 | — | |
| Avalon South Miami | South Miami, FL | 290 | — | 126,402 | — | — | 126,402 | 126,402 | — | 126,402 | 43,909 | — | |
| Kanso Milford | Milford, MA | 162 | 14,361 | 47,357 | — | 14,361 | 47,357 | 61,718 | 1,008 | 60,710 | 38,557 | — | |
| Avalon Quincy Adams | Qunicy, MA | 288 | — | 38,834 | — | — | 38,834 | 38,834 | — | 38,834 | | | |
| Avalon Annapolis | Annapolis, MD | 508 | 13,195 | 160,461 | — | 13,195 | 160,461 | 173,656 | 372 | 173,284 | 115,599 | — | |
| Avalon Hunt Valley West | Hunt Valley, MD | 322 | — | 79,435 | — | — | 79,435 | 79,435 | — | 79,435 | 29,616 | — | |
| AVA Brewers Hill | Baltimore, MD | 418 | — | 23,182 | — | — | 23,182 | 23,182 | — | 23,182 | | | |
| Avalon Durham | Durham, NC | 336 | 17,329 | 99,764 | — | 17,329 | 99,764 | 117,093 | 1,436 | 115,657 | 80,784 | — | |

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

| Community | City and state | # of homes | Initial Cost Land and Improvements | Building / Construction in Progress & Improvements | Costs Subsequent to Acquisition / Construction | 2024 Total Cost Land and Improvements | Building / Construction in Progress & Improvements | Total | Accumulated Depreciation | Total Cost, Net of Accumulated Depreciation | 2023 Total Cost, Net of Accumulated Depreciation | 2024 Encumbrances |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avalon Lake Norman | Mooresville, NC | 345 | $   — | $   59,909 | $   — | $   — | $   59,909 | $   59,909 | $   — | $   59,909 | $   20,233 | $   — |
| Avalon Carmel | Charlotte, NC | 360 | — | 29,299 | — | — | 29,299 | 29,299 | — | 29,299 | | |
| Avalon Oakridge I | Durham, NC | 459 | — | 25,229 | — | — | 25,229 | 25,229 | — | 25,229 | | |
| Avalon W Squared at Princeton Junction | West Windsor, NJ | 535 | — | 118,103 | — | — | 118,103 | 118,103 | — | 118,103 | 50,414 | — |
| Avalon Princeton on Harrison | Princeton, NJ | 200 | — | 68,584 | — | — | 68,584 | 68,584 | — | 68,584 | 25,615 | — |
| Avalon Wayne | Wayne, NJ | 473 | — | 73,596 | — | — | 73,596 | 73,596 | — | 73,596 | 23,811 | — |
| Avalon Parsippany | Parsippany, NJ | 410 | — | 61,470 | — | — | 61,470 | 61,470 | — | 61,470 | 17,012 | — |
| Avalon Roseland II | Roseland, NJ | 533 | — | 65,048 | — | — | 65,048 | 65,048 | — | 65,048 | | |
| Avalon Montville | Pine Brook, NJ | 349 | 8,463 | 116,478 | 22 | 8,463 | 116,500 | 124,963 | 3,780 | 121,183 | 110,858 | — |
| Avalon Princeton Circle | Princeton, NJ | 221 | 11,705 | 75,606 | 55 | 11,705 | 75,661 | 87,366 | 3,770 | 83,596 | 84,482 | — |
| Avalon Amityville | Amityville, NY | 338 | 22,463 | 113,328 | — | 22,463 | 113,328 | 135,791 | 4,368 | 131,423 | 122,575 | — |
| Avalon Plano | Plano, TX | 155 | — | 14,502 | — | — | 14,502 | 14,502 | — | 14,502 | | |
| Avalon Tech Ridge I | Austin, TX | 444 | — | 29,142 | — | — | 29,142 | 29,142 | — | 29,142 | | |
| Avalon Bothell Commons | Bothell, WA | 467 | 26,699 | 205,180 | 155 | 26,699 | 205,335 | 232,034 | 6,826 | 225,208 | 216,782 | — |
| Avalon Redmond Campus | Redmond, WA | 214 | 7,003 | 81,183 | 103 | 7,003 | 81,286 | 88,289 | 2,443 | 85,846 | 81,531 | — |
| **TOTAL DEVELOPMENT** | | **9,460** | $   200,647 | $   2,281,033 | $   335 | $   200,647 | $   2,281,368 | $   2,482,015 | $   36,844 | $   2,445,171 | $   1,593,800 | $   — |
| | | | | | | | | | | | | |
| Land Held for Development | N/A | | $   151,922 | $   — | $   — | $   151,922 | $   — | $   151,922 | $   — | $   151,922 | $   199,062 | $   — |
| Corporate Overhead | N/A | | 53,179 | 13,305 | 70,703 | 53,179 | 84,008 | 137,187 | 56,729 | 80,458 | 36,563 | 7,400,000 |
| 2024 Disposed Communities | N/A | | — | — | — | — | — | — | — | — | 348,010 | |
| **TOTAL** | | **90,796** | $   5,042,184 | $   20,245,806 | $   2,661,792 | $   5,042,184 | $   22,907,598 | $   27,949,782 | $   8,182,720 | $   19,767,062 | $   19,342,871 | $   8,134,429 (6) |

(1)   Some or all of the land or associated parking structure for this community is subject to a finance lease.

(2)   This community was under redevelopment for some or all of 2024, with the redevelopment activities not expected to materially impact community operations, and therefore this community is included in the Same Store portfolio and not classified as a Redevelopment Community.

(3)   Some or all of the land for this community is subject to an operating lease.

(4) As of December 31, 2024, this community qualified as held for sale.

(5)   Current and Development Communities excludes Unconsolidated Communities and Unconsolidated Development Communities.

(6) Balance outstanding represents total amount due at maturity, and excludes deferred financing costs and debt discount associated with the unsecured and secured notes of $41,216 and $15,964, respectively.

Table of Contents

**AVALONBAY COMMUNITIES, INC.**
**REAL ESTATE AND ACCUMULATED DEPRECIATION (Continued)**
**December 31, 2024**
**(Dollars in thousands)**

Amounts include real estate assets held for sale.

The aggregate cost of total real estate for federal income tax purposes was approximately $26,195,803 at December 31, 2024.

The changes in total real estate assets for the years ended December 31, 2024, 2023 and 2022 are as follows:

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Balance, beginning of period | $ 26,864,833 | $ 25,871,363 | $ 24,927,305 |
| Acquisitions, construction costs and improvements (1) | 1,602,790 | 1,272,558 | 1,599,311 |
| Dispositions, including casualty losses, and other activity | (517,841) | (279,088) | (655,253) |
| Balance, end of period | $ 27,949,782 | $ 26,864,833 | $ 25,871,363 |

_____

(1)    2023 amounts have been adjusted to reflect the reclassification of software development costs from Furniture, fixtures and equipment to Prepaid expenses and other assets on the Consolidated Balance Sheet.

The changes in accumulated depreciation for the years ended December 31, 2024, 2023 and 2022, are as follows:

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Balance, beginning of period | $ 7,521,962 | $ 6,878,556 | $ 6,217,721 |
| Depreciation (1) | 846,853 | 781,313 | 814,978 |
| Dispositions, including casualty losses | (186,095) | (137,907) | (154,143) |
| Balance, end of period | $ 8,182,720 | $ 7,521,962 | $ 6,878,556 |

_____

(1)    2023 amounts have been adjusted to reflect the reclassification of software development costs from Furniture, fixtures and equipment to Prepaid expenses and other assets on the Consolidated Balance Sheet.

F-50

**Exhibit 10.2**

**AvalonBay Communities, Inc.**
**Restricted Stock Grant and Award Agreement**

Pursuant to the terms of the AvalonBay Communities, Inc. Second Amended and Restated 2009 Equity Incentive Plan (as the same may be amended hereafter from time to time, the "Plan"), in consideration for services rendered and to be rendered to AvalonBay Communities, Inc. (the "Company") and for other good and valuable consideration, which the Company has determined to be equal to the fair market value of the Shares, as defined below, the Company is issuing to the Employee named below contemporaneously herewith the Shares, upon the terms and conditions set forth herein and in the Restricted Stock Agreement Terms (the "Terms") which are attached hereto and incorporated herein in their entirety. Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Terms.

| | |
|---|---|
| Employee: | |
| Award Date: | |
| Vesting Commencement Date: | March 1 of the year after the Award Date |
| Number of Shares of Common Stock Granted ("Shares"): | |

**Vesting Schedule**:    Subject to the provisions of the Terms and the discretion of the Company to accelerate the vesting schedule, the Employee's ownership interest in the Shares shall vest, and the status of the Shares as Restricted Stock and all Restrictions with respect to the Shares shall terminate, in accordance with the following schedule of events:

33.3% incrementally on Vesting Commencement Date,

Additional 33.3% incrementally on the first anniversary of the Vesting Commencement Date (66.6% total vested), and

Additional 33.4% incrementally on the second anniversary of the Vesting Commencement Date. (100.0% total vested)

The Shares shall also vest on the thirtieth day following the occurrence of the following events (or, if such day is not a business day, the next business day) provided that, if requested by the Company, the Employee signs and delivers a Separation Agreement (as hereinafter defined), and such Separation Agreement becomes effective (including through the passage without revocation of any revocation period provided therein) within 30 days of his or her termination of employment:

| | |
|---|---|
| Termination of the Employee's Employment by the Company, other than for Cause | **100% of the Shares\*** |
| The death or Disability of the Employee | **100% of the Shares\*** |
| The Employee's Retirement | **100% of the Shares\*** |
| If a Sale Event shall have occurred, then this award may vest in full thereafter as provided in the Plan in the event of a termination of employment by the Employee for Good Reason within 24 months following the Sale Event. | **As provided for in the Plan** |

\*or, if fewer, all Restricted Shares

Notwithstanding the above, no Separation Agreement shall be required as a condition to accelerated vesting for (x) a termination of employment within 24 months after a Sale Event either without cause or for Good Reason or (y) a termination of employment by reason of death, or death during the thirty days following a termination of employment).

The Administrator's determination of the reason for termination of the Employee's employment shall be conclusive and binding on the Employee and his or her representatives or legatees except during the 24 months after a Sale Event.

**Additional Terms/Acknowledgements:** The undersigned Employee acknowledges receipt of, and understands and agrees to, this Restricted Stock Grant and Award Agreement, including, without limitation, the Terms. Employee further acknowledges that as of the Award Date, this Restricted Stock Grant and Award Agreement, including, without limitation, the Terms, sets forth the entire understanding between Employee and the Company regarding the stock grant described herein and supersedes all prior oral and written agreements on that subject.

**Attachment**: Restricted Stock Agreement Terms

**AVALONBAY COMMUNITIES, INC.**

**RESTRICTED STOCK AGREEMENT TERMS**

**ARTICLE I**

**DEFINITIONS**

The following terms used below in this Agreement shall have the meaning specified below unless the context clearly indicates to the contrary. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan.

Section 1.1 – Cause and Good Reason

"Cause" and "Good Reason" shall have the meanings set forth for such terms in the Plan.

Section 1.2 – Common Stock

"Common Stock" shall mean the common stock of the Company, $.01 par value.

Section 1.3 – Disability

"Disability" shall mean the Employee's inability to perform his normal required services for the Company and its Subsidiaries for a period of six consecutive months by reason of the individual's mental or physical disability, as determined by the Company in good faith in its sole discretion, except that Administrator approval will also be required in the event the participant is an officer as defined by Section 16 of the Securities Exchange Act or is at the level of executive vice president or above or is on the Company's Board of Directors.
.

Section 1.4 – Restricted Stock

"Restricted Stock" shall mean the Shares issued under this Agreement for as long as such shares are subject to the Restrictions (as hereinafter defined) imposed by this Agreement.

Section 1.5 – Restrictions

"Restrictions" shall mean the restrictions set forth in Article III of this Agreement.

Section 1.6 – Retirement

"Retirement" shall mean the termination of the Employee's employment (and other business relationships) with the Company and its Subsidiaries, other than for Cause, following the date on which the sum of the following equals or exceeds 70 years: (i) the number of full months of the Employee's employment and other business relationships with the Company and any predecessor Company and (ii) the Employee's age on the date of termination (i.e., a person whose age is 55 years, 6 months and who has worked at the Company for 14 years, 6 months meets the 70 years requirement); provided that:

(x) the Employee's employment by (or other business relationships with) the Company and any predecessor company of the Company have continued for a period of at least 120 continuous full months at the time of termination and, on the date of termination, the Employee is at least 50 years old; and

(y) in the case of termination of employment, the Employee gives at least six months' prior written notice to the Company of his or her intention to retire.

Section 1.7 - Secretary

"Secretary" shall mean the secretary of the Company.

<u>Section 1.8</u> – <u>Separation Agreement</u>

"Separation Agreement" means a written agreement between the Employee and the Company, in such form as the Company may reasonably require, providing as follows:

- the Employee provides a full release of any actual or potential claim against the Company and its current and former directors, officers, associates, agents and affiliates, under any applicable law and theory of claim, to the maximum extent permitted by law;
- the Employee agrees to provide reasonable cooperation with respect to investigation and litigation matters;
- the Employee acknowledges and agrees to return all Company property and not use any Company property or proprietary information;
- the Employee agrees not to disparage the Company or its officer, directors, agents or management, subject to reasonable exceptions set forth in the agreement; and
- for a period of at least 12 months following the Employee's termination of employment with the Company the Employee shall not, without the prior written consent of the Company, solicit or attempt to solicit for employment with or on behalf of any Competing Enterprise any employee of the Company or any of its affiliates or any person who was formerly employed by the Company or any of its affiliates within the preceding six months, unless such person's employment was terminated by the Company or any of such affiliates.

In addition, in connection with a termination of employment due to Retirement a Separation Agreement shall provide that, for a period of at least 12 months following the Employee's termination of employment with the Company the Employee shall not, without the prior written consent of the Company, become associated with, or engage in any "Restricted Activities" with respect to any "Competing Enterprise," as such terms are hereinafter defined, whether as an officer, employee, principal, partner, agent, consultant, independent contractor or shareholder. "Competing Enterprise," for purposes of this section, shall mean any person, corporation, partnership, venture or other entity which is engaged in the business of managing, owning, leasing, or joint-venturing multifamily rental real estate within 30 miles of multifamily rental real estate owned or under management by the Company or its affiliates. "Restricted Activities," for purposes of this section, shall mean executive, managerial, directorial, administrative, strategic, business development or supervisory responsibilities and activities relating to any aspects of multifamily rental real estate ownership, management, multifamily rental real estate franchising, and multifamily rental real estate joint-venturing.

It should be noted that no provision in any required Separation Agreement shall (i) preclude an Employee from communicating with federal, state or local governmental or regulatory agencies, (ii) require an Employee to inform the Company about any such communication, or (iii) preclude an Employee from collecting a government program bounty to which the Employee may be entitled.

## ARTICLE II

## **RESTRICTED STOCK**

Section 2.1 - Restricted Stock

Any shares of Common Stock granted pursuant to this Agreement which vest on a date other than the Award Date shall be considered Restricted Stock for purposes of this Agreement and shall be subject to the Restrictions until such time or times and except to the extent that the Employee's ownership interest in Shares vests in accordance with the Vesting Schedule set forth on the first page of this Agreement.

Section 2.2 - Escrow

If the Restricted Stock is certificated, the Secretary or such other escrow holder as the Company may from time to time appoint shall retain physical custody of the certificates representing Restricted Stock, until all of the Restrictions expire or shall have been removed; provided, however, that in no event shall the Employee retain physical custody of any certificates representing Restricted Stock issued to him. The Company may cause a book entry deposit of Restricted Stock at the Company's transfer agent in lieu of physical custody.

Section 2.3 - Rights as Stockholder

From and after the Award Date, the Employee shall have all the rights of a stockholder with respect to the Shares, subject to the Restrictions herein (including the provisions of Article IV), including the right to vote the Shares and to receive all dividends or other distributions paid or made with respect to the Shares unless and to the extent that the Employee's interest in Restricted Stock shall have terminated and the Restricted Stock reverts to the Company as provided in Section 3.1 of this Agreement.

## ARTICLE III

## **RESTRICTIONS**

Section 3.1 - Reversion of Restricted Stock

Except as provided in Section 2.3, this Section 3.1, and the Vesting Schedule set forth on the first page of this Agreement, the Restricted Stock shall be the property of the Company for as long as and to the extent that the Shares are Restricted Stock pursuant to Section 2.1. In the event that the Employee's employment by the Company terminates for any reason other than (a) death, (b) Disability, (c) Retirement, (d) termination of the Employee's employment by the Company other than for Cause, or (e) termination by the Employee for Good Reason within 24 months following a Sale Event, any interest of the Employee in Shares that are Restricted Stock shall thereupon immediately terminate and all rights with respect to the Restricted Stock shall immediately revert to and unconditionally be the property of the Company; provided, however, that the Employee shall be entitled to retain any cash dividends paid before the date of such event on the Restricted Stock.

Section 3.2 - Restricted Stock Not Transferable

No Restricted Stock or any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of the Employee or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law or judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that the Employee may designate one or more trusts or other similar arrangements for the benefit of the Employee or members of his immediate family as the registered holders of Restricted Stock if and as long as the Employee acts as trustee or in a similar capacity with respect to such trust or arrangement. Any Restricted Stock so registered shall for all purposes hereunder be deemed to be held of record by the Employee and shall be subject to all of the terms and conditions of this Agreement, including but not limited to the Restrictions and the provisions of Article III of this Agreement.

Section 3.3 - Legend

Certificates representing shares of Restricted Stock or book entries for shares of Restricted Stock issued pursuant to this Agreement shall, until all Restrictions lapse and new certificates are issued pursuant to Section 3.4, bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN VESTING REQUIREMENTS AND MAY BE SUBJECT TO FORFEITURE TO AVALONBAY COMMUNITIES, INC. (THE "COMPANY") UNDER THE TERMS OF THAT CERTAIN RESTRICTED STOCK AGREEMENT BY AND BETWEEN THE COMPANY AND THE HOLDER OF THE SECURITIES. PRIOR TO VESTING OF OWNERSHIP IN THE SECURITIES, THEY MAY NOT BE, DIRECTLY OR INDIRECTLY, OFFERED, TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNDER ANY CIRCUMSTANCES. COPIES OF THE ABOVE REFERENCED AGREEMENT ARE ON FILE AT AND MAY BE OBTAINED ON REQUEST AND WITHOUT CHARGE FROM THE OFFICES OF THE COMPANY AT 671 NORTH GLEBE ROAD, SUITE 800, ARLINGTON, VA 22203."

Section 3.4 - Lapse of Restrictions

Upon the vesting of some or all of the Restricted Stock as provided in the Vesting Schedule set forth on the first page of this Agreement, and subject to the conditions to issuance set forth in Article IV, if such Shares are certificated, the Company shall cause new certificates to be issued with respect to such vested Shares and delivered to the Employee or his legal representative, free from the legend provided for in Section 3.3.

ARTICLE IV

**MISCELLANEOUS**

Section 4.1 - Conditions to Issuance of Stock

The Company shall not be required to issue or deliver any certificate or certificates for shares of stock or enter the Employee's name as the stockholder of record on the books of the Company pursuant to this Agreement prior to fulfillment of all of the following conditions:

(a) The admission of such shares to listing on all stock exchanges on which such class of stock is then listed; and

(b) The completion of any registration or other qualification of such shares under any state or Federal law or under rulings or regulations of the Securities and Exchange Commission or of any other governmental regulatory body, which the Company shall deem necessary or advisable; and

(c) The obtaining of any approval or other clearance from any state or Federal governmental agency which the Company shall, in its absolute discretion, determine to be necessary or advisable; and

(d) The payment by the Employee of all amounts required to be withheld under federal, state and local tax laws, with respect to the issuance of Restricted Stock and/or the lapse or removal of any of the Restrictions.

Section 4.2 - Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary, and any notice to be given to the Employee shall be addressed to him at his address as set forth in the Company's records. By a notice given pursuant to this Section 4.2, either party may hereafter designate a different address for notices to be given to it or him. Any notice which is required to be given to the Employee shall, if the Employee is then deceased, be given to the Employee's personal representative if such representative has previously informed the Company of his status and address by written notice under this Section 4.2. Any notice shall have been deemed duly given when enclosed in a properly sealed envelope or wrapper addressed as aforesaid and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service.

Section 4.3 - Titles

Titles and captions are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

Section 4.4 - Amendment

This Agreement may be amended only by a writing executed by the parties hereto which specifically states that it is amending this Agreement.

Section 4.5 - <u>Tax Withholding</u>

The Company's obligation (i) to issue or deliver to the Employee any certificate or certificates for unrestricted shares of stock or (ii) to pay to the Employee any dividends or make any distributions with respect to the Common Stock issued under this Agreement is expressly conditioned on the Company's satisfaction of its obligation, if any, to withhold taxes. The Employee shall, not later than the date as of which the receipt of this Award becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event. The Company shall satisfy any required minimum tax withholding obligation (or such greater tax withholding as the Administrator may approve) by withholding from shares of Stock to be issued or released by the transfer agent a number of shares of Stock with an aggregate Fair Market Value that would satisfy the withholding amount due (with the resulting number being rounded up to the nearest whole share of Stock). In addition, by acceptance of this Award, the Employee agrees that for all outstanding Awards not yet vested under the Plan, the Company shall satisfy any required minimum tax withholding obligation (or such greater tax withholding as the Administrator may approve) by withholding from shares of Stock to be issued under such awards a number of shares of Stock with an aggregate Fair Market Value that would satisfy the minimum tax withholding amount due (with the resulting number being rounded up to the nearest whole share of Stock).

Section 4.6 – <u>Governing Law</u>

The laws of the State of Maryland shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 4.7 - <u>Counterparts</u>

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 4.8 - <u>No Special Employment Rights</u>

This Agreement does not, and shall not be interpreted to, create any right on the part of the Employee to continue in the employ of the Company or any subsidiary or affiliate thereof, nor to any continued compensation, prerequisites or other current or future benefits or other incidents of employment.

Section 4.9 – <u>Non-Solicitation</u>

Employee hereby agrees that, for a period of at least 12 months following Employee's termination of employment with the Company for any reason, Employee shall not, without the prior written consent of the Company, solicit or attempt to solicit for employment with or on behalf of any other person, firm or entity any employee of the Company or any of its affiliates or any person who was formerly employed by the Company or any of its affiliates within the preceding six months, unless such person's employment was terminated by the Company or any of such affiliates.

Section 4.10 – <u>Recoupment Policy</u>

To the extent Employee is a "Covered Officer", as defined in the Policy for Recoupment of Incentive Compensation adopted by the Company's Board of Directors, as amended from time to time (the "Recoupment Policy"), the Shares and any proceeds received in connection with any sale of such Shares shall be subject to the Recoupment Policy.

Section 4.11 – <u>Amendment of Prior Restricted Stock Agreements</u>

Employee hereby agrees that, to the extent the terms in this Restricted Stock Agreement (including any terms relating to accelerated vesting and conditions thereto, but not including the number of restricted shares or the vesting schedule or calendar of vesting dates) conflict with the terms in any previously awarded and agreed to Restricted Stock Agreement, the provisions in this agreement shall apply.

Section 4.12 – <u>Acknowledgment and Acceptance of Award</u>

Employee hereby acknowledges that acceptance of the Restricted Stock referenced herein and/or the dividends thereon constitutes an unequivocal acceptance of this agreement and any attempted modification or objection to the terms herein will have no force or effect on the Company's right to enforce the terms and conditions stated herein. The Employee further agrees that he or she may be required to evidence his or her acknowledgement of this award and agreement to the terms hereof by

accepting this award in the Company's stock plan administrator's system, which acceptance may be required within a certain number of days from the grant date hereof in accordance with instructions and/or announcements provided by the Company to the Employee and, failing to accept this award within the Company's stock plan administrator's system within such number of days may constitute grounds for forfeiture of this award in the Company's sole and absolute discretion.

<u>Section 4.13</u> – <u>Data Privacy Consent</u>

In order to administer the Plan and this agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this agreement (the "Relevant Information"). By entering into this agreement, you (i) authorize the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waive any privacy rights you may have with respect to the Relevant Information; (iii) authorize the Relevant Companies to store and transmit such information in electronic form; and (iv) authorize the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. You shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law

[End of Text]

**Exhibit 10.3**

**AvalonBay Communities, Inc.**
**[Incentive][Non-Qualified] Stock Option Agreement**
**(2009 Equity Incentive Plan)**

Pursuant to the AvalonBay Communities, Inc. Second Amended and Restated 2009 Equity Incentive Plan (the "Plan"), AvalonBay Communities, Inc. (the "Company") hereby grants to the Optionee named below an Option to purchase on or prior to the tenth anniversary of the grant date of this option award as set forth below (the "Expiration Date") up to the number of shares of the Company's Common Stock, par value $.01 per share ("Common Stock"), set forth below at the Exercise Price set forth below:

| | |
|---|---|
| Optionee: | |
| Grant Date: | |
| Vesting Commencement Date: | [typically March 1 of the year after the Grant Date] |
| Number of Shares Underlying Option (the "Option Shares"): | |

This option is subject to all of the terms and conditions as set forth herein, in the [Incentive][Non-Qualified] Stock Option Agreement Terms (the "Terms") which are attached hereto and incorporated herein in their entirety, and in the Plan. Capitalized terms used but not defined herein or in the Terms shall have the respective meanings ascribed thereto in the Plan.

**Incentive Stock**
**Option:**    This Option [shall be construed in a manner to][does not] qualify [it] as an "incentive stock option" under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

**Vesting Schedule**:    Subject to the provisions of Section 4 and 6 of the Terms and the discretion of the Company to accelerate the vesting schedule, this Option shall vest as to exercisability to purchase the Option Shares as follows:

33.3% incrementally on the Vesting Commencement Date,

Additional 33.3% incrementally on the first anniversary of the Vesting Commencement Date (66.6% total vested), and

Additional 33.4% incrementally on the second anniversary of the Vesting Commencement Date. (100.0% total vested)

In any event this Option shall become fully vested and exercisable with respect to all of the Option Shares on March 1 of the third year following the year of grant.

**Additional Terms/Acknowledgements:** The undersigned Optionee acknowledges receipt of, and understands and agrees to, this [Incentive][Non-Qualified] Stock Option Agreement, including, without limitation, the Terms. Optionee further acknowledges receipt of a copy of the Plan. Optionee further acknowledges that as of the Date of Grant, this [Incentive][Non-Qualified] Stock Option Agreement, including, without limitation, the Terms, and the Plan set forth the entire understanding between Optionee and the Company regarding the Options described herein and supersede all prior oral and written agreements on that subject.

**Attachment**: [Incentive][Non-Qualified] Stock Option Agreement Terms

**AVALONBAY COMMUNITIES, INC.**
**2009 EQUITY INCENTIVE PLAN**

**[INCENTIVE][NON-QUALIFIED] STOCK OPTION AGREEMENT TERMS**

1.  <u>Vested Option Shares</u>. Subject to Section 4, when this Option is vested with respect to any of the Option Shares, this Option shall continue to be exercisable with respect to such Option Shares ("Vested Option Shares") at any time or times prior to the Expiration Date.

2.  <u>Manner of Exercise</u>. The Optionee may exercise this Stock Option only in the following manner: from time to time on or prior to the Expiration Date of this Option, the Optionee may give written notice to the Administrator of his or her election to purchase some or all of the Option Shares purchasable at the time of such notice. This notice shall specify the number of Option Shares to be purchased.

Payment of the purchase price for the Option Shares may be made by one or more of the following methods: (i) in cash, by certified or bank check or other instrument acceptable to the Administrator; (ii) through the delivery (or attestation to the ownership) of shares of Common Stock that have been purchased by the Optionee on the open market or that are beneficially owned by the Optionee and are not then subject to any restrictions under any Company plan and that otherwise satisfy any holding periods as may be required by the Administrator; (iii) by the Optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the option purchase price, provided that in the event the Optionee chooses to pay the option purchase price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; [for ISO's: or (iv) a combination of (i), (ii) and (iii) above.] [for NQSO's: (iv) by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Common Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price; or (v) a combination of (i), (ii) (iii) and (iv) above.] Payment instruments will be received subject to collection.

The transfer to the Optionee on the records of the Company or of the transfer agent of the Option Shares will be contingent upon (i) the Company's receipt from the Optionee of the full purchase price for the Option Shares, as set forth above, (ii) the fulfillment of any other requirements contained herein or in the Plan or in any other agreement or provision of laws, and (iii) the receipt by the Company of any agreement, statement or other evidence that the Company may require to satisfy itself that the issuance of Common Stock to be purchased pursuant to the exercise of Options under the Plan and any subsequent resale of the shares of Common Stock will be in compliance with applicable laws and regulations. In the event the Optionee chooses to pay the purchase price by previously-owned shares of Common Stock through the attestation method, the number of shares of Common Stock transferred to the Optionee upon the exercise of the Option shall be net of the shares attested to.

The shares of Common Stock purchased upon exercise of this Option shall be transferred to the Optionee on the records of the Company or of the transfer agent upon compliance to the satisfaction of the Administrator with all requirements under applicable laws or regulations in connection with such issuance and with the requirements hereof and of the Plan. The determination of the Administrator as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to this Option unless and until this Option shall have been exercised pursuant to the terms hereof, the Company or the transfer agent shall have transferred the shares to the Optionee, and the Optionee's name shall have been entered as the stockholder of record on the books of the Company. Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such shares of Common Stock.

The minimum number of shares with respect to which this Option may be exercised at any one time shall be 100 shares, unless the number of shares with respect to which this Option is being exercised is the total number of shares subject to exercise under this Option at the time.

Notwithstanding any other provision hereof or of the Plan, no portion of this Option shall be exercisable after the Expiration Date hereof.

3.   <u>Non-transferability of Option</u>. This Option is personal to the Optionee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution. This Option is exercisable, during the Optionee's lifetime, only by the Optionee, and thereafter, only by the Optionee's legal representative or legatee.

4.   <u>Termination of Employment (or other Business Relationship)</u>. If the Optionee's employment by (or other business relationship with) the Company or a Subsidiary (as defined in the Plan) is terminated, the period within which to exercise the Option may be subject to earlier termination as set forth below.

(a)   <u>Termination Due to Death</u>. If the Optionee's employment (or other business relationship) terminates by reason of death, any Option held by the Optionee shall be automatically vested on the date of termination and shall be exercisable by the Optionee's legal representative or legatee (i) for a period of twelve (12) months from the date of termination or until the fifth anniversary of the grant date of this option award, if later, or (ii) until the Expiration Date, if earlier.

(b)   <u>Termination Due to Disability</u>. If the Optionee's employment (or other business relationship) terminates by reason of Disability (as defined below), any Option held by the Optionee shall be automatically vested on the date of termination, and shall be exercisable (i) for a period of twelve (12) months from the date of termination or until the fifth anniversary of the grant date of this option award, if later, or (ii) until the Expiration Date, if earlier. The death of the Optionee during the period provided in this Section 4(b) shall extend such period (if it would otherwise expire) for six (6) months from the date of death or until the Expiration Date, if earlier.

(c)   <u>Termination by Reason of Retirement</u>. If the Optionee's employment terminates by reason of Retirement (as defined below), any Option held by the Optionee shall be automatically vested on the date of termination, and shall be exercisable (i) for a period of twelve (12) months from the date of termination or until the fifth anniversary of the grant date of this option award, if later, or (ii) until the Expiration Date, if earlier. The death of the Optionee during the period provided in this Section 4(c) shall extend such period (if it would otherwise expire) for six (6) months from the date of death, or until the Expiration Date, if earlier.

(d)   <u>Termination for Cause</u>. If the Optionee's employment (or other business relationship) terminates for Cause (as defined below), any Option held by the Optionee shall immediately terminate and be of no further force and effect.

(e)   <u>Termination Without Cause or for Good Reason within 24 Months of Sale Event</u>. If the Optionee's employment (or other business relationship) is terminated by the Company without Cause (whether before or after a Sale Event) or, as provided in the Plan, is terminated by the Optionee for Good Reason within 24 months following a Sale Event, any option held by the Optionee shall be automatically vested on the date of termination, and shall be exercisable (i) for a period of twelve (12) months from the date of termination or until the fifth anniversary of the grant date of this option award, if later, or (ii) until the Expiration Date, if earlier. The death of the Optionee during the period provided in this Section 4(e) shall extend such period (if it would otherwise expire) for six (6) months from the date of death, or until the Expiration Date, if earlier.

(f)   <u>Termination at the Election of the Optionee</u>. If the Optionee's employment (or other business relationship) is voluntarily terminated at the election of the Optionee (other than for Good Reason within 24 months following a Sale Event, death, Disability, Retirement, or a termination at the Company's election whether for Cause or without Cause), any option held by the Optionee may be exercised, to the extent exercisable on the date of termination, for a period of three (3) months from the date of termination, or until the Expiration Date, if earlier. For clarification, it is noted that this means that the remaining unvested portion of the Option shall terminate immediately and be of no further force or effect.

For purposes hereof, a business relationship shall include (i) serving on the Company's Board of Directors, which service preceded or began immediately following a termination of employment, or (ii) a consulting arrangement between Optionee and the Company that immediately follows termination of employment or termination from the Board of Directors, but only if so stated in a written consulting agreement executed by the Company and Optionee, and in such case as described in the preceding clauses (i) or (ii) Optionee shall not be considered to have suffered a termination of employment or other business relationship until the termination of such service on the Board of Directors and/or consulting arrangement.

Notwithstanding the foregoing, the Company may require, as a condition to vesting of the unvested portion of the Option, that the Optionee sign and deliver a Separation Agreement (as hereinafter defined), and such Separation Agreement becomes effective (including through the passage without revocation of any revocation period provided therein) within 30 days of his or her termination of employment, provided that no Separation Agreement shall be required as a condition to accelerated vesting for (x) a termination of employment within 24 months after a Sale Event either without Cause or for Good Reason or (y) a termination of Optionee by reason of death, or death during the thirty days following a termination of employment.

For this purpose, neither a transfer of employment from the Company to a Subsidiary (or from a Subsidiary to the Company) nor an approved leave of absence shall be deemed a "termination of employment." The Administrator's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees except during the 24 months after a Sale Event.

For purposes of this Option, following terms shall have the meaning specified below:

"Cause" and "Good Reason" and "Sale Event" shall have the meanings set forth for such terms in the Plan.

"Disability" shall mean the Optionee's inability to perform his normal required services for the Company and its Subsidiaries for a period of six consecutive months by reason of the individual's mental or physical disability, as determined by the Company in good faith in its sole discretion, except that the Administrator's approval will also be required in the event the participant is an officer as defined by Section 16 of the Securities Exchange Act or is at the level of executive vice president or above or is on the Company's Board of Directors..

"Retirement" shall mean the termination of the Optionee's employment (and other business relationship) with the Company and its Subsidiaries, other than for Cause, following the date on which the sum of the following equals or exceeds 70 years: (i) the number of full months of the Optionee's employment and other business relationships with the Company and any predecessor Company and (ii) the Optionee's age on the date of termination (i.e., a person whose age is 55 years, 6 months and who has worked at the Company for 14 years, 6 months meets the 70 years requirement); provided that:

(x)    the Optionee's employment by (or other business relationships with) the Company and any predecessor company of the Company have continued for a period of at least 120 continuous full months at the time of termination and, on the date of termination, the Optionee is at least 50 years old; and

(y)    in the case of termination of employment, the Optionee gives at least six months' prior written notice to the Company of his or her intention to retire.

"Separation Agreement" means a written agreement between the Optionee and the Company, in such form as the Company may reasonably require, providing as follows:

- the Optionee provides a full release of any actual or potential claim against the Company and its current and former directors, officers, associates, agents and affiliates, under any applicable law and theory of claim, to the maximum extent permitted by law;

- the Optionee agrees to provide reasonable cooperation with respect to investigation and litigation matters;

- the Optionee acknowledges and agrees to return all Company property and not use any Company property or proprietary information;

- the Optionee agrees not to disparage the Company or its officer, directors, agents or management, subject to reasonable exceptions set forth in the agreement; and

- for a period of at least 12 months following the Optionee's termination of employment with the Company the Optionee shall not, without the prior written consent of the Company, solicit or attempt to solicit for employment with or on behalf of any Competing Enterprise any employee of the Company or any of its affiliates or any person who was formerly employed by the Company or any of its affiliates within the preceding six months, unless such person's employment was terminated by the Company or any of such affiliates.

In addition, in connection with a termination of employment due to Retirement a Separation Agreement shall, to the extent permitted by applicable law, provide that, for a period of at least 12 months following the Optionee's termination of employment with the Company the Optionee shall not, without the prior written consent of the Company, become associated with, or engage in any "Restricted Activities" with respect to any "Competing Enterprise," as such terms are hereinafter defined, whether as an officer, employee, principal, partner, agent, consultant, independent contractor or shareholder. "Competing Enterprise," for purposes of this section, shall mean any person, corporation, partnership, venture or other entity which is engaged in the business of managing, owning, leasing, or joint-venturing multifamily rental real estate within 30 miles of multifamily rental real estate owned or under management by the Company or its affiliates. "Restricted Activities," for purposes of this section, shall mean executive, managerial, directorial, administrative, strategic, business development or supervisory responsibilities and activities relating to any aspects of multifamily rental real estate ownership, management, multifamily rental real estate franchising, and multifamily rental real estate joint-venturing.

It should be noted that no provision in any required Separation Agreement shall (i) preclude an Optionee from communicating with federal, state or local governmental or regulatory agencies, (ii) require an Optionee to inform the Company about any such communication, or (iii) preclude an Optionee from collecting a government program bounty to which the Optionee may be entitled.

5.    Option Shares. The Option Shares are shares of the Common Stock of the Company as constituted on the date of this Option, subject to adjustment as provided in the Plan.

6.    Acknowledgment and Acceptance of Grant. Optionee agrees that he or she may be required to evidence his or her acknowledgement of this award and agreement to the terms hereof by accepting this award in the Company's stock plan administrator's system, which acceptance may be required within a certain number of days from the grant date hereof in accordance with instructions and/or announcements provided by the Company to the Optionee and, failing to accept this award within the Company's stock plan administrator's system within such number of days may constitute grounds for forfeiture of this award in the Company's sole and absolute discretion.

7.    No Special Employment Rights. This Option will not confer upon the Optionee any right with respect to continuance of employment (or other business relationship) by the Company or a Subsidiary, nor will it interfere in any way with any right of the Optionee's employer to terminate the Optionee's employment (or other business relationship) at any time.

8.    Rights as a Shareholder. The Optionee shall have no rights as a shareholder with respect to any shares of Common Stock that may be purchased upon exercise of this Option unless and until a certificate or certificates representing such shares are duly issued and delivered to the Optionee. Except as otherwise expressly provided in the Plan, no adjustment shall be made for dividends or other rights for which the record date is prior to the date such stock certificate is issued.

9.    [For ISO's:  Qualification under Section 422. It is understood and intended that the Option granted hereunder shall qualify as an "incentive stock option" as defined in Section 422 of the Code, but the Company does not represent or warrant that this Stock Option qualifies as such. The Optionee should consult with his or her own tax advisors regarding the tax effects of this Option and the requirements necessary to obtain favorable income tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements. To the extent any portion of this Option does not so qualify as an "incentive stock option," such portion shall be deemed to be a non-qualified stock option. If the Optionee intends to dispose or does dispose (whether by sale, gift, transfer or otherwise) of any Option Shares within the one-year period beginning on the date after the transfer of such shares to him or her, or within the two-year period beginning on the day after the grant of this Option, he or she will so notify the Company within 30 days after such disposition.] [For NQSO's:  Omitted.]

10.     Incorporation of Plan. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. In the event of any discrepancy or inconsistency between this Agreement and the Plan, the terms and conditions of the Plan shall control.

11.     Withholding Taxes. The Optionee shall, not later than the date as of which the exercise of this Option becomes a taxable event for federal income tax purposes, pay to the Company (or make arrangements satisfactory to the Company for payment of) any Federal, state and local taxes required by law to be withheld on account of such taxable event. The Optionee may elect to have the minimum required tax withholding obligation satisfied, in whole or in part, by authorizing the Company to withhold from shares of Stock to be issued a number of shares of Stock with an aggregate Fair Market Value that would satisfy the withholding amount due.

12.     Non-Solicitation. Optionee hereby agrees that, for a period of at least 12 months following Optionee's termination of employment with the Company for any reason, Optionee shall not, without the prior written consent of the Company, solicit or attempt to solicit for employment with or on behalf of any other person, firm or entity any employee of the Company or any of its affiliates or any person who was formerly employed by the Company or any of its affiliates within the preceding six months, unless such person's employment was terminated by the Company or any of such affiliates.

13.     Recoupment Policy. To the extent Optionee is a "Covered Officer", as defined in the Policy for Recoupment of Incentive Compensation adopted by the Company's Board of Directors, as amended from time to time (the "Recoupment Policy"), the Option, and shares of Common Stock received pursuant to exercise of the Option, and any proceeds received in connection with any sale of shares of Common Stock shall be subject to the Recoupment Policy.

14.     Miscellaneous. Notices hereunder shall be mailed or delivered to the Company at its principal place of business, 4040 Wilson Blvd, Suite 1000, Arlington, Virginia 22203, Attention: Senior Director of Compensation, and shall be mailed or delivered to Optionee at his address set forth in the Company's records, or in either case at such other address as one party may subsequently furnish to the other party in writing. This Option shall be governed by the laws of the State of Maryland, except to the extent such law is preempted by federal law.

[End of Text]

**Exhibit 10.9**

**INDEMNIFICATION AGREEMENT**

[The Company has entered into an Indemnification Agreement with each of its Directors in substantially the following form.]

INDEMNIFICATION AGREEMENT, as of _____, _____ (the "Agreement"), between AvalonBay Communities, Inc., a Maryland corporation (the "Company"), and _____ (the "Indemnitee").

WHEREAS, it is essential to the success of the Company to retain and attract as directors and officers the most capable persons available;

WHEREAS, Indemnitee has agreed to serve as a director of the Company;

WHEREAS, both the Company and Indemnitee recognize the increased risk of litigation and other claims being asserted against directors and officers of public companies in today's environment;

WHEREAS, the charter of the Company (the "Articles") provides that the Company has the power, and the Bylaws of the Company (the "Bylaws") require the Company, to indemnify and advance expenses to its directors and officers to the fullest extent provided by law, and the Indemnitee has agreed to serve as a director of the Company in part in reliance on such provisions in the Articles and Bylaws;

WHEREAS, the Company and Indemnitee are parties to an existing Indemnity Agreement, dated as of _____, _____ (the "Prior Agreement");

WHEREAS, in recognition of Indemnitee's need for substantial protection against personal liability in order to enhance Indemnitee's continued service to the Company in an effective manner and Indemnitee's reliance on the foregoing provisions in the Articles and Bylaws, and in part to provide Indemnitee with specific contractual protections in addition to those protections promised Indemnitee in the Articles and Bylaws and with specific contractual assurance that the protection promised by such provisions in the Articles and Bylaws will be available to Indemnitee (regardless of, among other things, any amendment to or revocation of such provisions in the Articles or Bylaws or any change in the composition of the Company's Board of Directors (the "Board") or any acquisition transaction relating to the Company), the Company wishes to amend and restate the Prior Agreement and provide in this Agreement for the indemnification of and the advancing of expenses to Indemnitee to the fullest extent permitted by law, in addition to any other right to indemnification to which Indemnitee may be entitled, and as set forth in this Agreement and, to the extent insurance is maintained, for the continued coverage of Indemnitee under the Company's directors' and officers' liability insurance policies;

NOW THEREFORE, in consideration of the premises and of the Indemnitee agreeing to continue to serve as a director of the Company, and intending to be legally bound hereby, the parties agree as follows:

1.    <u>Certain Definitions</u>.

        (a)    <u>Change in Control</u>. A change in control of the Company occurring after the date hereof of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar schedule or form) promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), whether or not the Company is then subject to such reporting requirement; <u>provided</u>, <u>however</u>, that, without limitation, a Change in Control shall be deemed to have occurred upon any of the following events:

                (i)    The acquisition in one or more transactions by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the 1934 Act) of "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of twenty percent (20%) or more of the combined voting power of all of the Company's then-outstanding Voting Securities, <u>provided</u>, <u>however</u>, that for purposes of this Section 1(a)(i), the Voting Securities acquired directly from the Company by any Person with the prior approval of at least two-thirds of the members of the Board in office immediately prior to the acquisition of such Voting Securities shall be excluded from the determination of such Person's Beneficial Ownership of Voting Securities (but such Voting Securities shall be included in the calculation of the total number of Voting Securities then outstanding); or

                (ii)    The individuals who, as of the date hereof, are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least two-thirds of the Board; provided, however, that if the election, or nomination for election by the Company's stockholders, of any new director is hereafter approved or recommended by a vote of at least two-thirds of the Incumbent Board or by a committee of the Board consisting of at least two-thirds of the directors then in office who were members of the Incumbent Board, such new director shall, for purposes of this Agreement, be considered as a member of the Incumbent Board; or

(iii)  Approval by stockholders of the Company of (A) a merger, consolidation or reorganization involving the Company if (1) the stockholders of the Company immediately before such merger or consolidation do not own, directly or indirectly immediately following such merger or consolidation, more than eighty percent (80%) of the combined voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger or consolidation or (2) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization do not constitute at least two-thirds of the members of the board of directors of the Surviving Corporation or (B) a complete liquidation or dissolution of the Company or an agreement for the sale or other disposition of all or substantially all of the assets of the Company that is not approved by at least two-thirds of the Incumbent Board.

(iv)  Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because twenty percent (20%) or more of the then outstanding Voting Securities is acquired by (i) a trustee or other fiduciary holding securities under one or more employee benefit plans maintained by the Company or any of its subsidiaries or (ii) any corporation which, immediately prior to such acquisition, is owned directly or indirectly by the stockholders of the Company in the same proportion as their ownership of stock in the Company immediately prior to such acquisition. Nor shall a Change in Control be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of 20% or more of the outstanding Voting Securities as a result of the subsequent acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Person, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and after such share acquisition by the Company, the Subject Person becomes the Beneficial Owner of any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

(b)  Claim. Any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing, claim, demand or discovery request or any other actual, threatened or completed proceeding (including any appeals in any of the foregoing), whether civil (including intentional or unintentional tort claims), criminal, administrative or investigative (formal or informal), except one pending or completed on or before the date hereof, unless otherwise specifically agreed in writing by the Company and Indemnitee or if the Company would have been required to indemnify Indemnitee, or advance Expenses to Indemnitee, in connection therewith pursuant to the Prior Agreement. If Indemnitee reasonably believes that a given situation may lead to or culminate in the institution of a Claim, such situation shall also be considered a Claim.

(c)  Disinterested Director. A director of the Company who is not and was not a party to the Claim in respect of which indemnification or advance of Expenses is sought by Indemnitee.

(d)  Expenses. Any and all reasonable and out-of-pocket attorneys' fees and costs, retainers, court costs, arbitration and mediation costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, ERISA excise taxes and penalties and any other disbursements or expenses incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in or otherwise participating in a Claim. Expenses shall also include Expenses incurred in connection with any appeal resulting from any Claim including, without limitation, the premium for, security for and other costs relating to any cost bond, supersedeas bond or other appeal bond or its equivalent.

(e)  Indemnifiable Event. Any event or occurrence related to the fact that Indemnitee is, was or has agreed to become a director, officer, employee, agent or fiduciary of the Company, or is, is deemed to be, or was serving or has agreed to serve in any capacity, at the request of the Company, in any other foreign or domestic corporation, real estate investment trust, partnership, limited liability company, association, joint venture, employee benefit plan, trust or other entity or enterprise, or by reason of anything done or not done by Indemnitee in any such capacity. For the purposes of the preceding sentence, the term "Company" shall be deemed to include Avalon Properties, Inc., a Maryland corporation which was merged into the Company on June 4, 1998. As a clarification and without limiting the circumstances in which Indemnitee may be serving at the request of the Company, service by Indemnitee shall be deemed to be at the request of the Company: (i) if Indemnitee serves or served as a director, officer, partner, employee, trustee, manager, member, agent or fiduciary of any corporation, real estate investment trust, partnership, limited liability company, joint venture, trust or other enterprise (A) of which a majority of the voting power or equity interest is or was owned directly or indirectly by the Company or (B) the management of which is controlled directly or indirectly by the Company and (ii) if, as a result of Indemnitee's service to the Company or any of its affiliated entities, Indemnitee is subject to duties to, or required to perform services for, an employee benefit plan or its participants or beneficiaries, including as a deemed fiduciary thereof.

(f)  Independent Counsel. A law firm, or a member of a law firm, that is experienced in matters of corporation law and neither is, nor in the past five years has been, retained to represent: (i) the Company or Indemnitee in any

matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement or of other indemnitees under similar indemnification agreements), or (ii) any other party to or participant or witness in the Claim giving rise to a claim for indemnification or advance of Expenses hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(g)    <u>Potential Change in Control</u>. A potential change in control shall be deemed to have occurred if (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any person (including the Company) publicly announces an intention to take or to begins taking actions which if completed would constitute a Change in Control; or (iii) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

(h)    <u>Voting Securities</u>. Any securities of the Company entitled to vote generally in the election of directors.

2.    <u>Indemnification; Expenses</u>.

(a)    <u>Basic Indemnification Agreement</u>. The Company shall indemnify, and advance Expenses to, Indemnitee (i) as provided in this Agreement and (ii) otherwise to the maximum extent permitted by Maryland law in effect on the date hereof and as amended from time to time; <u>provided</u>, <u>however</u>, that no change in Maryland law shall have the effect of reducing the benefits available to Indemnitee hereunder based on Maryland law as in effect on the date hereof. The rights of Indemnitee provided in this Section 2(a) shall include, without limitation, the rights set forth in the other sections of this Agreement, including any additional indemnification permitted by the Maryland General Corporation Law (the "MGCL"), including, without limitation, Section 2-418 of the MGCL. The Company shall indemnify Indemnitee's spouse (whether by statute or at common law and without regard to the location of the governing jurisdiction) and children to the same extent and subject to the same limitations applicable to Indemnitee hereunder for claims arising out of the status of such person as a spouse or child of Indemnitee, including claims seeking damages from marital property (including community property) or property held by such Indemnitee and such spouse or child or property transferred to such spouse or child but such indemnification shall not otherwise extend to protect the spouse or child against liabilities caused by the spouse's or child's own acts.

(b)    <u>Standard for Indemnification</u>. In the event that Indemnitee was, is or becomes, or is threatened to be made, a party to any Claim by reason of (or arising in whole or in part from) an Indemnifiable Event, the Company shall indemnify Indemnitee against all judgments, penalties, fines and amounts paid in settlement and all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with any such Claim unless it is established by clear and convincing evidence that (i) the act or omission of Indemnitee was material to the matter giving rise to the Claim and (A) was committed in bad faith or (B) was the result of active and deliberate dishonesty, (ii) Indemnitee actually received an improper personal benefit in money, property or services or (iii) in the case of any criminal Claim, Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

(c)    <u>Certain Limits on Indemnification</u>. Notwithstanding any other provision of this Agreement (other than Section 2(d) below), Indemnitee shall not be entitled to:

(i)    indemnification hereunder if the Claim was one by or in the right of the Company and Indemnitee is adjudged, in a final adjudication of the Claim not subject to further appeal, to be liable to the Company;

(ii)    indemnification hereunder if Indemnitee is adjudged, in a final adjudication of the Claim not subject to further appeal, to be liable on the basis that personal benefit in money, property or services was improperly received in any Claim charging improper personal benefit to Indemnitee, whether or not involving an Indemnifiable Event; or

(iii)    indemnification or advance of Expenses hereunder if the Claim was brought by Indemnitee, unless: (A) the Claim was brought to enforce indemnification under this Agreement, and then only to the extent in accordance with and as authorized by Section 6 of this Agreement, or (B) the Articles or Bylaws, a resolution of the stockholders entitled to vote generally in the election of directors or of the Board or an agreement approved by the Board to which the Company is a party expressly provide otherwise.

(d)    <u>Court-Ordered Indemnification</u>. Notwithstanding any other provision of this Agreement, a court of appropriate jurisdiction, upon application of Indemnitee and such notice as the court shall require, may order indemnification of Indemnitee by the Company in the following circumstances:

(i)    if such court determines that Indemnitee is entitled to reimbursement under Section 2-418(d)(1) of the MGCL, the court shall order indemnification, in which case Indemnitee shall be entitled to recover the Expenses of securing such reimbursement; or

(ii)    if such court determines that Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not Indemnitee (A) has met the standards of conduct set forth in Section 2-418(b) of the MGCL or (B) has been adjudged liable for receipt of an improper personal benefit under Section 2-418(c) of the MGCL, the court may order such indemnification as the court shall deem proper without regard to any limitation on such court-ordered indemnification contemplated by Section 2-418(d)(2)(ii) of the MGCL.

(e)    Advancement of Expenses. The Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Claim to which Indemnitee is, or is threatened to be made, a party by reason of (or arising in whole or in part from) an Indemnifiable Event, whether prior to or after final disposition of such Claim, to the maximum extent permitted by applicable law and without requiring a preliminary determination as to Indemnitee's ultimate entitlement to indemnification. The Company shall make such advance or advances of incurred Expenses within ten days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, which advance or advances may be in the form of, in the reasonable discretion of Indemnitee (but without duplication), (a) payment of such Expenses directly to third parties on behalf of Indemnitee, (b) advance of funds to Indemnitee in an amount sufficient to pay such Expenses or (c) reimbursement to Indemnitee for Indemnitee's payment of such Expenses. Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written affirmation by Indemnitee and a written undertaking by or on behalf of Indemnitee, in substantially the form attached hereto as Exhibit A or in such form as may be required under applicable law as in effect at the time of the execution thereof. To the extent that Expenses advanced to Indemnitee do not relate to a specific claim, issue or matter in the Claim, such Expenses shall be allocated on a reasonable and proportionate basis. Any such undertaking which may be required under this Section 2(e) shall be an unlimited general obligation by or on behalf of Indemnitee and shall be accepted without reference to Indemnitee's financial ability to repay such advanced Expenses, need not be secured, and shall not require the payment of interest on any such advances.

(f)    Notice to Insurers. If, at the time of the receipt of a notice of a Claim pursuant to Section 5(a) hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Claim in accordance with the terms of such policies.

3.    Procedure for Determination of Entitlement to Indemnification.

(a)    Request for Indemnification. To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary or appropriate to determine whether and to what extent Indemnitee is entitled to indemnification. Indemnitee may submit one or more such requests from time to time and at such time(s) as Indemnitee deems appropriate in Indemnitee's sole discretion. Promptly upon receipt of such a request for indemnification, the officer of the Company receiving any such request from Indemnitee shall advise the Board in writing that Indemnitee has requested indemnification.

(b)    Determination of Right to Indemnification. Upon written request by Indemnitee for indemnification pursuant to the first sentence of Section 3(a) hereof, a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall promptly be made in the specific case: (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee, which Independent Counsel shall be selected by Indemnitee and approved by the Board in accordance with Section 2-418(e)(2)(ii) of the MGCL, which approval shall not be unreasonably withheld; or (ii) if a Change in Control shall not have occurred, (A) by the Board by a majority vote of a quorum consisting of the Disinterested Directors or by a majority vote of a committee of the Board consisting of one or more Disinterested Directors designated to act in the matter by a majority vote of the Disinterested Directors, (B) if Independent Counsel has been selected by the Board in accordance with Section 2-418(e)(2)(ii) of the MGCL and approved by Indemnitee, which approval shall not be unreasonably withheld or delayed, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee, or (C) if so directed by a majority of the members of the Board, by the stockholders of the Company, other than directors or officers who are parties to the Claim. If it is determined that Indemnitee is entitled to indemnification, the Company shall make payment to Indemnitee within ten days after such determination. Indemnitee shall cooperate with the person making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary or appropriate to such determination in the discretion of the Board or Independent Counsel if retained pursuant to clause (ii)(B) of this Section 3(b). Any Expenses incurred by Indemnitee in so cooperating with the person making such

determination, in response to a request by such person, shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company shall indemnify and hold Indemnitee harmless therefrom. The Company shall pay the reasonable fees and expenses of Independent Counsel, if one is appointed.

4.   <u>Litigation or Arbitration Concerning Right to Indemnification</u>.

(a)   In the event that (i) a determination is made pursuant to Section 3(b) that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 2(e), (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 3(b) within 30 days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Section 7 or 8 within ten days after receipt by the Company of a written request therefor, or (v) payment of indemnification pursuant to any other section of this Agreement or the Articles or Bylaws is not made within ten days after a determination has been made that Indemnitee is entitled to indemnification, Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Maryland, or in any other court of competent jurisdiction, or in an arbitration conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "Arbitration"), of Indemnitee's entitlement to such indemnification or advancement of Expenses. Indemnitee shall commence a proceeding seeking an adjudication or an award in Arbitration within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 4(a); <u>provided</u>, <u>however</u>, that the foregoing clause shall not apply to a proceeding brought by Indemnitee to enforce Indemnitee's rights under Section 8 of this Agreement. Except as set forth herein, the provisions of Maryland law (without regard to its conflicts of laws rules) shall apply to any such Arbitration. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in Arbitration. Neither the failure of the Board or a committee thereof, or the stockholders of the Company, or Independent Counsel to have made a determination pursuant to Section 3(b) that Indemnitee is entitled to indemnification, nor an actual determination by the Board or a committee thereof, or the stockholders, of the Company, or Independent Counsel, that Indemnitee is not entitled to indemnification shall be a defense to any judicial adjudication or Arbitration sought by Indemnitee or create a presumption that the Indemnitee is not entitled to indemnification or advancement of Expenses.

(b)   In any judicial proceeding or Arbitration commenced pursuant to this Section 4, Indemnitee shall be presumed to be entitled to indemnification or advancement of Expenses, as the case may be, under this Agreement and the Company shall have the burden of proving that Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be. If Indemnitee commences a judicial proceeding or Arbitration pursuant to this Section 4, Indemnitee shall not be required to reimburse the Company for any advances pursuant to Section 2(e) of this Agreement until a final determination is made with respect to Indemnitee's entitlement to indemnification (as to which all rights of appeal have been exhausted or lapsed). The Company shall, to the fullest extent not prohibited by law, be precluded from asserting in any judicial proceeding or Arbitration commenced pursuant to this Section 4 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any court or before any arbitrator that the Company is bound by all of the provisions of this Agreement.

(c)   If a determination shall have been made pursuant to Section 3(b) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or Arbitration commenced pursuant to this Section 4, absent a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification that was not disclosed in connection with the determination.

(d)   In the event that Indemnitee is successful in seeking, pursuant to this Section 4, a judicial adjudication of or an award in Arbitration to enforce Indemnitee's rights under, or to recover damages for breach of, this Agreement, Indemnitee shall be entitled to recover from the Company, and shall be indemnified by the Company for, any and all Expenses actually and reasonably incurred by Indemnitee in such judicial adjudication or Arbitration. If it shall be determined in such judicial adjudication or Arbitration that Indemnitee is entitled to receive part but not all of the indemnification or advance of Expenses sought, the Expenses incurred by Indemnitee in connection with such judicial adjudication or Arbitration shall be appropriately prorated.

(e)   Interest shall be paid by the Company to Indemnitee at the maximum rate allowed to be charged for judgments under the Courts and Judicial Proceedings Article of the Annotated Code of Maryland for amounts which the Company pays or is obligated to pay for the period (i) commencing with either the tenth day after the date on which the Company was requested to advance Expenses in accordance with Section 2(e) or 6 of this Agreement or the 60th day after the date on which the Company was requested to make the determination of entitlement to indemnification under Section 3(b) of this Agreement, as applicable, and (ii) ending on the date such payment is made to Indemnitee by the Company.

5.    <u>Defense of the Underlying Claim</u>.

(a)    <u>Notice of Claim</u>. Indemnitee shall notify the Company promptly in writing upon being served with any summons, citation, subpoena, complaint, indictment, request or other document relating to any Claim which may result in the right to indemnification or the advance of Expenses hereunder and shall include with such notice a description of the nature of the Claim and a summary of the facts underlying the Claim. The failure to give any such notice shall not disqualify Indemnitee from the right, or otherwise affect in any manner any right of Indemnitee, to indemnification or the advance of Expenses under this Agreement unless the Company's ability to defend in such Claim or to obtain proceeds under any insurance policy is materially and adversely prejudiced thereby, and then only to the extent the Company is thereby actually so prejudiced.

(b)    <u>Company Participation</u>. Subject to the provisions of the last sentence of this Section 5(b) and of Section 5(c) below, the Company shall have the right to defend Indemnitee in any Claim which may give rise to indemnification hereunder; provided, however, that the Company shall notify Indemnitee of any such decision to defend within 15 days following receipt of notice of any such Claim under Section 5(a) above. The Company shall not, without the prior written consent of Indemnitee, which shall not be unreasonably withheld or delayed, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise with respect to Indemnitee which (i) includes an admission of fault of Indemnitee, (ii) does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release shall be in form and substance reasonably satisfactory to Indemnitee, or (iii) would impose any Expense, judgment, fine, penalty or limitation on Indemnitee. This Section 5(b) shall not apply to a Claim brought by Indemnitee under Section 4 of this Agreement.

(c)    <u>Selection of Counsel</u>. Notwithstanding the provisions of Section 5(b) above, if in a Claim to which Indemnitee is a party by reason of (or arising in whole or in part from) an Indemnifiable Event, (i) Indemnitee reasonably concludes, based upon an opinion of counsel approved by the Company, which approval shall not be unreasonably withheld or delayed, that Indemnitee may have separate defenses or counterclaims to assert with respect to any issue which may not be consistent with other defendants in such Claim, (ii) Indemnitee reasonably concludes, based upon an opinion of counsel approved by the Company, which approval shall not be unreasonably withheld or delayed, that an actual or apparent conflict of interest or potential conflict of interest exists between Indemnitee and the Company, or (iii) if the Company fails to assume the defense of such Claim in a timely manner, Indemnitee shall be entitled to be represented by separate legal counsel of Indemnitee's choice, subject to the prior approval of the Company, which approval shall not be unreasonably withheld or delayed, at the expense of the Company. In addition, if the Company fails to comply with any of its obligations under this Agreement or in the event that the Company or any other person takes any action to declare this Agreement void or unenforceable, or institutes any Claim to deny or to recover from Indemnitee the benefits intended to be provided to Indemnitee hereunder, Indemnitee shall have the right to retain counsel of Indemnitee's choice, subject to the prior approval of the Company, which approval shall not be unreasonably withheld or delayed, at the expense of the Company (subject to Section 5(d) of this Agreement), to represent Indemnitee in connection with any such matter.

6.    <u>Establishment of Trust</u>. In the event of a Potential Change in Control or a Change in Control, the Company shall, promptly upon written request by Indemnitee, create a trust for the benefit of Indemnitee (the "Trust") and from time to time, upon written request by or on behalf of Indemnitee to the Company, shall fund such Trust in an amount, as set forth in such request, sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for and defending any Claim relating to an Indemnifiable Event, and any and all judgments, fines, penalties and settlement amounts of any and all Claims relating to an Indemnifiable Event from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The terms of the Trust shall provide that upon a Change in Control (a) the Trust shall not be revoked or the principal thereof invaded, without the written consent of Indemnitee; (b) the trustee of the Trust (the "Trustee") shall advance, within ten days of a request by Indemnitee, any and all Expenses to Indemnitee, not advanced directly by the Company to Indemnitee (and Indemnitee hereby agrees to reimburse the Trust under the circumstances under which Indemnitee would be required to reimburse the Company under Section 2(e) of this Agreement); (c) the Trust shall continue to be funded by the Company in accordance with the funding obligation set forth above; (d) the Trustee shall promptly pay to Indemnitee all amounts for which Indemnitee shall be entitled to indemnification pursuant to this Agreement or otherwise; and (e) all unexpended funds in such Trust shall revert to the Company upon a final determination by a majority vote of the full Board ("Board Action") or Arbitration or a court of competent jurisdiction, as the case may be, that Indemnitee has been fully indemnified under the terms of this Agreement. The Trustee shall be an independent third party chosen by Indemnitee. Nothing in this Section 6 shall relieve the Company of any of its obligations under this Agreement.

7.    <u>Indemnification and Advance of Expenses as a Witness or Other Participant</u>. Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is or may be, by reason of (or arising in whole or in part from) an Indemnifiable Event, made a witness or otherwise asked to participate in any Claim, whether instituted by the Company or any other person, and to which Indemnitee is not a party, Indemnitee shall be advanced and indemnified against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith within ten days after the receipt by the Company of a statement or statements requesting any such advance or indemnification from time to time,

whether prior to or after final disposition of such Claim. Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee. In connection with any such advance of Expenses, the Company may require Indemnitee to provide an affirmation and undertaking substantially in the form attached hereto as <u>Exhibit A</u> or in such form as may be required under applicable law as in effect at the time of execution thereof.

       8.   <u>Indemnification for Expenses of an Indemnitee Who is Wholly or Partially Successful</u>. Notwithstanding any other provision of this Agreement, and without limiting any such provision, to the extent that Indemnitee was or is, by reason of (or arising in whole or in part from) an Indemnifiable Event, made a party to (or otherwise becomes a participant in) any Claim and is successful, on the merits or otherwise, in the defense of such Claim, the Company shall indemnify Indemnitee for all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith. If Indemnitee is not wholly successful in such Claim but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Claim, the Company shall indemnify Indemnitee under this Section 8 for all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with each such claim, issue or matter, allocated on a reasonable and proportionate basis. For purposes of this Section 8, and without limitation, the termination of any claim, issue or matter in such a Claim by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

       9.   <u>Presumptions and Effect of Certain Proceedings</u>.

     (a)   In making any determination with respect to entitlement to indemnification hereunder, the person or persons (including any court having jurisdiction over the matter) making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 3(a) of this Agreement, and the Company shall have the burden of overcoming that presumption in connection with the making of any determination contrary to that presumption.

     (b)   For purposes of this Agreement, the termination of any claim, action, suit or proceeding, by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of nolo contendere, or its equivalent, or entry of an order of probation prior to judgment, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law or this Agreement.

     (c)   The knowledge and/or actions, or failure to act, of any other director, officer, employee or agent of the Company or any other director, trustee, officer, partner, manager, managing member, fiduciary, employee or agent of any other foreign or domestic corporation, real estate investment trust, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise shall not be imputed to Indemnitee for purposes of determining any other right to indemnification under this Agreement.

      10.   <u>Contribution</u>. In the event that the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or Expenses, in connection with any Claim relating to an Indemnifiable Event, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such action by Board Action or Arbitration or by the court before which such action was brought in order to reflect (a) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such action and/or (b) the relative fault of the Company (and its other directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s). Indemnitee's right to contribution under this Section 10 shall be determined in accordance with, pursuant to and in the same manner as the provisions in Sections 2, 3 and 4 hereof relating to Indemnitee's right to indemnification under this Agreement.

      11.   <u>Non-exclusivity, Etc</u>. The rights of Indemnitee to indemnification and advance of Expenses hereunder shall not be deemed exclusive of any other rights to which Indemnitee may be entitled under the Articles or Bylaws, applicable law, any agreement or a resolution of the stockholders entitled to vote generally in the election of directors or of the Board, or otherwise, and nothing herein shall be deemed to diminish or otherwise restrict Indemnitee's right to indemnification and advance of Expenses under any such other provision. To the extent applicable law or the Articles or the Bylaws, as in effect on the date hereof or at any time in the future, permit greater indemnification or advance of Expenses than as provided for in this Agreement, the parties hereto agree that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such law or provision of the Articles or Bylaws and this Agreement shall be deemed amended without any further action by the Company or Indemnitee to grant such greater benefits. Indemnitee may elect to have Indemnitee's rights hereunder interpreted on the basis of applicable law in affect at the time of execution of this Agreement, at the time of the occurrence of the Indemnifiable Event giving rise to a claim or at the time indemnification is sought. Unless consented to in writing by Indemnitee, no amendment, alteration or repeal of the Articles or Bylaws, this Agreement or any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in respect of any Indemnifiable Event prior to such amendment, alteration or repeal, regardless of whether a claim with respect to such action or

inaction is raised prior or subsequent to such amendment, alteration or repeal. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right or remedy shall be cumulative and in addition to every other right or remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion of any right or remedy hereunder, or otherwise, shall not prohibit the concurrent assertion or employment of any other right or remedy.

12.    Liability Insurance.

(a)    The Company shall use its reasonable best efforts to acquire directors and officers liability insurance, on terms and conditions deemed appropriate by the Board, with the advice of counsel, covering Indemnitee or any claim made against Indemnitee by reason of an Indemnifiable Event and covering the Company for any indemnification or advance of Expenses made by the Company to Indemnitee for any claims made against Indemnitee by reason of an Indemnifiable Event. The purchase and maintenance of such insurance shall not in any way limit or affect the rights and obligations of the parties hereto, and the execution and delivery of this Agreement shall not in any way be construed to limit or affect the rights and obligations of the Company and/or of the other parties under any such insurance policy. In the event of a Change in Control, the Company shall use its reasonable best efforts to arrange for continuation of any such insurance policy and/or to obtain "tail" coverage for Indemnitee to the maximum extent obtainable at such time.

(b)    For seven years after Indemnitee no longer serves as a director or officer of the Company, the Company (or its successor or successors) shall continue to provide directors' and officers' liability insurance for events occurring during Indemnitee's service with the Company on terms no less favorable in terms of coverage and amount than such insurance maintained by the Company at the date of Indemnitee's separation from the Company. In the event such coverage is not available, the maximum available coverage shall be maintained pursuant to this covenant.

(c)    Without in any way limiting any other obligation under this Agreement, the Company shall indemnify Indemnitee for any payment by Indemnitee which would otherwise be indemnifiable hereunder arising out of the amount of any deductible or retention and the amount of any excess of the aggregate of all judgments, penalties, fines, settlements and Expenses incurred by Indemnitee in connection with a Claim over the coverage of any insurance referred to in Section 12(a) or 12(b). If, at the time the Company receives notice from any source of a Claim to which Indemnitee is a party or a participant (as a witness or otherwise), the Company has director and officer liability insurance in effect, the Company shall give prompt notice of such Claim to the insurers in accordance with the procedures set forth in the respective policies.

(d)    Indemnitee shall cooperate with the Company or any insurance carrier of the Company with respect to any Claim.

13.    Period of Limitations. No legal action shall be brought and no cause of action shall be asserted by or on behalf of the Company or any affiliate of the Company against Indemnitee or Indemnitee's spouse, heirs, executors or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company or any affiliate thereof shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, however, that if any shorter period of limitations is otherwise applicable to any such cause of action such shorter period shall govern.

14.    Amendments Etc. Except as provided in Section 11 hereof, no supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor, unless otherwise expressly stated, shall such waiver constitute a continuing waiver.

15.    Subrogation. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery with respect to such payment of Indemnitee, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

16.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment in connection with any Claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, contract, agreement, provision of the Bylaws or otherwise) of the amounts otherwise indemnifiable or payable or reimbursable as Expenses hereunder.

17.    Reports to Stockholders. To the extent required by the MGCL, the Company shall report in writing to its stockholders the payment of any amounts for indemnification of, or advance of Expenses to, Indemnitee under this Agreement arising out of a Claim by or in the right of the Company with the notice of the meeting of stockholders of the Company next following the date of the payment of any such indemnification or advance of Expenses or prior to such meeting.

18.    Duration of Agreement. This Agreement shall continue until and terminate on the later of (a) the date that Indemnitee shall have ceased to serve as a director, officer, employee or agent of the Company or as a director, trustee, officer, partner, manager, managing member, fiduciary, employee or agent of any other foreign or domestic corporation, real estate

investment trust, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving in such capacity at the request of the Company and (b) the date that Indemnitee is no longer subject to any actual or possible Claim (including any rights of appeal thereto and any Claim commenced by Indemnitee pursuant to Section 4 of this Agreement).

19.     Binding Effect, Etc.

(a)     The indemnification and advance of Expenses provided by, or granted pursuant to, this Agreement shall be binding upon and inure to the benefit of and be enforceable against and by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or a director, trustee, officer, partner, manager, managing member, fiduciary, employee or agent of any other foreign or domestic corporation, real estate investment trust, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving in such capacity at the request of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's spouse, heirs, devisees, executors, administrators and other personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place, but the absence of any such writing shall not be a defense to any claim for indemnification or advance of Expenses made hereunder.

(b)     The Company and Indemnitee agree that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause Indemnitee irreparable harm. Accordingly, the parties hereto agree that Indemnitee may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, Indemnitee shall not be precluded from seeking or obtaining any other relief to which Indemnitee may be entitled. Indemnitee shall further be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bonds or other undertakings in connection therewith. The Company acknowledges that, in the absence of a waiver, a bond or undertaking may be required of Indemnitee by a court, and the Company hereby waives any such requirement of such a bond or undertaking.

20.     Severability. If any provision or provisions of this Agreement shall be held to be invalid, void, illegal or otherwise unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, void, illegal or otherwise unenforceable that is not itself invalid, void, illegal or otherwise unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, void, illegal or otherwise unenforceable, that is not itself invalid, void, illegal or otherwise unenforceable) shall be construed so as to give effect to the intent manifested thereby.

21.     Exceptions. Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement to indemnify the Indemnitee in the following circumstances:

(a)     Insured Claims. The Company shall not be obligated to indemnify Indemnitee for expenses or liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) to the extent that Indemnitee has otherwise actually received payment, or payments have been made on behalf of Indemnitee, with respect to such expense or liability (under any insurance policy, provision of the Articles or Bylaws, or otherwise) of amounts otherwise indemnifiable hereunder; or

(b)     Claims Under Section 16(b). The Company shall not be obligated to indemnify Indemnitee for expenses and the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the 1934 Act or any similar successor statute.

22.     Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly if (i) delivered by hand and receipted for by the party to whom said notice, request, demand or other communication shall have been directed, on the day of such delivery, or (ii) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed:

(a)     If to Indemnitee, to:

> [NAME OF DIRECTOR]
> [ADDRESS]

or to such other person or address which Indemnitee shall furnish to the Company in writing pursuant to the above.

      (b)   If to the Company, to:

> AvalonBay Communities, Inc.
> 4040 Wilson Blvd., Suite 1000
> Arlington, VA 22203
> Attn: Corporate Secretary

or to such person or address as the Company shall furnish to Indemnitee in writing pursuant to the above.

      23.   <u>Attorneys' Fees</u>. In the event that any action is instituted by Indemnitee under this Agreement to enforce or interpret any of the terms hereof, Indemnitee shall be entitled to be paid all court costs and expenses, including reasonable attorneys' fees, incurred by Indemnitee with respect to such action, unless as a part of such action, a court of competent jurisdiction determines that each of the material assertions made by Indemnitee as a basis for such action were not made in good faith or were frivolous. In the event of an action instituted by or in the name of the Company under this Agreement or to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all court costs and expenses, including attorneys' fees, incurred by Indemnitee in defense of such action (including with respect to Indemnitee's counterclaims and cross-claims made in such action), unless as a part of such action the court determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

      24.   <u>Governing Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Maryland, which laws are applicable to contracts made and to be performed in such state without giving effect to the principles of conflicts of laws.

      25.   <u>Headings</u>. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

      26.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (delivery of which may be by facsimile or via e-mail as a portable document format (.pdf) or other electronic format), each of which will be deemed to be an original, and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one such counterpart. One such counterpart signed by the party against whom enforceability is sought shall be sufficient to evidence the existence of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first set forth above.

AVALONBAY COMMUNITIES, INC.

By: _____
 Name:
 Title:

INDEMNITEE


_____
Name:

**EXHIBIT A**

AFFIRMATION AND UNDERTAKING TO REPAY EXPENSES ADVANCED

To: The Board of Directors of AvalonBay Communities, Inc.

Re: Affirmation and Undertaking

Ladies and Gentlemen:

This Affirmation and Undertaking is being provided pursuant to that certain Indemnification Agreement, as of _____, _____, between AvalonBay Communities, Inc., a Maryland corporation (the "Company"), and the undersigned Indemnitee (the "Indemnification Agreement"), pursuant to which I am entitled to advance of Expenses in connection with **[Description of Claim]** (the "Claim").

Terms used herein and not otherwise defined shall have the meanings specified in the Indemnification Agreement.

I am subject to the Claim by reason of an Indemnifiable Event. I hereby affirm my good faith belief that at all times, insofar as I was involved as a director or officer of the Company, in any of the facts or events giving rise to the Claim, I (1) did not act with bad faith or active or deliberate dishonesty, (2) did not receive any improper personal benefit in money, property or services and (3) in the case of any criminal proceeding, had no reasonable cause to believe that any act or omission by me was unlawful.

In consideration of the advance by the Company for Expenses incurred by me in connection with the Claim (the "Advanced Expenses"), I hereby agree that if, in connection with the Claim, it is established that (1) an act or omission by me was material to the matter giving rise to the Claim and (a) was committed in bad faith or (b) was the result of active and deliberate dishonesty, (2) I actually received an improper personal benefit in money, property or services or (3) in the case of any criminal proceeding, I had reasonable cause to believe that the act or omission was unlawful, then I shall promptly reimburse the portion of the Advanced Expenses (including any interest paid thereon pursuant to Section 4(e) of the Indemnification Agreement) relating to the claims, issues or matters in the Claim as to which the foregoing findings have been established.

IN WITNESS WHEREOF, I have executed this Affirmation and Undertaking on this _____ day of _____, _____.

_____

Name:

Exhibit 19.1

**AVALONBAY COMMUNITIES, INC.**

**INSIDER TRADING POLICY**

AvalonBay Communities, Inc. ("AvalonBay" or the "Company") has adopted the following policy and procedures for securities trading by Company directors and employees (our "Insider Trading Policy"). Our Insider Trading Policy is intended to prevent the misuse of material nonpublic information, insider trading in securities, and the severe consequences associated with violations of insider trading laws. It is your obligation to review, understand and comply with this Insider Trading Policy and applicable laws. Our Board of Directors has approved this Insider Trading Policy, and we have appointed the Company's General Counsel as the compliance officer with regard to administration of this Insider Trading Policy and oversight of insider trading matters in general (the General Counsel when serving in such role, together with their designees from time to time to the extent permitted hereunder, the "Compliance Officer").

Additionally, it is the policy of the Company that the Company will not engage in transactions in Company securities while aware of material nonpublic information relating to the Company or Company securities. Prior to any transaction in Company securities or the commencement of direction to sell securities, the Compliance Officer will confirm that the Company is not in possession of material nonpublic information, including through confirmation with the executive officers of the Company.

**PART I. OVERVIEW**

*A.  Who Must Comply?*

This Insider Trading Policy applies to all of our employees and members of our Board of Directors, including anyone employed by or acting as a director of any of the Company's subsidiaries, as well as any other individuals whom the Compliance Officer may designate as Insiders (defined below) because they may have access to material nonpublic information about the Company.

**In addition, all of our directors, executive officers (as defined by Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other officers, and other employees who may be designated from time to time, must comply with the Trading Procedures included in Part II of this Insider Trading Policy (the "Trading Procedures"); we will refer to those individuals who must comply with the Trading Procedures in Part II of this policy as "Insiders."** The Trading Procedures provide rules for when Insiders can trade in our securities and explain the process for mandatory pre-clearance of proposed trades. While officers of the Company are always considered Insiders under this Insider Trading Policy, other employees may be designated as Insiders, either as a general matter related to their role or during the duration of a special project; if you are so designated, you will be informed of such fact by the Compliance Officer or another executive officer.

This Insider Trading Policy and, for Insiders, the Trading Procedures also apply to the following persons ("Affiliated Persons"):

•  your "Family Members" ("Family Members" are (a) your spouse or domestic partner, your children, stepchildren, grandchildren, parents, stepparents, grandparents, siblings and in-laws who reside in the same household as you; (b) your children or your spouse's children who do not reside in the same household as you but are financially dependent on you, (c) any of your other family members who do not reside in your household but whose transactions are directed by you, and (d) any other individual over whose account you have control and to whose financial support you materially contribute (e.g., materially contributing to financial support would include paying an individual's rent but not just a phone bill);

•  all trusts, family partnerships and other types of entities formed for your benefit or for the benefit of a member of your family and over which you have the ability to influence or direct investment decisions concerning securities;

•  all persons who execute trades on your behalf; and

- all investment funds, trusts, retirement plans, partnerships, corporations and other types of entities over which you have the ability to influence or direct investment decisions concerning securities; provided, however, that with the approval of the Compliance Officer the Trading Procedures do not apply to any such entity that engages in the investment of securities in the ordinary course of its business (e.g., an investment fund or partnership) if the entity has established its own insider trading controls and procedures in compliance with applicable securities laws and it (or an affiliated entity) has confirmed to the Company that its affiliated entities: (a) engage in the investment of securities in the ordinary course of their respective businesses; (b) have established insider trading controls and procedures in compliance with securities laws; and (c) are aware the securities laws prohibit any person or entity who has material nonpublic information concerning the Company from purchasing or selling securities of the Company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell securities.

You are responsible for ensuring compliance with this Insider Trading Policy, including the Trading Procedures contained herein, by all of your Affiliated Persons.

**B.    *What is Prohibited by this Insider Trading Policy?***

You and your Affiliated Persons are prohibited from engaging in insider trading and from trading in securities in violation of this Insider Trading Policy. "Insider trading" is (1) trading (buying or selling) the securities of a company whether for your account or for the account of another, while in the possession of material nonpublic information (see definition and discussion below) about that company or (2) disclosing material nonpublic information about a company to others who may trade on the basis of that information. Insider trading can result in criminal prosecution, jail time, significant fines and public embarrassment for you and the Company.

**Prohibition on Trading in Company Securities**

When you are in possession of material nonpublic information about the Company, whether positive or negative, you are prohibited from trading (whether for your account or for the account of another) in the Company's securities, which includes common stock, options to purchase common stock, any other type of securities that the Company may issue (such as preferred stock, convertible debentures, warrants and exchange-traded options), and any derivative securities that provide the economic equivalent of ownership of any of the Company's securities or an opportunity, direct or indirect, to profit from any change in the value of the Company's securities, except for trades made pursuant to plans approved by the Compliance Officer in accordance with this Insider Trading Policy that are intended to comply with Rule 10b5-1 under the Exchange Act.

The trading prohibitions in this Insider Trading Policy do not apply to: (1) an exercise of an employee stock option when payment of the exercise price is made in cash and the purchased shares underlying the stock option are not sold in violation of this Insider Trading Policy, or (2) the withholding by the Company of shares of stock upon vesting of restricted stock or upon settlement of restricted stock units to satisfy applicable tax withholding requirements if (a) such withholding is required by the applicable plan or award agreement or (b) the election to exercise such tax withholding right was made by the Insider in compliance with the Trading Procedures.

The trading prohibitions in this Insider Trading Policy do apply, however, to the use of outstanding Company securities to pay part or all of the exercise price of a stock option, any sale of stock as part of a broker-assisted cashless exercise of an option and any other market sale for the purpose of generating the cash needed to pay the exercise price of an option.

**Prohibition on Tipping**

Providing material nonpublic information about the Company to another person who may trade or advise others to trade on the basis of that information is known as "tipping" and is illegal. You are prohibited from providing material nonpublic information about the Company to a friend, relative or anyone else who might buy or sell a security or other financial instrument on the basis of that information, whether or not you intend to or actually do realize a profit (or any other benefit) from such tipping. Additionally, you are prohibited from recommending to any person that such person engage in or refrain from engaging in any transaction involving the Company's securities, or otherwise give trading advice concerning the Company's securities, if you are in possession of material nonpublic information about the Company.

**Prohibition on Trading in Securities of Other Companies**

This Insider Trading Policy's prohibitions against insider trading and tipping also apply to trading in securities of other companies, including the Company's customers, suppliers, partners and other enterprises with which we are working (such as when negotiating an acquisition, investment or other transaction that could be material to the other company). Whenever, during the course of your service to or employment by the Company, you become aware of material nonpublic information about another company, including any confidential information that is reasonably likely to affect the market price of that company's securities (for example, discussions of a significant portfolio sale or acquisition by such other company), neither you nor your Affiliated Persons may trade in any securities of that company, give trading advice about that company, tip or disclose that information, pass it on to others or engage in any other action to take advantage of that information.

If your work regularly involves handling or discussing confidential information of one of our partners, suppliers or customers, you should consult with the Compliance Officer before trading in any of that company's securities.

This Insider Trading Policy also prohibits so called "shadow trading" in the securities of other companies (such as a competitor) based on non-public information you learn about AvalonBay, a third party company or industry trends that the Company is experiencing or expected to experience. For example, you should not trade in the securities of other companies that are timed in relation to non-public information about AvalonBay or another company in our sector or industry such that the trading may be regarded as an attempt by you to profit from the use of knowledge of AvalonBay's operating results, strategies, investment intentions or other confidential information.

**Duration of Trading Prohibitions**

These trading prohibitions continue whenever and for as long as you know or are in possession of material nonpublic information. Remember, anyone scrutinizing your transactions will be doing so after the fact, with the benefit of hindsight. As a practical matter, before engaging in any transaction, you should carefully consider even the appearance of improper insider trading and how enforcement authorities and others might view the transaction in hindsight.

This Insider Trading Policy applies to you and your Affiliated Persons so long as you are associated with the Company. If you leave the Company for any reason, this Insider Trading Policy, including, if applicable, the Trading Procedures described in Part III, will continue to apply to you and your Affiliated Persons until the later of: (1) the second business day following the public release of earnings for the fiscal quarter in which you leave the Company or (2) the second business day after any material nonpublic information known to you has become public or is no longer material (provided, in either case, if there will be an investor or other webcast call relating to such information promptly following release of the same (e.g. the following day in the case of an earnings release), the second business day after such webcast call).

**Restricted Trading Periods**

From time to time, in connection with an announcement of material information about the Company or when significant developments or announcements are anticipated, we may impose a temporary prohibition on trading in our securities that applies to specified groups of employees or, in rare instances, all persons covered by this policy. In such event, you will be notified by e-mail and/or other means of the imposition and expected duration of the trading prohibition. During that period, no person covered by such a notice may trade in our securities (subject to the limited exceptions set forth in this policy).

**Anti-Hedging, Anti-Speculation and No Pledging Policies**

The Company's Anti-Hedging, Anti-Speculation and No Pledging policies attached as <u>Exhibit A</u> to this Insider Trading Policy are incorporated herein and are a part of this Insider Trading Policy, and should be reviewed carefully. The Anti-Hedging and Anti-Speculation policies apply to the Board of Directors, all employees and all their Affiliated Persons. The No Pledging policy applies to the Board of Directors, officers, select other employees, and all their Affiliated Persons.

*C.   What is Material Nonpublic Information?*

This Insider Trading Policy prohibits you from trading in a company's securities if you are in possession of information about the company that is both "*material*" and "*nonpublic.*" If you have a question whether certain information you are aware of is material or has been made public, you should consult with the Compliance Officer.

**"Material" Information**

Information about our Company or any other company is "material" if it could reasonably be expected to affect the investment decisions of a stockholder or potential investor or if disclosure of the information could reasonably be expected to significantly alter the total mix of information in the marketplace about us or any other company. We speak mostly in this Insider Trading Policy about determining whether information about us is material and nonpublic, but the same analysis applies to information about other companies that would preclude you from trading in their securities.

In simple terms, material information is any type of information that could reasonably be expected to affect the market price of our securities. Both positive and negative information may be material. While it is not possible to identify all information that would be deemed "material," the following items are examples of the types of information that could be material:

- projections of future earnings or losses, or other earnings guidance;
- quarterly financial results that are known but have not been publicly disclosed;
- changes in senior management or members of the Company's Board of Directors;
- public offerings or private sales of debt or equity securities or other financings;
- potential restatements of the Company's financial statements, changes in auditors or auditor notification that the Company may no longer rely on an auditor's audit report;
- substantial changes in accounting methods;
- significant write-downs or write-offs of assets;
- significant asset acquisitions or dispositions;
- pending or proposed corporate mergers, acquisitions, tender offers, or joint ventures;
- significant actual or threatened litigation or governmental investigations or major developments in such matters;
- cybersecurity risks and incidents, including the discovery of significant vulnerabilities or breaches;
- significant property casualty or injury at an AvalonBay property due to fire, natural disaster or other event;
- significant developments regarding products, customers, suppliers, orders, contracts or financing sources (e.g., significant changes in financing arrangements);
- changes in dividend policy or declarations of stock splits;
- potential defaults under our credit agreements or indentures or potential material liquidity issues; and
- debt service or liquidity problems, or bankruptcies or receiverships.

The above items will not always be material. For example, a large portfolio acquisition of properties may clearly be material while most routine acquisitions or dispositions are likely not material. No "bright-line" standard or list of items can adequately address the range of situations that may arise; information and events should be carefully considered in terms of their materiality to the Company.

**"Nonpublic" Information**

Material information is "nonpublic" if it has not been disseminated in a manner making it available to investors generally.

To demonstrate that information is public, one must be able to point to some fact that establishes that the information has become publicly available, such as the filing of a report with the SEC or the distribution of a press release through channels that are reasonably designed to achieve broad public and investor access. Posting information on our website may make information "publicly available" if it is pursuant to a regular way we communicate with investors or we previously publicly disclosed that we would be posting the information (e.g., stating in a press release that on a given date we will be posting information such as an investor presentation). Before a person with material nonpublic information can trade, the market must have adequate time to absorb the information that has been disclosed. For the purposes of this Insider Trading Policy, except as the Compliance Officer otherwise deems appropriate prior to any action by you covered by this Insider Trading Policy, information will be considered public on the second business day following our public release of the information; however, if there will be an investor or other call relating to such information promptly following release of the same (e.g. the following day), then information will be considered public on the second business day after such call. For example, if the Company

4

publicly discloses material nonpublic information on Monday evening, then under this Insider Trading Policy, the information will generally be deemed public on Wednesday morning (the second business day after the release of the information), and if there is an investor or other call relating to such information on Tuesday, then the information will generally be deemed public on Thursday morning (the second business day after such call).

**D.    *What are the Penalties for Insider Trading and Noncompliance with this Insider Trading Policy?***

Both the U.S. Securities and Exchange Commission (the "<u>SEC</u>") and the national securities exchanges, through the Financial Industry Regulatory Authority ("<u>FINRA</u>"), investigate and are very effective at detecting insider trading. The U.S. government pursues insider trading violations vigorously, successfully prosecuting, for example, trading by employees in foreign accounts, trading by family members and friends of insiders and trading involving only a small number of shares.

The penalties for violating rules against insider trading can be severe and include:

- • forfeiting any profit gained or loss avoided by the trading;
- • payment of the loss suffered by the persons who, contemporaneously with the purchase or sale of securities that are subject of a violation, have purchased or sold securities of the same class;
- • payment of criminal penalties of up to $5,000,000;
- • payment of civil penalties of up to three times the profit made or loss avoided; and
- • imprisonment for up to 20 years.

The Company and/or the supervisors of the person engaged in insider trading may also be required to pay civil penalties or fines of $2 million or more, up to three times the profit made or loss avoided, as well as criminal penalties of up to $25,000,000, and could under some circumstances be subject to private lawsuits.

Violation of this Insider Trading Policy or any federal or state insider trading laws may subject you to disciplinary action by the Company, including termination of your employment or other relationship with the Company. The Company reserves the right to determine, in its own discretion and on the basis of the information available to it, whether this Insider Trading Policy has been violated. The Company may determine that specific conduct violates this Insider Trading Policy whether or not it also violates the law. It is not necessary for the Company to await the filing or conclusion of a civil or criminal action against an alleged violator before taking disciplinary action.

**E.    *How Do You Report a Violation of this Insider Trading Policy?***

If you have a question about this Insider Trading Policy, including whether certain information you are aware of is material or has been made public, you should consult with the Compliance Officer. In addition, if you violate this Insider Trading Policy or any federal or state laws governing insider trading or know of any such violation by any director or employee of the Company, you should report the violation immediately to the Compliance Officer.

**F.    *Compliance Officer***

The Company's General Counsel shall be the Compliance Officer for purposes of this Insider Trading Policy. If the General Counsel is unavailable to approve trading requests or give other advice regarding this Insider Trading Policy, the most senior officer with the title of Vice President-Corporate Counsel who is available, or such other officer as the General Counsel may designate, or, if that individual is not available or no such other officer is designated, the most senior financial officer of the Company who is available, shall temporarily serve in the role of Compliance Officer.

[See Part II – Trading Procedures for Insiders on next page]

## PART II. TRADING PROCEDURES FOR INSIDERS

*A.  Special Trading Restrictions Applicable to Insiders*

In addition to needing to comply with the restrictions on trading in our securities set forth in Part I of this Insider Trading Policy above, Insiders and their Affiliated Persons are subject to the following special trading restrictions:

### 1.  No Trading Except During Trading Windows.

The announcement of the Company's quarterly financial results almost always has the potential to have a material effect on the market for the Company's securities. Although an Insider may not know the financial results prior to public announcement, if an Insider engages in a trade before the financial results are disclosed to the public, such trades may give an appearance of impropriety that could subject the Insider and the Company to a charge of insider trading. **Therefore, subject to limited exceptions described herein, Insiders may trade in Company securities only during four quarterly trading windows and then only after obtaining pre-clearance from the Compliance Officer in accordance with the procedures set forth below. Unless otherwise advised, the four trading windows consist of the periods that begin on the third business day following the Company's issuance of a press release (or other method of broad public dissemination) announcing its quarterly or annual earnings and end at the close of business on the sixth calendar day of the last month of the then-current quarter (or, if that is not a business day, the prior business day).** Insiders may be allowed to trade outside of a trading window only (a) pursuant to a pre-approved Rule 10b5-1 Plan as described below, (b) if granted a waiver in accordance with the procedure for granting waivers as described below or (c) if the Compliance Officer announces the opening of an extra, unscheduled trading window (for example, following the publication of an interim financial update).

For example, if we release earnings results Tuesday afternoon (whether before or after the market closes), the first time an Insider can buy or sell Company securities (after obtaining pre-clearance in accordance with this Insider Trading Policy) is after the market opens on Friday.

Of course, if an Insider has material nonpublic information about the Company during one of these trading windows, the Insider may not trade in the Company's securities.

### 2.  Special Closed Trading Periods

The Compliance Officer may designate, from time to time, a "Special Closed Window" during what would otherwise be a permitted trading window. During a Special Closed Window, designated Insiders (which could be all Insiders or a subset of them) may not trade in the Company's securities. The Compliance Officer may also impose a Special Closed Window on Insiders or a subset of them to prohibit trading in the securities of other companies, including specified peers or competitors of the Company. Depending on the circumstances, the imposition of a Special Closed Window may not be announced to the Company generally or to all Insiders, should not be communicated to any other person, and may itself be considered under this Insider Trading Policy to be material nonpublic information about the Company.

### 3.  Gifts and Other Distributions in Kind. [1]

No Insider may donate or make any other transfer of Company securities without consideration when the Insider is not permitted to trade unless the Compliance Officer approves such gift, which generally will not be given unless the donee agrees not to sell the shares until the Insider is permitted to sell. In addition to charitable donations or gifts to family members, friends, trusts or others, this prohibition applies to distributions to limited partners by limited partnerships that are subject to this Insider Trading Policy. Gifts require pre-clearance, which are generally only given during open trading windows. The Compliance Officer may approve an intra-family gift outside of a trading window if the effect of the gift is to merely change the Insider's ownership from "directly owned" to "indirectly beneficially owned," such as in the case of a gift to a minor or dependent child where any transaction with respect to the shares would continue to be subject to the terms of this Insider Trading Policy.

---

[1]  As additional background for the imposition of this rule to gifts of Company securities, it is noted that gifts of Company securities to a charity by an Insider when that Insider is aware of material nonpublic information or is otherwise not permitted to trade in Company securities may pose potential risk because: (a) the Insider is receiving an economic benefit as a result of the resulting tax deduction; and (b) the gift will likely result in a market transaction, as most charitable institutions are not allowed to hold securities and will promptly sell any securities donated to them by an Insider.

**B.    Pre-Clearance Procedures**

No Insider may transact in Company securities (including open market trading, exercises of options, giving or receiving gifts, or withdrawing cash from the Employee Stock Purchase Plan before the scheduled investment of such cash in Company securities), even during an open trading window, unless the trade has been approved in accordance with the procedures described below. In reviewing trading requests, the individual(s) authorized to approve the request may consult with our officers and/or outside legal counsel. Trading requests require approval from the following:

| Pre-Approval Chart | | |
|---|---|---|
| *Position of Individual* | *Authorization must be received from:[2]* | *Procedure* |
| Executive Officers (other than CEO and Compliance Officer) | Compliance Officer and CEO (two approvals) | Submission and approval of Trading Request form through Company database. |
| Chief Executive Officer<br><br>Chairman of the Board | Compliance Officer and the Chair of the Nominating, Governance and Corporate Responsibility Committee ("NGCR") or other NGCR member if not available (two approvals) | Submission of Trading Request form through Company database and approval by Compliance Officer with email confirmation from applicable NGCR member. |
| Compliance Officer | CEO (one approval) | Submission and approval of Trading Request form through Company database. |
| Other Officers | Compliance Officer (one approval) | Submission and approval of Trading Request form through Company database. |
| Director (other than CEO or Chairman of the Board) | Compliance Officer and CEO | Submission of required information by email, with email confirmation of approval |
| Other Covered Person | Compliance Officer | Submission of Trading Request form through Company database, or if not accessible by such individual, submission of required information by email or other directed means, with similar form of communication for approval, |

---

[2]    If the Chief Executive Officer is unavailable to provide authorization as contemplated by this chart, the Chief Financial Officer, if available, or, if the Chief Financial Officer is not available, the next most senior financial officer that is available, may be substituted for the Chief Executive Officer as an authorizing officer.

The Trading Request form used in the Company database, or the email used to make a request for those without access to that database, will solicit the following required information:

- the amount and nature of the proposed trade(s) or other transaction. If practicable, request should be submitted at least two (2) business days before the intended trade date;

- certification that the Insider does not possess material nonpublic information concerning the Company; and

- if the Insider is an executive officer or director, confirmation whether, to the Insider's best knowledge, (a) the Insider has (or is deemed to have) engaged in any opposite way transactions within the previous six months that were not exempt from Section 16(b) of the Exchange Act and (b) if the transaction involves a sale by an "affiliate" of the Company or of "restricted securities" (as such terms are defined under Rule 144 under the Securities Act of 1933, as amended ("Rule 144")), whether the transaction meets all of the applicable conditions of Rule 144.

The Compliance Officer does not assume responsibility for, and approval by the Compliance Officer does not protect the Insider from, the consequences of prohibited insider trading.

**1.    Additional Information.**

Insiders shall provide to the Compliance Officer any documentation the Compliance Officer reasonably requires in furtherance of the foregoing procedures. Any failure to provide such information will be grounds for the Compliance Officer to deny approval of the trade request.

**2.    Notification of Brokers of Insider Status**

Insiders who are required to file reports under Section 16 of the Exchange Act shall inform their broker-dealers that (a) the Insider is subject to Section 16; (b) the broker shall confirm that any trade by the Insider or any of their affiliates has been precleared by the Company; and (c) the broker is to provide transaction information to the Insider and/or Compliance Officer on the day of a trade.

**3.    No Obligation to Approve Trades.**

The foregoing approval procedures do not in any way obligate the Compliance Officer to approve any trade. The Compliance Officer has sole discretion to reject any trading request.

From time to time, an event may occur that is material to the Company and is known by only a limited number of directors and employees. The Compliance Officer may decline an Insider's request to preclear a proposed trade based on the existence of a material nonpublic development – even if the Insider is not aware of that material nonpublic development. If any Insider engages in a trade before a material nonpublic development is disclosed to the public or resolved, the Insider and the Company might be exposed to a charge of insider trading that could be costly and difficult to refute even if the Insider was unaware of the development. So long as the event remains material and nonpublic, the Compliance Officer may decide not to approve any transactions in the Company's securities. The Compliance Officer will subsequently notify the Insider once the material nonpublic development is disclosed to the public or resolved. If an Insider requests preclearance of a trade during the pendency of such an event, the Compliance Officer may reject the trading request without disclosing the reason.

**4.    Completion of Trades.**

After receiving written clearance to engage in a trade signed by the Compliance Officer, an Insider must complete the proposed trade within five business days (or, if earlier, by the end of the current trading window). If an Insider has not completed a trade within such five business day period and there is more time in the current trading window to complete a

8

trade, the Insider may seek an extension of time through an email to the Compliance Officer, with approval or rejection to be given by email.

Even if an Insider has received clearance, the Insider may not engage in a trade if (i) such clearance has been rescinded by the Compliance Officer, (ii) the Insider has otherwise received notice that the trading window has closed or (iii) the Insider is or acquires material nonpublic information.

**5.    Post-Trade Reporting.**

The details of any transactions in our securities (including transactions effected pursuant to a Rule 10b5-1 Plan) by an Insider (or an Affiliated Person) who is required to file reports under Section 16 of the Exchange Act must be reported to the Compliance Officer by the Insider or their brokerage firm on the same day on which a trade order is placed or such a transaction otherwise is entered into. The report shall include the date of the transaction, quantity of shares, the price and the name of the broker-dealer that effected the transaction. This reporting requirement may be satisfied by providing (or having the Insider's broker provide) a trade order confirmation to the Compliance Officer if the Compliance Officer receives such information by the required date. Compliance by directors and executive officers with this provision is imperative given the requirement of Section 16 of the Exchange Act that these persons generally report changes in ownership of Company securities within two (2) business days. The sanctions for noncompliance with this reporting deadline include mandatory disclosure in the Company's proxy statement for the next annual meeting of stockholders, as well as possible civil or criminal sanctions for chronic or egregious violators.

*C.    Exemptions*

**1.    Pre-Approved Rule 10b5-1 Plan.**

Transactions made pursuant to an approved Rule 10b5-1 Plan (as defined below) will not be subject to our trading windows or pre-clearance procedures. Rule 10b5-1 of the Exchange Act provides an affirmative defense from insider trading liability under the federal securities laws for trading plans, arrangements or instructions that meet specified requirements. A trading plan, arrangement or instruction that meets the requirements of the SEC's Rule 10b5-1 (a "Rule 10b5-1 Plan") enables Insiders to trade in Company securities outside of our trading windows, even when in possession of material nonpublic information.

The Company may adopt from time to time a separate Rule 10b5-1 Trading Plan Policy that sets forth the requirements for putting in place a Rule 10b5-1 Plan with respect to Company securities. If an Insider intends to trade pursuant to a Rule 10b5-1 Plan, such plan, arrangement or instruction must:

- satisfy the requirements of Rule 10b5-1 and the Company's then current Rule 10b5-1 Trading Plan Policy, if any;

- be documented in writing;

- be established during a trading window when such Insider does not possess material nonpublic information; and

- be pre-approved in accordance with the pre-approval chart above.

Prior to approving a Rule 10b5-1 Plan, the Compliance Officer may require that the plan exclude or include certain provisions (e.g., cooling off period, minimum number of trades requirement, limited term) that ensure compliance with SEC regulations and practices the Compliance Officer deems to be in the best interests of the Company.

Any proposed deviation from the specifications of an approved Rule 10b5-1 Plan (including, without limitation, the amount, price or timing of a purchase or sale) must be reported immediately to, and be approved by, the Compliance Officer. **All transactions pursuant to a Rule 10b5-1 Plan must be timely reported in accordance with the procedures set forth above.**

Any modification or termination of a Rule 10b5-1 Plan previously approved by the Compliance Officer requires a new approval by the Compliance Officer. The Compliance Officer may require as a condition to such approval that the modification or termination occur during a trading window and that the Insider be not aware of material nonpublic information.

9

2.    **Employee Equity, ESPP and DRP.**

*Exercise of Stock Options.* Pre-clearance will be given outside of an established trading window for the exercise for cash of an option to purchase securities of the Company. However, the securities acquired upon the exercise of an option to purchase Company securities are subject to all of the requirements of this Insider Trading Policy, including the Trading Procedures, such that approval during an open trading window is needed to sell the acquired securities. Moreover, the Trading Procedures apply to the use of outstanding Company securities to pay part or all of the exercise price of an option, any net option exercise, any exercise of a stock appreciation right, share withholding (if not mandatory) and any sale of stock as part of a broker-assisted cashless exercise of an option or any other market sale for the purpose of generating the cash needed to pay the exercise price of an option.

*Tax Withholding on Restricted Stock/Units.* The trading prohibitions and restrictions set forth in the Trading Procedures do not apply to the withholding by the Company of shares of stock to satisfy tax withholding requirements upon vesting of restricted stock or upon settlement of restricted stock units or other awards if (a) withholding is required by the applicable plan or award agreement or (b) the election to exercise the tax withholding right was made by the Insider in compliance with the Trading Procedures.

*Employee Stock Purchase Plan.* The pre-clearance and trading window procedures above do not apply to purchases of Company shares under the Company's employee stock purchase plan ("ESPP") resulting from periodic contributions of money to the ESPP pursuant to the elections made at the time of enrollment, and do not apply to a decision to cease making further cash contributions to the plan. However, these procedures ***do apply*** to a participant's sale of Company shares purchased pursuant to the ESPP or a decision, during an ESPP period, to withdraw cash already contributed pursuant to an election to participate in that period or to change cash contributions.

*Dividend Reinvestment Plan.* The pre-clearance and trading window procedures above do not apply to purchases of Company shares under the dividend reinvestment and stock purchase plan ("DRP"), including by way of enrollment of ESPP shares in the DRP, resulting from reinvestment of dividends paid on Company Securities. However, these procedures ***do apply*** to voluntary purchases of Company shares that result from additional contributions a participant chooses to make to the plan, and to a participant's election to participate in the plan or increase his or her level of participation in the plan. These procedures also apply to the sale of any Company shares purchased pursuant to the plan.

D.    *Waivers*

A waiver of any provision of this Insider Trading Policy, including with respect to the Trading Procedures for Insiders, may be authorized in writing by the Compliance Officer after such investigations and consultations with other officers as the Compliance Officer deems appropriate. All waivers shall be reported to the Board of Directors or the NGCR.

E.    *Anti-Hedging, Anti-Speculation and Anti-Pledging Policies*

As many Insiders may consult this Part II for guidance, reference is made again to attached <u>Exhibit A</u> which contains the Anti-Hedging, Anti-Speculation and Anti-Pledging policies of the Company.

**PART III. AMENDMENT**

This Insider Trading Policy may be amended from time to time with the approval of the Board of Directors or a designated committee thereof.

**PART IV. ACKNOWLEDGEMENT**

We will deliver a copy of this Insider Trading Policy to all current employees and directors and to future employees and directors at the start of their employment or relationship with the Company. Each of these individuals must acknowledge that they have received a copy and agree to comply with the terms of this Insider Trading Policy, and, if applicable, the Trading Procedures contained herein using a form approved by the Compliance Officer.

At our request, directors and employees will be required to re-acknowledge and agree to comply with the Insider Trading Policy (including any amendments or modifications). For that purpose, an individual will be deemed to have acknowledged and agreed to comply with the Insider Trading Policy, as amended from time to time, when the Policy is delivered by regular or electronic mail (or other delivery option used by the Company).

10

\*   \*   \*

Questions regarding this Insider Trading Policy are encouraged and may be directed to the Compliance Officer.

ADOPTED:     February 13, 2024
EFFECTIVE:    June 30, 2024

11

**Anti-Hedging, Anti-Speculation and Anti-Pledging Policies**

**Introduction**

AvalonBay Communities, Inc. (the "Company") believes:

- it is improper and inappropriate for any Company personnel to engage in short-term or speculative transactions involving our common stock (our common stock and any other outstanding class of equity stock from time to time is referred to collectively herein as "equity securities"). Such transactions can lead to abusive trading, misuse of inside information, and loss of trust;

- it is improper and inappropriate for Company personnel to take steps to hedge or offset possible declines in Company equity securities that they own. Such transactions can lead to misalignment between the interests of Company personnel and our shareholders and can subvert compensation and other policies of the Company designed to give Company personnel a stake in the success of the Company; and

- it is inadvisable for officers and members of the Board of Directors to pledge their Company equity securities or hold such securities in margin accounts. Such actions can (i) result in a forced sale at an inopportune time, such as a closed trading window, (ii) subject the Company and its leaders to adverse publicity in the event of a forced sale, or (iii) cause leaders of the Company to experience financial duress and make decisions that are not in the best interests of the Company.

Therefore, the Company has adopted an Anti-Hedging and Anti-Speculation Policy and a No Pledging Policy, as set forth below.

**Anti-Hedging and Anti-Speculation Policy**

Associates (including officers) and members of the Board of Directors of the Company may not, directly or indirectly (including, without limitation, through trading done by immediate family members sharing the person's household and/or not financially independent of such person or through trading done through an account over which the person has investment power or authority):

1.  Sell Company equity securities short (i.e., sell Company equity securities that are not owned by the seller at the time of sale).

2.  Buy or sell securities or financial instruments that are derivatives of Company equity securities, including, without limitation, puts, calls, futures contracts and options (other than receiving employee stock options under an equity compensation plan of the Company).

3.  Purchase financial instruments or engage in other transactions for the purpose of speculating in Company equity securities, including, without limitation, financial instruments and transactions designed for the purpose of providing the economic equivalent of profiting from a change in the value of Company equity securities.

12

4.      Purchase financial instruments or engage in other transactions for the purpose of hedging or offsetting a decrease in the price of Company equity securities, including, without limitation, prepaid variable forward contracts, equity swaps and collars.[3]

**No Pledging Policy**

No officer[4] and no member of the Board of Directors of the Company may, directly or indirectly (including, without limitation, through accounts owned by immediate family members sharing the person's household and/or not financially independent of such person or through trading done through an account over which the person has investment power or authority), purchase Company equity securities on margin, hold Company equity securities in a margin account, or borrow money from a broker or other lender that is secured by Company equity securities.

_____

[3]    For the sake of clarity, it is noted that a sale of Company equity securities (including any transaction by an executive officer that would be reported as a sale on Form 4 under the Securities Exchange Act of 1934) that complies with (i) the Company's Insider Trading Policy and (ii) the Company's Senior Officer Stock Ownership Guidelines and Board of Directors Stock Ownership Guidelines, as applicable, is not prohibited by this policy, even if motivated by a financial planning desire to reduce holdings and exposure to Company equity securities. The commentary in this footnote is not part of the Anti-Hedging and Anti-Speculation policy.

[4]    For clarification, it is noted that the term officer in the No Pledging Policy means an associate of the Company with a title of Vice President or higher.

**Exhibit 21.1**

**SUBSIDIARY LIST (BY JURISDICTION)**

**California**

San Francisco Bay Partners II, Ltd.

**Connecticut**

Smithtown Galleria Associates Limited Partnership
Town Close Associates Limited Partnership

**Delaware**

1865 Broadway For-Sale, LLC
1865 Broadway Retail, LLC
4100 Massachusetts Avenue Solar, LLC
650 North Sherman, LLC
Acton Solar Avalon, LLC
Alameda Financing, L.P.
Alexander City Park, LLC
Archstone Communities LLC
Archstone DC Master Holdings LLC
Archstone DC One Holdings LLC
Archstone East 39th Street (Nominee) GP LLC
Archstone East 39th Street (Nominee) LP
Archstone East 39th Street Holdings GP LLC
Archstone East 39th Street Holdings LP
Archstone East 39th Street Land LLC
Archstone East 39th Street Principal GP LLC
Archstone East 39th Street Principal LP
Archstone HoldCO CM LLC
Archstone Huntington Beach College Park LLC
Archstone Huntington Beach Member LLC
Archstone Lincoln Towers LLC
Archstone Master Property Holdings LLC
Archstone Multifamily Partners AC JV Asset Manager LLC
Archstone Multifamily Series II LLC
Archstone Multifamily Series III LLC
Archstone Multifamily Series IV LLC
Archstone North Capitol Hill 2 GP LLC
Archstone North Capitol Hill 2 LP
Archstone North Capitol Hill GP LLC
Archstone North Capitol Hill LP
Archstone Oak Creek I LLC
Archstone Oak Creek II LLC
Archstone Oakwood Toluca Hills LLC
Archstone Old Town Pasadena LLC

Archstone Parallel Residual JV 2, LLC
Archstone Parallel Residual JV, LLC
Archstone Parkland Gardens LLC
Archstone Property Holdings GP LLC
Archstone Property Holdings LLC
Archstone Redmond Campus LLC
Archstone Residual JV, LLC
Archstone San Bruno III LLC
Archstone San Bruno III-B LLC
Archstone San Mateo Holdings LP
Archstone Smith Corporate Holdings LLC
Archstone Texas Land Holdings LLC
Archstone Thousand Oaks LLC
Archstone Trademark JV, LLC
Archstone Tysons Corner LLC
Archstone Westbury (Nominee) GP LLC
Archstone Westbury (Nominee) LP
Archstone Westbury GP LLC
Archstone Westbury Holdings GP LLC
Archstone Westbury Holdings LP
Archstone Westbury LP
Archstone Westbury Principal GP LLC
Archstone Westbury Principal LP
Archstone-Smith Unitholder Services LLC
Aria at Laurel Hill, LLC
Arlington Square Financing, LLC
ASN 50th Street LLC
ASN Bear Hill LLC
ASN Calabasas I LLC
ASN Calabasas II LLC
ASN La Jolla Colony LLC
ASN Lake Mendota Investments LLC
ASN Long Beach LLC
ASN Los Feliz LLC
ASN Meadows at Russett I LLC
ASN Meadows at Russett II LLC
ASN Mountain View LLC
ASN Pasadena LLC
ASN Redmond Lakeview LLC
ASN San Jose LLC
ASN Tanforan Crossing I LLC
ASN Tanforan Crossing II LLC
ASN Thousand Oaks Plaza LLC
ASN Walnut Ridge LLC
ASN Woodland Hills East LLC
AVA Arts District CM, LLC

AVA Arts District Developer, LLC
AVA Arts District GP, LLC
AVA Arts District TRS, LLC
AVA Arts District, L.P.
AVA Balboa Park, L.P.
AVA Balboa Park GP, LLC
AVA Brewers Hill, LLC
AVA Burbank Solar, LLC
AVA Capitol Hill, LLC
AVA Lawrence Street, LLC
AVA Ninth, L.P.
AVA Pacific Beach Solar, LLC
AVA Pasadena Solar, LLC
AVA SC I Solar, LLC
AVA SC II Solar, LLC
AVA Toluca Hills Solar, LLC
Avalon 210 Wall, LLC
Avalon 645 North Grant, LLC
Avalon 657 North Grant, LLC
Avalon 850 Boca, LLC
Avalon Addison, L.P.
Avalon Addison GP, LLC
Avalon Alameda Solar, LLC
Avalon Alderwood CM, LLC
Avalon Alderwood MF, LLC
Avalon Alderwood MF Member, LLC
Avalon Alderwood Phase I, LLC
Avalon Alderwood PM, LLC
Avalon Alexander, LLC
Avalon Aliso Viejo Commons GP, LLC
Avalon Aliso Viejo Commons, L.P.
Avalon Amityville, LLC
Avalon Amityville II, LLC
Avalon Arboretum, L.P.
Avalon Arundel Crossing, LLC
Avalon at 318 I Street, LLC
Avalon at 318 I Street Solar, LLC
Avalon at Ballston, LLC
Avalon at Florham Park, LLC
Avalon at Mission Bay III, L.P.
Avalon at Pacific Bay, L.P.
Avalon at Pier 121, L.P.
Avalon at Pier 121 GP, LLC
Avalon at Providence Park, LLC
Avalon Baker Ranch, L.P.
Avalon Ballard, LLC

Avalon Beacon Square, LLC
Avalon Belltown, LLC
Avalon Bloomfield Station Solar, LLC
Avalon Bloomingdale Solar, LLC
Avalon Bonterra, LLC
Avalon Boonton Solar, LLC
Avalon Bothell Commons, LLC
Avalon Brea Place, LLC
Avalon Brea Place Member, LLC
Avalon Brea Place (Phase I), LLC
Avalon Brea Place (Phase II), LLC
Avalon Burbank Solar, LLC
Avalon Burlington, LLC
Avalon Campbell Solar, LLC
Avalon Carmel, L.P.
Avalon Carmel GP, LLC
Avalon Cerritos, L.P.
Avalon Cherry Hills, LLC
Avalon Chino Hills, L.P.
Avalon Columbus Circle, LLC
Avalon Columbus Circle Retail, LLC
Avalon Denver West, LLC
Avalon Doral, LLC
Avalon DownREIT V, L.P.
Avalon Dublin Station II, L.P.
Avalon East Harbor, LLC
Avalon Element, LLC
Avalon Encino, L.P.
Avalon Exeter, LLC
Avalon Fair Lakes, LLC
Avalon Fairfax City, LLC
Avalon Flatirons, LLC
Avalon Florham Solar, LLC
Avalon Foundry Row, LLC
Avalon Framingham, LLC
Avalon Frisco at Main, L.P.
Avalon Frisco at Main GP, LLC
Avalon Ft. Lauderdale, LLC
Avalon Glendora, L.P.
Avalon Gold, LLC
Avalon Great Neck, LLC
Avalon Grosvenor, L.P.
Avalon Hackensack, LLC
Avalon Hawk, L.P.
Avalon Hawk GP, LLC
Avalon Highland Creek GP, LLC

Avalon Highland Creek, L.P.
Avalon Hill Country GP, LLC
Avalon Hill Country, L.P.
Avalon Hoboken, LLC
Avalon Hoboken JV, LLC
Avalon Hoboken TRS, LLC
Avalon Hollywood, L.P.
Avalon Hollywood GP, LLC
Avalon Hub South End, L.P.
Avalon Hub South End GP, LLC
Avalon Hunt Valley, LLC
Avalon HVTC, LLC
Avalon Ironwood at Red Rocks, LLC
Avalon Irvine III, L.P.
Avalon Irvine, L.P.
Avalon Kendall, LLC
Avalon Kendall Member, LLC
Avalon La Jolla Solar, LLC
Avalon La Mesa Solar, LLC
Avalon Lake Norman GP, LLC
Avalon Lake Norman, L.P.
Avalon Lakeside, L.P.
Avalon Lakeside, LLC
Avalon Laurel, LLC
Avalon Lowry, LLC
Avalon Maplewood Solar, LLC
Avalon Marlborough, LLC
Avalon Merrick Park, LLC
Avalon Merrick Park Member, LLC
Avalon Middletown Urban Renewal, LLC
Avalon Milazzo, L.P.
Avalon Miramar, LLC
Avalon Miramar Park Place I, LLC
Avalon Miramar Park Place II, LLC
Avalon Mission Oaks, L.P.
Avalon Mission Valley, L.P.
Avalon Mission Valley GP, LLC
Avalon Monrovia, LLC
Avalon Mooresville, L.P.
Avalon Mooresville GP, LLC
Avalon Morningside Fee, LLC
Avalon Morrison Park, L.P.
Avalon Mosaic II, LLC
Avalon Mosaic, LLC
Avalon Nashua, LLC
Avalon Natick Solar, LLC

Avalon New Canaan, LLC
Avalon Newport, L.P.
Avalon North Creek, LLC
Avalon Northlake, LLC
Avalon Oak Road, L.P.
Avalon Oak Road GP, LLC
Avalon Oakridge, L.P.
Avalon Oakridge GP, LLC
Avalon Ocean Avenue, L.P.
Avalon Old Bridge, LLC
Avalon Old Bridge Solar, LLC
Avalon Overlake, LLC
Avalon Overlake Phase II, LLC
Avalon Parker, LLC
Avalon Parker Venture, LLC
Avalon Parsippany 2 Campus Urban Renewal, LLC
Avalon Parsippany 3 Campus Urban Renewal, LLC
Avalon Perimeter Park, L.P.
Avalon Perimeter Park GP, LLC
Avalon Piscataway, LLC
Avalon Piscataway Solar, LLC
Avalon Plano, L.P.
Avalon Plano GP, LLC
Avalon Pleasanton, L.P.
Avalon Pleasanton GP, LLC
Avalon PM Solar, LLC
Avalon Portico at Silver Spring Metro, LLC
Avalon Potomac Yard, LLC
Avalon Princeton, LLC
Avalon Princeton Solar, LLC
Avalon Public Market, L.P.
Avalon Public Market Parcel C, LLC
Avalon Queen Anne, LLC
Avalon Rancho Vallecitos, L.P.
Avalon Ridge at Wheatlands, LLC
Avalon Riverview I, LLC
Avalon Riverview North, LLC
Avalon Rockwell & Lanes, LLC
Avalon Roseland, LLC
Avalon Roseland Becker Farm Urban Renewal, LLC
Avalon Roseland Livingston Urban Renewal, LLC
Avalon Roseland Solar, LLC
Avalon Rutherford, L.P.
Avalon Rutherford GP, LLC
Avalon San Dimas, L.P.
Avalon SC Solar, LLC

Avalon Shipyard, LLC
Avalon Somers, LLC
Avalon Somerville Station Solar, LLC
Avalon Somerville Station Urban Renewal, LLC
Avalon SoMi, LLC
Avalon SoMi Investor, LLC
Avalon South Durham, L.P.
Avalon South Durham GP, LLC
Avalon SR Lender, L.P.
Avalon SR Lender Parent, LLC
Avalon Stuart, LLC
Avalon Studio 77, L.P.
Avalon Teaneck, LLC
Avalon Three30Five GP, LLC
Avalon Three30Five, L.P.
Avalon Toscana, LLC
Avalon Towers Bellevue, LLC
Avalon Townhomes at Bee Cave GP, LLC
Avalon Townhomes at Bee Cave, L.P.
Avalon Towson, LLC
Avalon Union City, L.P.
Avalon Union Solar, LLC
Avalon Upper Falls Limited Partnership
Avalon Upper Falls, LLC
Avalon Villa Bonita, L.P.
Avalon Villa San Dimas, L.P.
Avalon Vista, L.P.
Avalon Vista Solar, LLC
Avalon Walnut Creek II, L.P.
Avalon Walnut Creek II GP, LLC
Avalon Watch, LLC
Avalon West Dublin, L.P.
Avalon West Dublin GP, LLC
Avalon West Dublin QRS, LLC
Avalon West Hollywood, L.P.
Avalon West Plano, L.P.
Avalon West Plano GP, LLC
Avalon West Windsor, LLC
Avalon West Windsor Venture, LLC
Avalon Westminster Promenade, LLC
Avalon Wharton Solar, LLC
Avalon White Plains II, LLC
Avalon Willoughby West, LLC
Avalon Wilshire, L.P.
Avalon Wolf Ranch GP, LLC
Avalon Wolf Ranch, L.P.

Avalon Woodland Hills, L.P.
Avalon WP I, LLC
Avalon WP II, LLC
Avalon WP III, LLC
Avalon WP IV, LLC
Avalon WP V, LLC
Avalon WP VI, LLC
Avalon Yonkers ATI Site, LLC
Avalon Yonkers Sun Sites, LLC
AvalonBay BT Investor, LLC
AvalonBay Trade Zone Village, LLC
AVB-Griffin JV, LLC
AVB 1865 Broadway, LLC
AVB 1865 Developer, LLC
AVB Albemarle, LLC
AVB Albemarle Solar, LLC
AVB Balboa, LLC
AVB BG Investment, LLC
AVB Birkdale Investor, L.P.
AVB Birkdale Investor GP, LLC
AVB Bloomfield Station Urban Renewal, LLC
AVB Boonton Bondholder, LLC
AVB Bowery II, LLC
AVB Brandywine Member, LLC
AVB Buffaloe Investor, L.P.
AVB Buffaloe Investor GP, LLC
AVB Cerritos, LLC
AVB Consulate, LLC
AVB Del Rey, L.P.
AVB EIP Investor, LLC
AVB FL Construction, LLC
AVB Gallery Place Solar, LLC
AVB Glover Park, LLC
AVB Harbor Isle, LLC
AVB Harrison, LLC
AVB Hicksville Investor, LLC
AVB Investor, LLC
AVB Kendall Investor, LLC
AVB La Mesa GP LLC
AVB La Mesa II GP LLC
AVB La Mesa II LP
AVB La Mesa LP
AVB Legacy DownREIT, LLC
AVB LoHi Investor, LLC
AVB Market Common, LLC
AVB ME Investor, LLC

AVB Meadows, LLC
AVB Morgan Hill Investor GP, LLC
AVB Morgan Hill Investor, L.P.
AVB Morningside Ground Tenant, LLC
AVB Morningside Park, LLC
AVB Morningside Tenant, LLC
AVB North Capitol Hill Solar, LLC
AVB NP II JV GP, LLC
AVB NP II JV Investor, LLC
AVB NY Investor, LLC
AVB NY Portfolio CM, LLC
AVB Old Tappan Investor, LLC
AVB Opera Warehouse GP, LLC
AVB Opera Warehouse TRS, LLC
AVB Opera Warehouse, L.P.
AVB Pleasant Hill Investor, LLC
AVB Portals Investor, LLC
AVB Prop Tech, LLC
AVB Residual Parallel II, LLC
AVB Reston Investor, LLC
AVB Santa Monica on Main GP LLC
AVB Santa Monica on Main LP
AVB Simi Valley GP LLC
AVB Simi Valley LP
AVB Southwest Berkeley GP LLC
AVB Southwest Berkeley LP
AVB Statesman, LLC
AVB Statesman Solar, LLC
AVB Studio City GP LLC
AVB Studio City III-A GP LLC
AVB Studio City III-A LP
AVB Studio City III-B GP LLC
AVB Studio City III-B LP
AVB Studio City III-C GP LLC
AVB Studio City III-C LP
AVB Studio City LP
AVB Trademark, LLC
AVB Tunlaw Gardens, LLC
AVB VA Construction, LLC
AVB Van Ness Solar, LLC
AVB Walnut Creek GP LLC
AVB Walnut Creek LP
AVB Walnut Creek Station GP LLC
AVB Walnut Creek Station LP
AVB Wayne Valley, LLC
AVB West Chelsea, LLC

AVB Willow Glen GP LLC
AVB Willow Glen LP
AVBQ, LLC
Bay Countrybrook L.P.
Bay Pacific Northwest, L.P.
Bellevue Financing, LLC
Bloomingdale Urban Renewal, LLC
Boonton Urban Renewal, LLC
Bowery Place I Low-Income Operator, LLC
Bowery Place I Manager, LLC
BPR Sudbury Development LLC
Brighton Avalon, LLC
Brighton Solar Avalon, LLC
Burlington Solar Avalon, LLC
Cahill Park Solar, LLC
CG-N Affordable LLC
CG-N Affordable Manager LLC
CG-S Affordable LLC
CG-S Affordable Manager LLC
Clinton Green North, LLC
Clinton Green South, LLC
Clinton Green Theatre, LLC
CNH Solar Avalon, LLC
Courthouse Hill LLC
Crescent Financing, LLC
Crest Financing, L.P.
CVP II, LLC
Darien Financing, LLC
Dermot Clinton Green, LLC
Doral AVB Member, LLC
Dublin Station Solar, LLC
Dublin Station II Solar, LLC
Eaves Artesia, L.P.
Eaves Burlington, LLC
Eaves Burlington Solar, LLC
Eaves Creekside Solar, LLC
Eaves Dublin Solar, LLC
Eaves Fremont Solar, LLC
Eaves Mission Ridge Solar, LLC
Eaves OT Pasadena Solar, LLC
Eaves Pacifica Solar, LLC
Eaves Pleasanton Solar, LLC
Eaves Rancho Solar, LLC
Eaves San Jose Solar, LLC
Eaves Union City Solar, LLC
Eaves Warner Center Solar, LLC

10

Eaves WC Solar, LLC
Eaves WV Solar, LLC
Edgewater Financing, LLC
Fairfax Towers Financing, L.P.
Foster City Solar, LLC
Garden City Apartments, LLC
Garden City SF, LLC
Garden City Townhomes, LLC
Hayes Valley, L.P.
Kanso Hillcrest GP, LLC
Kanso Hillcrest, L.P.
Kanso Parsippany Urban Renewal, LLC
Laurel Hill Private Sewer Treatment Facility, LLC
Legacy Holdings JV, LLC
Lexford Properties, L.P.
Maplewood Urban Renewal, LLC
Mark Pasadena Financing, L.P.
Marlborough Solar Avalon, LLC
Maynard Kanso, LLC
Mission Bay North Financing, L.P.
Monrovia Solar, LLC
Montville Urban Renewal, LLC
Morrison Park Solar, LLC
Mountain View Middlefield Solar, LLC
MVP I, LLC
NC Commons Solar, LLC
Newburyport Avalon, LLC
Newcastle Construction Management, LLC
Newcastle For Sale, LLC
Newcastle Joint Venture, LLC
Newcastle Multifamily Rental, LLC
Newton HL Solar Avalon, LLC
North Andover Avalon, LLC
North Andover II Avalon, LLC
North Bergen Residential Urban Renewal, LLC
North Bergen Retail Urban Renewal, LLC
North Point II Apartments, LLC
North Point II JV, LP
North Point II REIT, LLC
Northtown Multifamily, L.P.
Northtown Multifamily GP, LLC
Norwalk Retail, LLC
NYTA MF Investors, LLC
OEC Holdings LLC
PHVP I GP, LLC
PHVP I, LP

Pleasant Hill Manager, LLC
Pleasant Hill Transit Village Associates LLC
Plymouth Kanso, LLC
Post Road Iron Works Development, LLC
Princeton SC Residential Urban Renewal, LLC
Princeton Thanet Road Urban Renewal, LLC
Quincy Adams Avalon, LLC
Quincy Avalon, LLC
Reservoir Community Partners, LLC
Ridgefield Park Urban Renewal, LLC
San Bruno III Financing, L.P.
Saugus Avalon, LLC
Saugus Avalon Retail, LLC
Saugus Avalon CP Retail, LLC
SF Bay Partners II GP, LLC
SF Bay Partners II TRS, LLC
Shady Grove Road Financing, LLC
Sheepshead Bay Road Lender, LLC
Sheepshead Bay Road Manager, LLC
Sheepshead Bay Road Owner, LLC
Sheepshead Bay Road Partner, LLC
Sheepshead Bay Road PM, LLC
Silicon Valley Financing, LLC
Smith Property Holdings Consulate L.L.C.
Smith Property Holdings Five (D.C.) L.P.
Smith Property Holdings One (D.C.) L.P.
Smith Property Holdings Reston Landing L.L.C.
Sudbury Land Avalon, LLC
Towson Circle North, LLC
Union Urban Renewal, LLC
Valet Waste Holdings, Inc.
Wesmont Station Residential I Urban Renewal, LLC
Wesmont Station Residential II Urban Renewal, LLC
Wesmont Station Retail I Urban Renewal, LLC
Wesmont Station Retail II Urban Renewal, LLC
West LA Commons, LLC
Wharton Urban Renewal, LLC
Willow Glen Solar, LLC
WN Ridge I Solar, LLC
WN Ridge II Solar, LLC
Woburn Avalon, LLC
Woburn Solar, LLC
Woodland Hills Solar, LLC

**District of Columbia**

12

4100 Massachusetts Avenue Associates, L.P.

**Maryland**

Archstone
Archstone Multifamily Series I Trust
Avalon 4100 Massachusetts Avenue, Inc.
Avalon Acton, Inc.
Avalon at Chestnut Hill, Inc.
Avalon at Great Meadow, Inc.
Avalon BFG, Inc.
Avalon Chase Glen, Inc.
Avalon Chase Grove, Inc.
Avalon Chino Hills Manager, Inc.
Avalon Collateral, Inc.
Avalon Commons, Inc.
Avalon DownREIT V, Inc.
Avalon Fairway Hills I Associates
Avalon Fairway II, Inc.
Avalon Glendora Manager, Inc.
Avalon Grosvenor LLC
Avalon Hayes Valley Manager, Inc.
Avalon Mission Oaks Manager, Inc.
Avalon Natick, Inc.
Avalon Oaks, Inc.
Avalon Oaks West, Inc.
Avalon Promenade, Inc.
Avalon Public Market GP, Inc.
Avalon SR Lender GP, Inc.
Avalon Studio 77 GP, Inc.
Avalon Symphony Woods, Inc.
Avalon Twinbrook Station, Inc.
Avalon Upper Falls Limited Dividend Corporation
Avalon West Hollywood Manager, Inc.
AvalonBay Assembly Row, Inc.
AvalonBay Construction Services, Inc.
AvalonBay Grosvenor, Inc.
AvalonBay NYC Development, Inc.
AvalonBay Traville, LLC
AVB Development Transactions, Inc.
AVB NC Mezz QRS, Inc.
AVB NC QRS, Inc.
AVB Northborough, Inc.
AVB Realty Management Services, Inc.
AVB Service Provider, Inc.
Bay Asset Group, Inc.

13

Bay Development Partners, Inc.
Bay GP, Inc.
Brandywine Apartments of Maryland, LLC
California Multiple Financing, Inc.
California San Bruno III Financing, Inc.
CCC Service Provider, Inc.
Easton Avalon, Inc.
Georgia Avenue, Inc.
Hingham Shipyard Avalon II, Inc.
Juanita Construction, Inc.
Lexington Ridge-Avalon, Inc.
Milford Avalon, Inc.
Norwood Avalon, Inc.
Pomorum Holdings, Inc.
Smith Realty Company
Sudbury Avalon, Inc.

**Massachusetts**

855 Broadway Licensee, LLC
AvalonBay BFG Limited Partnership

**New Jersey**

Town Cove Jersey City Urban Renewal, Inc.

**New York**

Avalon Huntington Former S Corp

**Virginia**

Hillwood Square Mutual Association
Pomorum Renters Insurance Agency, LLC

**FOREIGN ENTITIES:**

Pomorum Insurance Company Ltd. (Bermuda)
Pomorum Renters Insurance Company, Ltd. (Bermuda)

14

**Exhibit 23.1**

### Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statements and Related Prospectuses (Forms S-3 No. 333-253532, No. 333-87063 and No. 333-107413) of AvalonBay Communities, Inc., and

(2)    Registration Statements (Forms S-8 No. 333-216221, No. 333-161258 and No. 333-16837) pertaining to AvalonBay Communities, Inc.'s Deferred Compensation Plan, AvalonBay Communities, Inc. 2009 Stock Option and Incentive Plan and AvalonBay Communities, Inc. 1994 Stock Incentive Plan, as amended and restated and 1996 Non-Qualified Employee Stock Purchase Plan, respectively,

of our reports dated February 27, 2025, with respect to the consolidated financial statements of AvalonBay Communities, Inc. and the effectiveness of internal control over financial reporting of AvalonBay Communities, Inc. included in this Annual Report (Form 10-K) of AvalonBay Communities, Inc. for the year ended December 31, 2024.

/s/ Ernst & Young LLP

Tysons, Virginia
February 27, 2025

**Exhibit 31.1**

**CERTIFICATION**

I, Benjamin W. Schall, certify that:

1.  I have reviewed this annual report on Form 10-K of AvalonBay Communities, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2025

/s/ BENJAMIN W. SCHALL
Benjamin W. Schall
Chief Executive Officer and President
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION**

I, Kevin P. O'Shea, certify that:

1.  I have reviewed this annual report on Form 10-K of AvalonBay Communities, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2025

/s/ KEVIN P. O'SHEA
Kevin P. O'Shea
Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32**

**CERTIFICATION**

The undersigned officers of AvalonBay Communities, Inc. (the "Company") hereby certify that the Company's annual report on Form 10-K to which this certification is attached (the "Report"), as filed with the Securities and Exchange Commission on the date hereof, fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 27, 2025

/s/ BENJAMIN W. SCHALL
Benjamin W. Schall
Chief Executive Officer and President
(Principal Executive Officer)

/s/ KEVIN P. O'SHEA
Kevin P. O'Shea
Chief Financial Officer
(Principal Financial Officer)

This certification is being furnished and not filed, and shall not be incorporated into any document for any purpose, under the Securities Exchange Act of 1934 or the Securities Act of 1933.